EXHIBIT F

Joseph Patella, Esq.
ANDREWS KURTH LLP
450 Lexington Avenue, 15th Floor,
New York, New York 10017
Tel:    609.716.6500
Fax:    609.799.7000

Thomas E. Starnes, Esq.
Charles M. Crout, Esq.
ANDREWS KURTH LLP
1350 I Street NW
Suite 1100
Washington, DC  20005
Tel:    202.662.2700
Fax:    202.662.2739

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THE COMMISSIONER OF THE NEW JERSEY ENVIRONMENTAL PROTECTION AGENCY, and THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND, | |
| Plaintiffs, | |
| vs. | SUPERIOR COURT OF NEW JERSEY |
| OCCIDENTAL CHEMICAL CORPORATION, TIERRA SOLUTIONS, INC., MAXUS ENERGY CORPORATION, REPSOL YPF, S.A., YPF, S.A., YPF HOLDINGS, INC. and CLH HOLDINGS, | LAW DIVISION - ESSEX COUNTY DOCKET NO. L-009868-05 |
| Defendants, | |
| MAXUS ENERGY CORPORATION  and TIERRA SOLUTIONS, INC., | |
| Third-Party Plaintiffs, | |
| vs. | |
| 3M COMPANY, A.C.C., INC., ACH FOOD COMPANIES, INC., ACTIVE OIL SERVICE, ADCO CHEMICAL COMPANY, AGC CHEMICALS AMERICAS, INC., | |

ALDEN-LEEDS, INC.,
ALLIANCE CHEMICAL, INC.,
ALUMAX MILL PRODUCTS, INC.,
AMCOL REALTY CO.,
AMERICAN INKS AND COATINGS CORPORATION,
APEXICAL, INC.,
APOLAN INTERNATIONAL, INC.,
ARKEMA, INC.,
ASHLAND INC.,
ASHLAND INTERNATIONAL HOLDINGS, INC.,
ASSOCIATED AUTO BODY & TRUCKS, INC.,
ATLAS REFINERY, INC.,
AUTOMATIC ELECTRO-PLATING CORP.,
AKZO NOBEL COATINGS, INC.,
BASF CATALYSTS LLC,
BASF CONSTRUCTION CHEMICALS INC.,
BASF CORPORATION,
BAYER CORPORATION,
BEAZER EAST, INC.,
BELLEVILLE INDUSTRIAL CENTER,
BENJAMIN MOORE & COMPANY,
BEROL CORPORATION,
B-LINE TRUCKING, INC.,
BORDEN & REMINGTON CORP.,
C.S. OSBORNE & CO.,
CAMPBELL FOUNDRY COMPANY,
CASCHEM, INC.,
CBS CORPORATION,
CELANESE LTD.,
CHEMICAL COMPOUNDS INC.,
CHEMTURA CORPORATION,
CLEAN EARTH OF NORTH JERSEY, INC.,
COSMOPOLITAN GRAPHICS CORPORATION,
CIBA CORPORATION,
COLTEC INDUSTRIES INC.,
COLUMBIA TERMINALS, INC.,
COMO TEXTILE PRINTS, INC.,
CONAGRA PANAMA, INC.;
CONOPCO, INC.,
CONSOLIDATED RAIL CORPORATION,
COOK & DUNN PAINT CORPORATION,
COSAN CHEMICAL CORPORATION,
COVANTA ESSEX COMPANY,
CRODA, INC.,
CRUCIBLE MATERIALS CORPORATION,
CURTISS-WRIGHT CORPORATION,
CWC INDUSTRIES, INC.,
DARLING INTERNATIONAL, INC.,
DAVANNE REALTY CO.,
DELEET MERCHANDISING CORPORATION,
DELVAL INK AND COLOR, INCORPORATED,

DILORENZO PROPERTIES COMPANY, L.P.,
E.I. DU PONT DE NEMOURS AND COMPANY,
EASTMAN KODAK COMPANY,
EDEN WOOD CORPORATION,
ELAN CHEMICAL COMPANY, INC.,
EM SERGEANT PULP & CHEMICAL CO.,
EMERALD HILTON DAVIS, LLC,
ESSEX CHEMICAL CORPORATION,
EXXON MOBIL
F.E.R. PLATING, INC.,
FINE ORGANICS CORPORATION,
FISKE BROTHERS REFINING COMPANY,
FLEXON INDUSTRIES CORPORATION,
FLINT GROUP INCORPORATED,
FORT JAMES CORPORATION,
FOUNDRY STREET CORPORATION,
FRANKLIN-BURLINGTON PLASTICS, INC.,
GARFIELD MOLDING COMPANY, INC.,
GENERAL CABLE INDUSTRIES, INC.;
GENERAL DYNAMICS CORPORATION,
GENERAL ELECTRIC COMPANY,
GENTEK HOLDING LLC,
GIVAUDAN FRAGRANCES CORPORATION,
G. J. CHEMICAL CO.,
GOODY PRODUCTS, INC.,
GORDON TERMINAL SERVICE CO. OF N.J., INC.,
HARRISON SUPPLY COMPANY,
HARTZ MOUNTAIN CORPORATION,
HAVENICK ASSOCIATES L.P.,
HEXCEL CORPORATION,
HEXION SPECIALTY CHEMICALS, INC.,
HOFFMANN-LA ROCHE INC.,
HONEYWELL INTERNATIONAL INC.,
HOUGHTON INTERNATIONAL INC.,
HUDSON TOOL & DIE COMPANY, INC,
HY-GRADE ELECTROPLATING CO.,
ICI AMERICAS INC.,
INNOSPEC ACTIVE CHEMICALS LLC,
INX INTERNATIONAL INK CO.,
ISP CHEMICALS INC.,
ITT CORPORATION,
KEARNY SMELTING & REFINING CORP.,
KAO BRANDS COMPANY,
KOEHLER-BRIGHT STAR, INC.,
LINDE, INC.,
LUCENT TECHNOLOGIES, INC.,
MACE ADHESIVES & COATINGS COMPANY, INC.,
MALLINCKRODT INC.,
MERCK & CO., INC.,
METAL MANAGEMENT NORTHEAST, INC.,
MI HOLDINGS, INC.,

3

MILLER ENVIRONMENTAL GROUP, INC.,
MORTON INTERNATIONAL, INC.,
N L INDUSTRIES, INC.,
NAPPWOOD LAND CORPORATION,
NATIONAL FUEL OIL, INC.,
NATIONAL-STANDARD, LLC,
NELL-JOY INDUSTRIES, INC.,
NESTLE U.S.A., INC.,
NEW JERSEY TRANSIT CORPORATION,
NEWS AMERICA, INC.,
NEWS PUBLISHING AUSTRALIA LIMITED,
NORPAK CORPORATION,
NOVELIS CORPORATION,
ORANGE AND ROCKLAND UTILITIES, INC.,
OTIS ELEVATOR COMPANY,
PRC-DESOTO INTERNATIONAL, INC.,
PASSAIC PIONEERS PROPERTIES COMPANY,
PFIZER INC.,
PHARMACIA CORPORATION,
PHELPS DODGE INDUSTRIES, INC.,
PHILBRO, INC.,
PITT-CONSOL CHEMICAL COMPANY,
PIVOTAL UTILITY HOLDINGS, INC.,
PPG INDUSTRIES, INC.,
PRC-DESOTO INTERNATIONAL, INC.,
PRAXAIR, INC.,
PRECISION MANUFACTURING GROUP, LLC,
PRENTISS INCORPORATED,
PROCTER & GAMBLE MANUFACTURING COMPANY,
PRYSMIAN COMMUNICATIONS CABLES AND
         SYSTEMS USA LLC,
PSEG FOSSIL LLC,
PUBLIC SERVICE ELECTRIC AND GAS COMPANY,
PURDUE PHARMA TECHNOLOGIES, INC.,
QUALA SYSTEMS, INC.,
QUALITY CARRIERS, INC.,
RECKITT BENCKISER, INC.,
REICHHOLD, INC.,
REVERE SMELTING & REFINING CORPORATION,
REXAM BEVERAGE CAN COMPANY,
ROMAN ASPHALT CORPORATION,
ROYCE ASSOCIATES, A LIMITED PARTNERSHIP,
R.T. VANDERBILT COMPANY, INC.,
RUTHERFORD CHEMICALS LLC,
S&A REALTY ASSOCIATES, INC.,
SCHERING CORPORATION,
SEQUA CORPORATION,
SETON COMPANY,
SIEMENS WATER TECHNOLOGIES CORP.
SINGER SEWING COMPANY
SPECTRASERV, INC.,

4

STWB, INC.,
SUN CHEMICAL CORPORATION,
SVP WORLDWIDE, LLC,
TATE & LYLE INGREDIENTS AMERICAS, INC.,
TEVA PHARMACEUTICALS USA, INC.,
TEVAL CORP.,
TEXTRON INC.,
THE DIAL CORPORATION,
THE DUNDEE WATER POWER AND LAND COMPANY,
THE NEWARK GROUP, INC.,
THE OKONITE COMPANY, INC.,
THE SHERWIN-WILLIAMS COMPANY,
THE STANLEY WORKS,
THE VALSPAR CORPRATION,
THIRTY-THREE QUEEN REALTY INC.,
THREE COUNTY VOLKSWAGEN CORPORATION,
TIDEWATER BALING CORP.,
TIFFANY & CO.,
TIMCO, INC.,
TRIMAX BUILDING PRODUCTS, INC.,
TROY CHEMICAL CORPORATION, INC.,
UNIVERSAL OIL PRODUCTS COMPANY,
V. OTTILIO & SONS, INC.,
VELSICOL CHEMICAL CORPORATION,
VEOLIA ES TECHNICAL SOLUTIONS, L.L.C.,
VERTELLUS SPECIALTIES INC.,
VITUSA CORP.,
VULCAN MATERIALS COMPANY,
W.A.S. TERMINALS CORPORATION,
W.A.S. TERMINALS, INC.,
W.C. INDUSTRIES,
WHITTAKER CORPORATION,
WIGGINS PLASTICS, INC.,
ZENECA INC.,

                    Third-Party Defendants.

## MAXUS ENERGY CORPORATION'S AND TIERRA SOLUTIONS, INC.'S

### THIRD-PARTY COMPLAINT "B"

Defendants Maxus Energy Corporation ("Maxus") and Tierra Solutions, Inc. ("Tierra") bring this

Third-Party Complaint against the herein named Third-Party Defendants, and allege as follows:

5

**PROCEDURAL BACKGROUND**

1.      The Plaintiffs (collectively, "the State," unless otherwise indicated) commenced this lawsuit on December 13, 2005, suing Defendants Occidental Chemical Corporation ("Occidental"), Tierra, Maxus, Repsol YPF, S.A., YPF, S.A., YPF Holdings, Inc. and CLH Holdings (collectively, "Defendants").[1]  After several revisions, the State's Complaint seeks to recover from the Defendants past and future "cleanup and removal costs"—as well as unspecified economic damages, punitive damages, damages for alleged "unjust enrichment," penalties and a variety of other forms of relief—purportedly arising from the alleged discharges into the Passaic River of 2,3,7,8-tetrachlorodibenzo-p-dioxin (a form of dioxin referred to as "TCDD") and other unspecified "hazardous substances" from a plant that operated at 80 Lister Avenue in Newark, New Jersey ("Lister Plant") for approximately twenty years before the plant was closed in 1969.

2.      The State further alleges that, after operations at the Lister Plant ceased, Hazardous Substances purportedly discharged from the plant "migrated" throughout the lower 17 miles of the Passaic River, Newark Bay, the lower reaches of the Hackensack River, the Arthur Kill, the Kill van Kull, "and into adjacent waters and sediments," which Plaintiffs define collectively as the "Newark Bay Complex."  Plaintiffs contend that Occidental, Maxus and Tierra are "responsible for the liabilities arising from almost forty years of discharges of TCDD, DDT, and other hazardous substances" at 80 Lister Avenue.

3.      In an Answer filed on October 6, 2008, Maxus and Tierra have substantially denied the Plaintiffs' allegations in the Second Amended Complaint.  On the same date, moreover, Maxus and Tierra filed a Counterclaim that explained in detail that the longstanding and widespread pollution of the vast water body addressed in the Complaint cannot plausibly be blamed on the operations of a single manufacturing facility that opened some 40 years **after** the Governor of New Jersey admitted in his

---

[1]      The Plaintiffs in the original complaint were the New Jersey Department of Environmental Protection ("NJDEP") and the Administrator of the New Jersey Spill Compensation Fund (the "Administrator").  The Commissioner of NJDEP ("Commissioner") was added as named plaintiff in the Second Amended Complaint filed in 2008.

WAS:144301.1

January 1902 inaugural address that "the pollution of the Passaic River from the adjacent population" had already "destroyed the use and beauty of a noble stream and gravely injured manufacturing and property interests on its banks." *See Counterclaim of Defendants Maxus Energy Corporation and Tierra Solutions, Inc.* ("*Counterclaim*"), ¶ 2 (citing *New York Times* (1/22/1902)).

4.      Indeed, more than a century before the State singled out the Defendants as scapegoats for the pollution that has long plagued the Passaic River and Newark Bay, yet another Governor acknowledged to the Senate and General Assembly that the Passaic River had already "undergone the fate of all similar streams that happen to flow through sections attractive to large populations and manufacturing industries.  It has become the receptacle of the wash, the refuse, and the general sewage of the great and rapidly growing populations of the valley, until public comfort and health are threatened from the excess of pollution poured into the stream." *Id.*, ¶ 1 (citing *Journal of the Fifty-Third Senate of the State of New Jersey Being the One Hundred and Twenty-First Session of the Legislature*, at 17 (1897)).

5.      The Counterclaim further explains that significant blame for the polluted condition of the Passaic River and Newark Bay resides with the "several cities whose sewers empty into the river," that is, with essentially "every municipal corporation that now exists or may be hereafter created in the Passaic valley from Little Falls to Newark." *Id.*

6.      The longstanding and continued pollution of the Newark Bay Complex was driven primarily by economics.  As the Center for Analysis of Public Issues noted in its 1972 report entitled *Pollution Control on the Passaic River* (hereinafter "*Pollution Control*"):

> The dreadful condition of the Passaic River is due primarily to the fact that dozens of municipalities use the river as a secondary waste disposal system.  Bypassing raw or undertreated sewage into the stream is much cheaper than installing tertiary treatment facilities or laying new collection lines under city streets.  It is also, in the view of many municipal officials, the only way to compete successfully for new property tax ratables.  In the race for added local revenues, the town ready to welcome new industrial and residential construction without worrying about the additional sewage load has a great advantage.  It can appeal directly to the taxpayers' pocketbooks:  'Locate here and you won't have to worry about the rising costs of sewage collection and

> treatment. We have the most economical waste catch basin in New
> Jersey -- the Passaic River.' For several months each year, much of the
> Passaic is just that -- a sewage catch basin for overloaded treatment
> plants, inadequate collection systems and streamside factory outfalls.

7.      In this very litigation, the State has acknowledged that there are potentially thousands of

sources of the pollution in the Newark Bay Complex that is the subject of this lawsuit. Furthermore, in

2003, just two years before filing this lawsuit, plaintiff NJDEP issued a Directive ("2003 Directive")

identifying 66 companies that NJDEP said were involved in discharges directly traceable to 18 different

sites within the lower seventeen miles of the Passaic River, which the 2003 Directive concludes "are

responsible for the hazardous substances in the Lower Passaic River."

8.      None of this should be surprising. As the U.S. Army Corps of Engineers noted in a June

2004 Study Area Report, "[t]he Hackensack River and Passaic River basins and Newark Bay have been a

center of industrial activity since the Industrial Revolution. As a result, hundreds of chemical, paint and

pigment manufacturing plants, petroleum refineries, and other large industrial facilities have been located

along their banks. Effluent from these facilities have caused severe contamination of sediments in the

rivers."

9.      The Counterclaim further sought to achieve realistic balance and perspective by pointing

out that, whereas the State—notwithstanding its ownership of submerged lands that, for all intents and

purposes, have been used as liquid landfill for more than a century—has done nothing to remediate the

problem, Maxus and Tierra have spent many millions of dollars to assess and address contamination in

the Newark Bay Complex. *Counterclaim*, ¶¶ 23-26.

10.     Specifically, Maxus and Tierra: (i) have implemented a Remedial Investigation and

Feasibility Study ("RI/FS") under a 1994 Administrative Order On Consent ("AOC") with the United

States Environmental Protection Agency ("EPA"), which addresses the lower 6 miles of the Passaic River

("1994 AOC"); (ii) are funding and are implementing, as part of the "Lower Passaic River Study Area

Cooperating Parties Group" ("CPG"), a further RI/FS under two additional AOCs executed by the CPG

and EPA in 2004 and 2007, respectively, which address the lower 17 miles of the Passaic River ("CPG

8

AOCs"); and (iii) are funding and are implementing an RI/FS for the Newark Bay under a separate AOC with EPA, also executed in 2004 ("Newark Bay AOC").

11.    Additionally, Maxus and Tierra proposed and negotiated a momentous agreement in 2008 with EPA, pursuant to which 200,000 cubic yards of contaminated sediment will be removed from the portion of the Passaic River directly in front of the Lister Plant, at an estimated cost of $80 million. ("2008 Removal Action AOC").  EPA has described this removal action as "the most significant removal of contaminated material from the Passaic in history." *See Counterclaim*, ¶ 25 (citing EPA Press Release dated 6/23/08).

12.    The claims asserted in this Third-Party Complaint are brought pursuant to the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:1-23.11a *et seq*. ("Spill Act"), and the New Jersey statutory provisions for contribution (including N.J.S.A. 2A:53A-3 *et seq*.), arising from the environmental contamination of the Newark Bay Complex as a result of the actions and omissions of the Third-Party Defendants named herein.

13.    Given the multiple sources of the pollution, costs and damages that are the subject of the State's lawsuit, Maxus and Tierra seek to recover in this Third-Party Complaint, as in the Counterclaim, *inter alia*, all or a proportionate share of cleanup and removal costs, damages, or other loss or harm, if any, for which Maxus and Tierra may be held liable in this action.

14.    In addition, with one caveat (explained in the next paragraph), Maxus and Tierra also seek to recover from the Third-Party Defendants an equitable share of the cleanup and removal costs that Maxus and Tierra have incurred or will incur in the future relating to the Newark Bay Complex, including the cleanup and removal costs incurred in implementing the 1994 AOC, the CPG AOCs, Newark Bay AOC, and the 2008 Removal Action AOC.

15.    Pursuant to an agreement with the members of the CPG (identified in Exhibit A, hereto), Maxus and Tierra have agreed not to pursue claims against CPG members to recover costs incurred under the 1994 AOC, the CPG AOCs or Newark Bay AOC, to the extent such costs are attributable to the facilities identified in Exhibit B hereto, unless (among other possible conditions) a court order is issued

9

that requires such claims be brought in this action or be waived. Accordingly, unless and until such an order is issued (or one of the other conditions occurs, which has not yet happened), Maxus and Tierra are currently precluded by contract from asserting the claims described in this paragraph against any CPG members in this action, but expressly reserve all rights to pursue such claims if the Court so requires, or as soon as the agreement with the CPG members otherwise permits.

## THE PARTIES

### Third-Party Plaintiffs

16.    Third-Party Plaintiff Maxus Energy Corporation ("Maxus") is a corporation organized under the laws of the State of Delaware and is a defendant in this action.

17.    Third-Party Plaintiff Tierra Solutions, Inc. ("Tierra"), is a corporation organized under the laws of the State of Delaware and is a defendant in this action.

18.    Hereinafter, Maxus and Tierra will be referred to collectively as "Third-Party Plaintiffs."

### Third Party Defendants

19.    Third-Party Defendant 3M Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 3M Center, St. Paul, Minnesota.

20.    Third-Party Defendant A.C.C., Inc. is a corporation organized under the laws of the State of Florida with its principal place of business at 49 Central Avenue, South Kearny, New Jersey.

21.    Third-Party Defendant ACH Food Companies, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 7171 Goodlett Farms Parkway, Cordova, Tennessee.

22.    Third-Party Defendant Active Oil Service is a corporation organized under the laws of the State of New Jersey with its principal place of business at 110 Riverside Avenue, Newark, New Jersey.

WAS:144301.1

23.     Third-Party Defendant Adco Chemical Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 49 Rutherford Street, Newark, New Jersey.

24.     Third-Party Defendant AGC Chemicals Americas, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 229 E. 22nd Street, Bayonne, New Jersey.

25.     Third-Party Defendant Alden-Leeds, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 55 Jacobus Avenue, Kearny, New Jersey.

26.     Third-Party Defendant Alliance Chemical, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at P.O. Box 237, Ridgefield, New Jersey.

27.     Third-Party Defendant Alumax Mill Products, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 201 Isabella Street in Pittsburgh, Pennsylvania.

28.     Third-Party Defendant Amcol Realty Co. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 49 Central Avenue, South Kearny, New Jersey.

29.     Third-Party Defendant American Inks and Coatings Corporation is a corporation organized under the laws of the State of Pennsylvania with its principal place of business at 330 Pawlings Road, P.O. Box 803, Valley Forge, Pennsylvania.

30.     Third-Party Defendant Apexical, Inc. is a corporation organized under the laws of the State of South Carolina with its principal place of business at 1905 New Cut Road, Spartanburg, South Carolina.

31.     Third-Party Defendant APOLAN International, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at P.O. Box 790, Oakhurst, New Jersey.

WAS:144301.1

32.     Third-Party Defendant Arkema, Inc. is a corporation organized under the laws of the State of Pennsylvania with its principal place of business at 2000 Market Street in Philadelphia, Pennsylvania.

33.     Third-Party Defendant Ashland Inc. is a corporation organized under the laws of the State of Kentucky with its principal place of business at 50 East River Center Boulevard, P.O. Box 391, Covington, Kentucky.

34.     Third-Party Defendant Ashland International Holdings, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 3499 Dabney Drive, Lexington, Kentucky.

35.     Third-Party Defendant Associated Auto Body & Trucks, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 405 Raymond Boulevard in Newark, New Jersey.

36.     Third-Party Defendant Atlas Refinery, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 142 Lockwood Street, Newark, New Jersey.

37.     Third-Party Defendant Automatic Electro-plating Corp. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 185 Foundry Street, Newark, New Jersey.

38.     Third-Party Defendant Akzo Nobel Coatings, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 300 Campus Drive, #300B, Marlboro, New Jersey.

39.     Third-Party Defendant BASF Catalysts LLC is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 101 Wood Avenue, Iselin, New Jersey.

40.     Third-Party Defendant BASF Construction Chemicals Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 889 Valley Park Dr. S, Shakopee, Minnesota.

41.     Third-Party Defendant BASF Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 100 Campus Drive, Florham Park, New Jersey.

42.     Third-Party Defendant Bayer Corporation is a corporation organized under the laws of the State of Indiana with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania.

43.     Third-Party Defendant Beazer East, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at One Oxford Centre, Suite 3000, Pittsburgh, Pennsylvania.

44.     Third-Party Defendant Belleville Industrial Center is a corporation organized under the laws of the State of New Jersey with its principal place of business at 681 Main Street, Belleville, New Jersey.

45.     Third-Party Defendant Benjamin Moore & Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 51 Chestnut Ridge Road, Montvale, New Jersey.

46.     Third-Party Defendant Berol Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at  c/o Newell Rubbermaid Inc., 10B Glenlake Parkway, Suite 300, Atlanta, Georgia.

47.     Third-Party Defendant B-Line Trucking, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 67 Esther Street, Newark, New Jersey.

48.     Third-Party Defendant Borden & Remington Corp. is a corporation organized under the laws of the State of Massachusetts with its principal place of business at 63 Water Street, Fall River, Massachusetts.

49.     Third-Party Defendant CasChem Inc. is a Delaware corporation with a principal place of business at One Meadowlands Plaza, East Rutherford, New Jersey.

50.     Third-Party Defendant C.S. Osborne & Co. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 125 Jersey Street, Harrison, New Jersey.

51.     Third-Party Defendant Campbell Foundry Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 800 Bergen Street, New Jersey.

52.     Third-Party Defendant CBS Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 51 West 52nd Street, New York, New York.

53.     Third-Party Defendant Celanese Ltd. is a limited partnership organized under the laws of the State of Texas with its principal place of business at 1601 West LBJ Freeway, Dallas.

54.     Third-Party Defendant Chemical Compounds Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 29-75 Riverside Avenue, Newark, New Jersey.

55.     Third-Party Defendant Chemtura Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 199 Benson Road, Middlebury, Connecticut.

56.     Third-Party Defendant Clean of North Jersey, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 115 Jacobus Avenue, South Kearny, New Jersey.

57.     Third-Party Defendant Cosmopolitan Graphics Corporation is a corporation organized under the laws of the State of Pennsylvania with its principal place of business at 378 Thousand Oaks Blvd., Morgantown, Pennsylvania.

58.     Third-Party Defendant Ciba Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 540 White Plains Road, Tarry Town, New York.

59.     Third-Party Defendant Clean Earth of North Jersey, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 115 Jacobus Avenue, South Kearny, Hudson County, New Jersey.

60.     Third-Party Defendant Coltec Industries Inc. is a corporation organized under the laws of the State of Pennsylvania with its principal place of business located at 5605 Carnegie Boulevard, Suite 500, Charlotte, North Carolina.

61.     Third-Party Defendant Columbia Terminals, Inc. is a corporation organized under the laws of the State of New Jersey.  On information and belief, Columbia Terminals, Inc.'s principal place of business is at P.O. Box 2726, Palm Beach, Florida.

62.     Third-Party Defendant Como Textile Prints, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 191/195 East Railway Avenue, Paterson, New Jersey.

63.     Third-Party Defendant ConAgra Panama, Inc. is a corporation organized under the laws of the State of Kentucky with its principal place of business at One ConAgra Drive CC-242, Omaha, Nebraska.

64.     Third-Party Defendant Conopco, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey.

65.     Third-Party Defendant Consolidated Rail Corporation is a corporation organized under the laws of Pennsylvania with its principal place of business at 2001 Market Street, Philadelphia, Pennsylvania.

66.     Third-Party Defendant Cook & Dunn Paint Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 700 Gotham Parkway, Carlstadt, New Jersey.

67.     Third-Party Defendant Cosan Chemical Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 400 13th Street, Carlstadt, New Jersey.

68.     Third-Party Defendant Covanta Essex Company is a New Jersey general partnership with its principal place of business at 40 Lane Road, Fairfield, New Jersey.

69.     Third-Party Defendant Croda, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 300 A Columbus Circle, Edison, New Jersey.

WAS:144301.1

70.    Third-Party Defendant Crucible Materials Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business located at 575 State Fair Boulevard, Syracuse, New York.

71.    Third-Party Defendant Curtiss-Wright Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 4 Becker Farm Road, Roseland, New Jersey.

72.    Third-Party Defendant CWC Industries, Inc. is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 185 Foundry Street, Newark, New Jersey.

73.    Third-Party Defendant Darling International, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 251 O'Connor Ridge Boulevard, Suite 300, Irving, Texas.

74.    Third-Party Defendant Davanne Realty Co. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 80 Main Street, West Orange, New Jersey.

75.    Third-Party Defendant Deleet Merchandising Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 26 Blanchard Street, Newark, New Jersey.

76.    Third-Party Defendant DelVal Ink and Color, Incorporated is a corporation organized under the laws of the State of New Jersey with its principal place of business at 1301 Taylors Lane, Riverton, New Jersey.

77.    Third-Party Defendant DiLorenzo Properties Company, L.P. is a limited partnership organized under the laws of the State of New York with its principal place of business at 1040 2nd Avenue, New York, New York.

78.    Third-Party Defendant E.I. du Pont de Nemours and Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 1007 Market Street, Wilmington, Delaware.

79.    Third-Party Defendant Eastman Kodak Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 343 State Street, Rochester, New York.

80.    Third-Party Defendant Eden Wood Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 47 Parsippany Road, Whippany, New Jersey.

81.    Third-Party Defendant Elan Chemical Company, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 268 Doremus Avenue, Newark, New Jersey.

82.    Third-Party Defendant EM Sergeant Pulp & Chemical Co. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 6 Chelsea Road, Clifton, New Jersey.

83.    Third-Party Defendant Emerald Hilton Davis, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 2235 Langdon Farm Road, Cincinnati, Ohio.

84.    Third-Party Defendant Essex Chemical Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business located at 2030 Dow Center Tax Department, Midland, Michigan.

85.    Third-Party Defendant Exxon Mobil is a corporation organized under the laws of the State of New Jersey with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas.

86.    Third-Party Defendant F.E.R. Plating, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 52 Park Avenue, Lyndhurst, New Jersey.

87.    Third-Party Defendant Fine Organics Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 420 Kuller Road, Clifton, New Jersey.

17

88.     Third-Party Defendant Fiske Brothers Refining Company is a corporation organized under the laws of the State of New York with its principal place of business at 129 Lockwood Street, Newark, New Jersey.

89.     Third-Party Defendant Flexon Industries Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 366 Frelinghuysen Avenue, Newark, New Jersey.

90.     Third-Party Defendant Flint Group Incorporated is a corporation organized under the laws of the State of Michigan with its principal place of business at 1409 North Beck Road, Plymouth, Michigan.

91.     Third-Party Defendant Fort James Corporation is a corporation organized under the laws of the State of Virginia with its principal place of business at 133 Peachtree Street NE, Atlanta, Georgia.

92.     Third-Party Defendant Foundry Street Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 260 Knoll Drive, Park Ridge, New Jersey.

93.     Third-Party Defendant Franklin-Burlington Plastics, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 7733 Forsyth, Suite 1450, Clayton, Missouri.

94.     Third-Party Defendant Garfield Molding Company, Inc. is a corporation organized under the laws of the state of New Jersey with its principal place of business at 10 Midland Avenue, Wallington, New Jersey.

95.     Third-Party Defendant General Cable Industries, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at 4 Tesseneer Drive, Highland Heights, Kentucky.

96.     Third-Party Defendant General Dynamics Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 2941 Fairview Park Drive, Falls Church, Virginia.

97.      Third-Party Defendant General Electric Company is a corporation organized under the laws of the State of New York with its principal place of business at 3135 Easton Turnpike, Fairfield, Connecticut.

98.      Third-Party Defendant Gentek Holding LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 90 East Halsey Road, Parsippany, New Jersey.

99.      Third-Party Defendant Givaudan Fragrances Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 1775 Windsor Road, Teaneck, New Jersey.

100.      Third-Party Defendant G. J. Chemical Co. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 370-376 Adams Street, Newark, New Jersey.

101.      Third-Party Defendant Goody Products, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 3 Glenlake Parkway, Atlanta, Georgia.

102.      Third-Party Defendant Gordon Terminal Service Co. of N.J., Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 2 Hook Road also known as Foot of Hook Road, P.O. Box 143, Bayonne, New Jersey.

103.      Third-Party Defendant Harrison Supply Company is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 800 Passaic Avenue, Harrison, New Jersey.

104.      Third-Party Defendant Hartz Mountain Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 400 Plaza Drive, Secaucus, New Jersey.

105.      Third-Party Defendant Havenick Associates L.P. is a limited partnership organized under the laws of the State of New Jersey with its principal place of business at 65 Central Avenue, Kearny, New Jersey.

WAS:144301.1

106.    Third-Party Defendant Hexcel Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at Two Stamford Plaza, 281 Tresser Boulevard, Stamford, Connecticut.

107.    Third-Party Defendant Hexion Specialty Chemicals, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 830 Bear Tavern Road, Trenton, New Jersey.

108.    Third-Party Defendant Hoffmann-La Roche Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 340 Kingsland Street, Nutley, New Jersey.

109.    Third-Party Defendant Honeywell International Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 101 Columbia Road, Morris Township, New Jersey.

110.    Third-Party Defendant Houghton International Inc. is a corporation organized under the laws of the State of Pennsylvania with its principal place of business at 945 Madison Avenue, Valley Forge, Pennsylvania.

111.    Third-Party Defendant Hudson Tool & Die Company, Inc. is a corporation organized under the laws of the State of Michigan with its principal place of business at 1327 North US Highway One, Ormond Beach, Florida.

112.    Third-Party Defendant Hy-Grade Electroplating Co. is a corporation organized under the laws of the State of  New Jersey with its principal place of business at 35 Fourth Street, Newark, New Jersey.

113.    Third-Party Defendant ICI Americas Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 10 Finderne Avenue, Bridgewater, New Jersey.

114.    Third-Party Defendant Innospec Active Chemicals LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 510 West Grimes Avenue, High Point, North Carolina.

WAS:144301.1

115.    Third-Party Defendant INX International Ink Co. is a corporation organized under the laws of the State of Delaware with its principal place of business at 481 River Road, Clifton, New Jersey.

116.    Third-Party Defendant ISP Chemicals Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1361 Alps Road, Wayne, New Jersey.

117.    Third-Party Defendant ITT Corporation is a corporation organized under the laws of the State of Indiana with its principal place of business at 4 West Red Oak Lane, White Plains, New York.

118.    Third-Party Defendant Kearny Smelting & Refining Corp. is a corporation organized under the laws of the State of New York with its principal place of business at 936 Harrison Avenue, Kearny, New Jersey.

119.    Third-Party Defendant Kao Brands Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 2535 Spring Grove Avenue, Cincinnati, Ohio.

120.    Third-Party Defendant Koehler-Bright Star, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 380 Stewart Road, Wilkes-Bare, Pennsylvania.

121.    Third-Party Defendant Linde, Inc. (f/k/a The BOC Group, Inc.) is a corporation organized under the laws of the State of Delaware with its principal place of business at 575 Mountain Avenue, Murray Hill, New Jersey.

122.    Third-Party Defendant Lucent Technologies, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 600 Mountain Avenue, Murray Hill, New Jersey.

123.    Third-Party Defendant Mallinckrodt Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 675 McDonnell Boulevard, Hazelwood, Missouri.

124.    Third-Party Defendant Mace Adhesives & Coatings Company, Inc. is a corporation organized under the laws of the State of Massachusetts with its principal place of business at 38 Roberts Road, Dudley, Massachusetts.

125.    Third-Party Defendant Merck & Co., Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 1 Merck Drive, Whitehouse Station, New Jersey.

126.    Third-Party Defendant Metal Management Northeast, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at the Foot of Hawkins Street, P.O. Box 5158, Newark, New Jersey.

127.    Third-Party Defendant MI Holdings, Inc. is a corporation organized under the laws of the State of Missouri with its principal place of business at 1345 Avenue of the Americas, New York, New York.

128.    Third-Party Defendant Miller Environmental Group, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 538 Edwards Avenue, Calverton, New York.

129.    Third-Party Defendant Morton International, Inc. is a corporation organized under the laws of the State of Indiana with its principal place of business at 100 N. Riverside Plaza, Chicago, Illinois.

130.    Third-Party Defendant N L Industries, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 5430 LBJ Freeway, Suite 1700, Dallas, Texas.

131.    Third-Party Defendant Nappwood Land Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 199 Main Street, Lodi, New Jersey.

132.    Third-Party Defendant National Fuel Oil, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 175 Orange Street, Newark, New Jersey.

133.    Third-Party Defendant National-Standard, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1618 Terminal Road, Niles, Michigan.

134.    Third-Party Defendant Nell-Joy Industries, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 8 Reith St. #10, Copiague, New York.

135.    Third-Party Defendant Nestle U.S.A., Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 800 N. Brand Blvd., Glendale, California.

136.    Third-Party Defendant New Jersey Transit Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at One Penn Plaza East, Newark, New Jersey.

137.    Third-Party Defendant News America, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 1211 Avenue of the Americas, New York, New York.

138.    Third-Party Defendant News Publishing Australia Limited is a corporation organized under the laws of the State of Delaware with its principal place of business at 1211 Avenue of the Americas, New York, New York.

139.    Third-Party Defendant Norpak Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 70 Blanchard Street, Newark, New Jersey.

140.    Third-Party Defendant Novelis Corporation is a corporation organized under the laws of the State of Texas with its principal place of business at 6060 Parkland Boulevard, Cleveland, Ohio.

141.    Third-Party Defendant Orange and Rockland Utilities, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 4 Irving Place, Suite 1618-S, New York, New York.

142.    Third-Party Defendant Otis Elevator Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 1 Financial Plaza, Hartford, Connecticut.

WAS:144301.1

143.     Third-Party Defendant PRC-DeSoto International, Inc. is a corporation organized under the laws of the State of California with its principal place of business at 410 Jersey Avenue, Gloucester City, New Jersey.

144.     Third-Party Defendant Passaic Pioneer Properties Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 35 Eighth Street, Passaic, New Jersey.

145.     Third-Party Defendant Pfizer Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located at 235 East 42nd Street, New York, New York.

146.     Third-Party Defendant Pharmacia Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 700 Portage Road, Kalamazoo, Michigan.

147.     Third-Party Defendant Phelps Dodge Industries, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at One North Central Avenue, Phoenix, Arizona.

148.     Third-Party Defendant PhilBro, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 800 Passaic Avenue, Harrison, New Jersey.

149.     Third-Party Defendant Pitt-Consol Chemical Company is a corporation organized under the laws of the state of New Jersey with its principal place of business at 1007 Market Street, Wilmington, Delaware.

150.     Third-Party Defendant Pivotal Utility Holdings, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at Ten Peachtree Place, LOC 1466, Atlanta, Georgia.

151.     Third-Party Defendant PPG Industries, Inc. is a corporation organized under the laws of the State of Pennsylvania with its principal place of business located at One PPG Place 07 East, Pittsburgh, Pennsylvania.

WAS:144301.1

152.    Third-Party Defendant Praxair, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 39 Old Ridgebury Road, Danbury, Connecticut.

153.    Third-Party Defendant Precision Manufacturing Group, LLC is a limited liability company organized under the laws of the State of Illinois with its principal place of business at 501 Little Falls Road, Cedar Grove, New Jersey.

154.    Third-Party Defendant Prentiss Incorporated is a corporation organized under the laws of the State of New York with its principal place of business at 21 Vernon Street, P.O. Box CB2000, Floral Park, New York.

155.    Third-Party Defendant Prysmian Communications Cables and Systems USA LLC, is a corporation organized under the laws of the State of Delaware with its principal place of business at 700 Industrial Driver, Lexington, South Carolina.

156.    Third-Party Defendant PSEG Fossil LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 80 Park Plaza, Newark, New Jersey.

157.    Third-Party Defendant Public Service Electric and Gas Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 80 Park Plaza, Newark, New Jersey.

158.    Third-Party Defendant Purdue Pharma Technologies, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at One Stamford Forum, Stamford, Connecticut.

159.    Third-Party Defendant Quala Systems, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 3802 Corporex Park Drive, Tampa, Florida.

160.    Third-Party Defendant Quality Carriers, Inc. is a corporation organized under the laws of the State of Illinois with its principal place of business at 3802 Corporex Park Drive, Tampa, Florida.

WAS:144301.1

161.    Third-Party Defendant Reckitt Benckiser, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 399 Interpace Parkway, Parsippany, New Jersey 07054.

162.    Third-Party Defendant Reichhold, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 2400 Ellis Road, P.O. Box 13582, Research Triangle Park, North Carolina.

163.    Third-Party Defendant Revere Smelting & Refining Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2777 North Stemmons Freeway, Dallas, Texas.

164.    Third-Party Defendant Rexam Beverage Can Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 4201 Congress Street, Suite 340, Charlotte, North Carolina.

165.    Third-Party Defendant Roman Asphalt Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 14 Ogden Street, Newark, New Jersey.

166.    Third-Party Defendant Royce Associates, A Limited Partnership, is a limited partnership organized under the laws of the State of New Jersey with its principal place of business at 35 Carlton Avenue, East Rutherford, New Jersey.

167.    Third-Party Defendant R.T. Vanderbilt Company, Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 30 Winfield Street, Norwalk, Connecticut.

168.    Third-Party Defendant Rutherford Chemicals LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 40 Avenue A, Bayonne, New Jersey.

26

169.    Third-Party Defendant S&A Realty Associates, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 55 Passaic Avenue, Kearny, New Jersey.

170.    Third-Party Defendant Schering Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 2000 Galloping Road, Kenilworth, New Jersey.

171.    Third-Party Defendant Sequa Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 200 Park Avenue, New York, New York.

172.    Third-Party Defendant Seton Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 1000 Madison Avenue, Norristown, Pennsylvania.

173.    Third-Party Defendant Siemens Water Technologies Corp. is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business at 181 Thorn Hill Road, Warrendale, Pennsylvania.

174.    Third-Party Defendant Singer Sewing Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 1224 Heil Quaker Blvd, La Vergne, Tennessee.

175.    Third-Party Defendant Spectraserv Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business located at 75 Jacobus Avenue, South Kearny, New Jersey.

176.    Third-Party Defendant STWB, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania.

177.    Third-Party Defendant Sun Chemical Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 185 Foundry Street, Newark, New Jersey.

178.    Third-Party Defendant SVP Worldwide, LLC is a corporation organized under the laws of the State of Delaware with its principal place of business at 1224 Heil Quaker Blvd, La Vergne, Tennessee.

179.    Third-Party Defendant Tate & Lyle Ingredients Americas, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 2200 East Eldorado Street, Decatur, Illinois.

180.    Third-Party Defendant Teva Pharmaceuticals USA, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania.

181.    Third-Party Defendant Teval Corp. is a corporation organized under the laws of the State of New York with its principal place of business located at 99 Cherry Hill Road, Suite 105, Parsippany, New Jersey.

182.    Third-Party Defendant Textron Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 40 Westminster Street, Providence, Rhode Island.

183.    Third-Party Defendant The Dial Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 15501 N. Dial Boulevard, Scottsdale, Arizona.

184.    Third-Party Defendant The Dundee Water Power and Land Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 200 Old Hook Road, Harrington Park, New Jersey.

185.    Third-Party Defendant The Newark Group, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 20 Jackson Drive, Cranford, New Jersey.

186.    Third-Party Defendant The Okonite Company, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 102 Hilltop Road, Ramsey, New Jersey.

187.    Third-Party Defendant The Procter & Gamble Manufacturing Company is a corporation organized under the laws of the State of Ohio, with its principal place of business at One Procter & Gamble Plaza, Cincinnati, Ohio.

188.    Third-Party Defendant The Sherwin-Williams Company is a corporation organized under the laws of the State of Ohio with its principal place of business at 101 Prospect Avenue, Cleveland, Ohio.

189.    Third-Party Defendant The Stanley Works is a corporation organized under the laws of the State of Connecticut with its principal place of business at 1000 Stanley Drive, New Britain, Connecticut.

190.    Third-Party Defendant The Valspar Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 1101 South Third Street, Minneapolis, Minnesota.

191.    Third-Party Defendant W.C. Industries is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 59 Dover Street, Patterson, New Jersey.

192.    Third-Party Defendant Thirty-Three Queen Realty Inc. is a corporation organized under the laws of the State of New York with its principal place of business at One Flexon Plaza, 366 Frelinghuysen Avenue, Newark, New Jersey.

193.    Third-Party Defendant Three County Volkswagen Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business located at 701 Riverside Avenue, Lyndhurst, New Jersey.

194.    Third-Party Defendant Tidewater Baling Corp. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 26 Saint Charles Street, Newark, New Jersey.

195.    Third-Party Defendant Tiffany & Co. is a corporation organized under the laws of the State of Delaware with its principal place of business at 727 Fifth Avenue in New York, New York.

196.    Third-Party Defendant Timco, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 666 South 16th Street, Newark, New Jersey.

197.    Third-Party Defendant Troy Chemical Corporation, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at One Avenue L, Newark, New Jersey.

198.    Third-Party Defendant Universal Oil Products Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 25 East Algonquin Road, Des Plaines, Illinois.

199.    Third-Party Defendant V. Ottilio & Sons, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 575 Preakness Avenue, Paterson, New Jersey.

200.    Third-Party Defendant Velsicol Chemical Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 10400 W. Higgins Road, Suite 600, Rosemont, Illinois.

201.    Third-Party Defendant Veolia ES Technical Solutions, L.L.C. is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 700 E. Butterfield Road, Suite 201, Lombard, Illinois.

202.    Third-Party Defendant Vertellus Specialties Inc. is a corporation organized under the laws of the State of Indiana with its principal place of business at 300 North Meridian Street, Suite 1500, Indianapolis, Indiana.

203.    Third-Party Defendant Vitusa Corp. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 110 Charlotte Place, P.O. Box 1095, Englewood Cliffs, New Jersey.

204.    Third-Party Defendant Vulcan Materials Company is a corporation organized under the laws of the State of New Jersey with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama.

WAS:144301.1

205.     Third-Party Defendant W.A.S. Terminals Corporation is a corporation organized under the laws of the State of New Jersey with its principal place of business at 126 Passaic Street, Newark, New Jersey.

206.     Third-Party Defendant W.A.S. Terminals, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 126 Passaic Street, Newark, New Jersey.

207.     Third-Party Defendant Whittaker Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 1955 North Surveyor Ave., Simi Valley, California.

208.     Third-Party Defendant Wiggins Plastics, Inc. is a corporation organized under the laws of the State of New Jersey with its principal place of business at 180 Kingsland Road, Clifton, New Jersey.

209.     Third-Party Defendant Zeneca Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19850.

210.     Each of the Third-Party Defendants is a "person" within the meaning of the Spill Act, N.J.S.A. § 58:10-23.11b.o.

## DEFINITIONS

211.     "BOD" means biochemical oxygen demand.

212.     "CERCLA" refers to the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq.

213.     The term "Cleanup and Removal Costs" shall have the meaning given that term under the Spill Act, N.J.S.A. § 58:10-23.11b.d.

214.     "COD" means chemical oxygen demand.

215.     The term "CSO" stands for Combined Sewer Overflow, and refers to the frequent instances, during periods of  heavy rainfall or snowmelt, when the wastewater volume in a Combined Sewer System exceeds the capacity of the sewer system or treatment plant, and the excess wastewater--which contains not only stormwater but also untreated human and industrial waste, toxic materials, and debris--is allowed to discharge directly to a nearby streams, rivers, or other water body.

31

216.    The term "Combined Sewer System" refers to any sewer system designed to collect wet-weather runoff, domestic sewage, commercial and/or industrial wastewater in the same system.

217.    The term "Diamond Alkali Site" shall mean the property located at 80 Lister Avenue in Newark, New Jersey and the adjacent property at 120 Lister Avenue, Newark, New Jersey.

218.    The term "Discharge" shall have the meaning given that term under the Spill Act, N.J.S.A. § 58:10-23.11b.h.

219.    "EPA" refers to the United States Environmental Protection Agency.

220.    The term "Hazardous Substance" shall have the meaning given that term under the Spill Act, N.J.S.A. § 58:10-23.11b.k.

221.    The term "ISC" refers to the Interstate Sanitation Commission.

222.    The term "the Lower Passaic River Study Area" shall have the meaning given that term by the EPA in CERCLA Docket No. 02-2004-2011 (*In the Matter of:  Lower Passaic River Study Area portion of the Diamond Alkali Superfund Site*), paragraph 10.a, namely the 17-mile stretch of the Lower Passaic River and its tributaries from Dundee Dam to Newark Bay.

223.    The term "MGD" refers to million gallons per day.

224.    The terms "Municipality" or "Municipalities" refers to any city of any class, any borough, village, town, township, or any other municipality other than a county or a school district, and any agency thereof, or any two or more thereof acting jointly.

225.    The term "Newark Bay Complex" shall mean the lower 17 miles of the Passaic River, Newark Bay, the lower reaches of the Hackensack River, the Arthur Kill, the Kill Van Kull, including the waters and sediments of such bodies, and any adjacent waters and the sediments of such adjacent bodies.

226.    The term "Newark Bay Study Area" shall have the meaning given that term by the EPA in CERCLA Docket No. 02-2004-2010 (*In the Matter of the Diamond Alkali Superfund Site (Newark Bay Study Area)*), paragraph 2.r, namely Newark Bay and portions of the Hackensack River, Arthur Kill, and Kill Van Kull.

227.    "NJDEP" refers to the New Jersey Department of Environmental Protection.

228.    "NJPDES" refers to the New Jersey Pollutant Discharge Elimination System.

229.    "NJDOH" refers to the New Jersey Department of Health.

230.    "PAHs" means polycyclic aromatic hydrocarbons.

231.    The term "Person" shall have the meaning given that term under the Spill Act, N.J.S.A. § 58:10-23.11b.o.

232.    "PVSC" refers to the Passaic Valley Sewerage Commission.

233.    The term "Separate Sewer System" refers to any sewer system designed to collect only domestic sewage and commercial and industrial wastewater in the same system, but that is not designed to collect wet-weather runoff.

234.    "Spill Act" refers to the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.

235.    The term "Storm Water System" refers to any sewer system designed to collect only wet-weather runoff.

236.    The term Wet-Weather Runoff" or "Storm Water" refers to water runoff from land that is generated by natural non-anthropogenic weather phenomena, including, without limitation, rain, ice, snow, dew, and fog.

## FACTUAL ALLEGATIONS

### COMMERCIAL SITES

#### 80 Lister Avenue Site

237.    In 1962, Marisol, Incorporated ("Marisol") was founded and incorporated in the State of New Jersey.

238.    On or about June 4, 1981, Marisol acquired the real property and improvements located at 80 Lister Avenue, in Newark, New Jersey.

239.    Marisol owned and operated the 80 Lister Avenue Site from June 4, 1981, until January 27, 1986.

WAS:144301.1

240.    In Paragraph 61 of the Plaintiffs' Second Amended Complaint, the Plaintiffs allege that "extremely high levels of TCDD and other hazardous substances remained in and on the process buildings, tanks, sumps, drains, sewers, pipes and other equipment, which were simply left on the [80 Lister Avenue Site].   The TCDD and other hazardous substances continued to discharge into the environment from the process buildings, tanks, sumps, drains, sewers, pipes and other equipment throughout the 1970s and 1980s."

241.    Maxus and Tierra have denied the Plaintiffs' allegations that discharges of TCDD and other Hazardous Substances continued from facilities at the 80 Lister Avenue Site through the 1980s. However, in the event Plaintiffs' allegations that discharges of Hazardous Substances from the 80 Lister Avenue Site continued "throughout the 1970s and 1980s" are true, then Marisol has liability for such discharges.

242.    In 2007, Marisol was acquired by and merged into Veolia ES Technical Solutions, L.L.C. ("Veolia").   Upon information and belief, Veolia is the corporate successor of Marisol and, therefore, succeeds to Marisol's environmental liabilities related to the 80 Lister Avenue Site.

243.    If Plaintiffs' allegations regarding purported Discharges from the Lister Site throughout the 1970s and 1980s are true, then Veolia, as successor to Marisol, is a "discharger" and/or a person "in any way responsible" for Hazardous Substances that were allegedly Discharged at the 80 Lister Avenue Site and that have Discharged into the Newark Bay Complex.

### Active Oil Service Site

244.    On information and belief, Active Oil Service ("Active Oil") operated at 101-102 Riverside Avenue, Newark, New Jersey (the "Active Oil Site").

245.    Active Oil was formed in 1936 and operates as an oil remediation contractor dealing with the installation and removal of oil storage tanks and the cleanup of oil and hazardous waste spills.   On or about June 9, 1976, Active Oil discharged oil into a catch basin, which flowed into a storm sewer and discharged into the Passaic River.

246.    Active Oil is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Active Oil Site and released into the Newark Bay Complex.

**Adco Rome Site**

247.    On information and belief, Adco Chemical Company ("Adco") operated the site located at 148-154 Rome Street, Newark, New Jersey 07105 (the "Adco Rome Site"). The Adco Rome Site lies approximately .65 miles south of the Passaic River and consists of approximately .344 acres of real property and associated improvements.

248.    On or about December 30, 1936, Adco Chemical Company ("Adco") was incorporated in the State of New Jersey. Adco operated from the Adco Rome Site from approximately 1940-1975, after which time operations were moved to 49 Rutherford Street, Newark, New Jersey. Although all operations at the Adco Rome Site allegedly ceased around 1975, an investigative report, dated August 30, 1979, stated that Adco trucked its industrial wastewater to the Adco Rome Site on a daily basis for discharge to the sanitary sewer. Adco sold its assets to Deltech Properties, LLC in 2005.

249.    Adco's operations at the Adco Rome Site included the processing and distribution of substances used in paint manufacturing and related industries, including surface coating resins. Adco's manufacturing process used monoglyceride and dibasic acid heated to reaction temperature. The raw materials used in this process included vinyl acetate, butyl acrylate, and methyl methacrylate monomers, which were added to water and a soap solution. These materials were heated to reaction temperature until all of the monomers reacted, then cooled and adjusted to attain the appropriate characteristics. Finished products included varnishes, latex polymers and alkyd resins.

250.    Wastewater containing Hazardous Substances was discharged from the Adco Rome Site to the sanitary sewer from 1945-1970.

251.    On October 6, 1971, a drum in Adco's storage area leaked a white latex emulsion which flowed into the catch basin at the corner of Rome Street and St. Charles Street and was discharged into the Passaic River via the Roanoke Avenue storm sewer.

WAS:144301.1

252.    On July 28, 1975, Adco personnel dumped 2,000 gallons of experimental, untreated acrylic emulsion into the sanitary sewer system.

253.    On July 30, 1975, an inspection by the Newark Department of Engineering revealed two men at the Adco Rome Site washing and sweeping a white-colored pollutant into a street storm sewer.

254.    A memo dated August 30, 1979 noted that a sample of water discharged to the sanitary sewer at Rome Street was 5% explosive.  The sample was described as an opaque grayish-white liquid with an industrial odor and a pH of 3.2.

255.    Upon information and belief, process wastewater and surface water runoff from the Adco Rome Site discharged into the PVSC Combined Sewer System and discharged directly into the Passaic River during rain events and/or mechanical failures of the interceptor.

256.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Adco Rome Site.

257.    Adco is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Adco Rome Site and released into the Newark Bay Complex.

### Adco Rutherford Site

258.    On information and belief, Adco owned and operated the site located at 49 and 91-127 Rutherford, Newark, New Jersey 07101 (the "Adco Rutherford Site").  The Adco Rutherford Site consists of approximately 11.5 acres of real property and associated improvements and lies approximately 4500 feet west of Newark Bay.

259.    Adco's operations at the Adco Rutherford Site consisted of manufacturing acrylic and vinyl acetate polymers, alkyds, varnishes and polyurethanes.  Adco's manufacturing process used the reaction of a polybasic acid or anhydride with a polyol (glycerine) to create organic esters (resins).  Raw materials used in this manufacturing process included phthalic anhydride, glycerine, diethylene glycol, xylol, and various oils.  Waste materials generated by this process include aziridine, mercury, 2-propenoic acid, toluene, phthalic anhydride, diisocyanate, furandione, carbamic acid, xylene, methanol, methyl methacrylate, mineral spirits and naphtha.  Other substances handled on the Adco Rutherford Site include

36

vinyl acetate, butyl acrylate, methacrylic acid, acetylene, benzene, tert-butyl hydroperoxide solution, methyl alcohol, gasoline, propane, methyl ether, methyl propyl ketone and ethyleneimine.

260.    On July 13, 1978, NJDEP discovered contaminated, stagnant puddles of water behind abandoned buildings in the south field on the Adco Rutherford Site.

261.    An October 4, 1978 site inspection by NJDEP revealed several violations at the Adco Rutherford Site, including:  (i) the presence of contaminated soils behind abandoned buildings in the south field at the Adco Rutherford Site, which were noted as representing a danger of groundwater contamination; (ii) an unpermitted 10-inch discharge pipe for contaminated rainwater runoff into Jasper Creek and, thence, Newark Bay that was located in the southeast corner of the plant at the Adco Rutherford Site; and (iii) a wooden sump ditch in the southeast corner of the plant at the Adco Rutherford Site that was filled with contaminated waters.

262.    On August 28, 1979, PVSC took a sample at Adco Rutherford Site from an unauthorized connection to an 8-inch cast iron sewer main.  The sample was an emulsified liquid with a solvent odor and a pH of 2.6.  The sample was also noted as not being approved for discharge to the sanitary sewer.

263.    On August 30, 1979, an investigative report noted that the plans PVSC had regarding Adco's sewer connections were incorrect.  It was also noted that the City of Newark was complaining that Adco performed construction without proper permits, did not submit complete piping drawings and made connections that were not shown on their drawings.  It was also noted that Adco accumulated its industrial wastewater and trucked the water on a daily basis to the Adco Rome Site for discharge to the sanitary sewer.

264.    On December 23, 1980, an inspection revealed that industrial waste having a pH of 11 was being pumped from a holding tank at the Adco Rutherford Site into a manhole.

265.    Adco filed a Notification of Hazardous Waste Activity form on August 18, 1980, describing itself as a generator and a treatment, storage or disposal ("TSD") facility.

266.    A RCRA inspection form dated May 13, 1981 noted that waste was stored at Adco for as long as 5 years.

267.    A memo dated April 11, 1988, states that a white gummy material that appeared to be saponified resin was reported at the outlet of an Adco storm sewer. The same material was found further downstream of Pierson Creek.

268.    Inspections on June 16, 1988, July 8, 1988, and July 11, 1988, revealed evidence of spillage in the yard, warehouse, tank farm area and beneath rail cars at the Adco Rutherford Site.

269.    A Notice of Violation was issued to Adco on September 23, 1988, for storing spent filter media, and thereby operating as a treatment and/or storage facility without a permit.

270.    On April 4, 1989, the Newark Office of Emergency Management observed Adco employees dumping the contents of numerous 55-gallon drums on the ground at the Adco Rutherford Site. Samples taken at the site of the dumping were noted to have a pH of 12. Adco received a Notice of Violation for discharge of a Hazardous Substance, toluene diisocyanate.

271.    On April 5, 1989, Adco received a Notice of Violation for failing to notify NJDEP of a discharge of a Hazardous Substance, and for disposing and handling of hazardous waste in a manner which caused an unauthorized discharge of pollutants.

272.    A Potential Hazardous Waste Site Preliminary Assessment dated June 23, 1989, stated that overturned drums made contaminant migration possible via groundwater, surface water and the air. The Adco Rutherford Site is in a flood zone.

273.    On June 27, 1989, Adco received a Notice of Violation for failing to properly manage hazardous waste containers, failing to mark drums with an accumulated start date, and storing waste for more than 90 days without a permit.

274.    An NJDEP memo dated July 27, 1989, noted that Adco was operating as an unregistered treatment, storage or disposal facility.

275.    Adco received a Notice of Violation from the Division of Water Resources on May 17, 1990, after an inspection revealed unpermitted discharges (in the form of condensate water and storm water runoff) from the Adco Rutherford Site to the surface waters of the State.

276.    In a letter dated June 27, 1990, the Metro Bureau of Regional Enforcement directed Adco to obtain an NJPDES permit for discharges to the surface waters of the State (in the form of condensate water and storm water runoff) from the Adco Rutherford Site.

277.    On March 12, 2003, Adco was cited by the NJDEP for:  (1) failing to have a secondary containment or diversion system block all probable routes by which leaked Hazardous Substances could reasonably be expected to become discharges; (2) failing to inspect storage areas and secondary containment or diversion systems, and all aboveground pipes monthly; and (3) failing to provide secondary containment for a drum or other storage area used in the storage of Hazardous Substances.

278.    On July 6, 2005, Adco was cited for failing to clean up all leaks of Hazardous Substances promptly and for allowing loose quantities of those substances to persist on places within the Adco Rutherford Site.  Adco was also cited for failing to maintain secondary containment or diversion systems in good repair and free of cracks through which Hazardous Substances could be discharged.

279.    Upon information and belief, process wastewater and surface water runoff from the Adco Rutherford Site discharged into the PVSC Combined Sewer System and discharged directly into the Passaic River and/or Newark Bay during rain events and/or mechanical failures of the interceptor.

280.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Adco Rutherford Site.

281.    Adco is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Adco Rutherford Site and released into the Newark Bay Complex.

### Aircraft Engineering Site

282.    The Aircraft Engineering Site consists of a property located at 2 Ackerman Avenue, Clifton, New Jersey, also designated as Block 3.16, Lots 2 and 3, on the tax maps of the Township of Clifton, Passaic County, New Jersey ("Aircraft Engineering Site").  The Aircraft Engineering Site is located on a small peninsula that separates the Dundee Canal from the Passaic River and sits adjacent to the western bank of the Passaic River near river mile 17.5.  The Aircraft Engineering Site has been utilized for industrial operations since approximately 1909.

283.    Aircraft Engineering Products, Inc. ("AEP") was a co-tenant/lessee at the Aircraft Engineering Site from 1940 until approximately 1995.  During this time, AEP conducted manufacturing operations in a small building which was attached to a larger building occupied by Dundee Mills, the owner/operator/lessor of the Aircraft Engineering Site from approximately 1909 until 1970.  AEP later leased the same building from Universal Chain Metal, Inc. ("Universal"), the owner/operator/lessor of the Aircraft Engineering Site from 1970 to 1987.

284.    AEP was incorporated in Delaware on February 20, 1940.  Upon information and belief, in or around May 1995, Nell-Joy Industries, Inc. ("Nell-Joy") acquired AEP, liquidated AEP's assets at the Aircraft Engineering Site, and moved AEP's operations to New York.  Upon information and belief, Nell-Joy is the successor-in-interest, or otherwise responsible for, AEP's operations at the Aircraft Engineering Site.

285.    From approximately 1940 until 1995, AEP manufactured metal components and auxiliary equipment for aircraft at the Aircraft Engineering Site.  Upon information and belief, AEP utilized, processed, handled, stored, or otherwise used Hazardous Substances at the Aircraft Engineering Site, including, but not limited to, arsenic, beryllium, cadmium, chromium, copper, lead, mercury, nickel, zinc, selenium, naphthalene, 2-methylnaphthalene, dibenzofuran, fluorine, anthracene, pyrene, bis(2-ethylhexyl)phthalate, di-n-octyl phthalate, 1,1,1-trichloroethane, 1,1-dichloroethane, and trichloroethene.

286.    In October 1997, a Remedial Investigation Report/Remedial Action Work Plan concerning the Aircraft Engineering Site documented the presence of priority pollutant metals, volatile organics, and other contaminants in the soil and in the shallow groundwater at the Aircraft Engineering Site.  The report concludes that AEP's on-site metal plating operations were the primary source of contamination at the Aircraft Engineering Site.

287.    Soil samples taken from areas in and around the Aircraft Engineering Site during the remedial investigation in 1997 confirmed the presence of Hazardous Substances, including, but not limited to, cadmium and hexavalent chromium.

WAS:144301.1

288.    Upon information and belief, stormwater and direct discharges from the Aircraft Engineering Site collect in stormwater drains located on the site, which discharge to the Passaic River. According to a November 6, 1986 ECRA report concerning the site, stormwater run-off from the Aircraft Engineering Site is captured by a number of on-site stormwater drains, is diverted, and then is directly discharged into the adjacent Passaic River.

289.    Upon information and belief, the Aircraft Engineering Site has been prone to flooding during heavy rain events.  During these occasions, the floodwaters of the Passaic River exceed the elevation of the stormwater drains on the Aircraft Engineering Site, which result in heavy flooding of the Site.  According to a November 6, 1986 ECRA report concerning the site, the stormwater drainage at the Aircraft Engineering Site is diverted to an on-site stormwater pump-house which pumps the accumulated floodwaters on the Aircraft Engineering Site directly into the Passaic River by means of an elevated overhead pipeline.  Upon information and belief, the advancing and receding floodwaters on the Aircraft Engineering Site have eroded and transported Hazardous Substances and other compounds from the soils on the Aircraft Engineering Site, including contaminated soil from in and around AEP's metal plating and processing areas, and discharged Hazardous Substances into the Passaic River.

290.    Upon information and belief, spills, leaks and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Aircraft Engineering Site.  For example, in 1995, AEP discharged 1,000 gallons of reinstate water that was generated from its metal plating operations into the surface soil on the Aircraft Engineering Site.  The reinstate water consisted of, among other Hazardous Substances, chromium, cadmium, selenium, naphthalene, 2-methylnaphthalene, dibenzofuran, fluorine, anthracene, pyrene, bis(2-ethylhexyl)phthalate, and di-n-octyl phthalate.  Surface soil and groundwater testing conducted at the Aircraft Engineering Site following this discharge event revealed a high level of cadmium contamination in the soil as a result of AEP's discharge.

291.    The 1997 remedial investigation of the Aircraft Engineering Site confirmed contamination of shallow groundwater at the Aircraft Engineering Site.  Contamination was found in the

41

wells near AEP's former on-site plating room and discharge pit, where the following substances were detected: cadmium, chromium, copper, lead, arsenic, mercury, nickel, and trichloroethene.

292.    Groundwater at the Aircraft Engineering Site flows from west to east, moving from the Dundee Canal towards the Passaic River.  Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the Aircraft Engineering Site ultimately discharge into the Passaic River.

293.    On or about November 8, 2005, EPA sent a General Notice Letter notifying Nell-Joy Industries, Inc. of its potential liability for Response costs relating to the Lower Passaic River as the result of the Release of Hazardous Substances, including solid and/or hazardous wastes, from the Aircraft Engineering Site.

294.    Upon information and belief, Nell-Joy is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Aircraft Engineering Site and released into the Newark Bay Complex.

**Airwick Site**

295.    Airwick Industries, Inc. ("Airwick") was the former owner of manufacturing, warehousing, and laboratory facilities located at 111, 145, and 179 Commerce Road, Carlstadt, Bergen County, New Jersey, also designated as Block 127, Lots 3, 4, and 5 on the tax assessment map of the Borough of Carlstadt (the "Airwick Site").  The Airwick Site is located approximately 1.4 miles from the Hackensack River.

296.    Upon information and belief, Airwick Industries, Inc., previously known as Airkem, Inc., was incorporated in New York on June 18, 1962 ("Airwick Industries of NY").

297.    Upon information and belief, Airwick Industries, Inc. was incorporated in New Jersey on or about  December 13, 1982 ("Airwick Industries of NJ").

298.    Upon information and belief, Airwick Industries of NY was merged with and into Airwick Industries of NJ on or about December 27, 1982.

42

299.    Upon information and belief, on or about January 3, 1989, Airwick was merged into Reckitt & Colman, North America, Inc.

300.    Upon information and belief, Reckitt & Colman, North America, Inc. changed its name to Reckitt & Colman, Inc. on or about February 3, 1989 and to Reckitt Benckiser, Inc. ("Reckitt Benckiser") on or about February 1, 2000, after the merger of Reckitt & Colman PLC and Benckiser N.V. Reckitt Benckiser is the successor to Airwick Industries, Inc. and, therefore, succeeds to the environmental liabilities related to the Airwick Site.

301.    From approximately 1962 until 1997, Airwick and/or Reckitt Benckiser manufactured consumer air fresheners, rug cleaners, disinfectants, and other cleaning products at the Airwick Site. Airwick utilized, processed, handled, stored, or otherwise used Hazardous Substances at the Airwick Site, including, but not limited to, formaldehyde, trichloroethylene, potassium hydroxide, ammonium hydroxide, methylene chloride, petroleum hydrocarbons, sulfuric acid, sodium hydroxide, silver nitrate, and dodecylbenzenesulfonic acid.

302.    Upon information and belief, Airwick also utilized hexachlorophene in a rug cleaner product at the Airwick Site until 1983.    As of late 1983, Airwick was storing 40 pounds of hexachlorophene at the Airwick Site that was awaiting disposal.    Hexachlorophene is a substance identified by USEPA as associated with the formation of dioxin

303.    Upon information and belief, from the early 1970's to 1983, Airwick formulated approximately 1,810 pounds of hexachlorophene at the Airwick Site.    During this same period, Airwick discharged approximately 34 pounds of hexachlorophene to the Bergen County Utility Authority municipal water treatment plant.

304.    Upon information and belief, spills, leaks and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other Pollutants to and from the Airwick Site.    From 1962 through 1981, tank washings from the mixing of gel products on the Airwick Site were discharged behind one of the buildings on the site.    The materials discharged were typically gelatinous materials comprised of water, gelling agents, surfactant, dye, and perfume.

43

305.    Upon information and belief, in the fall of 1984, a 10,000 gallon underground storage tank containing fuel oil leaked and discharged oil into the soil at the Airwick Site.

306.    In 1985, an EPA National Dioxin Study Sampling Report showed that sediment samples taken from an open drainage ditch at the Airwick Site that runs from the southwest corner of the main manufacturing building at 111 Commerce Road to the culvert at Commerce Road contained 2,3,7,8-TCDD.  The on-site drainage ditch at the Airwick Site leads to Moonachie Creek, which leads to the Hackensack River, approximately 1.4 miles away.

307.    Soil samples taken from areas in and around the Airwick Site during the EPA's dioxin study confirmed the presence of Hazardous Substances, including, but not limited to, arsenic, beryllium, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc, cyanide, phenols, and 4-methyl-1-decene.

308.    According to a 1987 ECRA report, Hazardous Substances were detected in the surface soil and groundwater near a former dry well disposal area and a wastewater disposal area located on the Airwick Site.  Soil samples taken at the Airwick site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, mercury, petroleum hydrocarbons, assorted base neutral compounds, and various volatile organic chemicals.

309.    According to the 1987 ECRA report and a follow-up ECRA report in 1989, groundwater samples confirmed the presence of Hazardous Substances and other substances at the Airwick Site, including, but not limited to, mercury, 1,1-dichloroethane, 1,1,1-trichloroethane, assorted base neutral compounds, acid extractable organics, and various volatile organic chemicals.  0-dichlorobenzene, a chemical identified by USEPA as associated with the formation of dioxin, was detected in the groundwater at the Airwick Site.  Phenols were also present in groundwater at the Airwick Site.  On March 4, 1991, it was reported that a 12,000 gallon underground storage tank had discharged fuel oil into the soil at the Airwick Site.

44

310.     Reckitt Benckiser is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Airwick Site and released into the Newark Bay Complex.

**Alcan Site**

311.     On information and belief, River Terminal Development Company is the current owner of a property located at Jacobus Avenue, Tompkins Tidewater, Terminal Bldg. #10, Kearny, New Jersey (the "Alcan Site"). The Alcan Site is located adjacent to the Passaic River.

312.     On information and belief, Wallmaster Aluminum Company ("Wallmaster") operated at the Alcan Site and produced aluminum siding. In 1965, Alcan Aluminum Corporation ("Alcan") purchased Wallmaster and continued operations at the Alcan Site.

313.     On information and belief, Novelis Corporation ("Novelis") is the successor to Alcan and, therefore, succeeds to Alcan's environmental liabilities related to the Alcan Site.

314.     On information and belief, Alcan manufactured aluminum and other building products at the Alcan Site and had an aluminum coating operation at the site. Alcan produced chromate waste at the Alcan Site.

315.     During Alcan's operations at the Alcan Site, the site had at least five outlets to the Passaic River. At least one of those outlets was an emergency overflow in the event Alcan's industrial waste pump failed. Alcan had a sump well into which all of its plating wastes drained. The well had an overflow drain pipe which drained into the Passaic River if the pump failed. On information and belief, the float that controlled this pump did fail on occasion, polluting the Passaic River.

316.     By an order dated October 3, 1969, the State Department of Health of the State of New Jersey found that Alcan was discharging harmful, deleterious and polluting matter from a sewer or drain into the Passaic River without approval of the State Department of Health. On information and belief, this discharge by Alcan consisted of plating wastes.

317.     A 1969 report by the U.S. Department of the Interior documented direct discharges to the Passaic River by Alcan of chromium and cyanide.

45

318.     On or about April 26, 1996 and September 15, 2003, EPA sent a General Notice Letter notifying Alcan of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Alcan Site.

319.     Novelis is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Alcan Site and released into the Newark Bay Complex.

### Alden Leeds Sites

Alden Leeds Newark Site

320.     The Alden Leeds property in Newark consists of real property and associated improvements located at 2145 McCarter Highway in Newark, Essex County, New Jersey ("Alden Leeds Newark Site").

321.     On or about June 26, 1959, Alden-Leeds, Inc. ("Alden Leeds") was incorporated in the State of New York.

322.     Alden Leeds's operations primarily consist of manufacturing water treatment compounds, including chlorine tablets, for use in swimming pools.

323.     From approximately July 1961 until approximately July 1971, Alden Leeds owned and operated the Alden Leeds Newark Site.  Alden Leeds' operations at the property included pressing chlorine tablets and packaging of cyanuric acid, soda ash, sodium carbonate, sodium bisulfate, and trichloroisocyanuric acid for distribution.

324.     The Alden Leeds Newark Site abuts the Second River, which receives overland flow and sheet storm water runoff directly from the Alden Leeds Newark Site.  From the Alden Leeds Newark Site, the Second River flows east approximately 0.1 miles and empties into the Passaic River.

325.     In July 1971, a fire completely destroyed the Alden Leeds Newark Site.  During the course of putting out the fire, large quantities of chlorinated cyanuric acid and, upon information and belief, other Hazardous Substances were washed into the Second River, and thence into the Passaic River.

326.     On or about September 15, 2003, EPA sent a General Notice Letter notifying Alden Leeds of its potential liability for Response Costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Alden Leeds Newark Site.

<u>Alden Leeds Kearny Site</u>

327.     The Alden Leeds Kearny property consists of real property and associated improvements located at 55 Jacobus Avenue in Kearny, Hudson County, New Jersey ("Alden Leeds Kearny Site").

328.     Since at least July 1971, Alden Leeds owned and/or operated a processing, packaging, distribution and warehousing facility at the Alden Leeds Kearny Site.

329.     Alden Leeds utilized, stored, and/or handled Hazardous Substances and other compounds at the Alden Leeds Kearny Site including, but not limited to, chlorine, bromo-chloro-dimethyl hydanoin, calcium hypochlorite, copper-based pesticides, dichloro-a-triazine trione, hydrochloric acid, kerosene, lithium hypochlorite, motor oil, muriatic acid, sodium acid sulfate, sodium hydrogen sulfate, sodium hydrosulfate, 1,3,5-triazine, trichloroisocyanuric acid, and trichloro-a-triazinetrione.

330.     The Alden Leeds Kearny Site abuts the Passaic River, which receives overland flow and sheet storm water runoff directly from the Alden Leeds Kearny Site.

331.     On or about April 21, 1987, Hudson County Regional Health Commission inspectors observed a septic holding tank on the Alden Leeds Kearny Site that was piped to an area storm water drain.

332.     In April 1993, a fire completely destroyed the Alden Leeds Kearny Site.  During the course of putting out the fire, chlorine and bromine compounds and, upon information and belief, other Hazardous Substances were washed into the Passaic River.  The fire created a plume of chlorinated smoke estimated to be five miles long.

<u>Alden Leeds Hackensack Site</u>

333.     The Alden Leeds Hackensack property consists of real property and associated improvements located at 100 Hackensack Avenue in Kearny, Hudson County, New Jersey ("Alden Leeds Hackensack Site").

47

334.    Alden Leeds owned and/or operated a processing, packaging, distribution, and warehousing facility at the Alden Leeds Hackensack Site.

335.    Alden Leeds utilized, stored, and/or handled Hazardous Substances and other compounds at the Alden Leeds Hackensack Site including, but not limited to, sodium carbonate, trichloro-triazine trione, boric acid, simazine, copper sulfate, trisodium phosphate, herbicides, sodium sulfate, sodium bisulfate, and aluminum sulfate.

336.    The Alden Leeds Hackensack Site abuts the Hackensack River, which receives overland flow and sheet storm water runoff directly from the Alden Leeds Hackensack Site.

337.    In September 1993, the NJDEP reported that the wastewater treatment system at the Alden Leeds Hackensack Site was not connected to a PVSC line and likely discharged directly into the Hackensack River.  The NJDEP also observed that it was common practice for Alden Leeds' employees to discard floor sweepings into its wastewater collection system.  Upon information and belief, the floor sweepings contained Hazardous Substances.

338.    In a July 1994 PVSC Application for a Sewer Connection Permit, Alden Leeds admitted that it generated approximately 300,000 gallons of process wastewater, 111,250 gallons of sanitary wastewater, and 1,100,000 of cooling wastewater effluent per year at the Alden Leeds Hackensack Site.

339.    Alden Leeds is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Alden Leeds Hackensack Site, Alden Leeds Kearny Site, and Alden Leeds Newark Site and released into the Newark Bay Complex.

**Allied Signal Site**

340.    The Allied Signal property consists of approximately 177.3 acres of real property and associated improvements located at 10 East North Street (Avenue), also described as 10 North Avenue East, in Elizabeth, Union County, New Jersey ("Allied Signal Site").

341.    In approximately 1957, Allied Chemical and Dye Corporation constructed and operated an acid manufacturing facility that occupied approximately 39 acres of the Allied Signal Site.  Between 1957 and at least 1999, Allied Chemical and Dye Corporation and its successors expanded operations at

48

the Allied Signal Site to include, without limitation, the manufacture of sulfuric acid, monochlorodifluoromethane products, Genetron refrigerant gases, specialty fluoropolymer resins, stain and water repellant products, and hydrochloric acids. From at least 1962 through 1999, chlorofluorocarbon solvents were blended and packaged at the Allied Signal Site.

342.    Upon information and belief, in approximately 1958, Allied Chemical and Dye Corporation changed its name to Allied Chemical Corporation.

343.    Upon information and belief, in approximately 1981, Allied Chemical Corporation changed its name to Allied Corporation.

344.    Upon information and belief, in approximately 1985, Allied Corporation merged with and into The Signal Companies, Inc. and the surviving entity was renamed Allied-Signal Corporation.

345.    In approximately 1993, Allied-Signal Corporation changed its name to AlliedSignal Inc. ("AlliedSignal").

346.    Upon information and belief, on or about December 1, 1999, AlliedSignal merged with and into Honeywell Inc., and the surviving corporation was ultimately renamed Honeywell International Inc. ("Honeywell").  Upon information and belief, Honeywell is the successor to Allied Chemical and Dye Corporation and therefore succeeds to Allied Chemical and Dye Corporation's environmental liabilities related to the Allied Signal Site.

347.    Upon information and belief, in approximately 1999, Continental Airlines, Inc. purchased the Allied Signal Site.  Upon information and belief, in approximately April 2005, Catellus Development Corporation acquired the Allied Signal Site.

348.    Honeywell and its predecessors manufactured organic and inorganic chemicals, acids, and specialty plastic resins at the Allied Signal Site.

349.    Honeywell and its predecessors utilized, manufactured, processed, stored, and/or discharged Hazardous Substances and other compounds at the Allied Signal Site including, but not limited to, antimony pentachloride, hydrochloric acid, chloroform, iron sulfate, methylene chloride, methylene fluoride, monochlorofluorodifluoromethane, sulfur, vanadium pentoxide chloride,

49

trichloroacetyl chloride, monochloromonofluoromethane, monochlorotrifluoroethylene, difluoroethane, and chlorotrifluoromethane.

350.     The Allied Signal Site abuts Newark Bay, which received direct discharges, overland flow, and sheet storm water runoff directly from the Allied Signal Site.

351.     Process wastewaters generated at the Allied Signal Site contained, without limitation, effluent from acid production processes, non-contact cooling water, boiler feed, equipment wash water, deionization back flushes, organic chemical waste effluent, spent caustic solutions, polymer organic production wastes, and other process waste streams.

352.     Upon information and belief, wastewater generated at and discharged from the Allied Signal Site contained Hazardous Substances and other compounds, including, without limitation, antimony, chloroform, chromium, copper, manganese, mercury, nickel, phenol, zinc, arsenic, cadmium, dibromochloromethane, methylene chloride, selenium, silver, 1,1,2,2-tetrachloroethane, trichloroethylene, and trichlorofluoromethane.

353.     An unlined ditch surrounded the Allied Signal Site and collected process wastewaters and storm water generated at the Allied Signal Site.  The ditch discharged into Newark Bay.

354.     Upon information and belief, until at least 1965, process wastewaters generated at the Allied Signal Site received minimal, if any, treatment beyond primary neutralization or sedimentation prior to discharge into Newark Bay.

355.     Wastewater lagoons were utilized at the Allied Signal Site as primary sedimentation and neutralization basins.  Effluent from the lagoons were ultimately discharged directly into Newark Bay.

356.     On or about March 1, 1965, the NJDOH reported that treatment of wastewater effluent at the Allied Signal Site "does not appear adequate."

357.     On or about March 11, 1968, the NJDOH reported that "Allied is discharging a highly polluted effluent from its neutralization treatment plant."  Rates of discharge were estimated to vary between 0.7 and 1.2 millions of gallons per day.

358.     On or about June 24, 1970, the NJDEP reported that wastewater effluent from the Allied Signal Site bypassed the rudimentary treatment systems at the Allied Signal Site when the trench conveying wastewater to the neutralization basins was washed out during heavy rains.   Analysis of wastewater effluent discharging from the Allied Signal Site indicated the presence of a gray-green color, detergents, phenols, chlorides, suspended solids, ash, and iron.

359.     On or about July 16, 1971, the NJDEP issued an order, which stated that the industrial wastewater treatment plant at the Allied Signal Site was "inadequate in capacity or unit design to properly care for, treat and dispose of the industrial wastewater" generated by the facility.   Wastewaters generated at the Allied Signal Site were discharged directly into Newark Bay.

360.     On or about June 30, 1993, the New Jersey Department of Environmental Protection and Energy reported that state inspectors at the Allied Signal Site discovered "an unpermitted overflow pipe from the lift station to the surface waters of the state which allows bypassing of the treatment system."

361.     Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Allied Signal Site.

362.     Hazardous Substances and other compounds have been detected in the soil at the Allied Signal Site, including, but not limited to, total volatile organic compounds, base neutral compounds, cadmium, copper, lead, zinc, antimony, petroleum hydrocarbons, and 1,1,2,2-tetrachloroethane.

363.     Upon information and belief, storm events and erosion transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

364.     Hazardous Substances and other compounds have been detected in the sediments of the on-site wastewater ditch system at the Allied Signal Site, including, but not limited to, total volatile organic compounds, chloroform, 1,1-dichloroethane, methylene chloride, 1,1,2,2-tetrachloroethane, tetrachloroethane, 1,1,1-trichloroethane, trichloroethene, antimony, arsenic, chromium, copper, lead, mercury, zinc, and PCBs.

365.    Hazardous Substances and other compounds have been detected in the surface waters in the on-site wastewater ditch system at the Allied Signal Site, including, but not limited to, total volatile organic compounds, carbon tetrachloride, chloroform, dichlorodifluoromethane, 1,1,2,2-tetrachloroethane, tetrachloroethene, trichloroethene, trichlorofluoromethane, trichlorotrifluoroethane, antimony, arsenic, chromium, copper, lead, nickel, and zinc.

366.    Hazardous Substances and other compounds have been detected in the groundwater at the Allied Signal Site, including, but not limited to, total volatile organic compounds, acetone, carbon tetrachloride, chloroform, 1,2,-dichloroethane, freon, methylene chloride, methyl isobutyl ketone, naphthalene, 1,1,2,2-tetrachloroethane, tetrachloroethene, trichlorofluoromethane, trichlorofluoroethane, trichloroethane, and trichloroethene.

367.    Groundwater at the Allied Signal Site flows into Newark Bay.  Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the Allied Signal Site discharge into the Newark Bay Complex.

368.    On or about August 24, 2006, the EPA sent a General Notice Letter notifying Honeywell of its potential liability for Response costs relating to the Newark Bay Study Area as the result of the Release of Hazardous Substances, including solid and/or hazardous wastes, from the Allied Signal Site.

369.    Honeywell, as successor to Allied Chemical and Dye Corporation, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Allied Signal Site and released into the Newark Bay Complex.

### Alliance Chemical, Inc. Site

370.    On information and belief, Alliance Chemical, Inc. ("Alliance") is the current owner of property located at 309-327 Avenue P, Newark, New Jersey 07657 (the "Alliance Site").  The Alliance Site is located approximately one-half mile from the Passaic River.

371.    On information and belief, Alliance Chemical Company, Alliance Color & Chemical Company and Plum Point Realty Corporation owned and/or operated the Alliance Site before 1968.  In June 1968, Alliance Chemical Company and Plum Point Realty Corporation were merged into Alliance

52

Color and Chemical Company, the latter of which whose name was changed to Alliance Chemical, Inc. As a result, Alliance is the successor to Alliance Chemical Company and Plum Point Realty Corporation, and was previously known as Alliance Color and Chemical Company.

372.    Alliance and/or its predecessors manufactured specialty organic chemicals including dyes, diazo compounds, zinc compounds and pigments from raw materials at the Alliance Site.  Alliance manufactured substances associated with the generation of dioxin, including EPA Class II organic compounds 2-chloro-1,4-diethoxy-5-nitrobenzene and 5-chloro-2,4-dimethoxyaniline.    Alliance also utilized an EPA Class III organic compound, 1,2,4-trichlorobenzene.

373.    On information and belief, the production process that Alliance employed to manufacture 5-chloro-2,4-dimethoxyaniline resulted in the generation of 2,3,7,8-TCDD.

374.    An unlined lagoon existed from at least 1965 until at least 1979 on the Alliance Site. From at least 1965 until at least 1970, Alliance discharged process effluent, including effluent from the unlined lagoon, to a drainage ditch known as Plum Creek.   Plum Creek discharges to Newark Bay at the mouth of the Passaic River.

375.    Inspections by the U.S. Army Corps of Engineers revealed that acidic liquefied materials were being discharged by Alliance Color & Chemical Company into the Newark Bay in June and December of 1965.  Alliance Color & Chemical Company attributed the June 1965 event to a leak in a pit wall on the Alliance Site.  Alliance Color & Chemical Company attributed the December 1965 event to a malfunctioning collection pump on the Alliance Site.  In an internal memorandum, it was noted that the fundamental problem was that everything except strong acid from Building 7 at the Alliance Site went to the brook.

376.    Inspections by the U.S. Army Corps of Engineers revealed that Alliance Color & Chemical Company was discharging acid into Newark Bay on several occasions in February of 1966.

377.    In an internal memorandum dated August 5, 1968 regarding the Alliance Plant effluent, it was noted that the present method of handling acidic waste and color from the Alliance Site was inadequate and would not serve as a convincing method of neutralization of plant wastewater.   The

53

memorandum further noted that various regulatory agencies were aware of Alliance's plant effluent and had been procrastinating for the past several years. The memorandum also observed that it was very difficult to "mask" the continuous red color water that came from the Alliance plant.

378.    In a letter dated June 26, 1969, the PVSC noted that polluting material in the Passaic River had been traced to the plant at the Alliance Site.

379.    In a letter dated December 18, 1969, the PVSC noted that a sample taken from the discharge from the plant at the Alliance Site to Plum Creek was found to be flammable and dangerous.

380.    After March 1970, the Alliance Site was connected to the PVSC sanitary sewer system, which was within the Roanoke Avenue district. The Roanoke Avenue combined sewer lines discharged to the Passaic River. From as early as 1958 until the early 1980s, a malfunctioning regulator on the Roanoke Combined Sewer System resulted in untreated sewage flows discharging into the Passaic River.

381.    A routine inspection in May 1979 found that discharge from the Alliance plant was entering the sewer with a pH of 1.

382.    Hazardous Substances detected in the soil at the Alliance Site include:   2,4-dinitrotoluene; 3,3-dichlorobenzidine; benzo(a)pyrene; lead; zinc; xylene; ethylbenzene, and aroclor 1254.

383.    The Alliance Site is located within the 100-year flood plain and has been subject to periodic flooding.

384.    According to a March 21, 1972 memorandum from the Alliance Site plant manager, one effect of the flooding at the Alliance Site was that the on-site treatment plant would become overloaded and become unable to handle the flooding conditions.

385.    On or about June 19, 2002, EPA sent a General Notice Letter notifying Alliance of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Alliance Site.

386.    Alliance is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Alliance Site and released into the Newark Bay Complex.

WAS:144301.1

**American Modern Metals Site**

387.    The American Modern Metals Site consists of a property located at 65 Passaic Avenue; Kearny, New Jersey, also designated as Block I, Lots 9, 10, and I 1 and Block 14, Lots 3 and 4 on the tax maps of the Township of Kearny, Hudson County ("American Modern Site").

388.    Upon information and belief, Linen Thread Company owned the American Modern Site from the early 1900's to 1959.  Linen Thread Company manufactured linen thread, material and yarns from raw flax and twine, and sacks from raw hemp and jute.

389.    Upon information and belief, Linen Thread Company sold the American Modern Site to York Associates on or about October 13, 1959.  York Associates renamed the site as the Elite Industrial Park and leased the property to various industrial tenants

390.    Upon information and belief, Sol Goldman, Irving Goldman, and Alex DiLorenzo Jr. Partnership ("Goldman") assumed ownership of the American Modern Site on or about September 16, 1963 and continued to lease the site to various tenants under the name Elite Industrial Park.

391.    On or about February 15, 1980, Airlite Aluminum Corporation leased the entire American Modern Site from Goldman.  Airlite Aluminum Corporation subsequently subleased areas of the American Modern Site to various industrial tenants.

392.    In late 1980, American Modern Metals Corporation ("American Modern") purchased Airlite Aluminum Corporation.  In May 1986, an explosion and fire in a boiler room at the American Modern Site destroyed many of the structures located within the portion of the site to the east of Passaic Avenue.

393.    In December 1988, Goldman sold the American Modern Site to DiLorenzo Properties Company.  DiLorenzo Properties Company is now known as DiLorenzo Properties Company, L.P. ("DiLorenzo").

394.    In 1992, DiLorenzo Properties Company sold the American Modern Site to Kearny Industrial Associates ("Kearny Industrial").

55

395.    Kearny Industrial Associates is the current owner of Block 14, Lots 3 and 4 of the American Modern Site.

396.    In 2001, Kearny Industrial Associates sold Block 1, Lots 9 and 11 to S&A Realty Corporation, which is now known as S&A Realty Associates, Inc. ("S&A Realty").

397.    Hazardous Substances and other compounds have been detected in the soil at the American Modern Site, including, but not limited to, benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, chrysene, indeno(1,2,3-c,d)pyrene, dibenzo(a,h)anthracene, arsenic, zinc, 1,3-dichlorobenzene, 1,4-dichlorobenzene, 1,2-dichlorobenzene, PAHs, and total petroleum hydrocarbons.

398.    The western portion of the American Modern Site abuts the Passaic River. On information and belief, the American Modern Site slopes to the west towards the Passaic River, which received direct discharges, overland flow, and sheet stormwater runoff directly from the American Modern Site. Surface water runoff from the area of the American Modern Site located west of Passaic Avenue tidally flows overland and ultimately into an aquifer beneath the American Modern Site. Surface water runoff from the area of the American Modern Site east of Passaic Avenue flows to storm drains. Additional drainage surrounding the American Modern Site occurs through natural drainage channels and storm drains that discharge into the PVSC sewer system.

399.    Upon information and belief, a drain discharge point at the American Modern Site located in the loading dock area of the Marshall Clark Building discharged directly to the Passaic River up until the 1990's.

400.    Hazardous Substances and other compounds have been detected in the groundwater at the American Modern Site, including, but not limited to, aluminum, tetrachloroethene, trhichloroethene, benzene, cis-1,2-dichloroethene, vinyl chloride, 1,1-dichloroethene, trans-1,2-dichloroethene, toluene, total xylenes, chlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorobenzene, 1,2-dichlorobenzene, and ethylbenzene. Groundwater tidally flows from the American Modern Site to the Passaic River.

401.    On September 19, 2003, the NJDEP issued Directive No. 1 In the Matter of the Lower Passaic River in which NJDEP found that Hazardous Substances were discharged at the American

Modern Site and that those Hazardous Substances are and/or have emanated into the Lower Passaic River. NJDEP further determined that DiLorenzo and S&A Realty Corporation are Persons, pursuant to the Spill Act, in any way responsible for the Hazardous Substances that were discharged at the American Modern Site.

402.   Upon information and belief, in June 2004, EPA sent a General Notice Letter notifying American Modern Metals Company of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the American Modern Metals Site.

403.   On or about September 24, 2004, EPA sent a General Notice Letter notifying DiLorenzo Properties Company of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the American Modern Metals Site.

404.   On or about August 13, 2004, EPA sent a General Notice Letter notifying S&A Realty of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the American Modern Metals Site.

405.   On or about August 13, 2004, EPA sent a General Notice Letter notifying Kearny Industrial Associates, L.P. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the American Modern Metals Site.

406.   On or about September 20, 2004, EPA sent a General Notice Letter notifying Marshall Clark Manufacturing Corporation of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the American Modern Metals Site.

407.   On information and belief, DiLorenzo and S&A Realty Persons "in any way responsible" for the Hazardous Substances that were discharged at the American Modern Site and released into the Newark Bay Complex.

57

**American Ref-Fuel Site**

408.    On information and belief, the Port Authority of New York and New Jersey is the current owner of an approximately 25 acre property at 66 Blanchard Street, Newark, New Jersey (the "American Ref-Fuel Site").  The American Ref-Fuel Site is bounded by the Passaic River on the north, the New Jersey Turnpike on the east and Blanchard Street on the west.

409.    The Essex County Resource Recovery Facility, a waste to energy facility, is situated on the American Ref-Fuel Site  On information and belief, American Ref-Fuel Company of Essex County ("American Ref-Fuel") began operating the Essex County Resource Recovery Facility in approximately 1990 pursuant to an agreement with the Port Authority of New York and New Jersey.  Before the Essex County Resource Recovery Facility was constructed, the American Ref-Fuel Site was an open dump site.

410.    American Ref-Fuel changed its name to Covanta Essex Company ("Covanta").

411.    From at least 1990 until at least 1994, stormwater at the American Ref-Fuel Site was collected and discharged into two ditches, which in turn discharged to the Passaic River via two outfalls.

412.    American Ref-Fuel exceeded permitted discharge levels for its outfalls to the Passaic River on numerous occasions.  American Ref-Fuel's discharges exceeded permitted levels for lead, total petroleum hydrocarbons, zinc, toluene, methylene chloride, pH, fecal coliform, and total suspended solids.

413.    On June 21, 1993, NJDEP gave the American Ref-Fuel Site an "unacceptable" rating for, among other things, exceeding permit effluent limitations for the period of December 1, 1992 to April 30, 1993.

414.    On June 8, 1994, NJDEP gave the American Ref-Fuel Site an "unacceptable" rating for, among other things, exceeding permit effluent limitations for the period of November 1, 1993 to April 30, 1994.  Compounds discharged in violation of American Ref-Fuel's NJPDES permit included, but were not limited to, toluene, benzene, and lead.

415.    By letter dated March 25, 1995, American Ref-Fuel reported to the NJDEP that it had discharged zinc, toluene, and methylene chloride in excess of its NJPDES permit limits

58

416.    On June 8, 1994, NJDEP gave the American Ref-Fuel Site an "unacceptable" rating for, among other things, exceeding permit effluent limitations for the period of November 1, 1993 to April 30, 1994.  Compounds discharged in violation of American Ref-Fuel's NJPDES permit included, but were not limited to, toluene, benzene, and lead.

417.    On June 20, 1995, NJDEP gave the American Ref-Fuel Site an "unacceptable" rating for, among other things, exceeding permit effluent limitations for the period of October 1, 1994 to April 30, 1995.  Compounds discharged in violation of American Ref-Fuel's NJPDES permit included, but were not limited to, benzene.

418.    On June 22, 1998, NJDEP gave the American Ref-Fuel Site an "unacceptable" rating for, among other things, failing to monitor stormwater discharges and inaccurately reporting on discharge monitoring reports that there were no stormwater discharges.

419.    On or about December 1, 1992, NJDEP and American Ref-Fuel Company entered into an administrative consent order in which NJDEP found that American Ref-Fuel had exceeded certain discharge limits in its NJPDES permit and violated the Water Pollution Control Act and the regulations promulgated thereto.  Compounds discharged in violation of American Ref-Fuel's NJPDES permit included, but were not limited to, lead and zinc.

420.    Substances detected in the groundwater at the American Ref-Fuel Site include:  arsenic, manganese, ammonia, phenol, total coliform, copper, zinc, chromium, chloroform, methylene chloride, toluene, vinyl chloride, dichloroethane, trichloroethane, ethylbenzene, napthalene, chlorobenzene, dichlorobenzene, and dichloroethylene.

421.    At least one of the outfalls to the Passaic River at the American Ref-Fuel Site experienced infiltration of contaminated groundwater.

422.    On or about August 13, 2004, EPA sent a General Notice Letter notifying American Ref-Fuel Co. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the American Ref-Fuel Site.

423.    On information and belief, Covanta is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the American Ref-Fuel Site and released into the Newark Bay Complex.

**Andrew Jergens Site**

424.    The Andrew Jergens Company ("Andrew Jergens") owned and operated a facility on approximately 23.3 acres of land at 1 Franklin Avenue, Belleville, New Jersey (the "Andrew Jergens Site") from 1940 until 1975.  On information and belief, Hoffmann-LaRoche purchased The Andrew Jergens Company facility in 1975 and currently operates on a portion of the Andrew Jergens Site.  On information and belief, the Clara Mass Medical Center is also situated on a portion of the Andrew Jergens Site.

425.    When Andrew Jergens operated the Andrew Jergens Site, the facility consisted of a main plant, a power house, and a gate house.  An on-site coal bunker was located in close proximity to the Second River, which is a tributary of the Passaic River.

426.    Andrew Jergens produced personal care products consisting of lotions, creams, powders, and shampoos at the Andrew Jergens Site.  Andrew Jergens' production process used the batch blending of waxes, ethanol, glycerin, fatty alcohols, sodium hydroxide fragrances and water.  Andrew Jergens used the Hazardous Substance sodium hydroxide in its production process.

427.    In December of 1973, Andrew Jergens discharged boiler blowdown through a sanitary sewer connection, which resulted in discharges to the Second River.

428.    On or about September 7, 2004, Andrew Jergens changed its name to Kao Brands Company.

429.    Hazardous Substances and other contaminants detected in the soil at the Andrew Jergens Site include:  naphthalene, acenaphthene, fluorene, phenanthrene, anthracene, fluoroanthene, pyrne, benzo(a)anthracene, chrysene, PHC, and TPHC.  Benzene was also detected in the groundwater at the Andrew Jergens Site.

WAS:144301.1

430.    Sediment samples from the Passaic River showed the presence of, *inter alia*, the following substances, all of which were detected at the Andrew Jergens Site:  acenaphthene, anthracene, benzo(a)anthracene, chrysene, fluoranthene, any pyrene.

431.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Andrew Jergens of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Andrew Jergens Site.

432.    Kao Brands Company is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Andrew Jergens Site and released into the Newark Bay Complex.

### Apex Chemical Site

433.    The Apex Chemical property consists of approximately 2.64 acres of real property and associated improvements located at 200 South First Street in Elizabeth, Union County, New Jersey ("Apex Chemical Site").

434.    In 1917, Apex Chemical Company, Inc. ("Apex") took title to the Apex Chemical Site and began operating a facility that manufactured chemicals for the treatment of textile and leather goods, including the manufacture of fire retardant materials.

435.    In approximately 1954, Apex was acquired by Mr. Emil Baer.

436.    In December 1980, Apex changed its name to Emil Baer, Inc.  Mr. Emil Baer was the president of Emil Baer, Inc.

437.    In 1980, Apex Chemical Corp. was incorporated in New Jersey and, upon information and belief, operated as a subsidiary of Emil Baer, Inc.  Emil Baer, Inc. leased the Apex Chemical Site to Apex Chemical Corp.  Mr. Emil Baer was the president of Apex Chemical Corp.

438.    In 1993, Apex Chemical Corporation of S.C., Inc. was formed in South Carolina.

439.    Upon information and belief, in 1994, Apex Chemical Corp. began transferring its production, manufacturing, research and development, and other business activities, including its operations at the Apex Chemical Site, to Apex Chemical Corporation of S.C., Inc. in South Carolina.

61

440.    On or about March 20, 1997, Apex Chemical Corp. reported to NJDEP that it had reduced its operations at the Apex Chemical Site by ninety percent.

441.    In 2002, Apex Chemical Corp. was merged with and into Emil Baer, Inc.

442.    In 2003, Emil Baer, Inc. was dissolved.

443.    In 2006, Apex Chemical Corporation of S.C., Inc. changed its name to Apexical, Inc. ("Apexical"). Mr. Emil Baer is and/or was the chairman of the board of Apexical. Mr. Steven A. Baer, Mr. Emil Baer's son, is the current president of Apexical.

444.    On its website and product catalog, Apexical traces its corporate history as originating with Apex.

445.    Apexical is completing remedial activities at the Apex Chemical Site.

446.    Upon information and belief, Apexical is the corporate successor of Apex, Emil Baer, Inc., and Apex Chemical Corp., and, therefore, succeeds to those companies' environmental liabilities related to the Apex Chemical Site.

447.    Hazardous Substances utilized, manufactured, processed, handled, mixed, consumed, stored, and/or discharged of at the Apex Chemical Site include, but are not limited to, ammonium bromide, antimony products, antimony trioxide, decabromodiphenyl oxide, epichlorohydrin, maleic anhydride, phenol, trichlorobenzene, octabromodiphenyl oxide, pentabromodiphenyl oxide, ammonium chloride, benzene, benzoic acid, benzyl chloride, boron trifluoride, brominated phthalic acid, dodecylbenzene, chloroform, alkyl phenol, perchloroethylene, phosphoric anhydride, phosphorus pentoxide, and formaldehyde.

448.    Upon information and belief, maleic anhydride, phenol, and trichlorobenzene are associated with the formation of dioxin compounds.

449.    Decabromodiphenyl ether, octabromodiphenyl ether, and pentabromodiphenyl are in a class of brominated fire retardant chemicals known as polybrominated diphenyl ethers ("PBDEs"), which are hydrophobic, persistent environmental compounds.

450.    Process wastewater generated at the Apex Chemical Site included wastes generated during cleaning and rinsing of chemical processing kettles located within the chemical process building. Upon information and belief, the kettle rinsate contained Hazardous Substances.

451.    Apex reported that the Apex Chemical Site was connected to the City of Elizabeth's municipal sewer system in approximately 1950.

452.    In 1957, the City of Elizabeth completed construction of the Easterly Interceptor Sewer, which is a combined sewer interceptor that directed wastewater from the Apex Chemical Site and surrounding areas to the Joint Meeting of Essex and Union Counties ("JMEUC") treatment plant.

453.    Upon information and belief, prior to construction and operation of the Easterly Interceptor Sewer, wastewater entering the City of Elizabeth sewer system from the Apex Chemical Site was discharged directly into the Elizabeth River without treatment.

454.    The Apex Chemical Site is located within the City of Elizabeth combined sewer overflow district "Area SSW," which is connected to a CSO known as the Third Avenue CSO or CSO Number 035 and which discharges into the Elizabeth River.  Upon information and belief, after 1957, during wet weather events, periods of peak flow, mechanical failures, blockages, or other faults in the Elizabeth Combined Sewer System, all or a portion of the wastewater generated at the Apex Chemical Site was discharged into the Newark Bay Complex without treatment through CSO Number 035 and/or other segments or areas of the City of Elizabeth or JMEUC Combined Sewer Systems.

455.    In was not until November 30, 1978, that the City of Elizabeth was issued an NPDES permit to discharge wastewaters from various CSOs to the Elizabeth River.

456.    In 1977, Apex reported to the JMEUC that it neutralized its process wastewater prior to discharge to the sewer system.

457.    In 1977, the JMEUC reported that wastewater discharged from the Apex Chemical Site was contributing 0.0961 lbs/day of copper, 0.0067 lbs/day of lead, 0.0334 lbs/day of zinc, and 0.00014 lbs/day of mercury to the wastewater entering JMEUC treatment plant.

458.    In 1977, Apex reported that aromatic, aliphatic and chlorinated solvents, and aminoplasts, were occasional constituents of the wastewater generated and discharged from the Apex Chemical Site.

459.    In 1977, Apex reported discharging 8,000 gallons of wastewater per day from the Apex Chemical Site into the municipal sewer system.

460.    Samples of wastewater discharged from the Apex Chemical Site between 1977 and 1991 indicated the presence of Hazardous Substances, including, without limitation, chloroform, 1,2,4-trichlorobenzene, bis(2-ethylhexyl)phthalate, 2,4-dimethylphenol, 4-methylphenol, ethylbenzene, nitrobenzene, sulfate, toluene, antimony, cadmium, chromium, copper, nickel, lead, and zinc.

461.    In 1990, Apex reported discharging 3.3 million gallons of wastewater per year from the Apex Chemical Site into the municipal sewer system.

462.    The Apex Chemical Site abuts the Elizabeth River, which received direct discharges, overland flow, and storm water runoff directly from the Apex Chemical Site.  From the Apex Chemical Site, the Elizabeth River flows eastward and empties into the Arthur Kill.

463.    On September 19, 2005, NJDEP inspectors reported observing chemical powders, which potentially contained antimony and/or other Hazardous Substances, blowing from process areas and onto the Apex Chemical Site.

464.    In 1990, miscellaneous solvents and flame retardants were reportedly spilled at the Apex Chemical Site.

465.    On February 10, 1998, NJDEP inspectors observed that flooring within a Warehouse Building and Cold Room at the Apex Chemical Site were composed of wood and were stained.  The Warehouse Building extended to the banks of the Elizabeth River.  Emil Baer, Inc. reported in 1999 that the Warehouse Building was used to store raw materials and orphaned or excess product.

466.    A crawl space was located beneath the wood floors along the western half of the Warehouse Building at the Apex Chemical Site.  In 1999, Emil Baer, Inc. reported that the crawl space was covered with approximately one to three inches of tidally influenced water from the Elizabeth River.

64

467.    Hazardous Substances and other compounds have been detected in the soils within the crawl space beneath the Warehouse Building at the Apex Chemical Site, including, without limitation, 1,2,4-trichlorobenzene, antimony, arsenic, chromium, copper, lead, mercury, zinc, and petroleum hydrocarbons.

468.    Upon information and belief, materials containing Hazardous Substances were stored in the Warehouse Building at the Apex Chemical Site and leaked and spilled onto and through the floors and into the crawl space beneath the Warehouse Building and into the Elizabeth River.

469.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Apex Chemical Site.

470.    Hazardous Substances and other compounds have been detected in the soil at the Apex Chemical Site, including, but not limited to, chloroform, ethyl benzene, methylene chloride, tertiary butyl alcohol, tetrachloroethene, trichloroethene, toluene, xylenes, antimony, beryllium, copper, zinc, arsenic, barium, cadmium, chromium, lead, mercury, selenium, silver, 1,2,4-trichlorobenzene, chlorobenzene, 1,4-dichlorobenzene, 1,2-dischloroethene, 1,1-dichloroethane, 2,6-dinitrotoluene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(g,h,i)perylene, bis(2-ethylhexyl)phthalate, chrysene, dibenzo(a,h-anthracene, fluoranthene, naphthalene, ideno(1,2,3-cd)pyrene, phenanthrene, pyrene, toluene, tetrachloroethene, trichloroethene, tetrachloroethylene, acenaphthene, and petroleum hydrocarbons.

471.    Upon information and belief, wet-weather events washed Hazardous Substances and other compounds from the Apex Chemical Site into the Newark Bay Complex.

472.    Hazardous Substances and other compounds have been detected in the groundwater at the Apex Chemical Site, including, but not limited to, chloroform, vinyl chloride, arsenic, antimony, cadmium, copper, nickel, silver, and zinc.

473.    Upon information and belief, groundwater at the Apex Chemical Site flows to the Elizabeth River, which then flows to the Arthur Kill. Upon information and belief, Hazardous Substances

65

and other compounds released to the groundwater at the Apex Chemical Site Discharge into the Newark Bay Complex.

474.    Apexical is a "discharger" and/or a person "in any way responsible" for the Hazardous Substances that were discharged at the Apex Chemical Site and that have discharged into the Newark Bay Complex.

### Associated Auto Body Site

475.    The Associated Auto Body property consists of real property and associated improvements located at 405 Raymond Boulevard in Newark, Essex County, New Jersey ("Associated Auto Body Site").

476.    On or about December 10, 1954, Associated Auto Body & Trucks, Inc. ("Associated") was incorporated in the State of New Jersey, and owned and operated an automobile repair and refinishing facility at the Associated Auto Body Site.

477.    Associated received, utilized, manufactured and/or Discharged Hazardous Substances and other compounds at the Associated Auto Body Site including, but not limited to, cadmium, lead, copper, xylene, methyl ethyl ketone, toluene, paint thinners, paint, and assorted petroleum hydrocarbons.

478.    The Associated Auto Body Site is approximately one-half mile south of the Passaic River.  Overland flow, direct discharges, and sheet storm water runoff flows into area storm sewers beneath Raymond Boulevard and the Morris Canal right-of-way, and which empty into the Lockwood Street storm sewer.  The Lockwood Street storm sewer discharges directly into the Passaic River and is tidally influenced.

479.    Between 1978 and 1979, the City of Newark conducted an investigation of the storm sewer system around the Associated Auto Body Site.  During the inspection, City inspectors observed personnel at Associated dumping paint into storm sewer inlets leading into the storm sewer beneath Morris Canal.  Samples taken of effluent within the Morris Canal storm sewer indicated "high levels of pollutants," which the City attributed to Associated.

480.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Associated Auto Body Site.

481.    The Associated Auto Body Site occasionally flooded during heavy rain events when area storm sewers surcharged.  Upon information and belief, the advancing and receding floodwaters eroded and transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

482.    Hazardous Substances and other compounds similar to those that have been discharged from the Associated Auto Body Site have been detected in sediment core samples taken from the Passaic River adjacent to the Lockwood Street storm sewer outfall, including, but not limited to, cadmium, copper, lead, methyl ethyl ketone, xylene, and toluene.

483.    Associated is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Associated Auto Body Site and released into the Newark Bay Complex.

### Ashland Chemical Company Site

484.    On information and belief, Ashland Chemical Company is the current owner of a property located at 221 Foundry Street, Newark, New Jersey, also designated as Block 5005, Lots 1, 6, 10, and 15 on the tax maps of the City of Newark, Essex County (the "Ashland Site").  The Ashland Site is a former organic chemicals packaging and distribution facility and is located approximately 2,000 feet west of the Passaic River.

485.    Ashland Chemical Company acquired the Ashland Site in June 1968 and operated it from June of 1968 through November of 1990.  Ashland manufactured alkyd resins, polyesters, and plasticizers at the Ashland Site.  Ashland also used, stored, generated, or otherwise managed hazardous wastes at the Ashland Site.

486.    On information and belief, at the time Ashland Chemical Company owned and operated the Ashland Site, it was a division of Ashland Inc.  In 1999, two new divisions were created out of

67

Ashland Chemical Company, both of which are divisions of Ashland Inc. Ashland Inc. is responsible for actions of Ashland Chemical Company at the Ashland Site.

487.    According to the 1971 PVSC Annual Report, washings from Ashland Chemical Company that entered the Roanoke Avenue Storm Sewer were sampled and determined to be highly polluting and to be containing flammable and explosive materials. The Roanoke Avenue Storm Sewer discharges to the Passaic River.

488.    On May 6, 1976, a PVSC inspector discovered Ashland Chemical Company personnel pumping material out of a catch basin on Avenue P. The catch basin flowed into the Roanoke Avenue storm sewer, and then to the Passaic River. Samples of the material confirmed that it was highly flammable and potentially explosive. PVSC noted that the source of the material was from a tank truck wash area where tank trucks were brought for steam cleaning.

489.    Widespread contamination, resulting from numerous spills, leaks, and poor house keeping practices, has been documented at the Ashland Site.

490.    During an NJDEP inspection of the Ashland Site conducted on September 8, 1988, the inspector noted that the bulk of the Site was unpaved, including the floor within the tank farm dikes. During the inspection, the inspector noted that the floors were heavily stained and ponded, as were the adjacent loading/unloading areas. The inspector also noted soil staining generally throughout the Ashland Site.

491.    Hazardous Substances detected at the Ashland Site include: arsenic, copper, chromium, lead, nickel, cyanide, benzene, toluene, xylenes, methylene chloride, 1,2,4-trichlorobenzene, naphthalene, acenaphthene, dibenzofuran, fluorene, phenanthrene, anthracene, fluoranthene, pyrene, benzo(a)anthracene, chrysene, benzo(b)fluoranthene, benzo(a)pyrene, indeno(1,2,3-cd)pyrene, dibenz(a,h)anthracene, benzo(g,h,i)perylene, di-n-butylphthalate, di-n-octylphthalate, and butyl benzyl phthalate.

492.     On or about April 26, 1996, EPA sent a General Notice Letter notifying Ashland of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Ashland Site.

493.     On September 19, 2003, the NJDEP issued Directive No. 1 In the Matter of the Lower Passaic River in which NJDEP found that Hazardous Substances were Discharged at the Ashland Site and that those Hazardous Substances are and/or have emanated into the Lower Passaic River.  NJDEP further determined that Ashland is a person, pursuant to the Spill Act, in any way responsible for the Hazardous Substances that were Discharged at the Ashland Site.

494.     Ashland is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Ashland Site and released into the Newark Bay Complex.

### Atlantic Industries Site

495.     The Atlantic Industries property consists of approximately six acres of real property and associated improvements located at 10 Kingsland Road in Nutley, Essex County, New Jersey, also designated as Block 82.6, Lots 51 and 62 on the Tax Map of the City of Clifton, and Block 496A and 496C, Lots 1, 6-13, and 21-28, on the Tax Map of the City of Nutley  ("Atlantic Industries Site").

496.     The Atlantic Industries Site abuts the Third River, a tributary of the Passaic River that receives overland flow and sheet stormwater runoff directly from the Atlantic Industries Site.  From the Atlantic Industries Site, the Third River flows east and empties into the Passaic River.  A surface water stream or millrace flowed along the eastern boundary of the Atlantic Industries Site and passed through the adjacent Wiggins Plastic Site before emptying into the Third River.

497.     From at least 1948 until approximately 2001, Atlantic Industries, Inc. ("Atlantic Industries"), and/or its successors, owned and/or operated a synthetic organic colorant and dyestuff manufacturing facility at the Atlantic Industries Site.  Aqueous and crystalline powder products manufactured at the Atlantic Chemical Site were sold and distributed for use in the textile, paper, leather, and plastic industries.

69

498.    On or about September 11, 1990, Atlantic Industries was sold to Crompton & Knowles Corporation ("CK").  Upon information and belief, CK continued operations at the Atlantic Industries Site.

499.    On or about September 1, 1999, Witco Corporation entered into a stock-for-stock merger transaction with CK.  As a result of the merger, Witco Corporation and CK merged with and into CK Witco Corporation.  In 2000, CK Witco Corporation changed its name to Crompton Corporation ("Crompton").

500.    Upon information and belief, in 2001, Crompton ceased operations at the Atlantic Industries Site.

501.    On or about July 1, 2005, Crompton entered into an all-stock merger transaction with Great Lakes Chemical Corporation ("Great Lakes").  As a result of the merger, the combined company became Chemtura Corporation ("Chemtura"), a Delaware Corporation.  Upon information and belief, Chemtura is the current successor of Atlantic Industries, CK, and Crompton and, therefore, succeeds to the environmental liabilities related to the Atlantic Industries Site.

502.    In approximately 1956, blue dye from a tank at the Atlantic Industries Site overflowed and discharged into the Third River.

503.    In approximately 1971, PVSC inspectors reported that oil leaking from a tank at the Atlantic Industries Site discharged into the Third River.

504.    On or about April 13, 1971, approximately 300-gallons of yellow pigment spilled from a tank at the Atlantic Chemical Site.  Plant workers flushed the spill into an area storm drain, which, upon information and belief, emptied into the Third River.

505.    In approximately 1974, PVSC inspectors reported that an industrial sewer on the Atlantic Industries Site backed up and overflowed onto the Atlantic Industries Site.  The effluent seeped into a 48-inch storm sewer and discharged into the Third River.

506.    On or about April 25, 1974, an explosion and fire occurred at the Atlantic Industries Site and large storage tanks of chemical dyes, solvents, and acids ruptured and washed into the Third River.

70

Additionally, runoff from the firefighting efforts washed additional Hazardous Substances and other compounds into the Third River.  According to PVSC inspectors, polluting runoff from the fire damaged areas continued discharging into the Third River until at least May 13, 1974.

507.    In approximately 1975, PVSC inspectors reported that red dye from the Atlantic Industries Site discharged into the Third River.

508.    Soil samples taken at the Atlantic Industries Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, 1,2,4-trichlorobenzene, aniline, mercury, nickel, lead, PCBs and related derivatives, chromium, copper, cadmium, arsenic, benzidine, barium, benzo(a)pyrene, phenols, pyrene, 2,4-dimethylaniline, 4-chloroaniline, 4-aminotoluene, selenium, silver, assorted base neutral compounds, 1,2,4-trichlorobenzene, zinc, trichlorethene, and petroleum hydrocarbons.

509.    Groundwater samples taken at the Atlantic Industries Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, benzene, benzidine, ethylbenzene, copper, chlorobenzene, dioctyl phthalate, vinyl chloride, phenols, tetrachloroethene, zinc, trichloroethene, and petroleum hydrocarbons.

510.    On or about April 28, 1973, PVSC inspectors observed red dye discharging into the Third River from the Atlantic Industries Site.  The inspectors reported that spills and wash-downs in Building 13 at the Atlantic Industries Site drained into a basement and thence into groundwater beneath the site, which then flowed into the Third River.

511.    Upon information and belief, groundwater at the Atlantic Industries Site flows to the Third River, which empties into the Passaic River.  Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater from the Atlantic Industries Site discharge into the Passaic River.

512.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Atlantic Industries Site.

71

513.    In approximately 1999, EPA inspectors observed several hundred drums containing Hazardous Substances and wastes stored outside without cover at the Atlantic Industries Site. The drums were stored along the property boundary adjacent to the Third River and many were rusted or otherwise showing signs of corrosion and exposure.

514.    On or about November 9, 2005, EPA sent a General Notice Letter notifying Chemtura of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Atlantic Industries Site.

515.    Chemtura, as successor to Atlantic Industries, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Atlantic Industries Site and released into the Newark Bay Complex.

**Atlas Refinery Site**

516.    Atlas Refinery, Inc. owns and operates real property and associated improvements located at 142 Lockwood Street in Newark, Essex County, New Jersey ("Atlas Refinery Site").

517.    The Atlas Refinery Site lies approximately one quarter of a mile from the Passaic River. Overland flow, direct discharges, and sheet stormwater runoff flows into area storm drains beneath Lockwood Avenue and Lister Avenue, and which empty into the Lockwood Street storm sewer, which discharges directly into the Passaic River.

518.    On or about December 6, 1897, Atlas Refinery, Inc. was incorporated in the State of New Jersey ("Atlas") and has owned and operated a chemical manufacturing facility at the Atlas Refinery Site since at least 1897.

519.    Atlas's operations at the Atlas Refinery Site include the manufacture of specialty chemicals and lubricants for the leather, textile and paper industries. Operations have included the rendering of animal oils and fats, the manufacture of aircraft carbon removing compounds, and the development of new chemicals, paint oils, and synthetic linseed oils. Upon information and belief, until the 1920s, Atlas stored bulk chemicals within wooden barrels. In the 1930s, Atlas constructed a large tank farm for bulk storage operations.

72

520.     Atlas processed, handled, mixed, manufactured, consumed, stored, or otherwise used Hazardous Substances and other compounds at the Atlas Refinery Site, including but not limited to phenol, acetic acid, acetylene, ammonia, fuel oil, petroleum hydrocarbons, sulfuric acid, acrylic acid, anhydrous ammonia, ammonium hydroxide, isobutyl alcohol, sodium bisulfate, petroleum naphtha, and assorted bisulfates. Atlas also generated a variety of Hazardous Waste streams including, but not limited to, aniline, mercury, naphthalene, phenols, organic peroxides, dichloromethane, chromium sulfate, mercurous nitrate, formaldehyde, selenium, and sulfuric acid.

521.     On or about June 6, 1972, PVSC inspectors observed oil and industrial wastes on the Atlas Refinery Site, which, during periods of rainfall, released from the Atlas Refinery Site, entered a catch basin, and discharged to the Passaic River. According to Atlas, the discharge was caused by a broken on-site sanitary sewer line. In 1972, Atlas typically discharged approximately 1,700,000-2,000,000 gallons of wastewater containing Hazardous Substances a year to the sanitary sewer system including, but not limited to copper, lead, iron, sodium, arsenic, cadmium, chromium, cyanide, mercury, nickel, zinc, phenol, formaldehyde, and other organic compounds.

522.     In August 1977, PVSC inspectors discovered a four-inch pipe discharging effluent from an oil/water separator on the Atlas Refinery Site and to the Lockwood Street storm sewer line. The four-inch pipe was discharging an "objectionable material" into the storm sewer line. PVSC inspectors also observed other illicit connections to the storm sewer system from the Atlas Refinery Site. The Lockwood Street storm sewer line discharges to the Passaic River.

523.     Between 1978 and 1979, the City of Newark conducted an investigation of the storm sewer system around the Atlas Refinery Site and identified multiple discharges from the Atlas Refinery Site into area storm sewers, including significant runoff of "major spills" from the Atlas Refinery Site railroad siding and into the Blanchard Street storm sewer line, which ultimately discharges to the Passaic River. Furthermore, the City identified continuing discharges from an oil/water separator at the Atlas Refinery Site that collected daily flow from leaks, spills, and releases of chemicals and wastes from the on-site railroad siding. Samples taken of the discharges from the separator confirmed the presence of

73

Hazardous Substances including, but not limited to, cadmium, chromium, copper, iron, lead, magnesium, manganese, nickel, zinc, and assorted inorganic compounds.

524.    Between approximately August 13-17, 1979, inspectors observed "fatty material" from drums at the Atlas Refinery Site washing into the Lockwood Street storm sewer.  The Lockwood Street storm sewer discharges into the Passaic River.

525.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Atlas Refinery Site.  On numerous occasions between 1972 and 1981, PVSC and City inspectors recorded that poor housekeeping practices at the Atlas Refinery Site were attributing to discharges of polluting runoff from the Atlas Refinery Site.  Upon information and belief, it was not until approximately 1986 that Atlas rerouted its on-site storm sewer collection system into the PVSC sanitary sewer line.

526.    On or about February 14, 2006, EPA sent a General Notice Letter notifying Atlas of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Atlas Refinery Site.

527.    Atlas is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Atlas Refinery Site and released into the Newark Bay Complex.

**Automatic Electroplating Site**

528.    Automatic Electroplating Corp. ("Automatic Electroplating") has operated at Buildings 19 (and adjacent parking lot), 21, and 22 at 185 Foundry Street, Newark, New Jersey (the "Automatic Electroplating Site").  Automatic Electroplating has operated at 185 Foundry Street since at least 1970.

529.    The Automatic Electroplating Site is owned by Foundry Street Corporation, which leases the site to Automatic Electroplating.

530.    Automatic Electroplating has been engaged in the electroplating of steel components with zinc or nickel finishes at the Automatic Electroplating Site.  Automatic Electroplating used, stored, generated and/or discharged the following Hazardous Substances and other compounds at the Automatic Electroplating Site:  alkaline cleaners, arsenic, boric acid, cadmium, caustic soda, chromium, copper,

74

cyanide, lead, mercury, mineral acids, oil and grease, potassium chloride, nickel, silver, sulfuric acid, and zinc.

531.    Automatic Electroplating utilized boric acid, nickel sulfate, zinc chloride, chromium, nickel annodes, silver, and zinc annodes in its electroplating process.  Excess chemicals used in this process were rinsed off the components being plated and discharged into the sanitary sewer.

532.    On information and belief, wastewater from the Automatic Electroplating Site discharged to the Roanoke Combined Sewer System.

533.    The Roanoke Avenue combined sewer lines discharged to the Passaic River.  From as early as 1958 until the early 1980s, a malfunctioning regulator on the Roanoke Combined Sewer System resulted in untreated sewage flows discharging into the Passaic River.

534.    A sample of Automatic Electroplating's wastewater taken in or about 1979 revealed the presence of arsenic, lead, cadmium, copper, nickel, zinc and chromium.

535.    Automatic Electroplating's process lines in Buildings 21 and 22 discharged into a drain on the north side of the Automatic Electroplating Site.  A water sample taken from this drain by NJDEP in 1988 confirmed the presence of chromium, copper, lead, mercury, silver, and zinc.

536.    A soil sample taken from a catch basin near the corner of Building 21 at the Automatic Electroplating Site revealed the presence of volatile organic compounds, PCBs, organic acids, semi-volatile compounds, cadmium, chromium, copper, lead, nickel and zinc.

537.    The sewer line into which Automatic Electroplating discharged its process waste was partially clogged, which resulted in period back-ups and flooding of the area.

538.    On information and belief, Automatic Electroplating Corporation and Foundry Street Corporation had, and/or continue to have, common owners.

539.    On or about June 8, 2006, EPA sent a General Notice Letter notifying Foundry Street Corporation of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Automatic Electroplating Site.

75

540.    On or about June 8, 2006, EPA sent a General Notice Letter notifying Automatic Electro Plating Corp. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Automatic Electroplating Site.

541.    Automatic Electroplating and Foundry Street Corporation are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the Automatic Electroplating Site and released into the Newark Bay Complex.

### B-Line Trucking Site

542.    B-Line Trucking, Inc. ("B-Line") owns and operates a property located at 67 Esther Street, Newark, New Jersey (the "B-Line Site").  B-Line is a commercial truck tank hauling and cleaning company.

543.    In analyzing pollution sources in the Lockwood Street storm sewer, a Newark Pollution Abatement Study issued in 1979 documented that B-Line was discharging black oily waste into the system.  The study identified the source of the oil as spillage at the B-Line Site, where tank trucks were allowed to drain while parked at the facility.  The study noted that black oily chemicals flowed into the inlets on Lister Avenue and Esther Street.

544.    In May of 1979, a dark grayish liquid and truck oil drippings from the yard area at the B-Line Site were observed entering the storm catch basin on Esther Street in Newark.

545.    In 1989, NJDEP issued a notice of violation to B-Line for an unpermitted discharge to the surface waters of the State of New Jersey.

546.    On May 30, 1989, PVSC issued a notice of violation to B-Line for discharging petroleum hydrocarbons in excess of PVSC rules and regulations.

547.    On June 1, 1989, PVSC issued a notice of violation to B-Line, finding that its discharge was out of compliance for pH in violation of PVSC rules and regulations.

548.    In May 1991, B-Line discharged petroleum hydrocarbons in excess of PVSC rules and regulations.

WAS:144301.1

549. On May 19, 1993, PVSC issued a notice of violation to B-Line for discharging petroleum hydrocarbons in excess of PVSC rules and regulations.

550. In October 1999, an inspection of the B-Line Site by NJDEP revealed that B-Line's industrial activity was in the proximity of storm drains discharging to the Passaic River and had the potential of causing unpermitted discharges of contaminated stormwater associated with industrial activity to the surface waters of the State.

551. B-Line is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the B-Line Site and released into the Newark Bay Complex.

### BASF Hawthorne Site

552. BASF Corporation ("BASF") is the current owner of a property located at 150 Wagaraw Road, Hawthorne, New Jersey (the "BASF Hawthorne Site"). The BASF Hawthorne Site consists of approximately 25 acres and is bounded on the south by the Passaic River and on the north by Wagaraw Road.

553. Interchemical Company acquired the BASF Hawthorne Site from Weidman Silk Dyeing Company in 1946. On April 15, 1969, Interchemical Company changed its name to Inmont Corporation, an Ohio corporation. On December 12, 1973, Inmont Corporation merged into MEW Corporation, a Delaware corporation and the surviving entity was known as Inmont Corporation.

554. On May 21, 1985, BASF America Corporation acquired Inmont Corporation. On December 31, 1985, BASF Wyandotte Corporation was merged into Inmont Corporation, which simultaneously changed its name to BASF Corporation. BASF Corporation is the successor to Interchemical Company; Inmont Corporation, an Ohio corporation; and Inmont Corporation, a Delaware Corporation; and, therefore, succeeds to such companies' environmental liabilities related to the BASF Hawthorne Site.

555. BASF and its predecessors owned and operated a manufacturing facility at the BASF Hawthorne Site from 1946 until 1986.

WAS:144301.1

556.    Inmont Corporation produced a broad range of dyestuffs, dyestuff intermediates, pigment intermediates, specialty polymers and chemicals at the BASF Hawthorne Site.  Products manufactured by Inmont Corporation at the BASF Hawthorne Site include:  vat yellow, phthalo cyanine blue crude, dioxazine violet crude, phthalocyanime green crude, brown Y pigment and quinizarin.

557.    BASF manufactured pigments from a wide range of intermediates and also produced aqueous dispersions, flush bases, and specialty printing inks at the BASF Hawthorne Site.  BASF's operations included the synthesis of azo pigments and processing of phthalocyanine blue pigment.

558.    Hazardous Substances used or generated by BASF and its predecessors at the BASF Hawthorne Site include:  PCBs, xylene, lead chromates, copper, nitrobenzene, toluene, chromium, benzene, styrene, bis(2-ethylhexyl)pthalate, tetrachloroethylene, sulfuric acid, aluminum sulfate, hydrochloric acid, acetic acid, ammonia, sodium hydroxide, dichlorobenzidine, sodium nitrite, petroleum hydrocarbons, methanol, formaldehyde, barium chloride, 2,4,5-trichlorophenol, ethyl benzene, chlorodifluromethane, and sodium bisulfide.

559.    The synthesis of diarylide yellow pigment at the BASF Hawthorne Site resulted in the production of 3,3 dichlorobiphenyl, a PCB.  Phthalo blue was manufactured at the BASF Hawthorne Site, which produced a PCB as a byproduct.

560.    There were at least sixteen transformers and three switches on the BASF Hawthorne Site that contained PCBs.  PCBs were detected in the soil at the BASF Hawthorne Site.

561.    On information and belief, a number of leaking drums containing sulfuric acid were buried behind what was Building #5 at the BASF Hawthorne Site.

562.    "Drowning" (through ice and water quenching) of quinizarin was conducted for many years outside what was Building #5 at the BASF Hawthorne Site, resulting in spills to the ground of sulfuric acid and phthalic acid.

563.    A drainage ditch on the BASF Hawthorne Site conveyed stormwater from the site into the Passaic River.  Total petroleum hydrocarbons were detected in shallow soil samples collected from

the drainage ditch on the BASF Hawthorne Site.  Substances detected in the drainage ditch on the BASF Hawthorne Site include:  phenanthrene, fluoranthene, and pyrene.

564.    On January 6, 1971, a PVSC inspector traced a green substance in the Passaic River to the BASF Hawthorne Site.  The PVSC inspector found that heavy rain had washed materials from old fiber and steel drums containing residue dye into storm drains at the BASF Hawthorne Site.  Sodium hypochlorite, a Hazardous Substance, was used to bleach residue dye in the storm ditches at the BASF Hawthorne Site.  The PVSC inspector also observed that a pump in the pretreatment system at the BASF Hawthorne Site had failed and overflow was being pumped to the storm water system and discharging to the Passaic River.

565.    On March 22, 1971, a PVSC inspector traced oil in a storm ditch to a leaky oil pump at the BASF Hawthorne Site.

566.    On June 15, 1971, fluorescein dye spilled on the ground at the BASF Hawthorne Site and heavy rains washed the dye into yard drains which emptied into a storm ditch which discharged into the Passaic River.  Attempts were made to bleach the area, but green color was visible along the Passaic River banks 1,000 feet downstream from the BASF Hawthorne Site.

567.    Samples taken by the PVSC in April and June of 1973 of stormwater discharges from the BASF Hawthorne Site to the Passaic River were determined to be polluting.

568.    On April 14, 1975, a PVSC inspector observed discoloration of the water in the drainage ditch at the BASF Hawthorne Site going to the Passaic River.  The source of the discoloration was a mixture of water, oil and red pigment that had been dumped into a yard drain that emptied into the storm ditch at the BASF Hawthorne Site.

569.    On November 10, 1976, condensate containing red ink overflowed from a vacuum condenser into a floor drain at the BASF Hawthorne Site, which discharged into the Passaic River.  The floor drain at the BASF Hawthorne Site discharged directly to the Passaic River.

570.    On March 21, 1977, approximately 400 gallons of fuel oil was spilled at the BASF Hawthorne Site and the spill traveled into the drainage ditch at the site.

79

571.     On August 8, 1978, paint was discharged to the drainage ditch at the BASF Hawthorne Site.

572.     On March 13, 1979, red pigment was found on the banks of the drainage ditch at the BASF Hawthorne Site.

573.     A March 15, 1979 NJPDES compliance inspection at the BASF Hawthorne Site revealed a number of non-compliance issues, including the discharge of excessive COD, oil and grease from the outfall to the Passaic River; and significant traces of chemical runoff at a storm drain located at the garbage unloading dock at the site.

574.     On May 23, 1979, approximately 200 gallons of fuel oil was spilled at the BASF Hawthorne Site and the spill traveled into the drainage ditch at the site.

575.     On April 4, 1986, sulfuric acid overflowed through a discharge pipe into a storm drain at the BASF Hawthorne Site.

576.     Nitrobenzene, aniline and other base neutrals leaked from a tank farm into the groundwater at the BASF Hawthorne Site.

577.     In a September 9, 1986 Directive to BASF, NJDEP concluded that as a result of past spillages and underground storages practices at the BASF Hawthorne Site, the groundwater at the site is severely contaminated.

578.     Substances detected in the groundwater at the BASF Hawthorne Site include: alkane, aniline, bis(2-ethylhexyl)phthalate, carboxylic acids, di-n-butyl phthalate, 1,2-dichlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorobenzene, fluorethene, 1,3-isobenzofurandione, methylene chloride, nitrobenzene, pyrene, tetrachlorobenzene, tetrachloroethylene, toluene, 1,2-trans-dichloroethylene, 1,2,4-trichlorobenzene, 1,1,1-trichloroethane, trichloroethylene, trichlorofluoromethane, chlorobenzene, benzene, ethylbenzene, napthalene, chromium, lead, zinc, and dimethyl phthalate.

579.     Groundwater in the overburden at the BASF Hawthorne Site flows to the Passaic River. Groundwater in the bedrock underlying the BASF Hawthorne Site flows both to the Passaic River and north toward Wagaraw Road.

580.    On information and belief, the highest concentrations of groundwater contamination at the BASF Hawthorne Site were detected at the southern perimeter of the site.

581.    Substances detected in the soil at the BASF Hawthorne Site include:  arsenic, cadmium, chromium, copper, lead, mercury, nickel, zinc, acetone, ethylbenzene, xylenes, methylene chloride, PCBs, phenanthrene, fluoranthene, pyrene, chrysene, bis(2-ethylhexyl)phthalate, benzo(g,h,i)perylene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(a)anthracene, benzo(k)fluoranthene, acenaphthene, anthracene, chrysene, dimethyl pthalate, fluorene, indeno(1,2,3-cd)pyrene, napthalene, chlorobenzene, nitrobenzene, 1,2- dichlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorobenzene, 1,2,4-dichlorobenzene, and parachlorophenol.

582.    Storm sewer catch basins at the BASF Hawthorne Site connected to the drainage ditch which discharged into the Passaic River.

583.    Overland flow and sheet storm water runoff was discharged directly from the BASF Hawthorne Site into the Passaic River.  Storm water picked up oil and pigment dust from the roadways and outdoor storage areas at the BASF Hawthorne Site.  In May 1987, the following substances were detected in storm water discharged from the BASF Hawthorne Site:  1,2,4-trichlorobenzene, 1,2-dichlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorobenzene, nitrobenzene, and fluoranthene.

584.    On or about September 15, 2003, EPA sent a General Notice Letter notifying BASF of its potential liability for Response costs relating to the Passaic River as the result of the Release of Hazardous Substances from the BASF Hawthorne Site.

585.    BASF Corporation is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the BASF Hawthorne Site and released into the Newark Bay Complex.

**BASF Kearny Site**

586.    BASF Corporation ("BASF") is the current owner of a property located at 50 Central Avenue, Kearny, New Jersey (the "BASF Kearny Site").  The BASF Kearny Site consists of approximately 27 acres, encompassing the western half of the southernmost portion of South Kearny,

81

which is also commonly referred to as Kearny Point.  The BASF Kearny Site is bounded on the west by the Passaic River and on the east by the Hackensack River.

587.    The BASF Kearny Site is located in a flood zone.  Dating back to the 1800s, the BASF Kearny Site was a landfill and the site has a history of industrial operations of over 100 years.

588.    On information and belief, United Cork Companies owned and operated a portion of the BASF Kearny Site from the mid-1930s until approximately 1966.  In 1966, United Cork Companies changed its name to Badische Products Corporation.

589.    In 1968, Badische Products Corporation and BASF Colors & Chemicals, Inc. merged, and the surviving corporation was known as BASF Colors & Chemicals, Inc.  BASF Colors & Chemicals, Inc. changed its name to BASF Corporation.  On information and belief, BASF Corporation is the successor to United Cork Companies and Badische Corporation, both of whom owned and/or operated the BASF Kearny Site.

590.    Beginning no later than 1968, BASF Corporation owned and operated the BASF Kearny Site.

591.    On information and belief, liquid waste from the United Cork manufacturing process was diverted into a sewer system that led to the stormwater outfall to the Passaic River.  Typical cork processing methods utilized Hazardous Substances including chlorinated and oxalic acid baths to remove lignin from the raw cork materials.

592.    In 1973, BASF discharged 2,500 barrels (approximately 150,000 gallons) of 2-ethyl-hexanol into the Passaic River.

593.    In October 1980, NJDEP found that BASF violated its NPDES discharge permit for an outfall to the Passaic River by discharging total organic carbon in excess of BASF's permit limitation.

594.    In 1982, EPA issued an order to Badische Corporation finding that Badische Corporation discharged total organic carbon and petroleum hydrocarbons to the Passaic River in excess of permitted levels during the years of 1980-1982.

595.    An inspection by the NJDEP revealed that BASF exceeded all of its permitted discharge levels during the period of June 1, 1987-August 31, 1987, and that BASF exceeded all of its permitted discharge levels for all parameters except petroleum hydrocarbons for the period September 1, 1987 to November 30, 1987.  On information and belief, these 1987 discharges by BASF in excess of its permit levels were from an outfall into the Passaic River.

596.    BASF has reported over fifty spills on the BASF Kearny Site that occurred during its ownership, including spills of Hazardous Substances.

597.    Hazardous Substances detected in the groundwater at the BASF Kearny Site include:  2,6 dinitrophenol, pentachlorophenol, 1,2 diphenylhydrazine, aldrin, chlordane, DDT, DDE, DDD, arochlor 1242, benzene, methylene chloride, total chromium, total lead, ammonia, and arsenic.

598.    Light Nonaqueous Phase Liquids ("LNPL") were detected in the groundwater throughout the BASF Kearny Site.  The LPNL present at the BASF Kearny Site consisted largely of bis(2-ethylhexyl)phthalate.

599.    Shallow groundwater at the BASF Kearny Site flows towards the Passaic River, which is in immediate contact with the BASF Kearny Site.

600.    Hazardous Substances detected in the soil at the BASF Kearny Site include: benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, bis(2-chloroethyl)ether, bis(2-ethylhexyl)phthalate, dibenzo(a,h)anthracene, 3,3-dichlorobenzidine, fluoranthene, hexachlorobenzene, indeno(1,2,3-c,d)pyrene, aroclor 1016, aroclor 1221, aroclor 1232, aroclor 1242, aroclor 1248, aroclor 1254, aroclor 1260, arsenic, toxaphene, pyrene, antimony, copper, lead, zinc, thallium, cadmium, and chrysene.

601.    Two wastewater lagoons were located on the BASF Kearny Site bordering on the Passaic River.  Substances detected in the soil in the vicinity of the former wastewater lagoons at the BASF Kearny Site include:  benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, bis(2-chloroethyl)ether, dibenzo(a,h) anthracene, 3,3-dichlorobenzidine, hexachlorobenzene, indeno(1,2,3-c,d)pyrene, N-nitrosodi-n-propylamine, and benzo(k)fluoranthene.

83

602.    Prior to sometime in 1988 or 1989, stormwater at the BASF Kearny Site was discharged into the Passaic River or Newark Bay.  The BASF Kearny Site did not have any stormwater discharge permits until at least November 30, 1979.  Soil samples from the stormwater outfall on the BASF Kearny Site next to the Passaic River revealed the presence of arsenic and bis(2-ethylhexyl)phthalate.

603.    BASF operated an incinerator on the BASF Kearny Site.  Particulate fallout and deposition from the incinerator occurred with such frequency and to such degree that BASF paid employees for having their cars washed.  In July of 1988, the NJDEP issued an Administrative Order of Revocation and Notice of Civil Administrative Penalty Assessment to BASF, finding that emissions from BASF's incinerator exceeded permitted levels for particulates, and that BASF emitted sulfur dioxide, hydrochloric acid, ammonia and oxides of nitrogen without a permit.  In 1989, the NJDEP issued an Administrative Order of Revocation and Notice of Civil Administrative Penalty Assessment to BASF, finding that emissions from BASF's incinerator exceeded permitted levels for particulates, SOx, and hydrocarbons.  On information and belief, the prevailing wind at the BASF Kearny Site during most seasons is southeasterly, in the direction of the Passaic River Study Area.

604.    On or about September 15, 2003, EPA sent a General Notice Letter notifying BASF of its potential liability for Response costs relating to the Passaic River as the result of the Release of Hazardous Substances from the BASF Kearny Site.

605.    BASF Corporation is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the BASF Kearny Site and released into the Newark Bay Complex.

**Belleville Industrial Site**

606.    The Belleville Industrial Center is the current owner of a multi-tenant industrial park located at 681 Main Street, Belleville, New Jersey (the "Belleville Industrial Site").

607.    On information and belief, Federal Leather Company ("Federal Leather"), itself or as a division of another company, owned and operated a portion of the Belleville Industrial Site from 1916

84

until 1968. Federal Leather's operations at the Belleville Industrial Site included leather tanning and the manufacturing of leather, artificial leather, and vinyl plastics.

608. Upon information and belief, in 1956, Federal Leather was acquired by Textron, Inc. ("Textron") and was subsequently operated as the Federal Industries division of Textron. Upon information and belief, Textron operated at the Belleville Industrial Site until 1962, when Air Reduction Company, Inc. ("Air Reduction") acquired the Federal Industries division of Textron. Upon information and belief, Air Reduction continued to operate at the Belleville Industrial Site until approximately 1968, when it sold the property to Belleville Industrial Center.

609. Upon information and belief, Air Reduction changed its name to Airco, Inc. ("Airco") in 1971. Upon information and belief, Airco was acquired by BOC International Ltd. in 1978. Upon information and belief, BOC International Ltd. changed its name to BOC International PLC in 1981, and changed its name again in 1982 to The BOC Group PLC.

610. Upon information and belief, Airco changed its name to The BOC Group, Inc. in 1983.

611. Upon information and belief, The BOC Group, Inc. was an indirect wholly owned subsidiary of The BOC Group PLC.

612. In 2006, The BOC Group PLC merged with Linde AG to become The Linde Group.

613. Upon information and belief, in late 2007, The BOC Group, Inc. changed its name to Linde, Inc.

614. Upon information and belief, Linde, Inc. (f/k/a The BOC Group, Inc.) is the current successor to Airco (f/k/a Air Reduction), Textron, and Federal Leather, and, therefore, succeeds to those companies' environmental liabilities related to the Belleville Industrial Site.

615. Upon information and belief, Federal Leather handled, processed, used, stored, or otherwise utilized Hazardous Substances and other compounds at the Belleville Industrial Site, including, but not limited to, antimony trifluoride, dyes, fuel oils, lacquers, naphtha, phthalate esters, solvents (methyl ethyl ketone and others), varnishes, and vinyl plastics.

85

616.     Upon information and belief, wastewater generated from the Belleville Industrial Site discharged into a storm sewer that ultimately discharged to the Passaic River.

617.     A 1926 PVSC report documents pollution of the Passaic River by Federal Leather due to lack of a sewer at the facility.

618.     On or about April 12, 1949, a PVSC inspector notified Federal Leather that a red liquid was discharging from a yard drain at its facility into the Passaic River.  The PVSC inspector also observed that considerable greasy refuse was found around the yard drain area.

619.     Upon information and belief, during a July 19, 1993 site investigation by NJDEP, a Belleville Fire Department captain stated that he was aware of a number of fires at the Federal Leather facility in the 1960s, as well as the dumping of methyl ethyl ketone by employees.

620.     Upon information and belief, Belleville Industrial Center was incorporated in the State of New Jersey in 1968.  Belleville Industrial Center purchased the property and improvements at 681 Main Street, Belleville, New Jersey in 1968 and has operated a multi-tenant industrial park at the Belleville Industrial Site since that time.

621.     From approximately 1975 until approximately 2001, Helion Industries, Inc. ("Helion") leased the Belleville Industrial Site from Belleville Industrial Center.  On information and belief, Helion manufactured solutions for use in the processes involved in developing photographic film at the Belleville Industrial Site.

622.     On information and belief, Helion was incorporated in the State of New Jersey in 1970 and its corporate status was revoked on August 5, 2005 for failure to file annual reports with the New Jersey Secretary of State for two consecutive years.

623.     On information and belief, Helion utilized, processed, handled, mixed, stored, and/or Discharged Hazardous Substances and other compounds at the Belleville Industrial Site, including, but not limited to, benzene, toluene, sodium bichromate, zinc nitrate, methylene chloride, 1,2,4 trimethylebenzene, xylene, cumene, ethylbenzene, ammonia, hydroquinone, acetic acid, sodium

86

hydroxide, potassium hydroxide, waste chromic acid solution, waste formaldehyde solution, and waste mercury.

624.    Until June 10, 1977, Helion discharged its tank washing wastewater from Building 11 through a floor drain into a catch basin illegally connected by a 6-inch storm sewer line to the main storm sewer that emptied into the Passaic River.

625.    Hazardous Substances detected in the soil at the Belleville Industrial Site include: benzene, cis-1,2 dichloroethene, tetrachloroethene, trichloroethene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, bis(2-ethylhexyl)phthalate, antimony, and copper.

626.    The Belleville Industrial Site is approximately 400 feet from the lower Passaic River, which received direct discharges, overland flow, and sheet stormwater runoff directly from the Belleville Industrial Site.

627.    Upon information and belief, groundwater at the Belleville Industrial Site flows to the Passaic River, which then flows to the Newark Bay. Upon information and belief, Hazardous Substances and other compounds released by Helion to the groundwater at the Belleville Industrial Site discharged into the Passaic River.

628.    On or about June 8, 2006, EPA sent a General Notice Letter notifying The BOC Group, Inc. of its potential liability for response costs relating to the Lower Passaic River Study Area as a result of the release of Hazardous Substances from the Belleville Industrial Site.

629.    On or about February 14, 2006, EPA sent a General Notice Letter notifying Belleville Industrial Center of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Belleville Industrial Site.

630.    Upon information and belief, Linde (f/k/a The BOC Group, Inc.), as successor to Airco, Textron and Federal Leather, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Belleville Industrial Site and released into the Newark Bay Complex.

87

631.    Belleville Industrial Center is a Person "in any way responsible" for the Hazardous Substances that were discharged at the Belleville Industrial Site and released into the Newark Bay Complex.

## Benjamin Moore & Company Site

632.    The Benjamin Moore & Company ("Benjamin Moore") is the current owner of a property located at 134 Lister Avenue, Newark, New Jersey, which is comprised of Block 2438, Lots 34, 40, and 62 on the tax maps of the City of Newark, Essex County (the "Benjamin Moore Site").

633.    Benjamin Moore has owned and operated the Benjamin Moore Site since approximately 1925.

634.    Benjamin Moore is a manufacturer and distributor of water and solvent-based paints.  It utilized various Hazardous Substances at the Benjamin Moore Site in its manufacturing processes including cobalt, glacial methacrylate, butyl acrylate, vinyl acetate, iron oxide, titanium dioxide, zinc, manganese, sodium hydroxide, mercury, lead, and copper.

635.    On information and belief, Benjamin Moore discharged paint solids to the sanitary sewer system in the 1960s until approximately 1973.  An inspection of the Lockwood Street storm sewer along Lister Street by the City of Newark in September 1967 revealed that sewage from the Lister Avenue sanitary sewer had corroded and eroded its way into the storm sewer.  According to the inspection, there was a heavy discharge of sewage containing paint solids that was entering the storm sewer.  The storm sewer flowed to the Passaic River.

636.    On August 15, 1969, the NJDOH issued an administrative order to Benjamin Moore, alleging that Benjamin Moore was discharging industrial waste and other polluting matter into the Passaic River and discharging harmful, deleterious and polluting material from a sewer or drain into the Passaic River.

637.    On March 13, 1978, the United States Coast Guard observed the contents of a punctured 55-gallon drum at the Benjamin Moore Site discharging into the Passaic River.  An internal Benjamin Moore memorandum describes this incident as an oil spill.  During the investigation, a Coast Guard

investigator learned that Benjamin Moore's storm sewer system discharged all of the surface water at the Benjamin Moore Site into the Passaic River. Benjamin Moore also used a discharge pipe, which led directly to the Passaic River, as the outfall for the backup stormwater discharge system.

638.    Three drains in the vehicle plant at the Benjamin Moore Site discharged directly to the storm sewer system, which discharged into the Passaic River.

639.    On July 8, 1980, Benjamin Moore had a valve malfunction resulting in a spill of 3,000 gallons of wash solvent into a retaining dike on the Benjamin Moore Site. According to Benjamin Moore, approximately 25-50 gallons of the solvent leaked from the retaining dyke and into the Passaic River.

640.    On April 14, 1982, a valve on a tank wagon malfunctioned on the Benjamin Moore Site, resulting in the discharge of 3,300 gallons of butyl acrylate. Benjamin Moore estimated that five to ten gallons of this Hazardous Substance discharged into the Passaic River.

641.    On September 19, 2003, the NJDEP issued Directive No. 1 In the Matter of the Lower Passaic River in which NJDEP found that Hazardous Substances were discharged at the Benjamin Moore Site and that those Hazardous Substances are and/or have emanated into the Lower Passaic River. NJDEP further determined that Benjamin Moore is a person, pursuant to the Spill Act, in any way responsible for the Hazardous Substances that were discharged at the Benjamin Moore Site.

642.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Benjamin Moore of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Benjamin Moore Site.

643.    Benjamin Moore is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Benjamin Moore Site and released into the Newark Bay Complex.

**Biocraft Site**

644.    In approximately 1972, Biocraft acquired property consisting of real property and associated improvements located at 12 Industrial Park and 140 Hopper Avenue in Waldwick, Bergen

County, New Jersey, also designated as Block 154, lot 46 on the Tax Map of the City of Waldwick ("Biocraft Site"). Biocraft constructed and operated a pharmaceutical manufacturing facility. In 1985, Biocraft constructed a storage warehouse on the Biocraft Site.

645. In approximately 1964, Biocraft Laboratories Inc. was incorporated in the State of New Jersey ("Biocraft").

646. In approximately 1996, Biocraft merged with Lemmon Pharmacal Company and changed its name to Teva Pharmaceuticals USA, Inc. ("Teva Pharmaceuticals"). Teva Pharmaceuticals is operated as a wholly-owned subsidiary of Teva Pharmaceuticals Industries, Ltd.

647. Upon information and belief, Teva Pharmaceuticals is the successor to Biocraft and, therefore, succeeds to Biocraft's environmental liabilities related to the Biocraft Site.

648. Upon information and belief, Teva Pharmaceuticals manufactured semi-synthetic penicillin products and other pharmaceutical agents in bulk form at the Biocraft Site from approximately 1972 until approximately 1997.

649. Hazardous Substances handled, processed, used, or otherwise utilized at the Biocraft Site include, but are not limited to chlorobenzene, chlorophenol, 1,2-dichlorobenzene, pentachlorophenol ("PCP"), benzene, toluene, xylene, antimony, arsenic, cadmium, chromium, copper, hydrochloric acid, lead, iron, mercury, methylene chloride, nickel, silver, sulfur, zinc, acetone, dichlorofluoromethane, silver nitrate, triethylamine, and sodium hydroxide. Other chemicals handled, processed, used, or otherwise utilized at the Biocraft Site include No. 2 Fuel Oil and other petroleum hydrocarbons.

650. PCP is associated with the formation of dioxin compounds.

651. In November 1975, a leaking 100-foot section of underground pipe that conveyed wastewater flow from production areas on the Biocraft Site to an underground storage tank was discovered. Wastewater released from the pipe entered area storm sewers and also leached directly into Allendale Brook. Water samples from area storm sewers in the vicinity of the leaking pipe confirmed the presence of Hazardous Substances released from the Biocraft Site including, but not limited to, methylene chloride, butyl alcohol, and acetone. Water samples taken from storm sewers at the Biocraft Site in the

vicinity of the leaking pipe and from Allendale Brook, to which the storm sewers discharged, confirmed the presence of Hazardous Substances released from the Biocraft Site including, but not limited to, butyl alcohol, dimethyl aniline, and phenylaceteic acid.

652.    Allendale Brook empties into the Saddle River, which ultimately discharges into the Passaic River.

653.    In approximately December 1993, fifty-gallons of hydrochloric acid, a Hazardous Substance, was released from a tank line at the Biocraft Site to the area stormwater collection system.

654.    In approximately February 1994, hydrochloric acid was released from a broken valve at the Biocraft Site and entered a secondary containment unit.  Some of this spill penetrated through the secondary containment unit and flowed into an adjacent parking lot.

655.    Soil samples taken from the Biocraft Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, carbon disulfide, methylene chloride, tetrachloroethene, and petroleum hydrocarbons.

656.    Groundwater samples taken from the Biocraft Site confirmed the presence of Hazardous Substances, including, but not limited to, acetone, butanol, methylene chloride, and aniline.

657.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Biocraft Site.

658.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Teva Pharmaceuticals of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Biocraft Site.

659.    Teva Pharmaceuticals is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Biocraft Site and released into the Newark Bay Complex.

**Bright Star Industries Site**

660.    The Bright Star Industries property consists of real property and associated improvements located at or about 600 Getty Avenue in Clifton, Passaic County, New Jersey ("Bright Star Site").

91

661.    The Bright Star Site is proximate to Wabash Brook, a tributary of the Passaic River. Upon information and belief, direct discharges, overland flow, and sheet storm water runoff flowed from the Bright Star Site into area storm drains, which discharged into Wabash Brook.  From the Bright Star Site, Wabash Brook flows east and empties into the Passaic River above Dundee Dam.

662.    Upon information and belief, Bright Star Battery Company was formed in 1909 and subsequently changed its name to Bright Star Industries Inc. ("Bright Star").

663.    Upon information and belief, in approximately 1978, H.M. Holdings, Inc., acquired Bright Star and operated it as a subsidiary.

664.    Upon information and belief, in approximately 1987, Kidde, Inc. acquired Bright Star and operated it as a subsidiary.  Upon information and belief, Hanson PLC, which, in approximately 1984, became the ultimate parent company of Kidde, Inc., sold several companies, including Bright Star, to Publicker Industries ("Publicker"), now known as PubliCARD, Inc., and in 1996 Publicker sold its Bright Star assets to an investment company, BancBoston Capital ("BancBoston").   Upon information and belief, BancBoston  subsequently divested Bright Star to Koehler Manufacturing Company.

665.    Upon information and belief, in approximately 1998, Koehler Manufacturing Company and Bright Star merged to form Koehler-Bright Star, Inc.  ("Koehler-Bright Star").  Upon information and belief Koehler-Bright Star is the successor to Bright Star and, therefore, succeeds to the environmental liabilities related to the Bright Star Site.

666.    From approximately 1909 until at least the early 1990s, Bright Star owned and operated a dry cell battery, lantern, and flashlight production facility at the Bright Star Site.

667.    Bright Star utilized, processed, handled, mixed, consumed, stored, and/or Discharged Hazardous Substances and other compounds at the Bright Star Site including, but not limited to, mercury, lead, cadmium, copper, chloroform, carbon tetrachloride, lead acetate, lead chloride, lead dioxide, lead nitrate, magnesium, mercuric acetate, mercuric cyanide, perchloroethylene, acids, bases, titanium, trichloroethylene, zinc, tetrachloroethylene, and petroleum hydrocarbons.

668.    In 1975, PVSC inspectors observed three outfalls discharging industrial wastewaters from the Bright Star Site directly into Wabash Brook. At least one of the discharges was described by the PVSC as "polluting."

669.    In 1985, analysis of samples of wastewaters discharging from the Bright Star Site and into the PVSC sanitary sewer connection indicated the presence of Hazardous Substances and other compounds including, but not limited to, cyanide and mercury.

670.    Analysis of soil samples taken at the Bright Star Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, copper, mercury, zinc, petroleum hydrocarbons, and assorted base neutral compounds.

671.    Upon information and belief, historical spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Bright Star Site.

672.    Koehler-Bright Star, as successor to Bright Star, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Bright Star Site and released into the Newark Bay Complex.

### Campbell Foundry Site Properties

673.    The Campbell Foundry Company properties consists of real property and associated improvements located at 800 Bergen Street in Harrison, Hudson County, New Jersey ("Bergen Street Site"); 2 Worthington Avenue in Harrison, Hudson County New Jersey ("Worthington Avenue Site"); and 1235 Harrison Avenue in Kearny, Hudson County, New Jersey ("Harrison Avenue Site"), hereinafter collectively referred to as the "Campbell Foundry Site Properties."

674.    The Campbell Foundry Site Properties are situated approximately 1500-2000 feet from the Passaic River. Direct discharges, overland flow, and sheet storm water runoff from the Campbell Foundry Site Properties empty into the Combined Sewer System within the Worthington Avenue Combined Sewer Overflow District ("Worthington Avenue CSO"). According to the PVSC, during wet

weather events, a portion of the combined flow within the Worthington Avenue CSO enters an interceptor and discharges through an outfall line into the Passaic River.

675.    On or about March 7, 1921, the Campbell Foundry Company ("Campbell Foundry") was incorporated in the State of New Jersey.

676.    From approximately 1921 until the present, Campbell Foundry Owned and Operated a steel foundry at the Bergen Street Site and has produced cast iron manhole covers, storm drain and sewer gratings, and other cast iron products for municipal and private use.  Campbell Foundry's operations at the Bergen Street Site include melting scrap iron, including engine blocks, old machinery, and radiators; sand casting molten metal; machining and drilling of products, and the priming and painting of finished products.

677.    From approximately 1975 until the early 1990s, Campbell Foundry owned and operated a storage yard at the Worthington Avenue Site.

678.    Upon information and belief, from at least 1981 until at least 1991, Campbell Foundry operated a shipping, disposal, and storage yard at the Harrison Avenue Site.

679.    Campbell Foundry generated waste cupola slag, waste sand, and metallic cupola dust at the Bergen Street Site.  Analysis of samples taken from cupola dust indicate the presence of Hazardous Substances and other compounds, including, but not limited to, lead, cadmium, and chrome.

680.    NJDEP inspectors observed that "overall housekeeping [at the Bergen Street Site] is terrible due to the ever present sand that spills over from the molds and forms in piles throughout the facility and coat[s] everything with a fine black dust."

681.    In approximately 1982, Campbell Foundry received an Order and Notice of Prosecution by NJDEP for improperly disposing of foundry generated wastes, including hazardous wastes, at the Harrison Avenue Site, which was not permitted to receive hazardous wastes.

682.    In approximately 1983, the NJDEP issued an administrative order to Campbell Foundry for, *inter alia*, improper storage and handling of hazardous wastes at its properties.

94

683.    Analysis of soil samples taken from areas in and around the Harrison Street Site indicate the presence of Hazardous Substances and other compounds.

684.    Analysis of soil samples taken at the Worthington Avenue Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, arsenic, barium, chromium, cadmium, mercury, silver, lead, selenium, copper, nickel, zinc, antimony, thallium, cyanide, phenols, petroleum hydrocarbons, PCBs, volatile organics, and base neutral compounds.

685.    In approximately 1986-1987, the PVSC reported that the Bergen Street Site discharged approximately 150,000 gallons of process wastewater a day into the Worthington Avenue CSO.  During that same time period, the PVSC reported that the Bergen Street Site was not in compliance with federally-established pretreatment standards as set for the metal molding and casting industry.

686.    Upon information and belief, process wastewater and surface water runoff from the Campbell Foundry Site Properties discharged into the PVSC Combined Sewer System and discharged directly into the Passaic River from the Worthington Avenue CSO outfall during rain events and/or mechanical failures of the interceptor.

687.    Upon information and belief, historical spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Campbell Foundry Site Properties.

688.    On or about December 27, 2006, the EPA sent a General Notice Letter notifying Campbell Foundry Company of its potential liability for Response costs relating to the Lower Passaic River Study Area as a result of Releases or threatened Releases of Hazardous Substances from the Bergen Street Site.

689.    Campbell Foundry is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Campbell Foundry Site Properties and released into the Newark Bay Complex.

WAS:144301.1

**Celanese Site**

690.    The Essex County Improvement Authority is the current owner of a property located on the east and west sides of Doremus Avenue at 354 and 375 Doremus Avenue in Newark, New Jersey (the "Celanese Site"). The Celanese Site abuts the Passaic River on the east. Plum Creek, a tributary of the Passaic River, flows adjacent to the Celanese Site.

691.    Celanese Corporation of America acquired the Celanese Site on April 23, 1954 and on the same day sold the site to The Prudential Insurance Company of America ("Prudential"). From April 30, 1954 until June 5, 1980, Prudential leased the Celanese Site to Celanese Corporation of America. On June 6, 1980, Prudential sold the Celanese Site to Celanese Chemical Company, Inc., a subsidiary of Celanese Corporation of America.

692.    In 1987, Celanese Corporation of America, whose name had been changed to Celanese Corporation, was renamed Hoechst Celanese Corporation. In 1988, Celanese Chemical Company, Inc., changed its name to Hoechst Celanese Chemical Group, Inc.

693.    Effective December 31, 1995, ownership of the Celanese Site was transferred to Hoechst Celanese Chemical Group, Ltd., a Texas limited partnership comprised of Hoechst Celanese Texas Holdings, Inc., as general partner, and Hoechst Celanese Chemicals, Inc., as limited partner. Effective December 31, 1997, Hoechst Celanese Chemical Group, Ltd., changed its name to Celanese Ltd. The general partner of Celanese Ltd. is Celanese International Corporation.

694.    From 1954 until operations ceased in approximately 1996, the predecessors to Celanese Ltd. including, but not limited to, Celanese Chemical Company, Inc., Hoechst Celanese Chemical, Inc., Hoechst Celanese Chemical Group, Inc., and Hoechst Celanese Chemical Group, Ltd. (the "Celanese Entities"), operated a chemical bulk storage and chemical distribution facility at the Celanese Site. During the same period until approximately 1993, the Celanese Entities also operated a formaldehyde manufacturing facility at the Celanese Site.

695.    Celanese Ltd. is the successor-in-interest to the Celanese Entities.

696.    Hazardous Substances were shipped in bulk to the Celanese Site via ship, barge, railroad car and/or tank truck for redistribution to customers.  Upon arrival, the Hazardous Substances were off-loaded to aboveground bulk storage tanks located on the site for later redistribution in tank trucks, drums or by other means.

697.    Hazardous Substances used, produced or stored at the Celanese Site include: acetaldehyde, acetic acid, acetic anhydride, acetone, acrylic acid, adipic acid, beryllium powder, butyl alcohol, butyl acrylate, butyl formacel, 1,3-butylene glycol, butyric acid, carbon disulfide, carbon tetrachloride, chlorobenzene, chromium, cyclohexane, diacetone alcohol, 1,2-dichlorobenzene, ethyl acrylate, ethyl acetate, ethylbenzene, ethylene glycol, 2-ethylhexy acrylate, formaldehyde, formalin, formic acid, heptanoic acid, hexamethylenediamine, hexanediol, isobutanol, isobutyl acetate, isopropyl acetate, methanol, methyl acrelate, methyl ethyl ketone, methyl formcel, methyl isobutyl ketone, methylene chloride, n-butyl acetate, n-butyl formacel, n-propyl alcohol, n-propyl acetate, naphtha, paraformaldehyde, pelargonic acid, propionic acid, pyridine, sodium hydroxide, sulfuric acid, tetrachloroethylene, toluene, 1,1,1-trichloroethane, trichloroethylene, trichlorofluoromethane, triethylene glycol, vinyl acetate, and xylene.

698.    Paraformaldehyde sludge, diatomaceous filter material and discarded plastic material from operations at the Celanese Site were disposed of in an on-site landfill bounded on two sides by Plum Creek.  Drums of paraformaldehyde were also buried at the Celanese Site.

699.    On August 15, 1969, the NJDOH ordered Celanese Chemical Company, Inc. to abate the discharge of inadequately treated wastewater from a sewer or drain into the Passaic River.

700.    In 1976, the NJDEP reported that approximately 50,000 gallons of methanol was discharged to the ground at the Celanese Site.  Approximately 25,000 - 30,000 gallons flowed into a ditch and discharged to the Passaic River by way of Plum Creek.

701.    In 1979, the PVSC reported that an alkaline substance with a pH of 12 was discharged from the Celanese Site into Plum Creek through an open construction ditch.

97

702.    In 1980, Celanese Chemical Company, Inc. reported that 500-900 gallons of methanol were discharged at the Celanese Site into the Passaic River.

703.    In 1981, Celanese Chemical Company, Inc. reported that approximately 14,000 gallons of cooling water containing 20-30 ppm of chromate were spilled and approximately 2,000 gallons entered Plum Creek.

704.    In 1987, Celanese Chemical Company, Inc. reported that approximately 150 gallons of formic acid were spilled onto the ground and during the clean up some of the formic acid discharged to Plum Creek.

705.    In 1987, Celanese Chemical Company, Inc. reported that between 1970-1987, forty-six spills of various Hazardous Substances occurred at the Celanese Site including spills of acrylic acid, acetic acid, ethylene glycol, 2-ethylhexyl acrylate, formaldehyde, isopropyl acetate, methanol and solvents.

706.    In 1992, a pipe leak caused butyl acrylate to be discharged from the Celanese Site into the Passaic River.

707.    In 1994, a leaking flange on a valve attached to a pier line caused approximately 187 gallons of acetic acid and water to be discharged to the ground at the Celanese Site.

708.    Soil, sediment and water samples taken at the Celanese Site detected Hazardous Substances including, but not limited to, chromium, benzo(a)pyrene, acetone, formaldehyde, ethylbenzene, chlorobenzene, toluene and total xylenes.  Groundwater samples taken at the Celanese Site detected the presence of formaldehyde and naphthalene.

709.    Overland flow, direct discharges and sheet storm water runoff from the Celanese Site are received by Plum Creek and the Passaic River by way of one or more ditches or storm sewers, including the Doremus Avenue storm sewer, with outfalls on Plum Creek or the Passaic River.

710.    On information and belief, leachate, seepage, overland flow and sheet stormwater runoff carried Hazardous Substances from the Celanese Site by way of Plum Creek, the Doremus Street sewers and/or other means into the Passaic River.

711.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Hoescht Celanese Chemicals, Inc. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Celanese Site.

712.    Celanese Ltd. is a "discharger" and a Person "in any way responsible" for the Hazardous Substances that were discharged at the Celanese Site and released into the Newark Bay Complex.

### Chemical Leaman Site

713.    The Chemical Leaman Site consists of real property and associated improvements located at 80 Doremus Avenue in Newark, Essex County, New Jersey (the "Chemical Leaman Site"). On or about May 15, 1948, Chemical Leaman Tank Lines, Inc. ("CLTLI") was incorporated in the State of Delaware. On or about December 20, 2002, CLTLI was merged into Quality Carriers, Inc., a corporation organized under the laws of the State of Illinois on or about August 9, 1965 ("Quality Carriers"). As a result, Quality Carriers is responsible for CLTLI's environmental liabilities related to the Chemical Leaman Site.

714.    On or about February 11, 1985, Quala Systems, Inc. ("Quala") was incorporated in the State of Delaware.

715.    From approximately 1970, Quality Carriers has owned and operated a trucking company and tank truck washing facility on the Chemical Leaman Site.

716.    From approximately 1992, Quala has operated a tank truck washing facility on the Chemical Leaman Site.

717.    Quality Carriers' operations at the Chemical Leaman Site include handling, transportation, storage, and disposal of bulk liquids, including chemicals, Hazardous Substances, food products, petroleum hydrocarbons, and/or other compounds. Quality Carriers and Quala both have operated a tank trailer cleaning and washing facility, which involves the use of detergent, caustic wash, steam, or water flushing agents to cleanse the interiors of its tank trailers. Wastewater from the truck washing operations flowed into area floor drains, which were plumbed to an on-site wastewater treatment

facility.  The wastewater facility was constructed in 1993 and discharges treated effluent into an 18-inch PVSC sewer line located beneath Doremus Avenue.

718.    Quality Carriers handled and transported, and both Quality Carriers and Quala subsequently treated trucks containing residuals of Hazardous Substances and other compounds at the Chemical Leaman Site, including but not limited to benzene, chlorobenzene, chloroethene, chloroform, chloromethane, phenol, tetrachloromethane, toluene, trichlorethene, naphthalene, di-n-butylphthalate, methyl ethyl ketone, methyl isobutyl ketone, di-n-octyl phthalate, waste oils and other petroleum hydrocarbons on the Chemical Leaman Site.

719.    Upon information and belief, chlorobenzene is associated with the formation of dioxin compounds.

720.    On or about June 8, 1999, a release of 30 gallons of an oil like substance from a tanker trailer was reported.

721.    Soil samples taken from the Chemical Leaman Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, benzene, 1,2-dichloroethane, methylene chloride, tetrachloroethene, trichloroethene, xylene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, chrysene, dibenz(a,h)anthracene, indeno(1,2,3-cd)pyrene, phenol, 4,4'-DDD, 4,4'-DDT, aroclor-1248, aroclor-1260, endosulfan, antimony compounds, arsenic compounds, beryllium compounds, cadmium compounds, copper compounds, lead compounds, and zinc compounds.

722.    Groundwater samples taken from the Chemical Leaman Site confirmed the presence of Hazardous Substances, including, but not limited to, 1,1-dichloroethane, benzene, 1,2-dichloroethene, ethyl benzene, methylene chloride, tetrachloroethene, toluene, trichloroethene, vinyl chloride, and xylene.

723.    Groundwater at the Chemical Leaman Site is tidally influenced by the Passaic River.  An ancient stream, which previously bisected the Chemical Leaman Site and that was filled during development of the Site, provides an avenue for groundwater flow into the Passaic River.  Upon information and belief, Hazardous Substances and other compounds discharged by CLTLI and Quala to the groundwater beneath or adjacent to the Chemical Leaman Site discharged into the Passaic River.

100

724.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices have resulted in Discharges of Hazardous Substances to and from the Chemical Leaman Site into the Passaic River.

725.    The Chemical Leaman Site abuts the Passaic River, which receives overland flow and sheet stormwater runoff directly from the Chemical Leaman Site.  Furthermore, stormwater on the central and southwestern areas of the Chemical Leaman Site collect in two area storm drains, which connect and flow into an approximately sixty-foot long drainage culvert that discharges directly into the Passaic River.

726.    Upon information and belief, the Chemical Leaman Site has been prone to flooding during heavy rain events.  The advancing and receding floodwaters eroded and transported Hazardous Substances from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

727.    Sediment core samples taken from the sediments in the Passaic River at a point slightly downriver from the stormwater outfall located in the central part of the Chemical Leaman Site confirmed the presence of Hazardous Substances similar to those which have been discharged to and from the Site including, but not limited to, PCBs (including aroclor 1260, aroclor 1248), 4,4'-DDD, arsenic compounds, cadmium compounds, copper compounds, lead compounds, zinc compounds, bis(2-ethylhexyl) phthalate, benzo(a)anthracene, benzo(p)fluoranthene, benzo(k)fluoranthene, chrysene, and indeno(1,2,3-cd)pyrene.

728.    On information and belief, PCBs, arsenic compounds, cadmium compounds, copper compounds, lead compounds, zinc compounds, bis(2-ethylhexyl) phthalate, benzo(a)anthracene, benzo(p)fluoranthene, benzo(k)fluoranthene, chrysene, and indeno(1,2,3-cd)pyrene and other compounds and Hazardous Substances, which were handled, processed, or formed as a result of operations at the Chemical Leaman Site, were discharged into the Passaic River.

729.    Quality Carriers and Quala are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the Chemical Leaman Site and released into the Newark Bay Complex.

101

## CasChem Site

730.    The CasChem property consists of approximately eight acres of real property and associated improvements located at 35 and 40 Avenue A, Bayonne, New Jersey 07002 (the "CasChem Site").

731.    Since at least 1910, all or a portion of the CasChem Site has been utilized for the manufacture, refining, purification, storage, and distribution of castor beans, castor oil, and related derivatives and specialty chemicals, including urethane systems and additives, personal care intermediates, and painting and coating intermediates.

732.    In the 1960s, operators of the CasChem Site ceased production of castor oil, and operations at the CasChem Site concentrated on the processing and purification of castor oil delivered from off-site sources.

733.    From at least 1910 until 1975, The Baker Castor Oil Company ("Baker") owned and operated all or a portion of the CasChem Site.

734.    Upon information and belief, for at least a part of Baker's existence, Baker was owned, controlled, and/or operated by National Lead Company.

735.    On or about April 16, 1971, National Lead Company changed its name to N L Industries, Inc. ("N L Industries").

736.    From at least 1975 until 1981, N L Industries owned and/or operated the CasChem Site through an operating division of N L Industries, commonly referred to as Industrial Chemicals (Division of N L Industries, Inc.).

737.    In approximately 1981, CasChem, Inc. ("CasChem") purchased the castor oil and derivatives product line business, including the CasChem Site, from N L Industries in a leveraged buyout.

738.    From 1981 until at least 2003, CasChem owned and operated the CasChem Site.

739.    On or about October 11, 1983, CasChem became a subsidiary of CasChem Group, Inc., which later changed its name to Cambrex Corporation ("Cambrex").

102

740.    Upon information and belief, Cambrex underwent a corporate restructuring and on or about October 24, 2001 formed a new subsidiary known as Cambrex Chemicals, Inc. which changed its name to Rutherford Chemicals, Inc. on November 28, 2001.  Upon information and belief, CasChem became a subsidiary of Rutherford Chemicals, Inc. on or about January 1, 2002.

741.    Upon information and belief, in November 2003, Cambrex sold the business of Rutherford Chemicals, Inc. and CasChem sold its business and assets, including the Caschem Site, to Rutherford Acquisition Corp.  Upon information and belief, CasChem retained certain environmental liabilities related to the CasChem Site.

742.    On or about September 17, 2003, CasChem notified the NJDEP of the acquisition of the CasChem Site and continuation of current operations by Rutherford Chemicals LLC ("Rutherford").  Upon information and belief, Rutherford has owned and operated the CasChem Site since at least September 17, 2003.

743.    Hazardous Substances and other compounds utilized, processed, handled, consumed, stored, and/or Discharged at the CasChem Site, include, without limitation, acetic acid, acetic anhydride, acetone, acetonitrile, acrylic acid, adipic acid, ammonium sulfide, butanol, n-butyl alcohol, caustic potash, caustic soda, chlorobenzene, cumene, dicyclopentadiene, ethylenediamine, ethyl acetate, ethylbenzene, ethyl ether, ethylene glycol, ferric chloride, formaldehyde, glycols, hexane, hydrochloric acid, isocyanates, isophorone diisocyanate, isopropyl alcohol, maleic anhydride, methanol, methyl ethyl ketone, methylene chloride, phosphoric acid, sodium hydroxide, sulfuric acid, toluene, TDI (toluene diisocyanate), xylene, and zinc compounds.

744.    The CasChem Site abuts Newark Bay, which receives direct discharges, overland flow, and sheet storm water runoff directly from the CasChem Site.

745.    Upon information and belief, process wastewater generated at the CasChem Site was discharged into the Bayonne Combined Sewer System.  Upon information and belief, the Bayonne Combined Sewer System was constructed in the late 1800s to early 1900s and was designed to collect and discharge untreated wastewater into Newark Bay and/or the Kill Van Kull.

103

746.    The City of Bayonne did not construct a wastewater treatment plant until at least 1954. Thus, from at least 1910 until 1954, process wastewater generated at the CasChem Site was discharged into Newark Bay without treatment.

747.    Upon information and belief, process wastewater generated at the CasChem Site contained, and contains, Hazardous Substances and other compounds.

748.    In the early 1980s, a wastewater treatment plant was constructed at the CasChem Site and process wastewater generated at the CasChem Site was reportedly directed into the on-site treatment plant prior to discharge into the Bayonne Combined Sewer System.

749.    Upon information and belief, prior to construction of the on-site wastewater treatment plant, process wastewater generated at the CasChem Site received minimal, if any treatment prior to discharge into the Bayonne Combined Sewer System.

750.    Process wastewater discharged from the CasChem Site into the Bayonne Combined Sewer System enters an intercepting sewer through a regulator, commonly referred to as Regulator 8, located at West 3rd Street, which includes an outfall into Newark Bay known as DSN#011.

751.    Upon information and belief, during wet-weather events, peak flow conditions, mechanical failures, blockages, or other similar events, wastewater entering Regulator 8 overflows from the Bayonne Combined Sewer System and discharges from DSN#011 into Newark Bay without treatment.

752.    Upon information and belief, the City of Bayonne did not receive a permit to discharge wastewater from DSN#011 until at least 1983.

753.    Non-contact cooling water, storm water runoff, and vacuum system water generated at the CasChem Site discharges into Newark Bay.

754.    The City of Bayonne joined the PVSC in 1986 and began to divert its wastewater flow to the PVSC for treatment in 1990.

755.    In June 1982, 20,000 pounds (2,600 gallons) of methyl ricinoleate, a substance subject to the Toxic Substances Control Act, were unaccounted for at the CasChem Site and the loss was attributed

to a leak in an underground pipe. Only 750 pounds of the methyl ricinoleate were recovered from the CasChem Site.

756.    On November 27, 1985, CasChem reported that at least 200 gallons of castor oil and caustic soap discharged from the CasChem Site into Newark Bay.

757.    Upon information and belief, in early September 1986, between 30 and 200 gallons of caustic soda spilled into Newark Bay from the CasChem Site.

758.    On June 29, 1988, NJDEP notified CasChem that the CasChem Site received an "unacceptable" rating in connection with a January 6, 1988 Compliance Evaluation Inspection, in part because very turbid wastewater had been discharged from the site to the surface waters of the State.

759.    Process wastewater discharged from the CasChem Site periodically violated pre-treatment standards. On May 18, 1990, NJDEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment pursuant to the Water Pollution Control Act to CasChem for violations of average daily effluent permit limits and the maximum effluent permit limits for total suspended solids for the periods from May 1, 1987 to April 30, 1989 and November 1, 1989 to January 31, 1990 and the maximum effluent permit limits for total organic compounds for the periods May 1, 1987 to July 31, 1987 and February 1, 1989 to April 30, 1989.

760.    On July 25, 1989, the NJDEP issued a Notice of Violation to CasChem because the level of total organic compounds in the process wastewater discharging from the CasChem Site was 1050 kg/d while the permit level was 68 kg/d.

761.    In its Annual Pretreatment Report for the period August 1, 1991 through July 31, 1992, the PVSC reported that the CasChem Site was not in compliance with effluent limitations for 1,1-dichloroethane.

762.    Between May 1 and July 30, 2000, process wastewater discharged from the CasChem Site exceeded CasChem's NJPDES permit limit for total suspended solids by 180 percent.

763.    On April 10, 1990, the EPA, the FBI, and the U.S. Customs Service searched the CasChem Site and discovered 10 drums of hazardous waste stored without a permit which constituted a felony. On December 1, 1994, CasChem, Inc. agreed to pay $1,000,000.00 to settle the resulting charges.

764.    On September 11, 1991, NJDEP notified CasChem that the CasChem Site received a "conditionally acceptable" rating in connection with a July 30,1991 Compliance Evaluation Inspection because of very poor housekeeping practices that could lead to contamination of Newark Bay.

765.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in discharges of Hazardous Substances to and from the CasChem Site.

766.    On January 13, 2006, the EPA issued a Consent Agreement and Final Order pursuant to which CasChem agreed to pay a civil penalty in the amount of $60,000.  The penalty was related to violations found during EPA's inspection of the CasChem Site on May 25, 2000 and a re-inspection on May 27, 2004 (when the CasChem Site was owned and operated by Rutherford), including violations that had been cited in the prior inspection.  The violations included:  oil tanks and pipelines throughout the facility were covered with a film or coating of oil so that visual inspections of the facility could not be properly conducted; large amounts of oil and water within diked areas compromised the volume of the containment; visible discharges from storage containers had not been corrected; accumulations of oil had not been cleaned up; and personnel had not been properly trained in maintenance of equipment to prevent discharges of oil.

767.    In a Preliminary Assessment Report dated June 2004, CasChem reported that since the early 1940s to the present, the principle operations and waste disposal practices at the CasChem Site "did not change significantly."  According to CasChem, the only improvements involved the construction of dikes and secondary containment controls around hazardous chemical and oil storage tanks and vessels in the early 1990s.

768.    Hazardous Substances and other compounds were detected in the soil at the CasChem Site on February 3, 1987 at concentrations above NJDEP soil action guidelines.

769.    Upon information and belief, storm events and general erosion transported Hazardous Substances and other compounds from the CasChem Site into Newark Bay.

770.    On or about July 20, 2005, the EPA issued a field Notice of Violation to operators of the CasChem Site because hazardous materials stored in drums were exposed to storm water.

771.    N L Industries, CasChem, and/or Rutherford are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the CasChem Site and released into the Newark Bay Complex.

### Columbia Terminals Site

772.    On information and belief, Amcol Realty Co. ("Amcol") is the current owner of real property and associated improvements located at 49 Central Avenue, in Kearny, New Jersey, also designated as Block 294, Lot 6 on the Tax Maps of the Town of Kearny, Hudson County, New Jersey. On information and belief, Havenick Associates L.P. ("Havenick") is the current owner of real property and associated improvements located at 65 Central Avenue, in Kearny, New Jersey, also designated as Block 294, Lot 1B on the Tax Maps of the Town of Kearny, Hudson County, New Jersey (the 49 and 65 Central Avenue properties are referred to herein collectively as the "Columbia Terminals Site"). The Columbia Terminals Site consists of approximately 5.05 acres on Lot 6 and 6.8 acres on Lot 1B.

773.    On information and belief, operations at the Columbia Terminals Site began in the early 1940's and ceased in January 2003. On information and belief, Columbia Terminals, Inc. ("Columbia Terminals") and A.C.C., Inc., ("ACC") operated at the Columbia Terminals Site.

774.    On information and belief, ACC operated as a wholesaler of industrial chemical products and distributor of liquid organic chemicals. ACC operated through its distribution and storage facilities located at the Columbia Terminals Site. ACC serviced over 200 customers, distributing over 350 products to a customer base including the paint and coatings, inks, flavor and fragrance, pharmaceutical and chemical process industries. On information and belief, ACC ceased operating at the Columbia Terminals Site in approximately January 2003.

107

775.    Columbia Terminals and Columbia Terminal, Inc. ("Old Columbia") operated a storage, blending, warehousing, and distribution facility at the Columbia Terminals Site.  Columbia Terminalss drum filling operations occurred at 65 Central Avenue in a warehouse.  Columbia Terminals offered tank storage for bulk liquid products, including chemicals, edible oils and specialty products.  On information and belief, Columbia Terminals/Old Columbia operated at the Columbia Terminals Site from 1977 until January 2003.

776.    Amcol served as a real estate broker and real estate property holding company.  On information and belief, Amcol has owned real estate at the Columbia Terminals Site since 1964.

777.    On information and belief, Havenick has owned real estate at the Columbia Terminals Site since 1978.

778.    On information and belief, Colt Corporation is the parent company of Columbia Terminals, A.C.C., and Amcol.

779.    On information and belief, Columbia Terminals, and/or their predecessors stored, handled, and/or discharged Hazardous Substances and other compounds at the Columbia Terminals Site, including, but not limited to, Toluol, DiOctyl Phthalate, n-Propyl Alcohol, DiMethyl Formamide, IsoPropyl Alcohol 99%, Tecsol 3 Anhydrous, Isopropyl Acetate, Acetone, Methyl IsoButyl Ketone, DiEthyl Phthalate, n-Propyl Acetate, DiButyl Phthalate, Liquid KOH 45%, Texanol, Ektasolve DB, Ektasolve EB, Ethyl Acetate 85-88%, IsoButyl IsoButyrate, IsoButyl Alcohol, Tecsol C 95%, Methyl Ethyl Ketone, Ektasolve EB Acetate, DiOctyl TriPhthalate, IsoButyl Acetate, n-Butyl Acetate, Tecsol B Anhydrous, BL-50-Cleaning Compound, Ektasolve EE Acetate, Propionic Acid, Tecsol 3 95%, Ektasolve EE, n-Methylpyrrolidone, Methyl Normal Butyl Ketone, Kodaflex DiMethyl Ethyl Phthalate, 2-Ethyl Hexanol, Alfonic 1412-60, Sorbitol, Glacial Acetic Acid, Methylene Chloride, Ethyl Acetate 99%, Texanol IsoButyrate, chloroform, 1,2,4-trimethylbenzene, dichloromethane, methanol, n-butyl alcohol, n-hexane, tetrachloroethylene, toluene, chloromethane, and xylene (mixed isomers).

780.    On information and belief, ACC stored, handled, generated, and/or discharged Hazardous Substances and other compounds at the Columbia Terminals Site including, but not limited to, acids,

anhydrides, aliphatic naphtha, aromatic naphtha, chlorinated hydrocarbons, amines, oils and process oils, lubricants and greases, glycols, glycol ethers, glycol ether acetates, ethers, ketones, active solvents, ether ester, polyether polyols, surfactants, plasticizers, silicone dimethyl fluids, alcohols, ethyl alcohol-denatured, proprietary solvents, SDA-specially denatured alcohols, silicone dimethyl fluids, surfactants, and duplicating fluids.

781.    The Columbia Terminals Site abuts the Hackensack River, which received direct discharges, overland flow, and sheet storm water runoff directly from the Columbia Terminals Site. The Columbia Terminals Site contained various aboveground storage tanks, drum storage facilities, and railroad tank cars along Newark Bay.

782.    Columbia Terminals discharged storm water to the Hackensack River under NJPDES Permit No. NJ0025631 from December 1, 1984 until at least July 2002. On information and belief, Columbia Terminals was also allowed to discharge petroleum hydrocarbons and total suspended solids at outfall number 001 to the Hackensack River, subject to certain limitations, on a daily basis under its NJPDES Permit.

783.    On information and belief, Columbia Terminals violated the New Jersey Water Pollution Control Act by constructing a system for collection of pollutants in a manner in which those pollutants were not treated by the facility's water treatment plant between June 24, 1999 and November 18, 1999.

784.    On information and belief, Columbia Terminals failed to ensure that the containment area used for the collection of pollutants spilled during the transfer and repackaging of hazardous chemicals at the Columbia Terminals Site was constructed in a manner that would return pollutants back to the facility's wastewater treatment plant and not enter the groundwater.

785.    Columbia Terminals operated a hazardous waste treatment storage disposal facility at the Columbia Terminals Site without first obtaining a hazardous waste treatment, storage, or disposal permit. Columbia Terminals, Inc. allowed the spillage of hazardous waste to the ground and the discharge of hazardous waste through a pipeline to the Hackensack River.

786.    Columbia Terminals discharged wastewater containing hazardous materials to the surface waters of New Jersey through an outfall other than one approved in its NJPDES permit.

787.    Columbia Terminals allowed discharges of restricted wastes onto the ground through the tank trailer loading area sump and storm drains at the Columbia Terminals Site.

788.    On information and belief, Columbia Terminals exceeded the limits under its NJPDES permit for outfall number 001 numerous times, including, but not limited to, October 1988, January 1989, February 1989, May 1989, June 1989, and July 1989.

789.    On information and belief, NJDEP inspections at the Columbia Terminals Site in July 1999 produced findings that contaminated groundwater, process waters, and stormwater from a portion of a warehouse at the Columbia Terminals Site were ultimately discharged to the surface waters of New Jersey at a non-permitted discharge point.    The inspections also revealed that Columbia Terminals discharged water softener blowdown into its out of service wastewater treatment system, a non-approved wastewater source for discharge from the Columbia Terminals Site.

790.    On information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Columbia Terminals Site.

791.    On information and belief, Columbia Terminals maintained seventeen (17) box trailers for the purpose of storing 1,386 55-gallon drums of hydrocarbon raw materials, intermediates, and finished products at the Columbia Terminals Site.    On or about June 11, 1999, officials from the NJDEP Bureau of Emergency Response, the NJDEP Northern Bureau of Hazardous Waste Enforcement, and the Hudson Regional Health Commission inspected the box trailers storing these drums and observed drums leaking and improperly stacked on pallets.    Organic odors were also detected when the box trailer doors were opened.

792.    On information and belief, NJDEP inspections at the Columbia Terminals Site in July 1999 also revealed that spills and drips from non-hazardous product transfers and poor housekeeping

throughout the facility had discharged, or had the potential for discharge, to the groundwater. Furthermore, the wastewater treatment system was out of service.

793.    Columbia Terminals failed to perform a tank assessment prior to storing hazardous waste in an aboveground storage tank and failed to perform integrity testing on tanks with a capacity greater than 2,000 gallons placed into service on or after July 22, 1990.

794.    Columbia Terminals failed to have a leak detection system or high liquid level audible or visual alarms on tanks storing hazardous waste at the Columbia Terminals Site.

795.    Columbia Terminals stored hazardous wastes in aboveground storage tanks, including, but not limited to, tanks 503 and 504, which had clay liners that were cracked and not impervious to spills.

796.    On or about July 13, 2007, EPA sent a General Notice Letter notifying Columbia Terminals, Inc. and Amcol Realty Co. of their potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Columbia Terminals Site.

797.    Havenick is a person "in any way responsible" for the Hazardous Substances that were discharged at the Columbia Terminals Site and released into the Newark Bay Complex.

798.    Columbia Terminals is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Columbia Terminals Site and released into the Newark Bay Complex.

799.    A.C.C. is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Columbia Terminals Site and released into the Newark Bay Complex.

800.    Amcol is a Person "in any way responsible" for the Hazardous Substances that were discharged at the Columbia Terminals Site and released into the Newark Bay Complex.

WAS:144301.1

## Como Textile Site

801.    The Como Textile Prints, Inc. property consists of real property and associated improvements located at 191 East Railway Avenue in Paterson, Passaic County, New Jersey ("Como Textile Site").

802.    Since at least 1964, Como Textile Prints, Inc. ("Como Textile") owned and operated a textile dye facility at the Como Textile Site.  Como Textile prints knit and woven nylon, rayon, cotton, acetate, and polyester fabrics on rotary screen printing machines and also operates a finishing line for broad woven fabrics, including synthetic and silk fibers.

803.    Como Textile utilized, processed, handled, stored and/or Discharged Hazardous Substances and other compounds at the Como Textile Site including, but not limited to, 1,1,1-trichloroethane, titanium dioxide, trichloroethene, 1,4-dioxane, manganese, nickel, silicon powder, molybdenum chloride, ammonium tartrate, arsenic, chromium, lead, benzene, petroleum oil, formaldehyde, cotton dust, naphthalene, cyanide compounds, copper, sulfuric acid, silver, varsol, xylenes, and petroleum naphtha.

804.    In July 1971, colored wastewaters were observed discharging into Wabash Brook from the Como Textile Site.  PVSC inspectors determined that since at least May 1971, Como Textile had plumbed its process wastewater sewer into a storm sewer pipe rather than into the sanitary sewer line.

805.    On or about March 27, 1973, red wastewaters were observed discharging into Wabash Brook from the Como Textile Site.  PVSC inspectors determined that the discharges consisted of process wastewaters overflowing from the Como Textile Site into area storm drains.

806.    As of 1994, Como Textiles reported that it discharged 300,000 gallons of process wastewater per day into the PVSC Combined Sewer System.

807.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Como Textile Site.

808.     Como Textile is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Como Textile Site and released into the Newark Bay Complex.

### Conrail Elizabeth Site

809.     On information and belief, the Consolidated Rail Corporation Elizabeth property consists of real property and associated improvements located at or about 123 Dowd Avenue, in Elizabeth, Union County, New Jersey (the "Conrail Elizabeth Site").

810.     From at least 1901 until at least 1988, the Conrail Elizabeth Site was utilized for the servicing and cleaning of passenger and freight train engines and cars.  Operations at the Conrail Elizabeth Site consisted primarily of passenger and freight rail service activities, including storage, repair and maintenance of storage and passenger cars, transfer of materials to and from rolling stock, freight classification and sorting, and fabrication of parts for locomotive and passenger car repair.  On-site facilities included a car repair shop, engine repair shop, carpenter shop and refueling area.  Materials used in the operations included fuel, acids, solvents, detergents, degreasers, oil and hydraulic fluid.

811.     From at least 1901 until 1976, Central Railroad of New Jersey, also known as Jersey Central Lines or CNJ, owned and operated the Conrail Elizabeth Site.

812.     On or about February 10, 1976, pursuant to the Regional Rail Reorganization Act of 1973, Consolidated Rail Corporation ("Conrail") was incorporated as part of the federally-funded takeover of the major railroad companies in the northeast United States, all of which were financially failing.  The takeover included the business, operations, and assets of Central Railroad of New Jersey. The railroads acquired by Conrail were dissolved and the sole surviving entity of the reorganization was Conrail.  Upon information and belief, the assets of the former railroads were conveyed to Conrail on April 1, 1976.

813.     Upon information and belief, Conrail is the successor to Central Railroad of New Jersey.

814.     From approximately 1976 until at least 1982, Conrail owned and operated the Conrail Elizabeth Site.

WAS:144301.1

815.    From at least 1983 until at least 1987, New Jersey Transit Corporation leased and operated a portion of the Conrail Elizabeth Site from Conrail.  Portions of the Conrail Elizabeth Site were also leased to other entities, including, but not limited to, Matlack Trucking Company and Armin Poly-Film Company.

816.    In 1999, the parent company of Conrail, Conrail, Inc. was acquired by Norfolk Southern Corporation and CSX Corporation through a joint stock purchase.  Most of Conrail's assets were split between its two new owners, and Conrail itself was restructured into a switching and terminal railroad.

817.    Portions of the Conrail Elizabeth Site abut Newark Bay, which received direct discharges, overland flow, and sheet storm water runoff directly from the Conrail Elizabeth Site.

818.    On or about June 16, 1980, inspectors with Conrail, the NJDEP, and the United States Coast Guard reported, *inter alia*: (1) that the refueling area at the Conrail Elizabeth Site was saturated with oil, which had entered a marsh area adjacent to the train yard; (2) that an oil water separator at the Conrail Elizabeth Site consisted of an unlined hole in the ground, which collected surface water runoff from a series of unlined ditches, and was described as a source of oil contamination in the area, especially during periods of heavy rain; (3) that the ground around the tank car storage area at the Conrail Elizabeth Site was completely saturated with various chemicals; and (4) that the Conrail Elizabeth Site had several waste dump areas, which contained household debris, drums, and oily waste.

819.    On or about March 24, 1981, the NJDEP reported that inspectors of the Conrail Elizabeth Site observed, *inter alia*, that: (i) all materials used in the car repair shop for engine maintenance -- including acids, solvents, oil and hydraulic fluid -- were washed into defunct work basins and steam line tunnels, which were flooded due to water line breaks; (ii) oil and other liquids from the train engines serviced in the engine repair shop were drained into a defunct drop table basin and then pumped to a drainage ditch, which emptied into an unlined pit that was used as an oil separator; (iii) soil in the refueling area had been heavily contaminated due to careless refueling practices; (iv) the area surrounding the fuel oil storage tanks was heavily contaminated due to spills; (v) a marshy area, which upon information and belief, was hydrologically connected to Newark Bay and/or its tributaries, was heavily

114

contaminated with oil that appeared to have been discharged from the Conrail Elizabeth Site; (vi) all areas at the Conrail Elizabeth Site where products were stored in fifty-five gallon drums were heavily contaminated due to improper storage and leaking containers; and (vii) that a "considerable amount of various chemicals" were noted to have been spilled in the Flexi-Flow area of the yard at the Conrail Elizabeth Site, and tests on the spilled substances revealed various concentrations of Hazardous Substances.

820.    An NJDEP memo dated October 13, 1981, documenting the investigation of a PCB spill, noted leaking transformers and stained soil at the Conrail Elizabeth Site.

821.    NJDEP personnel conducted a "windshield survey" on April 3, 1986, and observed 400-600 drums and 150-200 gas cylinders, all of which were abandoned and strewn about the Conrail Elizabeth Site.

822.    On May 24, 1989, the EPA reported that soil at the Conrail Elizabeth Site was saturated with oil throughout the active part of the train yard, and various chemical odors were detected.  The EPA also reported that there was a potential for human exposure and a release of Hazardous Substances and other compounds to surface water because of the Conrail Elizabeth Site's close proximity to a tidal area of Newark Bay and the Great Ditch, which discharged into Newark Bay.

823.    In May 1987, Conrail conducted an environmental inspection at the Conrail Elizabeth Site and noted batteries and drums on the property, as well as oil-stained soil.

824.    On August 26, 1987, the NJDEP reported that the Conrail Elizabeth Site contained many areas of soil contamination, housekeeping was generally poor, and there were several areas on the Conrail Elizabeth Site where illegal dumping had occurred.

825.    On September 1, 1987, the NJDEP reported that inspections of the Conrail Elizabeth Site revealed poor housekeeping practices, including drums of Hazardous Substances that were stored throughout the site without proper secondary containment.  The NJDEP also reported that oil saturated water discharged from a network of unlined ditches into the surrounding wetlands.

WAS:144301.1

826.    A December 26, 1989 site inspection report prepared for Conrail by O.H. Materials Corp. indicated that demolition debris, appliances, wood, scrap metal and approximately 4,000 tires had been dumped on the Conrail Elizabeth Site.  Soil at the Conrail Elizabeth Site was found to be contaminated with petroleum hydrocarbon compounds, transformer fluid, volatile organics, base/neutral compounds and metals.  Water collected from the basements of several buildings at the Conrail Elizabeth Site contained petroleum hydrocarbon compounds.

827.    In 1989, the EPA reported that soil and groundwater at the Conrail Elizabeth Site contained Hazardous Substances and other compounds, including, but not limited to, antimony, arsenic, cadmium, copper, lead, selenium, silver, thallium, zinc, benzene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(g,h,i)perylene, benzo(a)pyrene, bis(2-ethylhexyl)phthalate, chrysene, 4,4-DDT, 3,3-dichlorobenzidine, 4,6-dinitro-2-methylphenol, 2,6-dinitrololuene, fluoranthene, fluorene, indeno(1,2,3-cd)pyrene, isophorone, naphthalene, n-nitrosodiphenylamine, pentachlorophenol, phenanthrene, pyrene, tetrachloroethylene, 1,1,1-trichloroethane, and toluene.

828.    Upon information and belief, groundwater at the Conrail Elizabeth Site flows to Newark Bay.  Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the Conrail Elizabeth Site discharge into the Newark Bay Complex.

829.    In 1989, the EPA reported that the Conrail Elizabeth Site was unsecured and there was evidence of uncontrolled dumping on the property, including, tires, assorted debris, plastic bags of wastes, and at least sixty drums in various states of integrity.

830.    In August 1992, approximately 1,500 gallons of floating separate-phase product (fuel oil) was recovered from an excavation at the Conrail Elizabeth Site.

831.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in discharges of Hazardous Substances to and from the Conrail Elizabeth Site.

832.    Conrail is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Conrail Elizabeth Site and released into the Newark Bay Complex.

116

## Cook & Dunn Site

833.    The Cook & Dunn property consists of real property and associated improvements located at 109-121 St. Francis Street, 157-167 Kossuth Street, 156-166 and 157-159 Rome Street, 133-137 St. Charles Street, Newark, New Jersey 07101 (the "Cook & Dunn Site").

834.    From approximately 1928 until approximately 1988, Cook & Dunn Paint Corporation ("Cook & Dunn") owned and operated a factory that produced and packaged paints, varnishes and enamels at the Cook & Dunn Site for sale to wholesalers with associated office, warehouse, and garage space.

835.    Upon information and belief, Cook & Dunn utilized, processed, handled, mixed, consumed, stored, and/or Discharged Hazardous Substances and other compounds at the Cook & Dunn Site, including, but not limited to, pigments, driers, oils, including #4 fuel oil, latex emulsions, alkyd resins, solvent resins, aqueous resins, aromatic solvents, titanium dioxide, calcium carbonate, phenyl mercury acetate paints, and propylene glycol.

836.    Cook & Dunn discharged waste and process cooling water from the Cook & Dunn Site to the sewer system operated by the PVSC via an industrial sewer connection.  Upon information and belief, the section of the sewer system to which Cook & Dunn discharged from the Cook & Dunn Site flows through the Roanoke Avenue outlet to the Passaic River.  PVSC notified Cook & Dunn in multiple years, beginning as early as 1972, that the water it discharged into the sewer system from the Cook & Dunn Site contained mercury.  Upon information and belief, PVSC also detected chromium in the wash water from the Cook & Dunn Site on one or more occasions.

837.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Cook & Dunn Site.  Until 1983, Cook & Dunn pumped discolored water from the rain-flooded basement of one of the buildings at the Cook & Dunn Site into a storm sewer catch basin.  In 1987, PVSC notified Cook & Dunn that its practice of hosing material believed to be titanium oxide off the sidewalk at the Cook & Dunn Site into a storm sewer catch basin violated certain PVSC rules and regulations.  In 1991,

117

approximately 10 gallons of an aromatic solvent were discharged from an underground pipe at the Cook & Dunn Site.

838.    Hazardous Substances and other compounds have been detected in the soil at the Cook & Dunn Site, including, but not limited to, petroleum hydrocarbons.

839.    Cook & Dunn is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Cook & Dunn Site and released into the Newark Bay Complex.

### Cosan Chemical Site

840.    The Cosan Chemical Corporation property consists of real property and associated improvements located at or about 400 14th Street in Carlstadt, Bergen County, New Jersey ("Cosan Chemical Site").

841.    Since at least 1973, Cosan Chemical owned and operated an industrial chemical manufacturing and distribution facility at the Cosan Chemical Site.  Principal products manufactured at the Cosan Chemical Site include, but are not limited to, organo-mercury biocides, fungicides, agricultural chemicals, polishes, and assorted mercuric chemicals for the paints, coatings, and catalysts industries.

842.    On or about December 18, 1962, Cosan Chemical Corporation ("Cosan Chemical") was incorporated in the State of New Jersey.

843.    Cosan Chemical utilized, manufactured, processed, stored, and/or Discharged Hazardous Substances and other compounds at the Cosan Chemical Site including, but not limited to, mercury compounds (including elemental mercury), zinc, lead compounds, benzene, toluene, organic acids, trichloroethane, xylene, dichlorobenzene, assorted organometallic and organic compounds, and petroleum hydrocarbons.

844.    The Cosan Chemical Site abuts a drainage ditch which receives direct discharges, overland flow, and sheet storm water runoff directly from the Cosan Chemical Site.  From the Cosan Chemical Site, the drainage ditch flows into Berry's Creek, a tributary of the Hackensack River.  The

118

Hackensack River empties into Newark Bay. Upon information and belief, storm sewers on the Cosan Chemical Site also discharge directly into Berry's Creek.

845. Upon information and belief, process wastewater at the Cosan Chemical Site was discharged into the sanitary sewer system, where it was delivered to the Rutherford-Carlstadt Joint Meeting Sewage Treatment Plant. Upon information and belief, until the late 1980s, Cosan Chemical discharged its process wastewater with minimal pre-treatment.

846. From 1986 through 1990, Cosan Chemical was cited for violating the effluent limitations of its wastewater discharge permit, including the effluent parameters for pH, toluene, benzene, and petroleum hydrocarbons.

847. In 1986, Cosan Chemical was cited for discharges that caused a violation of the effluent parameters of the Rutherford-Carlstadt Joint Meeting's discharge permit.

848. In 1988, the Bergen County Utilities Authority indicated that analysis of effluent from the Cosan Chemical Site included excessive levels of discharged mercury.

849. In December 1987 and February 1988, inspectors observed several hundred drums stored outside on the Cosan Chemical Site. The drums contained, *inter alia*, mercury-based hazardous waste. Several drums were corroded and leaking. The area was uncurbed and otherwise not constructed to control storm water runoff and the facility's drum management system was described as poor. In 1990, inspectors observed similar problems with storage, management, and handling of hazardous materials and wastes in the exterior drum storage area.

850. Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Cosan Chemical Site.

851. Hazardous Substances and other compounds have been detected in the soil at the Cosan Chemical Site, including, but not limited to, mercury, methylene chloride, ethylbenzene, trichloroethane, arsenic, cadmium, chromium, nickel, and zinc.

852.    The Cosan Chemical Site flooded during heavy rain events.  Upon information and belief, the advancing and receding floodwaters eroded and transported Hazardous Substances and other compounds from chemical process areas, waste storage areas, and/or on-site soils into the Newark Bay Complex.

853.    Hazardous Substances and other compounds have been detected in the groundwater at the Cosan Chemical Site, including, but not limited to, mercury, chromium, cadmium, arsenic, lead, benzene, chlorobenzene, trichloroethane, dichloroethane, toluene, and phenol.

854.    Hazardous Substances and other compounds similar to those that have been discharged from the Cosan Chemical Site have been detected in sediment core samples taken from Berry's Creek, downstream from the Cosan Chemical Site, including, but not limited to, mercury, chromium, and cadmium.

855.    Cosan Chemical is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Cosan Chemical Site and released into the Newark Bay Complex.

**Croda Site**

856.    In 1957, Croda Inc. purchased the lanolin business of Hummel Chemical Company and transferred production to a newly constructed plant at 185 Foundry Street, Newark, New Jersey, Building 39 (the "Croda Site").

857.    On information and belief, Hummel Lanolin U.S.A., Inc. was incorporated in the State of New York in 1961 as a wholly-owned subsidiary of Croda, Inc. and continued the operations of Croda, Inc. at the Croda Site.

858.    In 1961, Hummel Lanolin U.S.A. Inc. changed its name to Hummel Lanolin Corporation.

859.    In 1989, Hummel Lanolin Corporation merged with Croda, Inc. and the surviving corporation was known as Croda, Inc. ("Croda").  As a result, Croda, Inc. is the successor to Hummel to Hummel Lanolin Corporation.

120

860.    Croda and its predecessors blended mixtures of lanolin and lanolin derivatives with mineral oils, paraffin waxes, fatty acids, and alcohols at the Croda Site.

861.    Hazardous Substances and other compounds detected in the soil at the Croda Site include: petroleum hydrocarbons, bis(2-ethylhexyl) phthalate, di-n-butylphthalate, napthalene, benxene, toluene, 2-butanone, trichloroethane, 1,2-dichloropropane, xylene, fluoranthene, pyrene, chrysene, benzo(a)pyrene, phenanthrene, cadmium, chromium, copper, lead, zinc, heptaclor, aldrin, and DDT.

862.    A water sample taken from a drainage basin located on the north side of the process building at the Croda Site revealed the presence of petroleum hydrocarbons, total cyanide, cadmium, and lead.  A sediment sample was taken from the drainage basin revealed the presence of methylene chloride, toluene, cadmium, copper, lead, selenium, zinc and total petroleum hydrocarbons.

863.    On information and belief, wastewater from the Croda Site discharged to the Roanoke combined sewer system.

864.    The Roanoke Avenue combined sewer lines discharged to the Passaic River.  From as early as 1958 until the early 1980s, a malfunctioning regulator on the Roanoke Combined Sewer System resulted in untreated sewage flows discharging into the Passaic River.

865.    According to a 1978 survey taken by the PVSC, Croda did not pretreat its wastewater before discharging it to the sanitary sewer.

866.    A sample of Croda's wastewater taken in or about 1979 revealed the presence of arsenic, lead, cadmium, copper, nickel, zinc and chromium.

867.    On or about June 8, 2006, EPA sent a General Notice Letter notifying Croda of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Croda Site.

868.    Croda is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Croda Site and released into the Newark Bay Complex.

121

**Crompton Site**

869.    The Crompton property consists of approximately 5.6 acres of real property and associated improvements located at 52 Amsterdam Street in Newark, Essex County, New Jersey ("Crompton Site").

870.    In the late 1920s to early 1930s, Otto B. May, Inc. purchased all or a portion of the Crompton Site and began operating a dye manufacturing and processing facility.  Upon information and belief, May Chemical Corporation, May Urban Renewal Corporation No. 1, and May Chemicals Works, Inc. also operated at the Crompton Site.

871.    In approximately 1958, Cone Mills Corporation ("Cone Mills") purchased Otto B. May, Inc. and May Chemical Corporation and operated the entities through a division of Cone Mills.

872.    Until approximately 1972, Cone Mills operated dye manufacturing and processing operations that utilized chlorinated organics, aromatics, and aniline compounds.  From approximately 1972 until 1979, Cone Mills operated dye manufacturing and processing operations that used predominantly aniline-based raw materials.

873.    In approximately 1971, May Chemical Corporation was merged into Otto B. May, Inc., and in 1979, Otto B. May, Inc. was merged into Cone Mills.  Cone Mills continued to operate the Crompton Site as Otto B. May, an unincorporated division of Cone Mills.

874.    On or about December 14, 1979, Cone Mills ceased operating the Crompton Site.

875.    On or about September 24, 2003, Cone Mills and related entities filed for protection under Chapter 11 of the U.S. Bankruptcy Code in U.S. Bankruptcy Court in Delaware.  Pursuant to a Section 363 sale on March 12, 2004 ("Sale Order"), substantially all of the assets of Cone Mills were sold to a fund of W.L. Ross & Co., WLR Recovery Fund II L.P., and its subsidiary, WLR Cone Mills Acquisition LLC.  The assets were ultimately consolidated into the International Textile Group, Inc.

876.    In approximately September 1980, Crompton & Knowles Corporation ("Crompton & Knowles") purchased the Crompton Site and began operating a dye manufacturing facility at the

Crompton Site. Crompton manufactured dispersed dyes, acid water-based dyes, diazo dyes, azo dyes, and dye intermediate components.

877.    Upon information and belief, in 1995, Crompton & Knowles changed its name to Crompton & Knowles Incorporated, and later changed its name to Crompton Corporation ("Crompton Corp.").

878.    In January 1995, Crompton & Knowles conveyed the Crompton Site to Dyes & Chemicals Corporation.

879.    Upon information and belief, Dyes & Chemicals Corporation was incorporated in the State of Delaware, and, on or about April 5, 1995, changed its name to Crompton & Knowles Colors Incorporated. On or about April 2, 2001, Crompton & Knowles Colors Incorporated changed its name to Crompton Colors Incorporated ("Crompton Colors").

880.    Upon information and belief, Crompton Colors operated the Crompton Site from 1995 until the present. Upon information and belief, Crompton Colors is the current owner of the Crompton Site.

881.    In approximately November 2001, Crompton Corp. and/or Crompton Colors ceased operating the Crompton Site and began decommissioning and demolishing the property in December 2001.

882.    On or about July 1, 2005, Crompton Corp. entered into an all-stock merger transaction with Great Lakes Chemical Corporation ("Great Lakes"). As a result of the merger, the combined company became Chemtura Corporation ("Chemtura"), a Delaware Corporation. Chemtura Corp. is the corporate successor of Crompton & Knowles.

883.    Hazardous Substances and other compounds utilized at the Crompton Site include, but are not limited to, isopropyl alcohol, dimethyl sulfate, dimethylaniline, sodium hydroxide, ammonia, flammable wastes, solvent wastewater, # 4 fuel oil, sulfuric acid, dimethyl aniline, and di-methyl sulfate.

WAS:144301.1

884.    The Crompton Site is located approximately 6,000 feet east of the Passaic River and 7,000 feet east of Newark Bay.  Upon information and belief, Newark Bay received storm water runoff and spills from the Crompton Site.

885.    On or about December 11, 1980, Crompton & Knowles reported discharging approximately 75-100 gallons of oil from the Crompton Site into a storm sewer along Amsterdam Street.

886.    In October 1981, Crompton & Knowles reported discharging "bright red" wastewater from a filtrate receiving tank at the Crompton Site into a storm sewer along Amsterdam Street.  Inspectors from the City of Newark reported seeing "red color…emptying into Newark Bay" and reportedly tracked the discharge to the Crompton Site.

887.    On March 17, 1987, the NJDEP reported "very poor housekeeping practices" at the Crompton Site.

888.    In January 1989, NJDEP inspectors reported observing several rusted drums in a drum storage area at the Crompton Site, one of which was leaking xylene onto the ground.

889.    On May 25, 1989, an EPA contractor reported that on August 18, 1980, operators of the Crompton Site reported that the facility generated approximately 31,000,000 pounds of solid and hazardous waste per year.

890.    Solid and hazardous wastes generated at the Crompton Site include, without limitation, xylene, chlorobenzene, aniline, dimethylsulfate, formic acid, methanol, nitrobenzene, o-toluidine, 1,2-dichlorobenzene, and methyl ethyl ketone.  Upon information and belief, 1,2-dichlorobenzene is associated with the formation of dioxin compounds.

891.    On May 25, 1989, an EPA contractor reported that a drum storage area at the Crompton Site was not "well-contained;" several drums were "deteriorated;" there were "stains throughout the area;" a "strong, pungent odor" was present proximate to the drum storage area; and an "orange stain" had migrated from the storage area "onto Magazine Street."  According to the NJDEP, at least 300 -55-gallon drums were stored in the drum storage area.

WAS:144301.1

892.    On November 29, 1990, officials with the City of Newark observed sloppy housekeeping around a drum storage area at the Crompton Site, with dye powder and puddles of purple dye located in the area on the facility grounds and runoff discharging off-site from the area.

893.    Process wastewater and non-contact cooling water generated at the Crompton Site is discharged into the PVSC System.

894.    Process wastewater generated at the Crompton Site contained Hazardous Substances and other compounds, including, without limitation, methanol, phosgene, hydrochloric acid, chlorobenzene, zinc compounds, xylene, toluene, sulfuric acid, 1,2,4-trimethylbenzene, phosphoric acid, phthalic anhydride, glycol ethers, dimethyl sulfate, n,n-dimethylaniline, 1,2-dichlorobenzene, and ammonium sulfate.

895.    On December 10, 1985, Crompton & Knowles reported that approximately 30,000 pounds of "corrosive filtrates" were discharged to the PVSC System.

896.    In 1989, Crompton & Knowles Corp. reported discharging approximately 96,374 pounds of methanol; 37,570 pounds of chlorobenzene; 26,870 pounds of zinc compounds; 66,632 pounds of xylene (mixed isomers); 7,840 pounds of toluene; 16,515 pounds of glycol ethers; 9,917 pounds of n,n-dimethylaniline; 2,700 pounds of 1,2-dichlorobenzene; and 274,499 pounds of ammonium sulfate into the PVSC System.

897.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Crompton Site.

898.    Hazardous Substances and other compounds have been detected in the soil at the Crompton Site, including, but not limited to, assorted base neutral acid compounds, arsenic, hexavalent chromium, copper, lead, mercury, zinc, and PCBs.

899.    Upon information and belief, storm events and erosion transported Hazardous Substances and other compounds from the Crompton Site into the Newark Bay Complex.

900.    Hazardous Substances and other compounds have been detected in the groundwater at the Crompton Site, including, but not limited to, 1,1-dichloroethene, 1,2-dichlorobenzene, 1,2-dichloroethane, 1,4-dichlorobenzene, benzene, chlorobenzene, chloroform, tetrachloroethene, trichloroethene, 1,2-dichloroethene, 1,2-dichlorobenzene, 2-chlorophenol, 1,4-dichlorobenzene, nitrobenzene, 1,2,4-trichlorobenzene, light non-aqueous phase liquids, dense non-aqueous phase liquids, arsenic, chromium, lead, mercury, nickel, and PCBs.

901.    Chemtura is a "discharger" and/or a person "in any way responsible" for the Hazardous Substances that were discharged at the Crompton Site and that have discharged into the Newark Bay Complex.

## Crucible Steel Site

902.    The Crucible Steel Company Site originally consisted of no less than approximately sixty acres of real property and associated improvements located at 900-1000 South Fourth Street (a/k/a Frank E. Rodgers Boulevard) in Harrison, Hudson County, New Jersey ("Crucible Steel Site").

903.    The Crucible Steel Site nearly abuts the Passaic River, which receives overland flow and sheet stormwater runoff directly from the Crucible Steel Site.  A network of storm sewer collection drains and pipes collected stormwater runoff, processes wastewaters, spills, leaks, spent acid washings, equipment washdown effluent, and other contaminants from the Crucible Steel Site and discharged such effluent directly to the Passaic River through a six foot box culvert.  Another twelve-inch storm sewer line collected stormwater runoff and cooling water discharges from the Crucible Steel Site and discharged such effluent directly to the Passaic River.  Many building floor drains across the Crucible Steel Site also connected to the storm sewer system.

904.    Upon information and belief, spills, leaks, and mechanical failures resulted in Discharges of Hazardous Substances to and from the Crucible Steel Site.  On information and belief, due to the proximity of the Crucible Steel Site to the Passaic River, flooding, storm events, and erosion caused Hazardous Substances that were Discharged to the Crucible Steel Site to be transported into the Passaic

WAS:144301.1

River either directly or indirectly through the on-site network of stormwater sewer pipes and channels, which discharged directly to the Passaic River.

905.    On information and belief, groundwater at the Crucible Steel Site is hydraulically connected to, and flows to, the Passaic River.  Hazardous Substances and other contaminants discharged to and/or from the Crucible Steel Site into the groundwater beneath the Crucible Steel Site are released to the Passaic River.

906.    Upon information and belief, beginning in approximately 1947, the Crucible Steel Site was subdivided and various lots were sold and/or leased to subsequent owners and/or operators over time.

907.    Upon information and belief, the Crucible Steel Site has remained relatively unoccupied since the early to mid-1990s, and for approximately the past several decades various federal, state, and local entities, including the NJDEP, have conducted, ordered, and directed various investigations and remedial activity on portions of the property to address the presence of Hazardous Substances previously Discharged onto and from the Crucible Steel Site.

<u>Crucible Materials Corporation</u>

908.    Upon information and belief, around 1900, the Crucible Steel Company of America ("Crucible") was formed following the union of thirteen individual steel companies.

909.    In approximately 1968, Crucible was purchased and operated by Colt Industries, Inc.

910.    On or about September 12, 1983, the Crucible Materials Corporation ("Crucible Materials") was incorporated in the State of Delaware.  In approximately December 1985, Crucible Materials purchased Colt Industries, Inc.'s outstanding interests in Crucible.

911.    Upon information and belief, Crucible Materials is the successor to Crucible and, therefore, succeeds to Crucible's environmental liabilities related to the Crucible Steel Site.

912.    Upon information and belief, from approximately 1900 until approximately 1947, Crucible owned and operated the entire Crucible Steel Site.  Beginning in approximately 1947, Crucible began subdividing, selling, and leasing portions of the Crucible Steel Site to other entities.  By

127

approximately 1970, Crucible's interest in the Crucible Steel Site was comprised of approximately fourteen acres of real property and improvements.

913.    From approximately 1901 until approximately 1973, Crucible, or its successors, owned and operated a steel manufacturing facility at the Crucible Steel Site.

914.    Crucible's operations at the Crucible Steel Site included, but were not limited to, the manufacture of ordnance, cold rolled steel, finished strip steel, wire rods, cast magnets, and high alloy casting for tools.  Crucible's operations involved the use of significant quantities of chromium, nickel, and lead in the manufacturing process.  Molten lead was used in quenching baths, and during the quenching process lead would vaporize and lead oxide would form as the lead vapors cooled in the atmosphere.

915.    Crucible processed, handled, generated, consumed, stored, or otherwise used Hazardous Substances and other chemicals and wastes at the Crucible Steel Site, including, but not limited to, cadmium, lead, zinc, nickel, copper, mercury, spent cyanide bath effluent, pickling acids, slag, metal tailings, trichloroethylene, phosphate, phenols, emulsions, chlorines, surfactants, perchloroethylene, chromates, borax, creosols, heavy metals, waste oils nitric acid, and sulfuric acid.

916.    Crucible treated portions of its steel product in nitric acid or sulfuric acid baths, which dissolved chrome, nickel, lead, and other heavy metals and compounds.  The waste acid was released to area storm drains, which discharged directly to the Passaic River.

917.    Crucible also washed steel with water.  The water dissolved quantities of remaining acid, lead, nickel, chromium, and other compounds.  This effluent was discharged to area storm drains, which discharged directly to the Passaic River.

918.    Prior to approximately 1970, Crucible and its successor discharged wastewater and acid effluent to the Passaic River without treatment.  In approximately 1970, Crucible installed a rudimentary pre-treatment system to neutralize the effluent prior to discharge into the Passaic River. However, the pre-treatment system was ineffective and in 1971, Crucible installed a new system to treat and route the acid wash effluent into the sanitary sewer system.  Upon information and belief, Crucible's pre-treatment

systems only addressed acidity and did not remove metals and other Hazardous Substances from the acid effluent.

919.    In approximately May 1970, the PVSC filed a complaint styled <u>Passaic Valley Sewerage Commissioners v. Crucible Steel Corporation of America, Spalding Works</u>, Superior Court of New Jersey, Chancery Division, Hudson County, Docket No. C-2403-69 ("PVSC Case"), alleging that Crucible, or its successor, "has allowed polluting material to be discharged into the Passaic River between the Great Falls in Paterson and the mouth of said river at Newark Bay, through a culvert owned by [Crucible]."

920.    Crucible admitted that prior to 1969, it routinely spread spent rolling solution, which was generated from the steel making process, on and around the Crucible Steel Site as a dust abatement measure.  Upon information and belief, use of the rolling solution resulted in the contamination of such solution with heavy metals and other Hazardous Substances.  Crucible also admitted that employees often steam cleaned oily equipment over area storm drains and dumped waste oil into a pit near a surface drain, which discharged to the Passaic River.

921.    Sediment core samples taken from the mudflats adjacent to the Crucible stormwater outfalls in the Passaic River confirmed the presence of Hazardous Substances and other contaminants similar to that which has been generated and discharged to and from the Crucible Steel Site including, but not limited to, arsenic, cadmium, chromium, copper, lead, mercury, silver, zinc, petroleum hydrocarbons, and PCBs.

922.    Heavy metals, waste oil, petroleum hydrocarbons, chlorinated compounds, PCBs and other compounds and Hazardous Substances, which were handled, formulated, or formed as a result of Crucible's operations at the Crucible Steel Site from approximately 1901 until approximately 1968, were Discharged by Crucible into the Passaic River.

<u>Coltec Industries Inc.</u>

923.    Coltec Industries Inc. (f/k/a Colt Industries, Inc.) ("Coltec") was originally formed in 1911.

129

924.    In approximately 1968, Coltec purchased Crucible and owned and operated Crucible's remaining interest and facilities at the Crucible Steel Site until approximately May 1973, when it sold its remaining interest in the real property.  Coltec operated Crucible's operations at the Crucible Steel Site through wholly-owned subsidiaries Crucible, Inc. and/or Crucible Steel Company.

925.    Upon information and belief, Coltec is a successor to Crucible and, therefore, succeeds to Crucible's environmental liabilities related to the Crucible Steel Site.

926.    In 1985, Coltec sold its remaining interest in Crucible to Crucible Materials Corporation in response to an employee buyout.

927.    On or about July 12, 1999, Coltec merged with and became a wholly-owned subsidiary of the B.F. Goodrich Corporation ("Goodrich").

928.    On or about January 11, 2002, EnPro Industries, Inc. ("EnPro") was incorporated in the State of North Carolina and operated as a wholly-owned subsidiary of Goodrich.  On or about May 31, 2002, Goodrich reorganized and distributed all of Coltec's engineered and industrial products segment to EnPro.

929.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Coltec Industries Inc. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Crucible Steel Site.

<u>Teval Corp.</u>

930.    On or about August 20, 1921, Charles F. Guyon, Inc. was incorporated in the State of New York.  In approximately 1985, Charles F. Guyon, Inc. changed its name to Guyon General Piping, Inc. (collectively, Charles F. Guyon, Inc. and Guyon General Piping, Inc. are referred to herein as "Guyon").  In approximately 1992, Guyon changed its name to Teval Corp. ("Teval").

931.    Upon information and belief, in 1947, Guyon leased, owned, and/or operated approximately thirty-eight acres of the Crucible Steel Site.  On or about April 7, 1967, Guyon purchased approximately seven acres of real property and associated improvements at the Crucible Steel Site, also designated as Block 150, Lot 16A on the Tax Map of the City of Harrison.  Upon information and belief,

130

Guyon's operating and/or ownership interest extended to the pierhead and bulkhead line of the Passaic River and also included property designated as Block 138, Lot 1 on the Tax Map of the City of Harrison.

932.    Upon information and belief, from approximately July 1, 1980 until approximately June 30, 1988, Fabco Piping, Inc. ("Fabco") leased and operated portions of the Crucible Steel Site from Guyon.

933.    Upon information and belief, Fabco dissolved and/or otherwise ceased to operate in approximately August 1988.

934.    Fabco's operations primarily consisted of manufacturing pipes, pipe fittings, and valves composed of various steel alloys. Carbon, chromium, and stainless steel were used in the manufacturing process. Fabco's operations included heating, cooling, cutting, bending, annealing, welding, painting, sandblasting, and x-raying of pipe and pipe parts.

935.    Upon information and belief, in 1990, Guyon completed remedial activities of the property, which included excavation of soils contaminated with Hazardous Substances, decontamination and demolition of select on-site improvements, and removal and disposal of sand blast grit.

936.    Soil samples from areas in and around the portion of the Crucible Steel Site owned and operated by Guyon confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, arsenic, cadmium, chromium, PCBs, copper, lead, mercury, nickel, selenium, zinc, chloroform, trichloroethylene, polynuclear aromatic hydrocarbons, and total petroleum hydrocarbons.

937.    Upon information and belief, stormwater runoff from the Crucible Steel Site collected in an on-site cistern, which discharged directly to the Passaic River.

938.    On or about October 1, 2004, EPA sent a General Notice Letter notifying Teval of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Crucible Steel Site.

939.    Teval, and Coltec and Crucible Materials, as successors to Crucible are "dischargers" and Persons "in any way responsible" for the Hazardous Substances that were discharged at the Crucible Steel Site and released into the Newark Bay Complex.

## C.S. Osborne Site

940.    The C.S. Osborne & Co. property consists of real property and associated improvements located at 125 Jersey Street in Harrison, Hudson County, New Jersey ("C.S. Osborne Site").

941.    Since at least 1826, C.S. Osborne owned and/or operated an industrial hand tool, leather working tool, and upholstery tool manufacturing facility at the C.S. Osborne Site.

942.    The C.S. Osborne Site currently lies approximately 0.2 miles from the Passaic River, which received direct discharges, overland flow, and sheet storm water runoff from the C.S. Osborne Site.

943.    Upon information and belief, in approximately 1911, the City of Harrison joined the PVSC System.  Upon information and belief, the PVSC completed construction of its first wastewater treatment system in approximately 1924.  Upon information and belief, from approximately 1826 until at least 1924, wastewater from the C.S. Osborne Site discharged into the Passaic River without treatment.

944.    Upon information and belief, since at least 1924, wastewater and/or surface water runoff from the C.S. Osborne Site discharged into the PVSC Combined Sewer System and discharged directly into the Passaic River from the Bergen Street CSO outfall during wet weather events and/or mechanical failures of the interceptor.

945.    In approximately 1976, the PVSC reported that C.S. Osborne's wastewater effluent contained Hazardous Substances, including, but not limited to, cadmium, chromium, copper, lead, nickel, and zinc.

946.    In approximately 1978, C.S. Osborne reported that it discharged approximately 600,000 gallons of wastewater annually into the PVSC system.  The wastewater contained Hazardous Substances including, but not limited to, chromium, copper, lead, and zinc.

947.    C.S. Osborne is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the C.S. Osborne Site and released into the Newark Bay Complex.

**Curtiss-Wright Site**

948.    The Curtiss-Wright Corporation property consists of real property and associated improvements located at 1 Passaic Street in Wood Ridge, Bergen County, New Jersey, also designated as Block 320, Lot 1.01 on the Tax Map of the Borough of Wood Ridge ("Curtiss-Wright Site").

949.    Stormwater and process wastewater collected in area drains on the Curtiss-Wright Site and discharged to Felds Brook, which empties into the Saddle River.  The Saddle River flows and discharges into the Passaic River.

950.    On or about August 9, 1929, Curtiss-Wright Corporation ("Curtiss-Wright") was incorporated in the State of Delaware.

951.    From approximately the 1930s until approximately 1983, Curtiss-Wright owned and operated an aircraft engine manufacturing and testing facility at the Curtiss-Wright Site.

952.    In 1942, the United States constructed an aircraft engine manufacturing complex on approximately 158 acres of the Curtiss-Wright Site ("Aircraft Complex").

953.    From at least 1942 until at least 1946, the United States leased the Aircraft Complex to Curtiss-Wright for one dollar, and Curtiss-Wright operated the Aircraft Complex for the United States and manufactured aircraft engines.  Operations at the Aircraft Complex included, without limitation, paint stripping, cleaning and plating of metal parts, and degreasing of oily components.

954.    The United States constructed waste handling and control equipment including, without limitation, sewer systems, industrial waste collection and conveyance systems, a varsol reclamation unit, and an incinerator at the Aircraft Complex.

955.    On or about September 14, 1944, the United States Defense Plant Corporation reported that industrial waste at the Aircraft Complex discharged from a collection/separation system into a storm sewer, which, upon information and belief, discharged into Felds Brook and/or the Saddle River, and thence into the Passaic River.

956.    In approximately 1946, Curtiss-Wright purchased the Aircraft Complex from the United States.

133

957.    During World War II, Curtiss-Wright manufactured cyclone engines and operations included paint stripping, cleaning and plating of metal parts, and degreasing of oily components. After World War II, Curtiss-Wright's operations included production of jet aircraft engine components, machining of rocket motor cases, and production of rocket exhaust nozzles. Curtiss-Wright also manufactured gas turbine generators in the 1970s and conducted experiments during the 1980s to collect data for use in minimizing pollution when burning coal.

958.    From approximately 1983 until approximately 2001, Curtiss-Wright operated the Curtiss-Wright Site as a multi-tenant industrial rental facility, and it leased space to various tenants engaged in light manufacturing, assembly, and warehousing operations. Tenants on the Curtiss-Wright Site include, but are not limited to American Tissue Corp., Anju Fabrics, Inc., Bond Commercial Warehouse, Carey Press Corp., Carillons Mills, Inc., CDP, Inc., CDS Computing Inc., Continental Cap, Import Corp., Dannex Mfg., Fabrite Laminating Corp., Four State Reprod., Garden State, Typing and Addressing Svcs., Len-Lo Realty, Mailco Inc., Outwater Plastics, Roseart Industries, Rotary Power Int'l, Sasson Jeans, Inc., Springfield Instruments, Top Priority Designs, and Uniflair Corp.

959.    On or about December 20, 2001, Curtiss-Wright sold the Curtiss-Wright Site to Shaw Achas LLC, a New York company, which formed on or about May 21, 2001.

960.    Curtiss-Wright processed, handled, consumed, stored, or otherwise used Hazardous Substances and other compounds at the Curtiss-Wright Site, including but not limited to ortho-dichlorobenzene, benzene, ethylbenzene, PCBs, cyanide, mercury, arsenic chlorine, bis 2(ethylhexyl) phthalate, copper cyanide, chromic acid, sulfuric acid, lead fluorobate acid, acetic acid, trichloroethylene, fuel oil, diesel, and other petroleum hydrocarbons.

961.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Curtiss-Wright Site.

962.    Upon information and belief, from 1942 until at least 1983, Curtiss-Wright discharged process wastewater from the Curtiss-Wright Site directly into Felds Brook, and thence into the Saddle River and the Passaic River.

963.    On multiple occasions between 1945 and 1974, PVSC inspectors observed discharges of oil and oily substances from the Curtiss-Wright Site into Feld's Brook and the Saddle River.

964.    In approximately 1976, the PVSC recorded a release of approximately 150-gallons of cutting fluid from the Curtiss-Wright Site and into Feld's Brook.

965.    In approximately 1977, the PVSC recorded a release of approximately fifty-gallons of an acidic pickling liquid from the Curtiss-Wright Site and into Feld's Brook.

966.    In approximately 1985, NJDEP inspectors observed that electrical transformers on the Curtiss-Wright Site were leaking PCB-contaminated oils in various locations on the property.

967.    In approximately 1985, NJDEP inspectors confirmed that past discharges of oil, sewage, and colored wastes appearing in Feld's Brook originated from discharges on the Curtiss-Wright Site.

968.    In approximately 1985, Carey Press Corp., a tenant operating on Curtiss-Wright Site, reported a release of approximately 14,000-gallons of No. 2 Heating Oil caused by a crack in a pipe attached to an underground storage tank.

969.    Curtiss-Wright operated approximately seventy underground storage tanks on the western portion of the Curtiss-Wright Site.  Solvents, jet fuel, and other petroleum hydrocarbons were discharged from the tank storage area into groundwater beneath the Curtiss-Wright Site.

970.    Soil samples taken from the Curtiss-Wright Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, ortho-dichlorobenzene, arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, zinc, 1,1-dichloroethene, chlorinated organics, methylene chloride, tetrachloroethylene, trichloroethylene, ethyl benzene, toluene, beryllium, PCBs, polycyclic hydrocarbons, and other petroleum hydrocarbons.

971.    Curtiss-Wright operated an on-site landfill for waste materials, including hazardous wastes.

972.    Upon information and belief, contaminated soils on the Curtiss-Wright Site are prone to erosion during storm events.  Upon information and belief, runoff containing contaminated sediments

discharged from the Curtiss-Wright Site into area stormwater drains, which discharge directly to Feld's Brook, thence to the Saddle and Passaic Rivers.

973.    Groundwater samples taken from the Curtiss-Wright Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, benzene, trichloroethene, dichloroethene, vinyl chloride, ethylbenzene, tetrachloroethylene, toluene, naphthalene, methylene chloride, lead, zinc, copper, mercury, and petroleum hydrocarbons. Between approximately 1998 and 2003, approximately 60,000 gallons of free product had been recovered from the groundwater at the Curtiss-Wright Site.

974.    Groundwater at the Curtiss-Wright Site flows into Felds Brook and the Saddle River.  As late as 2001, groundwater was observed flowing into the on-site storm sewer system at the Curtiss-Wright Site, which discharged into Felds Brook.  Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the Curtiss-Wright Site discharge into the Newark Bay Complex.

975.    In 1985, the NJDEP notified Curtiss-Wright that oily, colored discharges were observed in Felds Brook and emanating from the Curtiss-Wright Site.

976.    Surface water samples taken from Felds Brook in 1987 confirmed the presence of Hazardous Substances, including, but not limited to, trichloroethene, dichloroethene, and vinyl chloride.

977.    In 1999, surface water samples taken from five locations in the Saddle river, just downstream of the Curtiss-Wright Site, confirmed the presence of Hazardous Substances, including, but not limited to, trichloroethene, dichloroethene, and vinyl chloride.

978.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Curtiss-Wright of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Curtiss-Wright Site.

979.    Curtiss-Wright is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Curtiss-Wright Site and released into the Newark Bay Complex.

### CWC Industries Site

980.    CWC Industries, Inc. ("CWC") has operated at Buildings 17, 18, 36, 39 and 39A at 185 Foundry Street, Newark, New Jersey (the "CWC Site").  CWC currently operates in Buildings 39 and 39A at 185 Foundry Street.

981.    CWC has manufactured a broad range of pigmented and metallic foils at the CWC Site for the plastic and graphic arts industries since 1969.  Materials utilized by CWC in its production process include isopropanol, methyl ethyl ketone, methanol, v,m&p napthalene, plasticizers, and toluene.  CWC once stored these materials outside in a yard adjacent to Buildings 17 and 18 at 185 Foundry Street.  On November 17, 1990, staining was observed on the concrete throughout the yard and on the east side of Building 18.  No diking existed around CWC's storage yard.

982.    A water sample taken in October 1988 from a drain on the south side of Building 17 at 185 Foundry Street revealed high levels of 1,1-dichloroethane, 1,2-dichloroethane, trichloroethylene, benzene, 4-methyl-2-pentanone, toluene and chlorobenzene.  CWC operated at Building 17 at the time. Parts of Building 17 and the outside storage yard were periodically flooded when CWC operated at such locations.

983.    On information and belief, wastewater from the CWC Site discharged to the Roanoke Combined Sewer System.

984.    The Roanoke Avenue combined sewer lines discharged to the Passaic River.  From as early as 1958 until the early 1980s, a malfunctioning regulator on the Roanoke Combined Sewer System resulted in untreated sewage flows discharging into the Passaic River.

985.    Analysis of sediments in the Passaic River in the vicinity of the Roanoke Avenue combined sewer reveal the presence of materials used in CWC's operations, namely methyl ethyl ketone, naphthalene and toluene.

986.    CWC is a discharger and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the CWC Site and released into the Newark Bay Complex.

**Dial Site**

987.    The Dial Site consists of an approximately 2-acre property at 179 Entin Road, Clifton, New Jersey (the "Dial Site").

988.    On or about October 30, 1967, Armour Grocery Products Company incorporated in Delaware.  On or about June 6, 1968, Armour Grocery Products Company changed its name to Armour-Dial, Inc.

989.    On or about June 30, 1972, Armour-Dial, Inc. merged with and into Armour 222 Corporation and the surviving entity became known as Armour-Dial, Inc.

990.    On or about December 20, 1985, Armour-Dial, Inc. changed its name to The Dial Corporation.

991.    On or about March 3, 1992, The Dial Corporation merged with and into The Dial Corp.

992.    On August 15, 1996, The Dial Corp. split into two publicly-held companies.  The Dial Corp. consumer products companies became a new corporation named The Dial Corporation.  Upon information and belief, The Dial Corporation is the successor-in-interest to Armour-Dial, Inc.

993.    From approximately 1962 until approximately 1988, Armour-Dial, Inc. leased and operated a blending and packaging facility at the Dial Site.  On information and belief, Armour-Dial Inc.'s operations included household ammonia blending and packaging, liquid detergent packaging, liquid wax remover blending and packaging, and blowmolding high-density polyethylene containers.  Armour-Dial's household ammonia manufacturing process at the Dial Site involved blending of aqua ammonia with water, detergents, perfumes and food-grade dyes into household strength ammonia.  Ammonia was received by tank trucks into four 2500-gallon storage tanks.  Liquid detergents were received by trucks and stored into either of two 7000-gallon capacity storage tanks.  Perfumes and dyes were added through a premix pumping station into the blend tanks.

994.    Armour-Dial, Inc. also produced polyethylene bottles for the packaging of ammonia.  On information and belief, polyethylene resin pellets were delivered by truck and stored in two 200,000 lb. silos.  The bottles were extruded by blowmolders.  The raw material was vacuum fed into a virgin bin that

138

mixed the raw material with re-grinded plastic to reclaim scrap. The combined resin was loaded into the three blowmolds to extrude and blow bottles. Cooling of the molds was done by two 15-ton chillers which were closed-loop processes of water cooling. The bottles were warehoused in bulk and then transferred to the Packaging Department at the Dial Site.

995. On information and belief, Armour-Dial, Inc. leased the Dial Site from Davanne Realty Co., the owner of the Dial Site.

996. Armour-Dial, Inc. utilized, manufactured, processed, handled, mixed, consumed, stored and/or Discharged Hazardous Substances and other compounds at the Dial Site, including, but not limited to, hydrochloric acid, triethanolamine, acetone, acetylene, propane, trichloroethane, and ammonia.

997. Armour-Dial, Inc. discharged through the Entin Storm Sewer to the PVSC, which periodically discharged to the Passaic River.

998. On or about February 1971, pollution of the Passaic River was traced back to the Dial Site. An inspector noted an intermittent violation where spills of highly concentrated detergents periodically washed from the Dial Site into the storm sewer.

999. On or about July 31, 1973, the PVSC was notified that a white substance was discharging from the Entin Storm Sewer into the Passaic River. An inspector traced the discharge back to the Dial Site where the inspector learned that a spill of approximately 50 to 60 gallons of a detergent occurred. On information and belief, Armour-Dial, Inc. personnel washed the spilled detergent into a storm drain which discharged into the Passaic River via the Entin Storm Sewer.

1000. On or about August 9, 1974, an Armour-Dial, Inc. manager notified the PVSC that a truck driver's hose ruptured and released approximately 225 gallons of a anionic detergent at the Dial Site. On information and belief, Armour-Dial, Inc. personnel failed to recover 75 gallons of the spilled detergent, which flowed to the Entin Storm Sewer and then to the Passaic River.

1001. Truck drivers had spills from hoses at the Dial Site that were periodically washed into the storm sewer.

WAS:144301.1

1002.    Hazardous Substances and other compounds have been detected in the soil at the Dial Site, including, but not limited to, beryllium, copper, lead, zinc, and total petroleum hydrocarbons.

1003.    The Dial Corporation, as successor to Armour-Dial, is a discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Dial Site and released into the Newark Bay Complex.

1004.    On information and belief, Davanne Realty Co. is a Person "in any way responsible" for the Hazardous Substances that were discharged at the Dial Site and released into the Newark Bay Complex.

## Drew Chemical Site

1005.    The Drew Chemical Corporation property consists of real property and associated improvements at or about 1106 Harrison Avenue in Kearny, NJ 07032 ("Drew Chemical Site"). The Drew Chemical Site covers approximately six acres and contains several buildings used for production and warehousing. The Drew Chemical Site is located in the 100-year floodplain.

1006.    The Drew Chemical Site operated as a production and warehouse facility which produced boiler compounds, paint defoamers, water treatment chemicals and other specialty chemicals.

1007.    Drew Chemical Corporation ("Drew Chemical") was founded in 1941 and incorporated in the State of Delaware. Upon information and belief, Drew Chemical commenced operations at the Drew Chemical Site in 1970.

1008.    On Information and belief, Ashland Oil, Inc. acquired Drew Chemical in 1981 and has operated the Drew Chemical Site from 1981 through the present.

1009.    On information and belief, Drew Chemical was a wholly-owned subsidiary of Ashland Oil, Inc., but operated as a division of Ashland Chemical Company, a division of Ashland Oil, Inc., at the time Ashland Oil, Inc. owned and operated the Drew Chemical Site.

1010.    Ashland Chemical Company, a division of Ashland Oil, Inc., became Ashland Chemical, Inc., a wholly-owned subsidiary of Ashland Oil, Inc. on October 1, 1989. Drew Chemical transferred all of its operating assets, including the Drew Chemical Site, to Ashland Chemical, Inc. on October 1, 1989.

1011.    On information and belief, Ashland Oil, Inc. changed its name to Ashland Inc. in 1995.

1012.    In 1999, Ashland Inc. formed two new divisions - Ashland Distribution Company and Ashland Specialty Chemical Company - from Ashland Chemical Company.  On information and belief, the Drew Chemical Site is currently owned and operated by Ashland Specialty Chemical, a division of Ashland Inc.  Ashland Inc. is responsible for actions of Ashland Chemical Company at the Drew Chemical Site.

1013.    Drew Chemical merged with and into Valvoline Holdings, Inc. on or about May 31, 1996 and Valvoline Holdings, Inc. was the surviving corporation.  Valvoline Holdings, Inc. changed its name to Ashland International Holdings, Inc.

1014.    On information and belief, Ashland International Holdings, Inc. is the successor to Drew Chemical and, therefore, succeeds to Drew Chemical's environmental liabilities related to the Drew Chemical Site.

1015.    Drew Chemical utilized, processed, handled, stored and/or Discharged Hazardous Substances and other compounds at the Drew Chemical Site, including, but not limited to, trichlorophenol, phenol (cresylic acid), ortho benyl chlorophenol, phosphoric acid, isopropanol, acetic acid, 1,1,1 trichloroethane, sodium hydroxide, zinc chloride, organic phosphorus, dichlorotoluene, mineral spirits, ethylene diamine, methanol, methylene chloride, tetrachlorethylene, butyl alcohol, isobutyl alcohol, toluene, mineral seal oil, morpholine, dichlorotoluene, formic acid, triethanolamine, acrylamide, acrylic acid, aluminum sulfate, ammonium bicarbonate, ammonium bifluoride, benzoic acid, chromium, magnesium, iron, copper, ethylene glycol, zinc compounds, acrylamide, diethylamine, dodecylbenzene sulfonic, butanol, ferric chloride, ferrous sulfate, hydrazine, methyl ethyl ketone, sodium bisulfite, sodium chromate, sodium hypochlorite, sulfuric acid, zinc nitrate, zinc sulfate, epichlorohydrin, and chromium compounds.

1016.    The majority of the Drew Chemical Site was curbed and sloped inward, directing runoff to storm drains across the site and combined sewers which go to the PVSC in Newark.  Storm drains at the Drew Chemical Site flowed to a neutralization tank which ultimately discharged to the Worthington

Avenue combined sewer.  Runoff from the parking area flowed directly to the Worthington Avenue combined sewer.

1017.    On information and belief, a drainage ditch along the southern side of the Drew Chemical Site flowed to a combined sewer along Greenfield Avenue which goes to the PVSC in Newark.  Thirty aboveground tanks ranging in size from 4,200 to 15,000 gallons were located along the southern edge of the Drew Chemical Site as late as 1993.

1018.    The Drew Chemical Site's combined sewer collection system collects approximately seventy percent of the site's entire surface area.  Stormwater, process wastewater and spills are combined within the combined sewer collection system and are ultimately discharged to the PVSC.

1019.    According to correspondence sent on behalf of Drew Chemical to the City of Kearny Building Inspector on January 29, 1971, plant effluent containing process area floor washdowns discharged into the Worthington Avenue combined sewer.

1020.    On or about November 15, 1982, Drew Chemical notified the PVSC that Drew Chemical began discharging washdown water in a reactor vessel at the Drew Chemical Site to the Worthington Avenue CSO during the week of November 10, 1982.

1021.    According to Drew Chemical's PVSC Waste Effluent Survey responses, Drew Chemical discharged effluent containing chromium, calcium, magnesium, iron, and copper to the PVSC sewer based on a sample taken at the Drew Chemical Site on July 6, 1972.

1022.    The Drew Chemical Site is located within the Worthington Avenue Combined Sewer Overflow District ("Worthington Avenue CSO").  Upon information and belief, during wet weather events, a portion of the combined flow within the Worthington Avenue CSO enters an interceptor and discharges through an outfall line into the Passaic River

1023.    Hazardous Substances and other compounds have been detected in the soil at the Drew Chemical Site, including, but not limited to, anthracene, fluoranthene, pyrene, butyl benzyl phthalate, bis 2 (ethyl hexyl), phthalate, chrysene, di-n-octylphthalate, benzo(b)fluoranthene, 4-methylphenol, 2-methyl

naphthalene, trimethyl/napthalene, isomer, PCB, toluene, 1-methylnapthalene, phenanthrene, benzo (a) anthracene, benzo (k) fluoranthene, and benzo (a) pyrene.

1024.    Hazardous Substances and other compounds similar to those that have been Discharged from the Drew Chemical Site have been detected in sediment core samples taken from the Passaic River adjacent to the Drew Chemical Site, including, but not limited to, magnesium, copper, aluminum, manganese, silver, chromium, zinc, toluene, and methyl ethyl ketone.

1025.    Ashland International Holdings, Inc. as successor to Drew Chemical is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Drew Chemical Site and released into the Newark Bay Complex.

### Dundee Canal Site

1026.    The Dundee Canal consists of real property and associated improvements located in Passaic County, New Jersey along the Passaic River and running south from Dundee Dam ("Dundee Canal Site").

1027.    On or about March 15, 1832, The Dundee Water Power and Land Company ("Dundee Water") was incorporated in the State of New Jersey and in approximately 1861, Dundee Water completed construction of the Dundee Canal Site.   Dundee Water is a subsidiary of United Water Resources, Inc.

1028.    Upon information and belief, the Dundee Canal Site was utilized for a variety of industrial purposes, including transportation.

1029.    Upon information and belief, the Dundee Canal Site received direct discharges of Hazardous Substances and other compounds and storm water runoff from adjacent industrial facilities, including direct discharges of industrial wastewater from one or more paper mills.

1030.    In approximately 1994-1995, investigations of the Dundee Canal Site indicated the presence of wood, tires, and miscellaneous debris in and along the Dundee Canal Site.   At least one discharge pipe was observed extending into the Dundee Canal Site from an adjacent industrial facility. Other pipes were observed crossing the Dundee Canal Site.

1031.    Hazardous Substances and other compounds have been detected in sediment core samples taken from the Dundee Canal Site, including, but not limited to, assorted semi-volatile organic compounds, petroleum hydrocarbons, heavy metals, PCBs, and seventeen types of dioxin, which were detected at concentrations up to 41,960 parts per trillion.

1032.    Upon information and belief, the Dundee Canal Site flooded during heavy rain events.

1033.    Upon information and belief, the contaminated sediments within the Dundee Canal Site were a continuing source of pollution to the water column of the Passaic River.

1034.    Dundee Water is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Dundee Canal Site and released into the Newark Bay Complex.

### Du Pont Grasselli Site

1035.    The Grasselli property consists of approximately 206 acres of real property and associated improvements located at 216 Paterson Plank, Linden, New Jersey and (the "Du Pont Grasselli Site").

1036.    In the 1800s, Standard Chemical Company originally developed the site and operated a chemical manufacturing facility at the Du Pont Grasselli Site.

1037.    In the 1880's Grasselli Chemical Company ("Grasselli") acquired the Standard Chemical Company, including the Du Pont Grasselli Site.  Grasselli continued to operate a chemical manufacturing facility at the Du Pont Grasselli Site.

1038.    Chemicals manufactured by Grasselli included, without limitation, phosphate acid, sulfuric acid chambs, sodium thiosulfate, sodium bisulfite, sodium sulfide, copper sulfate, sodium sulfite, lead acetate, acetic acid, lithopone, sodium acetate, nitric acid, sodium phosphate, stannous bichloride, hydrochloric acid and salt cake, lead arsenate, bordeaux mixture, zinc battery anodes, zinc sulfate crystal, glauber's salt, mixed acids, lime sulfur solution, stannous chloride, ammonium chloride, ferric sulfate, sodium silicate, bone black, arsenic acid, iron arsenate, barium chloride, manganese sulfate, sodium sulfate, aluminum sulfate, sodium silicofluoride, and sulfuric acid.

144

1039.    In approximately 1928, E.I. du Pont de Nemours and Company ("Du Pont") acquired Grasselli and merged Grasselli into Du Pont. Du Pont took over the Du Pont Grasselli Site and operated a chemical manufacturing facility at the site until at least 1992.

1040.    Upon information and belief, Du Pont is the successor to Grasselli and, therefore, succeeds to Grasselli's environmental liabilities related to the Du Pont Grasselli Site.

1041.    Du Pont's operations at the Du Pont Grasselli Site consisted principally of manufacturing heavy chemicals, including, without limitation, sulfuric acid chambs, sodium thiosulfate, sodium bisulfite, sodium sulfide, sodium sulfite, lead acetate, acetic acid, nitric acid, sodium phosphate, hydrochloric acid and salt cakes, zinc battery anodes, glauber's salt, mixed acids, lime sulfur solution, stannous chloride, barium chloride, sodium sulfate, aluminum chloride, sodium silicofluoride, flame retardants, detergents, reagent grade chemicals, dozens of agricultural chemicals, including fungicides, herbicides, and pesticides, aluminum sulfate, ammonium thiosulfate, sodium bisulfite solution, dimethyl sulfate, formaldehyde, sulfamic acid, dimethylhydrocylamine, sodium silicate, DDT, strontium nitrate, and chlorosulfonic acid.

1042.    During World War II, Du Pont was the largest wartime manufacturer and supplier of DDT for the United States government, and produced up to 690,000 pounds of DDT per month at the Du Pont Grasselli Site during the war.

1043.    Chemical Leaman leased a portion of the Du Pont Grasselli Site (approximately 1.75 acres) for trucking maintenance and storage from 1970-1988. After Chemical Leaman, Conoco occupied the lease property until June 1989, at which time it was leased to Wade Brothers.

1044.    The Du Pont Grasselli Site abuts the Arthur Kill and Piles Creek, which received direct discharges, overland flow, and storm water runoff directly from the Du Pont Grasselli Site. Piles Creek is a tributary of the Arthur Kill. The Arthur Kill is a tidal strait separating the western side of Staten Island from mainland New Jersey. The Arthur Kill links Raritan Bay with Newark Bay. Upon information and belief, water and sediment flows from the Arthur Kill into Newark Bay.

145

1045.    Storm water runoff from process and waste storage areas at the Du Pont Grasselli Site discharge into the Arthur Kill and/or Piles Creek through at least three outfalls.

1046.    Between approximately 1928 and 1979, the EPA and NJDEP reported that Du Pont disposed of approximately 7,950 tons of chemical wastes at the Du Pont Grasselli Site.

1047.    On March 30, 1990, Du Pont reported that, from at least 1901 through 1988, Hazardous Substances and other compounds were disposed of into at least seventeen land disposal units about the Du Pont Grasselli Site, many of which were unlined and exposed to storm water runoff.

1048.    From at least the 1920s, aqueous wastewaters and solid wastes from production processes at the Du Pont Grasselli Site were discharged into marshy areas located in the north and northeastern areas of the Du Pont Grasselli Site ("Disposal Areas").  Upon information and belief, the solid and liquid wastes disposed of into the marshy areas contained Hazardous Substances and other compounds.  Upon information and belief, the Disposal Areas were generally unlined and hydrologically connected to the Arthur Kill and/or Piles Creek.

1049.    Other wastes disposed of into the Disposal Areas include, but are not limited to, phosphate plaster, hypo mud and sodium sulfate salt cake residuals, mud residuals from strontium sulfide and strontium nitrate production, sodium sulfate, salt cake, hypo and silicate muds.

1050.    Between 1940 and 1949, a small pond was constructed on the Du Pont Grasselli Site for the disposal of aqueous wastes from the chloroneb, methoxychlor and dimethyl hydroxylamine processes.  The wastes were pumped into the pond and allowed to evaporate and/or seep into the ground.  Although this practice ceased in 1977, settled residuals in the pond were removed and placed directly onto the ground and remained exposed to storm water runoff from at least 1970 until at least 1980.

1051.    During the 1960s, aluminum chloride and hydrochloric acid were discharged to a diked area in the southern portion of the Du Pont Grasselli Site.

1052.    On or about January 7, 1965, the ISC reported that at least seven outfalls and other outlets from septic tanks at the Du Pont Grasselli Site discharged approximately 6,400,000 gallons of effluent per day "directly to the Arthur Kill."

WAS:144301.1

1053.    In 1978, Du Pont reported on-site incineration of 186,000 lbs. of formaldehyde.

1054.    On December 19, 1984, 12-25 tons of sulfur were spilled in the Arthur Kill after a leak developed in the unloading hose of a ship delivering sulfur to the site.

1055.    In January 1985, organic vapors were detected in the western portion of the site. The origin of the vapors could not be determined.

1056.    Upon information and belief, until the 1970s, Du Pont and its predecessors discharged wastewater containing Hazardous Substances and other compounds, including, without limitation, process wastewater, non-contact cooling water, and runoff from process and waste disposal areas directly into the Arthur Kill and/or Piles Creek without a permit.

1057.    On or about May 11, 1978, the NJDEP reported that Du Pont generated approximately 15,000,000 gallons of treated process wastewater per day, 34,000,000 gallons of untreated process wastewater per year, and 1,000 gallons of sodium bisulfite/formaldehyde effluent per year. Upon information and belief, all or a portion of these wastes were ultimately discharged into the Arthur Kill.

1058.    Upon information and belief, in the 1970s, Du Pont received authorization under Section 402 of the Clean Water Act ("CWA"), 33 U.S.C. § 1342, to discharge process wastewater, non-contact cooling water, and runoff from process and waste disposal areas  into the Arthur Kill from four outfalls, which are referred to as Outfall 004, Outfall 005, Outfall 008, and Outfall 009.

1059.    Outfall 004 discharged non-contact cooling water from a series of cooling condensers into the Arthur Kill.

1060.    Outfall 005 discharged non-contact cooling water from the dimethyl sulfate drumming operations into the Arthur Kill.

1061.    Outfall 008 discharged process wastewater from at least four plant process areas. Wastewater included scrubber water, acid purges, demister discharges, process cooling water, filter sluice discharges, equipment and acid drum washings, storm drainage, general wash down water, and general process effluent from the manufacture of sulfur dioxide, ammonium thiosulfate, chloro-sulfonic acid,

147

sulfur trioxide, and sodium biosulfate. The wastewater was neutralized and discharged into two, unlined equalization ponds prior to discharge into the Arthur Kill.

1062.    Outfall 009 discharged non-contact cooling water and process wastewater from the sulfuric acid production area into the Arthur Kill.

1063.    On March 31, 1987, the NJDEP reported that outfall 005 exceeded TOC limitations.

1064.    On or about June 29, 1988, the NJDEP reported that Du Pont received an "unacceptable" rating under its NJPDES permit because of various reporting and testing violations, and although processes which had formerly discharged into the Arthur Kill through outfall 005 were shut down, there continued "a heavy discharge" from the outfall into the Arthur Kill which had a "sulfurous smell."

1065.    On March 31, 1989, an Administrative Order and Notice of Civil Administrative Penalty Assessment was issued to Du Pont for numerous violations of its NJPDES permit limitations.

1066.    On June 30, 1989, the NJDEP reported that Du Pont received an "unacceptable" rating under its NJPDES permit because the TSS limit for outfall 009 was exceeded.

1067.    On January 16, 1992, an Administrative Consent Order was issued, which noted amongst its findings that Du Pont had violated the Water Pollution Control Act, the Spill Compensation and Control Act and the Solid Waste Management Act.

1068.    In response to the cessation of manufacturing in 1992, Du Pont was required to remediate the site under the New Jersey Environmental Cleanup Responsibility Act (ECRA), now known as the Industrial Site Recovery Act (ISRA). The Remedial Investigation, conducted in three phases between 1993 and 1999, identified twenty-one (21) areas of concern at the site.

1069.    In July 1996, the New Jersey Turnpike Authority observed two seeps at the Du Pont Grasselli Site, near the Disposal Areas that were discharging into Piles Creek. Samples of the seeps indicated the presence of hydrogen sulfide vapors, copper, arsenic, mercury, DDD, and DDE.

1070.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in discharges of Hazardous Substances to and from the Du Pont Grasselli Site.

148

1071.    Hazardous Substances and other compounds have been detected in the soil at the Du Pont Grasselli Site, including, but not limited to, phenanthrene, fluoranthene, pyrene, chromium, lead, aldrin, dieldrin, methoxychlor, magnesium, nickel, selenium, vanadium, zinc, chlorobenzene, 1,2,4-trichlorobenzene, aluminum, cobalt, copper, manganese, strontium, arsenic, potassium, beryllium, DDT and related derivatives, methylene chloride, chloroform, toluene, ethylbenzene, and xylene.

1072.    The Du Pont Grasselli Site lies in a tidal flood plain and has been inundated on several occasions.  Upon information and belief, the advancing and receding floodwaters eroded and transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, waste disposal and storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

1073.    Hazardous substances and other compounds have been detected in the groundwater at the Du Pont Grasselli Site including, but not limited to, phenol, acetone, 2-butanone, 1,1,1-trichloroethane, toluene, barium, cadmium, carbon disulfide, chlorobenzene, mercury, aluminum, arsenic, beryllium, cobalt, lead, manganese, nickel, potassium, selenium, strontium, vanadium, zinc, and cyanide.

1074.    Groundwater at the Du Pont Grasselli Site flows into Newark Bay and/or into area tributaries, which then flow into Newark Bay.  Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the Du Pont Grasselli Site discharge into the Newark Bay Complex.

1075.    Hazardous Substances and other compounds similar to those that have been Discharged from the Du Pont Grasselli Site have been detected in sediment core samples taken from Piles Creek proximate to the Du Pont Grasselli Site, including, but not limited to, chlorobenzene, 1,4-dichlorobenzene, 1,2-dichlorobenzene, 1,2,4-trichlorobenzene, pyrene, DDT and related derivatives, PCBs and related derivatives, cobalt, copper, potassium, strontium, and cyanide.

1076.    Hazardous Substances and other compounds similar to those that have been Discharged from the Du Pont Grasselli Site have been detected in surface water samples taken from Piles Creek

149

proximate to the Du Pont Grasselli Site, including, but not limited to, arsenic, copper, mercury, DDT and related derivatives, dieldrin, heptachlor, and methoxychlor.

1077.    Hazardous Substances and other compounds similar to those that have been Discharged from the Du Pont Grasselli Site have been detected in sediment core samples taken from the Arthur Kill, including but not limited to, DDT and related derivatives, arsenic, barium, beryllium, lead, manganese, nickel, and zinc.

1078.    On or about July 13, 2007, the EPA sent a General Notice Letter notifying Du Pont of its potential liability for Response costs relating to the Newark Bay Study Area as the result of the Release of Hazardous Substances, including solid and/or hazardous wastes, from the Du Pont Grasselli Site.

1079.    Du Pont is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Du Pont Grasselli Site and released into the Newark Bay Complex.

### Elan Chemical Company Site

1080.    Elan is the current owner and operator of real property located at or about 268 Doremus Avenue in Newark, Essex County, New Jersey, and improved with a one-story 45,000 square foot frame building ("Elan Chemical Site").

1081.    Elan is a manufacturer of flavoring extracts and syrups and specializes in producing flavoring extracts.  Elan also manufactures assorted organic chemicals, synthetic flavors or flavoring materials, and synthetic perfume materials.

1082.    Upon information and belief, Hazardous Substances and other compounds used at the Elan Chemical Site by Elan include, but are not limited to acetophenone, cedarwood oil geraniol, acetic anhydride, styrene oxide, methanol, ethanol, toluene, and assorted organic acids.

1083.    On or about December 8, 1988, NJDEP inspectors noted that a drum storage area located on a slope at the Elan Chemical Site contained approximately 1,000 drums of assorted Hazardous Substances and other compounds including, but not limited to unused raw materials, waste solvents, heavy oils, waste oils, and unsold product.  Many of the drums were not labeled, haphazardly stored, in

WAS:144301.1

various stages of deterioration, bulging, rusted through, or actively releasing their contents. During the inspection, the NJDEP observed an oily substance discharging from the drum storage area. Subsequent inspections by NJDEP on or about February 3, 1989, revealed continuing contamination and visible black oil and multi-colored liquids on and about the drum storage area. Stormwater runoff from the drum storage area flowed directly into a drainage depression, which then flowed into the Passaic River.

1084. On or about June 14, 1990, NJDEP inspectors discovered a six-inch discharge pipe on the southeast corner of the Elan Chemical Site near the drum storage area that discharged directly into the Passaic River. The conditions in the drum storage area as observed in previous inspections remained.

1085. Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Elan Chemical Site.

1086. The Elan Chemical Site was flooded by overflow from the Passaic River and/or sanitary sewer surcharges in November 1993, December 1992, and January 1988. Upon information and belief, the Elan Chemical Site has flooded on other occasions. Upon information and belief, the advancing and receding floodwaters eroded and transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

1087. On or about September 15, 2003, the EPA sent a General Notice Letter notifying Elan of its potential liability for Response costs relating to the Diamond Alkali Superfund Site as the result of the Release of Hazardous Substances from the Elan Chemical Site.

1088. Elan is a discharger and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Elan Chemical Site and released into the Newark Bay Complex.

### Electric Boat Company Site

1089. The Electric Boat Company property is an approximately 62-acre site located in the vicinity of North Street and Avenue A, Bayonne, Hudson County, New Jersey (the "Electric Boat Company Site"). The Electric Boat Company Site is bounded on the west by Newark Bay, on the south

by a former railroad right of way, on the east by Avenue P, and on the north by residential housing in the vicinity of Howard Place and Schuyler Place.

1090.    The Electric Boat Company Site is a former ship-building facility occupied by The Electric Boat Company, its divisions, the Electric Launch Company and Electro-Dynamic Company, and its successor-in-interest, General Dynamics Corporation.

1091.    From approximately 1900 until 1952, when it merged with and into General Dynamics Corporation ("General Dynamics"), The Electric Boat Company owned and operated boat-building and related facilities at the Electric Boat Company Site.    Thereafter until the early 1960s, General Dynamics owned and operated the Electric Boat Company Site.

1092.    Upon information and belief, General Dynamics is the successor to The Electric Boat Company and its divisions and, therefore, succeeds to The Electric Boat Company's environmental liabilities related to the Electric Boat Company Site.

1093.    From 1900 until the 1940s, military boats and pleasure watercraft were manufactured at the Electric Boat Company Site.    During World War I, The Electric Boat Company manufactured submarine chasers for the United States.    During World War II, The Electric Boat Company manufactured PT boats for the United States.    The Electric Boat Company discontinued manufacturing watercraft in the 1940s, but The Electric Boat Company and its successors continued manufacturing operations at the Electric Boat Company Site, including manufacturing and assembly of electric motors, until at least the 1960s.

1094.    Manufacturing operations at the Electric Boat Company Site included the operation of lathes, milling machines, drill presses, grinding machines, welding machines, painting equipment, pipe threading machines, power-shearing devices, jigs, grease guns, cranes, and heaters.

1095.    Upon information and belief, The Electric Boat Company operated an incinerator at the Electric Boat Company Site for the disposal of waste materials generated at the site.

1096.    Beginning in the 1940s, portions of the Electric Boat Company Site were purchased and/or occupied and operated by other entities, including, National Kitchen Corporation, which

152

manufactured kitchen cabinets at the Electric Boat Company Site; Weiss and Besserman Company, which distributed Youngstown Kitchens at the Electric Boat Company Site; and The Englander Company, which manufactured and distributed mattresses at the Electric Boat Company Site. Multi-family housing units were also constructed on portions of the Electric Boat Company Site.

1097.  From approximately 1960 until 1990, a portion of the Electric Boat Company Site at 163 Avenue A was owned and occupied by Efka Plastics Corporation which operated a facility for the manufacture of plastic tablecloths. Upon information and belief, the Efka Plastics Corporation filed for bankruptcy and dissolved in the early 1990s.

1098.  Hazardous Substances used, produced or stored at the Electric Boat Company Site include, without limitation, lead, white lead, copper, manganese, zinc, aluminum (in Alumilastic waterproof seal), asbestos, naphtha or naphthalene (in Varsol), tributyltin (in Coperoyd paint), hexavalent chromium (in zinc chromate), toluene (in laquer thinner), phthalic anhydride (in Glyptol), urea-formaldehyde (in Weldwood glue) and potassium dishloro isocyanurate (in Steri-Chlor).

1099.  The Electric Boat Company Site abuts Newark Bay, which received direct discharges, overland flow, and sheet storm water runoff directly from the Electric Boat Company Site.

1100.  The ISC reported that on December 15, 1954, "sanitary wastes" were observed discharging into Newark Bay without treatment from a twelve inch pipe at the Electric Boat Company Site.

1101.  On September 12, 1956, the ISC reported that wastewater sewers at the Electric Boat Company Site were not connected to the Bayonne sewer system.

1102.  Upon information and belief, from 1900 until at least 1956, all wastewater generated at the Electric Boat Company Site discharged into Newark Bay with minimal or no treatment.

1103.  The City of Bayonne treatment plant was not constructed until 1954. To the extent that process wastewaters generated at the Electric Boat Company Site were in fact discharged into the City of Bayonne sewer system, these wastewaters were discharged into Newark Bay without treatment until at least 1954.

1104.    Upon information and belief, since the late 1950s, wastewater generated at the Electric Boat Company Site discharged into the City of Bayonne sewer system and flowed through regulator B035, also known as the Schuyler Outfall, and/or regulator B012, also known as the West 5th Street Outfall.  During wet-weather events, periods of peak flow, mechanical failures, or otherwise, regulator B035 and/or regulator B012 discharged untreated wastewater, including flow from the Electric Boat Company Site, directly into Newark Bay.

1105.    On or about April 20, 1963, a fire destroyed General Dynamic's facilities at the Electric Boat Company Site.  Upon information and belief, runoff from firefighting efforts was discharged into Newark Bay without treatment.

1106.    Upon information and belief, floor drains in buildings at the Electric Boat Company Site were plumbed directly to the Electric Boat Company Site and/or directly to Newark Bay.  Upon information and belief, spills, leaks, and floor washing effluent from process areas discharged into the area floor drains and thence to the Electric Boat Company Site and/or Newark Bay.

1107.    Soils at the Electric Boat Company Site contained Hazardous Substances and other compounds including, but not limited to, petroleum hydrocarbons, lead, copper, nickel, bis(2-ethylhexel)phthalate, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene and PCBs.

1108.    In December 1989, sediments in storm sewers at the Electric Boat Company Site were found to contain Hazardous Substances and other compounds, including, without limitation, volatile organic compounds and assorted base neutral compounds.

1109.    Upon information and belief, one or more septic systems were utilized at the Electric Boat Company Site.  In December 1989, samples of soils within a septic leach field at the Electric Boat Company Site contained Hazardous Substances and other compounds, including, without limitation, volatile organic compounds and assorted base neutral compounds.

1110.    Surface discharges, leaks, spills, septic field leachate, overland flow, sheet storm water runoff and flood waters carried Hazardous Substances from the Electric Boat Company Site into Newark Bay.

154

1111.  Sediments in Newark Bay near the Electric Boat Company Site contained Hazardous Substances and other compounds similar to those located on or discharged from the Electric Boat Company Site including, but not limited to, petroleum hydrocarbons, total Aroclor PCBs, total cogener PCBs, lead, copper, nickel, benzo(a)anthracene, benzo(a)pyrene and benzo(k)fluoranthene.

1112.  General Dynamics is a "discharger" and/or person "in any way responsible" for the Hazardous Substances that were discharged at the Electric Boat Company Site and released into the Newark Bay Complex.

### Elizabethtown Gas Sites

1113.  In 1855, Elizabethtown Gas Light Company was created by an act of the state legislature and in 1922 was merged into Elizabethtown Consolidated Gas Company.

1114.  In 1966, Elizabethtown Consolidated Gas Company changed its name to Elizabethtown Gas Company ("ETG"), which was a wholly-owned subsidiary of National Utilities & Industries Corporation.

1115.  In 1983, National Utilities & Industries Corporation changed its name to NUI Corporation.

1116.  In 1994, ETG merged with and into NUI Corporation.

1117.  In 2001, NUI Corporation changed its name to NUI Utilities, Inc.

1118.  In 2005, NUI Utilities, Inc. which also conducted business as "Elizabethtown Gas Company (a division of NUI Utilities)," changed its name to Pivotal Utility Holdings, Inc. ("Pivotal"). Pivotal also conducts business as "Elizabethtown Gas Company" and "Elizabethtown Gas."

1119.  Pivotal is the corporate successor of ETG and, therefore, succeeds to ETG's environmental liabilities related to the Elizabethtown Gas Sites.

### ETG South Street Site

1120.  The Elizabethtown Gas South Street property consists of approximately 2.7 acres of real property and associated improvements located at 406 South Street in Elizabeth, Union County, New Jersey ("ETG South Street Site").

1121.    From at least 1855 until the present, ETG owned and operated all or a portion of the ETG South Street Site.

1122.    From at least 1855 until 1901, ETG operated a coal gasification facility at the ETG South Street Site.  Upon information and belief, wastes generated at the ETG South Street Site between 1855 and 1901 include ash, coke, coal tar, light oils, clinker, coal tar pitch, spent oxide, spent lime, and ammonia liquor.  Coal tar, which contains high levels of PAHs, was disposed of into unlined pits at the ETG South Street Site.  Retort slag and coal tar has been detected in surface and subsurface soils at the ETG South Street Site.

1123.    From at least 1901 until 1965, ETG operated a natural gas storage and dispatch facility at the ETG South Street Site.

1124.    In 1929, the NJDOT began construction of the Routes 1 and 9 viaduct over the northwestern corner of the ETG South Street Site.  Upon information and belief, NJDOT retains a right of way over portions of the ETG South Street Site.

1125.    Between 1978 and 1980, the City of Elizabeth obtained the lower elevations of the ETG South Street Site by condemnation for the construction of flood control basins known as the Northern and Southern Retention Basins, which are along the Elizabeth River.

1126.    Between 1965 and 1990, ETG leased the ETG South Street Site to various entities including, without limitation, Vignola Salvage Corp. and Harvester Chemical Co.

1127.    The ETG South Street Site abuts the Elizabeth River, which received direct discharges, overland flow, and sheet storm water runoff directly from the ETG South Street Site.  From the ETG South Street Site, the Elizabeth River flows approximately two miles eastward and empties into the Arthur Kill.

1128.    Wastewater and surface water runoff from the ETG South Street Site discharged into the City of Elizabeth Combined Sewer System.  The City of Elizabeth never constructed or operated a wastewater treatment plant.  Upon information and belief, all wastewater generated at and discharged

156

from the ETG South Street Site between 1855 and 1912 was discharged into the Elizabeth River and/or other tributaries of the Newark Bay Complex without treatment.

1129.   In approximately 1912, the City of Elizabeth constructed the Westerly Interceptor Sewer, which diverted wastewater from portions of the City of Elizabeth sewer system into the JMEUC system. Upon information and belief, wastewater generated at the ETG South Street Site was discharged into the Westerly Interceptor Sewer and thence the JMEUC system.

1130.   Upon information and belief, the JMEUC did not construct a wastewater treatment plant until the 1930s.   Upon information and belief, until at least the 1930s, wastewater generated at and discharged from the ETG South Street Site was discharged into the Elizabeth River and/or other tributaries of the Newark Bay Complex without treatment.

1131.   Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the ETG South Street Site.

1132.   Hazardous Substances and other compounds have been detected in the soil at the ETG South Street Site, including, but not limited to, coal tar, pyrene, dibenzofuran, 2,4-dimethylphenol, acenaphthalene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, chrysene, dibenzo(a,h)anthracene, fluoranthene, fluorene, ideno(1,2,3-cd_pyrene, naphthalene, benzene, ethylbenzene, xylenes, arsenic, barium, beryllium, cadmium, lead, mercury, thallium, zinc, and cyanide.

1133.   Hazardous Substances and other compounds have been detected in the groundwater at the ETG South Street Site, including, but not limited to, coal tar, benzene, toluene, xylene, 2-methylphenol, 4-methylphenol, 2,4-dimethylphenol, naphthalene, 2-methylnaphthalene, dibenzofuran, antimony, arsenic, cadmium, lead, manganese, and cyanide.

1134.   Upon information and belief, groundwater at the ETG South Street Site flows to the Elizabeth River, which then flows to the Arthur Kill.  Upon information and belief, Hazardous Substances

157

and other compounds discharged to the groundwater at the ETG South Street Site Discharge into the Newark Bay Complex.

1135.    Hazardous Substances and other compounds similar to those that have been Discharged from the ETG South Street Site have been detected in sediment core samples collected from the Elizabeth River adjacent to the ETG South Street Site, including, but not limited to, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, chrysene, arsenic, manganese, phenols, and cyanide.

1136.    Upon information and belief, wet-weather events transported Hazardous Substances and other compounds from the ETG South Street Site into the Newark Bay Complex.

1137.    Pivotal is a "discharger" and/or a person "in any way responsible" for the Hazardous Substances that were discharged at the ETG South Street Site and that have discharged into the Newark Bay Complex.

<u>ETG Erie Street Site</u>

1138.    The Elizabethtown Gas Erie Street property consists of approximately 24.5 acres of real property and associated improvements located at 200-234 Third Avenue in Elizabeth, Union County, New Jersey ("ETG Erie Street Site").

1139.    Upon information and belief, Metropolitan Gas Light Company owned two acres of the ETG Erie Street Site no later than 1857.  Upon information and belief, in approximately 1892, ETG purchased the Metropolitan Gas Light Company and the remaining parcels of what is now the ETG Erie Street Site.  Upon information and belief, ETG is the successor to Metropolitan Gas Light Company.

1140.    Beginning in approximately 1889 until at least 1915, ETG operated a coal gasification facility at the ETG Erie Street Site.  Raw materials utilized in the production of coal gas include coal, coke, and oil.  Upon information and belief, wastes generated at the ETG Erie Street Site between 1889 and 1915 include ash, coal, coke, slag, coal tar, ammonia liquor, and oils.

1141.    Between 1915 and 1951, coal gas production was replaced with carbureted water gas production, which utilized water in place of oil in the production process.

158

1142.   In approximately 1947, Gas Holder No. 8 was constructed at the ETG Erie Street Site. Gas Holder No. 8 was the largest gas storage unit in the world at the time and had a total capacity of 10 million cubic feet of capacity.   Upon information and belief, sludges containing Hazardous Substances would collect at the bottom of Gas Holder No. 8 and required up to forty persons to clean out.

1143.   Beginning in approximately 1951, equipment at the ETG Erie Street Site was converted to produce gas from coal for distribution only during periods of peak demand.  A control facility was also constructed and ETG began distributing natural gas from the ETG Erie Street Site.  Coal gas continued to be produced until at least 1971.  By approximately 1978, the primary coal gas manufacturing facility and associated buildings at the ETG Erie Street Site had been demolished and removed.

1144.   In approximately 1974, a propane plant was installed at the ETG Erie Street Site.

1145.   In approximately 1989, propane and liquid natural gas was stored at the ETG Erie Street Site for peak demand distribution.  The ETG Erie Street Site continues to be utilized for distribution and storage of natural gas.

1146.   Upon information and belief, prior to 1950, ammonia liquor, a process waste generated at the ETG Erie Street Site, was mixed with cooling water and discharged directly into the Elizabeth River.

1147.   Upon information and belief, poor quality byproducts and solid and/or liquid process wastes generated at the ETG Erie Street Site were disposed of into unlined pits at the ETG Erie Street Site or otherwise disposed of directly onto the ETG Erie Street Site.

1148.   The ETG Erie Street Site abuts the Elizabeth River, which received direct discharges, overland flow, and sheet storm water runoff directly from the ETG Erie Street Site.  From the ETG Erie Street Site, the Elizabeth River flows approximately 0.7 miles eastward and empties into the Arthur Kill.

1149.   Wastewater and surface water runoff from the ETG Erie Street Site discharged into the City of Elizabeth Combined Sewer System.  The City of Elizabeth never constructed or operated a wastewater treatment plant.

1150.   In approximately 1957, the City of Elizabeth constructed the Easterly Interceptor Sewer, which diverted wastewater from portions of the City of Elizabeth sewer system into the JMEUC system.

Upon information and belief, after 1957, wastewater generated at the ETG Erie Street Site was discharged into the Easterly Interceptor Sewer and thence into the JMEUC system.

1151.    Upon information and belief, until at least 1957, wastewater discharged from the ETG Erie Street Site into the City of Elizabeth sewer system was discharged into the Elizabeth River and/or other tributaries of the Newark Bay Complex without treatment.

1152.    Upon information and belief, since at least 1957, wastewater generated at the ETG Erie Street Site and entering the Easterly Interceptor Sewer passed through a CSO known as CSO Number 035, located south of the foot of Third Avenue in Elizabeth, and which discharges into the Elizabeth River.    Upon information and belief, during wet-weather events, periods of peak flow, mechanical failures, blockages, or other faults in the JMEUC and/or the City of Elizabeth Combined Sewer System, all or a portion of the wastewater generated at the ETG Erie Street Site was discharged into the Elizabeth River without treatment through CSO Number 035 and/or other segments or areas of the JMEUC and/or the City of Elizabeth Combined Sewer System.

1153.    It was not until November 30, 1978, that the City of Elizabeth was issued an NPDES permit to discharge wastewaters from various CSOs to the Elizabeth River.

1154.    In 2007, an abandoned storm water collection system was discovered at the ETG Erie Street Site, which discharged untreated, contaminated storm water, containing benzene, a Hazardous Substance, into the Elizabeth River.

1155.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the ETG Erie Street Site.

1156.    Hazardous Substances and other compounds have been detected in the soil at the ETG Erie Street Site, including, but not limited to, benzene, xylene, acenaphthene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(k)fluoranthene, chrysene, dibenz(a,h)anthracene, fluoranthene, fluorene, ideno(1,2,3-cd)pyrene, naphthalene, pyrene, antimony, arsenic, barium, cadmium, copper, lead, mercury, thallium, zinc, and cyanide.

160

1157. Hazardous Substances and other compounds have been detected in the groundwater at the ETG Erie Street Site, including, but not limited to, benzene, ethylbenzene, xylene, 2-methylnaphthalene, acenaphthene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, benzo(g,h,i)perylene, chrysene, dibenz(a,h)anthracene, fluorene, fluoranthene, ideno(1,2,3-cd)pyrene, naphthalene, phenanthrene, pyrene, antimony, arsenic, barium, beryllium, cadmium, lead, manganese, silver, thallium, zinc, ammonia, and cyanide.

1158. Upon information and belief, groundwater at the ETG Erie Street Site flows to the Elizabeth River, which then flows to the Arthur Kill. Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the ETG Erie Street Site Discharge into the Newark Bay Complex.

1159. Hazardous Substances and other compounds similar to those that have been Discharged from the ETG Erie Street Site have been detected in sediment core samples collected from the Elizabeth River adjacent to the ETG Erie Street Site, including, but not limited to, 2-methylnaphthalene, acenaphthene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, benzo(g,h,i)perylene, chrysene, dibenz(a,h)anthracene, dibenzofuran, fluorene, fluoranthene, ideno(1,2,3-cd)pyrene, naphthalene, phenanthrene, pyrene, arsenic, cadmium, copper, lead, manganese, silver, zinc, cyanide.

1160. Hazardous Substances and other compounds similar to those that have been Discharged from the ETG Erie Street Site have been detected in surface water samples collected from the Elizabeth River downstream from the ETG Erie Street Site, including, but not limited to, arsenic and thallium.

1161. Upon information and belief, wet-weather events washed Hazardous Substances and other compounds from the ETG Erie Street Site into the Newark Bay Complex.

1162. Upon information and belief, the ETG Erie Street Site flooded during heavy rain events. Upon information and belief, the advancing and receding floodwaters washed Hazardous Substances and other compounds from the ETG Erie Street Site into the Newark Bay Complex.

WAS:144301.1

1163.    Pivotal is a "discharger" and/or a person "in any way responsible" for the Hazardous Substances that were discharged at the ETG Erie Street Site and that have discharged into the Newark Bay Complex.

## E.M. Sergeant Pulp & Chemical Company Site

1164.    The E.M. Sergeant Pulp & Chemical Co., Inc. Site is located at 120 Lister Avenue, Newark, New Jersey 07105 (the "E.M. Sergeant Site").

1165.    The E.M. Sergeant Site is located on the south bank of the Passaic River at river mile 1.975.  The E.M. Sergeant Site abuts the Passaic River, which received direct discharges from the E.M. Sergeant Site.

1166.    From approximately October 1942 until April 1984, E.M. Sergeant & Pulp Chemical Co., Inc. ("Sergeant Chemical") owned and operated an industrial chemical packaging and distribution facility at the E.M. Sergeant Site.

1167.    On information and belief, Sergeant Chemical's warehouse facility at the E.M. Sergeant Site involved the distribution of industrial chemicals, repackaging of chemicals, and blending of bleaches.

1168.    On information and belief, Sergeant Chemical stored, handled and/or Discharged Hazardous Substances and other compounds at the E.M. Sergeant Site, including, but not limited to, caustic solution and chlorine.

1169.    On information and belief, a PVSC inspector contacted a Sergeant Chemical plant engineer on or about July 24, 1956 regarding a violation arising from a 600-gallon concrete vat at the E.M. Sergeant Site, which discharged caustic soda and chlorine directly to the Passaic River approximately every three weeks.

1170.    On information and belief, a PVSC inspector contacted a Sergeant Chemical plant engineer on or about July 31, 1956 regarding Sergeant Chemical's continued violation of discharging caustic soda and chlorine from a 600-gallon concrete vat at the E.M. Sergeant Site directly to the Passaic River.

1171.    On information and belief, a PVSC inspector contacted a Sergeant Chemical plant engineer on or about August 6 and 7, 1956 regarding Sergeant Chemical's continued violation of discharging a mixed solution from a 600-gallon concrete vat at the E.M. Sergeant Site directly to the Passaic River.

1172.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Sergeant Chemical of its potential liability for response costs relating to the Lower Passaic River Study Area as the result of the release of Hazardous Substances from the E.M. Sergeant Site.

1173.    Sergeant Chemical is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the E.M. Sergeant Site and released into the Newark Bay Complex.

### Engelhard Site

1174.    The Engelhard Corporation property consists of approximately 42 acres of real property and associated improvements located at 429 Delancy Street in Newark, Essex County, New Jersey, also designated as Block 5042, lot 95-98 on the Tax Map of the City of Newark ("Engelhard Site").

1175.    A portion of the eastern boundary of the Engelhard Site abuts Pierson's Creek, which receives overland flow and sheet stormwater runoff from the Engelhard Site, as well as runoff from various on-site drains and stormwater collection pipes.  A drainage ditch, which runs along the southern boundary of the Engelhard Site, also receives overland flow and sheet stormwater runoff from the Engelhard Site.  The drainage ditch flows east and joins Pierson's Creek southeast of the Engelhard Site. From the Engelhard Site, Pierson's Creek flows in a southerly direction and after flowing beneath the Lehigh Valley Railroad yard via an underground culvert and subsequently entering two sixty-inch storm lines at the New Jersey Turnpike Toll Plaza at Exit Fourteen.  From the Toll Plaza, Pierson's Creek runs approximately three quarters of a mile underground until it discharges directly into Newark Bay in the Port Newark Channel.

1176.    Upon information and belief, Baker & Company, Incorporated ("Baker & Co.") was incorporated in the State of New Jersey prior to July 1927.  Upon information and belief, Baker & Co.

changed its name to Engelhard Industries, Inc. ("Engelhard Industries NJ") following the merger and consolidation of its holdings in various companies (including, but not limited to American Platinum Works, Hanovia Chemical and Manufacturing Company, and Baker & Co.) into Engelhard Industries NJ.

1177.    Upon information and belief, Engelhard Industries, Inc. was incorporated in April 6, 1960 in Delaware.  Upon information and belief, Engelhard Industries, Inc. was merged with Minerals Philipp and the combined company was renamed Engelhard Minerals & Chemicals Corporation ("EMCC") on October 18, 1967.  On information and belief, Engelhard Corporation ("Engelhard") succeeded to the business previously operated by EMCC.

1178.    According to Engelhard Corporation's ECRA Site Evaluation Submission filed November 21, 1985, Engelhard has operated at the Engelhard Site since 1954.  Upon information and belief, Engelhard is the successor to Engelhard Industries NJ.

1179.    On or about May 29, 2006, Engelhard entered into an Agreement and Plan of Merger with BASF Aktiengesellschaft ("BASF AK") wherein Iron Acquisition Corporation, a wholly-owned subsidiary of BASF AK, merged with and into Engelhard.  On or about August 1, 2006, Engelhard was renamed BASF Catalysts LLC  ("BASF Catalysts").

1180.    Upon information and belief, as a result of the merger, BASF Catalysts is the successor to Engelhard and, therefore, succeeds to Engelhard's environmental liabilities related to the Engelhard Site.

1181.    Engelhard owned and operated a precious metals (primarily platinum group metals, gold, and silver) refining and recovery facility as well as a catalyst and specialty chemicals manufacturing operation at the Engelhard Site.

1182.    Engelhard's refining operations at the Engelhard Site included screening, grinding, crushing, melting, and incinerating ores and other materials containing trace amounts of precious metals. Once physically processed, the materials were chemically processed in acid leaching or dissolution baths, and processed through precipitation and electrolysis baths.  Engelhard's catalyst manufacturing operations included the production of catalyst substrates, precious metal salts, and solutions used in the catalyst manufacturing process.

1183.    Upon information and belief, solid wastes generated at the Engelhard Site were either incinerated on-site, subjected to additional leaching or processing, or placed into drums and transported off-site for disposal.  Upon information and belief, wastewater solutions from the refining and production processes were discharged from the Engelhard Site into the sanitary sewer system.  Engelhard also released such wastewater solutions directly into on-site ditches, drains, or pipes that discharged into Pierson's Creek and Newark Bay.

1184.    Engelhard processed, handled, mixed, manufactured, consumed, stored, or otherwise used Hazardous Substances and other chemicals at the Engelhard Site, including but not limited to various acids, antimony, arsenic, chromium, copper, lead, mercury, nickel, cadmium, selenium, zinc, silver, PCBs, volatile organic compounds, and petroleum hydrocarbons.

1185.    From approximately 1970 until approximately 1974, process wastewater generated at the Engelhard Site discharged into an on-site septic system and dry well.  In approximately 1974, the septic system and dry well were connected to the PVSC sanitary sewer system.

1186.    Engelhard violated federal, state, and local effluent limitations for wastewaters discharged from the Engelhard Site into the PVSC sanitary sewer system and into Pierson's Creek.

1187.    Engelhard discharged approximately 300,000 to 600,000 gallons of highly acidic wastewater effluent into the PVSC sanitary sewer system.  The highly acidic content of the  wastewater corroded the PVSC sewer lines and on-site drainage lines.

1188.    Until the 1970s, overflow from a sump located in Building 8 at the Engelhard Site, which was utilized as a research and automotive catalyst manufacturing facility, discharged directly into Pierson's Creek.  The sump was designed to collect and hold effluent from research operations and wastewaters overflowing from automotive catalyst manufacturing operations prior to discharge to the sanitary sewer system.

1189.    Until the 1970s, process wastewater from an aluminum dissolving operation located in Building 4/4A at the Engelhard Site was discharged directly to an on-site ditch, which flowed into the stormwater channel located along the southern boundary of the Engelhard Site.

WAS:144301.1

1190.    In the mid-1950s, approximately 3,000 gallons of hydrochloric acid were discharged from and to the Engelhard Site after a pipeline ruptured.

1191.    In approximately 1956, approximately 10,000 gallons of hydrochloric acid were discharged from and to the Engelhard Site after a tank car hose ruptured.

1192.    On June 26, 1957, Baker & Co. received a license for the possession and use of uranium and for plutonium as a byproduct of their processes.

1193.    In approximately 1975, a sewer line on the Engelhard Site overflowed and approximately 3,000 gallons of effluent from Engelhard's automotive catalyst manufacturing operation were discharged directly into Pierson's Creek.

1194.    In 1982, two spills of PCBs occurred at the Engelhard Site.

1195.    In 1988, contractors for Engelhard discovered drums containing an unidentified white substance and waste catalyst beads from Engelhard's operations lying in the ditch located on the southern boundary of the Engelhard Site.  Soil samples taken from areas around the drums confirmed the presence of arsenic, silver, and chromium.

1196.    On multiple occasions, multi-colored liquid and precipitated metals were detected by Engelhard personnel in the drainage ditch along the southern boundary of the Engelhard Site, as well as within downstream areas of Pierson's Creek.

1197.    Soil samples taken at the Engelhard Site confirmed the presence of Hazardous Substances, including, but not limited to, PCBs, arsenic, chromium, copper, mercury, lead, nickel, thallium, zinc, antimony, cadmium, selenium, silver, and base neutral compounds, including fluorene, acenaphthene, naphthalene, phenanthrene, pyrene, and bis(2-ethyl-hexyl)phthalate.

1198.    Groundwater samples taken at the Engelhard Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, heavy metals, volatile organic compounds, petroleum hydrocarbons, and various base neutral compounds.  The groundwater is also highly acidic due to releases, spills, and leaks of processes wastewaters and other acidic compounds from and onto the Engelhard Site.

1199.    Groundwater at the Engelhard Site flows in the direction of Pierson's Creek, which then flows to Newark Bay.    Upon information and belief, Hazardous Substances and other compounds discharged by Engelhard to the groundwater beneath or adjacent to the Engelhard Site discharged into Pierson's Creek, thence into Newark Bay.

1200.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Engelhard Site.    In its initial Environmental Cleanup Responsibility Act application submitted to the State of New Jersey on or about November 21, 1985, Engelhard acknowledged that over the course of thirty years of operations at the property,  pipes and tanks -- which held and transferred various acids, cyanides, process solutions, and wastewaters -- were subject to leaks, spills, and discharges that subsequently flowed into Pierson's Creek.

1201.    Upon information and belief, portions of the Engelhard Site and Pierson's Creek have been prone to flooding during heavy rain events.    The advancing and receding floodwaters eroded and transported Hazardous Substances and other chemicals from chemical process areas, raw material storage areas, finished product storage areas, and on-site soils into the Newark Bay Complex.    Furthermore, as reported by a consultant for Engelhard in 1991, the flooding tidal flow and flooding conditions in Pierson's Creek served to flush sediments downstream toward Newark Bay.

1202.    Sediment samples taken from Pierson's Creek downstream of the Engelhard Site confirmed the presence of Hazardous Substances similar to those which were discharged to and from the Engelhard Site including, but not limited to, PCBs, arsenic, lead, cadmium, copper, lead, mercury, nickel, zinc, silver, petroleum hydrocarbons, and assorted semi-volatile compounds.

1203.    Sediment samples taken from the ditch located along the southern boundary of the Engelhard Site indicted the presence of Hazardous Substances similar to those which were discharged to and from the Engelhard Site including, but not limited to, antimony, arsenic, chromium, copper, selenium, silver, nickel, lead, cadmium, mercury, and petroleum hydrocarbons.

WAS:144301.1

1204.    On or about July 13, 2007, EPA sent a General Notice Letter notifying BASF Catalysts LLC of its potential liability for Response costs relating to the Newark Bay Study Area as the result of the Release of Hazardous Substances from the Engelhard Site.

1205.    BASF Catalysts, as successor to Engelhard, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Engelhard Site and released into the Newark Bay Complex.

### Essex Chemical Site

1206.    The Essex Chemical Company property consists of real property and associated improvements located at and about 330 Doremus Avenue in Newark, Essex County, New Jersey ("Essex Site").

1207.    The Essex Site abuts the mouth of the Passaic River and the northern reaches of Newark Bay, which both receive overland flow and sheet stormwater runoff directly from the Essex Site.

1208.    Upon information and belief, stormwater drains on the Essex Site discharged directly to the Passaic River and Newark Bay at the time Essex operated the Essex Site.

1209.    In 1953, the Dixon Chemical and Research Company, Inc. was incorporated in New Jersey and, on or about June 20, 1962,  changed its name to Essex Chemical Corporation ("Essex").

1210.    In approximately 1982, Essex Industrial Chemicals Incorporated ("Essex Industrial") was formed and operated as a wholly-owned subsidiary of Essex.  Essex Industrial operated the Essex Site until approximately December 1989.

1211.    In approximately December 1989, Essex Industrial was acquired by Peridot Chemicals (New Jersey), Inc. ("Peridot").  Upon information and belief, Peridot is a successor to Essex Industrial.

1212.    On or about March 31, 1998, Peridot merged with and into General Chemical Corporation ("General Chemical").  In approximately 2005, General Chemical changed its name to Gentek Holding LLC ("Gentek").  Upon information and belief, Gentek is the current successor to Essex Industrial.

1213.    Upon information and belief, Essex owned and/or operated a chemical manufacturing and processing facility at the Essex site from approximately 1955 until approximately 1982, after which Gentek, as successor to Essex Industrial and Peridot, owned and/or operated the Essex Site.

1214.    Products manufactured at the Essex Site included, but are not limited to, inorganic acids and salts, sulfuric acid, aluminum sulfate, oleum, magnesium oxide, and chromium sulfate.    Upon information and belief, the manufacture of these products involved the use of Hazardous Substances and other compounds at the Essex Site.

1215.    Soil and groundwater samples taken from the Essex Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, chromium, nickel, zinc, mercury, lead, selenium, silver, aluminum, various volatile organic compounds, various base neutral compounds, PCBs, and total petroleum hydrocarbons.

1216.    Upon information and belief, the Essex Site has been prone to flooding during heavy rains.    The advancing and receding floodwaters eroded and/or transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Passaic River and/or Newark Bay.

1217.    On or about October 31, 1972, a mixture of Hazardous Substances and other substances, including oleum, a sulfuric acid pre-curser compound, and nitric acid overflowed from a pressurized tank car and was released to the Essex Site.    The spilled mixture was washed from the Essex Site into the Passaic River and Newark Bay.

1218.    On or about July 11, 1974, the United States Attorney General for the District of New Jersey filed charges against Essex alleging violations of 33 U.S.C. § 407 for the October 31, 1972 unauthorized discharge of acidic compounds and refuse into navigable waters of the United States.

1219.    On or about April 4, 1983, the NJDEP reported that liquid aluminum sulfate leaked from the Essex Site and into the Passaic River.

1220.    On or about October 17, 1991, the NJDEP reported that a gasket failed in a pipeline and oleum was released to the atmosphere and the white cloud of oleum was observed dissipating over the Passaic River and/or Newark Bay.

1221.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Essex Site.

1222.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Essex of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Essex Site.

1223.    Gentek and/or and Essex are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the Essex Site and released into the Newark Bay Complex.

**Exxon Bayonne Site**

1224.    The Exxon Bayonne Site is approximately 288 acres in size and is located in the Constable Hook section of the City of Bayonne ("Exxon Bayonne Site").  The Exxon Bayonne Site is bordered by Upper New York Bay to the North and East and the Kill Van Kull on the South.  Platty Kill Creek, a tributary of the Kill Van Kull, is on the western side of the Exxon Bayonne Site.

1225.    Between 1877 and 1993, Exxon Mobil and its predecessors in interest  ("Exxon") owned and operated all of the Exxon Bayonne Site. On April 1, 1993, Exxon sold all of the Exxon Bayonne Site to IMTT, with the exception of the Lube Oil Area, Pier No. 1 Area, and the Stockpile Area.  From 1877 until approximately 1971, the Exxon Bayonne Site was operated as a refinery.  At the peak of refinery operations in 1936, Exxon owned an operated on approximately 650 acres on Constable Hook.  From approximately 1972 until 1993, Exxon operated the Exxon Bayonne Site as a petroleum products storage terminal and specialties plant.

1226.    Exxon produced a variety of products at the Exxon Bayonne Site, including kerosene, lubricating oils, waxes, grease, asphalt, gasoline, home heating oil, naphtha, aviation gas, aliphatic and

170

aromatic solvents, and flea, lice, insect and tick pesticides. A number of transformers at the Exxon Bayonne Site contained PCBs.

1227. Exxon discharged acid solution from the Chemical Products Plant to the Kill Van Kull in the 1950s.

1228. On May 29, 1973, pools of oil and oily water were observed along the railroad tracks paralleling the retaining wall at the Exxon Bayonne Site and the storm water collection system leading to tidal waters had oil floating on top of the water in the ditch. Water downstream of an oil/water separator was very oily, the vegetation on the banks was oil covered, and a large pool of oil was observed near the downstream end of the ditch.

1229. On May 31, 1973, sampling taken at the Exxon Bayonne Site indicated that there was oil floating on the water table.

1230. On November 15, 1975, Exxon discharged emulsified oil into the Kill Van Kull.

1231. On June 28, 1978, Exxon discharged waste oil into the Kill Van Kull.

1232. On September 28, 1979, the NJDEP observed floating oil at the Exxon Bayonne Site in the area around a submerged effluent outfall to the Kill Van Kull.

1233. On October 30, 1979, Exxon discharged heavy fuel oil into the Kill Van Kull.

1234. On June 4, 1989, Exxon discharged fuel oil into the Kill Van Kull.

1235. On February 9, 1990, Exxon discharged No. 2 fuel oil into the Kill Van Kull.

1236. In 1986, a toxic substance investigation of the sewer system at the Exxon Bayonne Site revealed that certain areas of the site had significant concentrations of organic compounds in the sewer system.

1237. Hazardous Substances detected in the soil at the Exxon Bayonne Site include: benzene, chlorobenzene, 1,2-dichlorobenzene, 1,4-dichlorobenzene, xylenes, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, chrysene, dibenzo(a,h)anthracene, ideno(1,2,3-cd)pyrene, pyrene, naphthalene, N-nitrosodiphenylamine, 4,4-DDD, 4,4-DDT, dieldrin, arsenic, beryllium, chromium, copper, lead, nickel, thallium, and zinc.

171

1238.    On information and belief, the Kill Van Kull received overland flow and sheet storm water runoff directly from the Exxon Bayonne Site.

1239.    Hazardous Substances detected in the groundwater at the Exxon Bayonne Site include: bromodichlomethane, chloroform, 1,2-dichloroethane, methylene chloride, perchloroethylene, trichloroethylene, vinyl chloride, benzene, chlorobenzene, 1,4-dichlorobenzene, ethylbenzene, xylene, acetone, methyl ethyl ketone, 2-methylnaphthalene, naphthalene, 2,4-dimethlyphenol, pentachlorophenol, alpha-BHC, 4,4-DDT, arsenic, antimony, beryllium, cadmium, chromium, cobalt, lead, and nickel.

1240.    At least seventeen non-aqueous phase liquid ("NAPL") plumes have been observed at the Exxon Bayonne Site.  According to a 1995 Phase 1A Remedial Investigation prepared on behalf of Exxon, "[b]oth floating NAPL and dissolved constituents in groundwater have the potential to migrate and eventually discharge into the Kill Van Kull Waterway."

1241.    Exxon is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Exxon Bayonne Site and released into the Newark Bay Complex.

### Exxon Bayway Site

1242.    On information and belief, ConocoPhillips Company is the current owner of  property located at 1400 Park Avenue, Linden, New Jersey (the "Exxon Bayway Site").  The Exxon Bayway Site is approximately 1,300 acres in size and is located within the cities of Linden and Elizabeth, New Jersey. The Exxon Bayway Site borders the Arthur Kill and is bisected by Morses Creek, which discharges into the Arthur Kill.

1243.    Between 1909 and 1993, Exxon Mobil and its predecessors in interest  ("Exxon") operated a refinery, petrochemical facilities and other facilities on the Exxon Bayway Site.  During much of the period between 1909 and 1972, the Exxon Bayway Site was interconnected by pipeline with Exxon's Bayonne refinery, and the two facilities were operated as an integrated facility known as the Jersey Works.

172

1244.   Exxon produced a variety of refined products at the Exxon Bayway Site, including gasoline, home heating oil, heavy fuel oil, jet fuel, diesel fuel, asphalt, white oils, alcohols, solvents, industrial chemicals, and lube oil additives..

1245.   Exxon discharged Hazardous Substances at the Exxon Bayway Site, including, monocyclic aromatics, PAHs, amines, pesticides, and various inorganics such as chromium and arsenic.

1246.   On information and belief, Exxon discharged process wastewaters containing Hazardous Substances into Morses Creek for decades.

1247.   On information and belief, prior to 1970, Exxon did not treat process wastewaters that it discharged to Morses Creek other than by use of oil-water separators.

1248.   In the first six months of 1949, over 3 million gallons of chemical products were lost to the atmosphere and sewers in the East Side Chemical Products Area of the Exxon Bayway Site.

1249.   An internal Exxon memorandum dated March 24, 1960 noted that:

> Mr. Joseph Pollock, a field inspector from the New York Harbor Inspector's Office, visited the Bayway waterfront area in the vicinity of our Bridge Boom on Tuesday, March 15. At the time of his visit, our effluent into the Arthur Kill was heavily covered with oil and a very bad pollution situation existed. Laboratory analysis of our effluent (spot sample) at this time indicated 725 ppm hydrocarbon. By taking into account the effluent water rate, we were putting into the Arthur Kill 2,900 bbls./day at the time of the sample. On the basis of the visual inspection alone, this high pollution rate does not seem out of line. (the Harbor Inspector's Office does not have the preceding effluent quality data.)

1250.   The internal Exxon Memorandum dated March 24, 1960 also observed that:

> Inspection of our separators, sewer systems, and the quality of the individual effluents which finally dump into the Morses Creek, following my run-in with the Harbor Inspector, disclosed that every major effluent, without exception, was heavily loaded with oil and that considerable quantities of emulsion existed throughout the entire refinery.

> \*\*\*

> Other than the large quantities of oil throughout the entire sewer system, the largest single contributor to our poor effluent was the emulsified condition existing on Morses Mill Creek, from the vicinity of No. 2 dam all the way down to the Bridge Boom.

1251.   A January 22, 1963 order from the New Jersey Department of Health noted that "industrial waste and other polluting matter is being discharged into the Arthur Kill" from the Exxon Bayway Site and "that said discharge is polluting said waters of this State in such a manner as to cause or threaten injury to the inhabitants of this State either in their health, comfort, or property...." The January 22, 1963 order from the Department of Health ordered Exxon to cease polluting the Arthur Kill within a year.

1252.   An August 14, 1964 internal memorandum from the Conservation & Services Division to all operating personnel at the Exxon Bayway Site states:

> On Tuesday, August 18th, members of outside control agencies will be in our Refinery to sample our water effluent at No. 1 Dam.
>
> In order to maintain the best possible conditions which currently are existing, all operating personnel are requested to refrain from dumping any materials, such as:
>
> a.  Water drawoff from tanks,
>
> b.  Line washes,
>
> c.  Equipment washes,
>
> d.  Spent acids,
>
> e.  Spent caustic,
>
> f.  Spent chemicals,
>
> g.  Chemical cleanings, and
>
> h.  Oily wastes
>
> to any of the sewer systems, beginning 3-11 shift Sunday, August 16th, thru 7-3 shift Wednesday, August 19th.
>
> Your cooperation in maintaining these restrictions for 64 hours will do much to present the best possible refinery appearance to these public officials during their period of sampling.

1253.   An internal Exxon memorandum dated February 3, 1967 states that Exxon was discharging a 2,270 gallons of oil, 30,900 pounds of total organic carbon, and 4,600 pounds of phenol per day into the Arthur Kill in 1966.

WAS:144301.1

1254.    As of 1967, Exxon had not complied with the 1963 Department of Health order to cease polluting the Arthur Kill.  According to an internal Exxon memorandum dated February 3, 1967, "[t]he unrealistically short time period was a legal and pressure tactic by the State to force us to act.  The actual date of compliance has been extended periodically by the State following our presentation of evidence of satisfactory progress toward compliance with the citation."

1255.    According to the Central Jersey Regional Air Pollution Control Agency, the Exxon Bayway Site "was the largest industrial polluter of the Arthur Kill" in 1965.

1256.    The United States Department of Interior concluded that in 1965, Exxon discharged 15,000 pounds of oil per day into the Arthur Kill and 49,920 pounds of BOD per day.

1257.    In January 1990, Exxon discharged more than 500,000 gallons of fuel oil into the Arthur Kill from a pipeline located near the docks at the Exxon Bayway Site that ran between Exxon's Bayway and Bayonne facilities.

1258.    Hazardous Substances detected in the soil at the Exxon Bayway Site include: benzo(a)pyrene, n-nitroso-di-n-propylamin, 2,4-dimethylphenol, naphthalene, aroclor-1260, lead, arsenic, copper, chromium, xylene, benzene, ethylbenzene, methylene chloride, toluene, 4,4'-DDD, and aldrin.

1259.    The Exxon Bayway Site is located in a low-lying area adjacent to the Arthur Kill which receives overland flow, and sheet storm water runoff directly from the Exxon Bayway Site.  Exxon discharged storm water from the Exxon Bayway Site into Morses Creek.

1260.    Hazardous Substances detected in the groundwater at the Exxon Bayway Site include: bis(2-ethylhexyl)phthalate, lead, arsenic, mercury, copper, chromium, benzene, tetrachloroethene, trichloroethene, 2-butanone, acetone, chloroform, 1,2-dichloroethane, and 4,4'-DDD.

1261.    In general, shallow groundwater at the Exxon Bayway Site flows toward surface water bodies.  At the northern parts of the facility, groundwater flows towards Morses Creek and the Arthur Kill.  At the southern parts of the Exxon Bayway Site, groundwater flows towards the Rahway River.

1262.    Free product seeps at the Exxon Bayway Site have been observed to discharge to surface water at the Spheroid No. 196 Area adjacent to Morses Creek, the Domestic Trade Terminal, the Tank No. 519 area, and the Domestic Trade Terminal, which is proximate to the Arthur Kill.

1263.    Exxon is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Exxon Bayway Site and released into the Newark Bay Complex.

### The Faber-Castell Site

1264.    The Faber-Castell site consists of real property and associated improvements at 41 Dickerson Street, which is comprised of Block 2843, Lots 1, 15 and 21 on the tax records of Newark, Essex County, New Jersey (the "Faber-Castell Site").

1265.    Upon information and belief, Faber-Castell Corporation ("Faber-Castell"), formerly known as A.W. Faber, Inc., was incorporated on July 3, 1919 in New Jersey.

1266.    On December 22, 1997, Faber-Castell Corporation merged with and into Berol Corporation, a Delaware corporation, and Berol Corporation was the survivor.  On information and belief, Berol Corporation is the successor to Faber-Castell Corporation's environmental liabilities related to the Faber-Castell Site.

1267.    Faber-Castell operated at the Faber-Castell Site from 1908 until at least 1995.  Faber-Castell operated out of three buildings:  Building 1 (the Main Building at 41 Dickerson Street) beginning in 1908, Building 2 (the Hudson Street building) beginning in 1968, and Building 3 (the Sussex Street warehouse) beginning in 1965.

1268.    From approximately 1908 to 1954, Faber-Castell manufactured pencil and ink erasers and rubbers bands utilizing rubber materials at Building 1.  The manufacturing process included the weighing and mixing of raw materials, extruding and shaping products, vulcanizing, printing, and packaging for sale.  Raw materials used in the production process within Building 1 included, without limitation, rubber, calcium carbonate, polyvinyl, and chloride.

1269.    In 1954, Faber-Castell ceased manufacturing rubber bands but continued manufacturing vinyl and rubber erasers.  Between 1969 and 1989, Faber-Castell also produced and sold under the name Higgins Inks at the Faber-Castell Site.

1270.    Hazardous Substances and other compounds utilized in the ink production process included di-octyl-phthalate, antimony, rhodamine dyes, sulphur and kerosene.

1271.    Faber-Castell utilized, manufactured, processed, handled, mixed, consumed, stored, and/or Discharged Hazardous Substances and other compounds at the Faber-Castell Site, including, but not limited to, calcium carbonate, vinyl chloride resins, carbon black, silica-containing barium sulfate, tetramethylthiuram monosulphide, zinc oxide, sulfur, triethanolamine, naphthenic distillate, magnesium oxide, N-(cyclohexylthio)-phthalimide, naphthenic distillates,  diethylene glycol, akrosperse green and blue pigments (copper compound), kerosene, ink, fuel oil, grease, waste oil, acetone, di-n-octyl-phthalate, naphtha, antimony, asbestos, rhodamine dies, chlorides, and sulfates.

1272.    The Faber-Castell Site is located within the City of Newark's Millbrook Basin, a district serviced by a Combined Sewer System.  Upon information and belief, wastewater from the Faber-Castell Site flowed from the City of Newark Combined Sewer System into the PVSC Main Interceptor through the Clay Street Overflow Chamber.

1273.    The Clay Street Overflow Chamber serves a tributary area of approximately 2,874 acres, which, on information and belief, includes the Faber-Castell Site.  In 1976, the PVSC estimated that the Clay Street Overflow Chamber discharged untreated wastewater into the Passaic River an average of forty-six to sixty times per year during wet weather events.  The PVSC estimated that the Clay Street Overflow Chamber discharged up to fifty million gallons of untreated wastewater into the Passaic River per wet-weather event.  According to the PVSC, when the main valve to the Clay Street Overflow Chamber is closed, "all tributary flow" entering the Clay Street Overflow Chamber is discharged into the Passaic River without treatment.

1274.    Industrial wastewater discharges from the Faber-Castell Site included steam condensation, boiler blow down, cooling water, and non-contact cooling water from Building 1 and Building 2.

1275.    The process piping at the Faber-Castell Site included floor drains and trenches which received process wastewater discharges.  The process piping converged at the industrial waste sumps in Building 1 and Building 2 and then discharged to the Newark Combined Sewer System and the PVSC Main Interceptor.  On information and belief, storm water drains located in the courtyard were included in the process piping system at the Faber-Castell Site.

1276.    On information and belief, Faber-Castell discharged sanitary and industrial wastewater at the Faber-Castell Site from 1908 until at least 1994.  Faber-Castell did not use any wastewater treatment processes at the Faber-Castell Site.  Faber-Castell discharged between 13,000 to 60,0000 gallons of untreated process wastewater per day to the PVSC Main Interceptor Line via the Newark Combined Sewer System by way of the Hudson Street sewer line and the Dickerson Street sewer line.

1277.    On information and belief, industrial wastewater discharged from the Faber-Castell Site included, without limitation, ammonia, cyanide, oil/grease, phenol, and chlorides.  The PVSC wastewater treatment plant was not completed until 1924.  Upon information and belief, from 1908 until at least 1924, wastewater generated at the Faber-Castell Site was discharged into the Passaic River without treatment.

1278.    Berol Corporation, as successor to Faber-Castell Corporation is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Faber-Castell Site and released into the Newark Bay Complex.

**Fiske Refining Site**

1279.    The Fiske Brothers Refining Company property consists of real property and associated improvements located at 129 Lockwood Street in Newark, Essex County, New Jersey ("Fiske Refining Site").

178

1280.   The Fiske Refining Site lies approximately one quarter of a mile from the Passaic River. Overland flow, direct discharges, and sheet stormwater runoff flows into area storm drains beneath Lockwood Avenue, Esther Street, and Lister Avenue, which empty into the 72" Lockwood Street storm sewer, that discharges directly into the Passaic River.

1281.   On or about February 10, 1891, Fiske Brothers Refining Company was incorporated in the State of New York ("Fiske Brothers").

1282.   From approximately the early 1870s until the present, Fiske Brothers owned and operated an oil and grease blending, compounding, and re-refining facility at the Fiske Refining Site.  Fiske also operated a rail spur at the Fiske Refining Site to receive and ship raw materials, products, and wastes.

1283.   Fiske Brothers processed, handled, mixed, manufactured, consumed, stored, or otherwise used Hazardous Substances and other chemicals at the Fiske Refining Site, including but not limited to petroleum, oil, mineral oil, greases, lubricants, other petroleum products, solvents, zinc compounds, and dichlorobenzene.

1284.   Between 1978 and 1979, the City of Newark identified multiple discharges from the Fiske Refining Site into area storm sewers.  These discharges included intermittent releases of "black oily chemicals" from the Fiske Brothers railroad siding into the Lister Avenue storm sewer line; oil and water discharging from the Fiske Refining Site into the Esther Street storm sewer; and cooling water discharging from the Fiske Refining Site into the Lockwood Street storm sewer.  The Lister Avenue, Esther Street and Lockwood Street storm sewers all discharge into the Passaic River.  Upon information and belief, one or more of these discharges contained Hazardous Substances.

1285.   Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Fiske Refining Site.

1286.   Fiske Brothers is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Fiske Refining Site and released into the Newark Bay Complex.

179

**Flexon Site**

1287.   The Flexon Industries property consists of real property and associated improvements located at 666 Washington Avenue in Belleville, Essex County, New Jersey, also designated as Block 162, Lot 16 on the Tax Map of the City of Belleville ("Flexon Site").

1288.   The Flexon Site lies approximately 1,500 feet due west of the Passaic River. Stormwater runoff and direct discharges from the Flexon Site are collected in on-site storm sewers and collection basins that empty into a forty-two inch storm sewer trunk line adjacent to the Flexon Site. The forty-two inch line progresses approximately 1,500 feet east and discharges directly into the Passaic River.

1289.   Upon information and belief, Associated Rubber & Plastic Corp. ("Associated Rubber") was incorporated in New York on or about March 14, 1944 and changed its name to Flexon Industries Corporation ("Flexon Industries New York") on or about March 27, 1973.

1290.   Upon information and belief, on or about January 26, 1983, Flexon Industries New York changed its name to Flexon Associates, Inc. and, on or about August 29, 1996, changed its name to Thirty-Three Queen Realty Inc. ("Thirty-Three Queen").

1291.   Upon information and belief, Flexon Industries Corporation was incorporated in the state of New Jersey ("Flexon Industries New Jersey") on or about December 30, 1981.

1292.   Upon information and belief, from approximately 1972 until the present, Thirty-Three Queen and/or Flexon Industries New Jersey have owned and/or operated a plastics manufacturing and warehousing facility at the Flexon Site.

1293.   Operations at the Flexon Site have included the manufacture of vinyl chloride and plastic films, sheets, hoses, and coated fabrics. Bulk chemicals and products were also stored at the Flexon Site, both in covered and uncovered areas. Upon information and belief, manufacturing operations at the Flexon Site involved the use and generation of Hazardous Substances and other compounds.

1294.   Upon information and belief, from approximately 1972 until present, 666 Washington Realty, Inc. has owned the real property at the Flexon Site.

1295.    Prior to approximately May 16, 1985, cooling waters from the vinyl chloride manufacturing operation at the Flexon Site were discharged directly into the storm sewer system without a Clean Water Act National Pollutant Discharge Elimination Permit.  The storm sewer system discharged directly into the Passaic River.

1296.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Flexon Site.  On or about April 5, 1977, city inspectors observed significant housekeeping problems at the Flexon Site, including drums of waste lubricating oil scattered about the property.  In approximately April 1983, a citation was issued for local fire code violations due to housekeeping problems at the Flexon Site.

1297.    On or about June 8, 2006, EPA sent a General Notice Letter notifying Flexon Industries Corporation of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Flexon Site.

1298.    Flexon Industries New Jersey and/or Thirty-Three Queen are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the Flexon Site and released into the Newark Bay Complex.

### Franklin Plastics Site

1299.    Franklin-Burlington Plastics, Inc. is the current owner of property located at 113 Passaic Avenue, Kearny, New Jersey, also designated as Block 1, Lot 12 on the tax maps of the Township of Kearny, Hudson County (the "Franklin Plastics Site").  The Franklin Plastics Site occupies approximately 8 acres of land and is bounded by the Passaic River on the west and is located approximately six miles upstream of the Passaic River's confluence with Newark Bay.

1300.    Franklin Plastics Corporation was incorporated in the State of New Jersey in 1962. Franklin Plastics purchased the Franklin Plastics Site in 1976.

1301.    In 1990, Franklin Plastics Corporation merged with and into Franklin-Burlington Plastics, Inc., the latter of which assumed all of Franklin Plastics Corporation's liabilities and obligations.  On

181

information and belief, Franklin-Burlington Plastics, Inc. does business as Spartech Vy-Cal and Spartech Polycom.

1302.   Since 1976, Franklin Plastics Corporation and its successor operated a plastics manufacturing facility at the Franklin Plastics Site, including the manufacture of polyvinylchloride pellets using plastic resin, pigments, and plasticizers in the process.

1303.   In 1985, NJDEP issued NJPDES Permit No. NJ 0002194 to Franklin Plastics Corporation for the discharge of non-contact cooling water from production processes at the Franklin Plastics Site into a common open sump pit.   The sump pit was divided into two sections, the first of which was used for settling of the cooling water.   The contents of the second section were discharged into the Passaic River via an outfall pipe.

1304.   In 1985, the NJDEP conducted an inspection of Franklin Plastics Corporation's compliance with its NJPDES Permit and determined that Franklin Plastics Corporation had exceeded the NJPDES Permit effluent limits for chromium and zinc.

1305.   In 1987 and 1990, Franklin Plastics Corporation reported that soil at the Franklin Plastics Site was contaminated with bis(2-ethylhexyl) phthalate, antimony, arsenic, cadmium, copper, lead, mercury, and zinc.

1306.   In 1990, EPA reported that contamination at the Franklin Plastics Site included bis(2-ethylhexyl)phthalate, antimony, arsenic, cadmium, copper, chromium, lead, mercury, nickel, and zinc in the soil.   EPA testing also detected cadmium, copper, lead, and zinc in surface water from the outfall pipe that drains from the Franklin Plastics Site into the Passaic River.   EPA also detected bis(2-ethylhexyl)phthalate, antimony, arsenic, beryllium, cadmium, copper, chromium, lead, mercury, nickel, and zinc in the sediment and surface water in the sump pit at the Franklin Plastics Site.

1307.   In 2002, Franklin-Burlington Plastics, Inc. reported the presence of benzo(a)anthracene, benzo(a)pyrene, chrysene, lead, mercury, and zinc in the sediments of the Passaic River; and benzo(a)pyrene, benzo(b)fluoranthene, benzo(g,h,i)perylene, bis(2-ethylhexyl)phthalate, indeno(1,2,3-cd)pyrene, arsenic, copper, lead, and zinc in the soil at the Franklin Plastics Site.

182

1308.    On September 19, 2003, the NJDEP issued Directive No. 1 In the Matter of the Lower Passaic River in which NJDEP found that Hazardous Substances were discharged at the Franklin Plastics Site and that those Hazardous Substances are and/or have emanated into the Lower Passaic River. NJDEP further determined that Franklin-Burlington Plastics, Inc. is a person, pursuant to the Spill Act, in any way responsible for the Hazardous Substances that were discharged at the Franklin Plastics Site.

1309.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Franklin-Burlington Plastics Inc. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Franklin Plastics Site.

1310.    Franklin-Burlington Plastics, Inc. is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Franklin Plastics Site and released into the Newark Bay Complex.

## Garfield Molding Site

1311.    On information and belief, Garfield Molding Company, Inc. ("Garfield") owns and operates the site located at 10 Midland Avenue, Wallington, New Jersey 07057 (the "Garfield Molding Site"). The Garfield Molding Site consists of approximately 3.43 acres of real property and associated improvements, and is bordered to the west by Midland Avenue, to the south by residential properties, and to the north and east by the Saddle River, a tributary of the Passaic River.

1312.    Garfield Manufacturing Company, Inc. began operating at the Garfield Molding Site around 1917. On or about December 26, 1978, Garfield Molding Co., Inc. was incorporated in the State of New Jersey. On or about December 30, 1982, Garfield Manufacturing Company, Inc. merged with Garfield Plastic Corporation, which was also located at the Garfield Molding Site, with the resulting entity being Garfield Molding Company, Inc.

1313.    Since 1908, operations at the Garfield Molding Site have involved the molding of plastics, cement and other materials for use in the electrical industry. The types of molding operations conducted at the facility include compression molding, custom cold molding, injection molding, thermoset molding and transfer molding. Other activities or operations at the site included coal storage,

183

drum storage, asbestos storage, impregnation building, heat treatment, finishing (drill presses and grinders), thermoset compound storage, and a tool and die shop.  No later than October 1988, parts of the Garfield Molding Site have been leased to an automotive repair business and to a direct mail advertising service.

1314.    Manufacturing processes and waste materials used or generated at the Garfield Molding Site include:  acetylene, ammonia, asbestos, molding compounds, bitumen, cutting oils, formaldehyde, fuel oil, furfural, gasoline, hydraulic oil, hydrocarbon waxes and solvents, lead, lubricating oil, mineral spirits, methylene chloride, non-halogenated solvents and still bottoms, petroleum distillates, tars, toluene, and waste oil.

1315.    Sanitary wastewater was discharged directly from the Garfield Molding Site to the Saddle River from 1908 through 1918.

1316.    Humidity room condensate wastewater was discharged from the Garfield Molding Site to the Saddle River from 1960 through 1988.

1317.    On June 6, 1974, PVSC inspectors noted that the Garfield Molding Site had four active outfall pipes and three inactive pipes.  One of the active pipes was sampled and documented to be discharging "polluting" boiler blow-down.

1318.    Boiler blow-down wastewater was discharged directly from the Garfield Molding Site to the Saddle River from 1969 through 1974.  On July 2, 1974, the Garfield Molding Site was cited by PVSC for violating water pollution control regulations by discharging polluting boiler blow-down into the Saddle River.

1319.    A wash sink in the mixing room at the Garfield Molding Site was tied into and discharging to storm drains from an unspecified start date through 1987.  On May 13, 1987, Garfield was cited for violating its NJPDES permit for having an unpermitted discharge from a wash sink in the mixing room to storm drains.  Other violations included poor housekeeping and failing to have a copy of the NJPDES permit on-site at the time of inspection.

1320.    On March 22, 1988, the Garfield Molding Site was found to have an unpermitted discharge of non-contact cooling water overflow and a violation of its NJPDES permit involving a discharge to the Saddle River.

1321.    On April 29, 1988, Garfield was cited for violating its NJPDES permit by having an unpermitted discharge of non-contact cooling water overflow.

1322.    On July 27, 1988, Garfield was cited for violating its NJPDES permit because a discharge with a source that could not be identified was found and was flowing at the time of the inspection. Additional violations at this time included failure to sample and file monitoring reports, and failure to submit a renewal application for its NJPDES permit within the specified time period.

1323.    The Garfield Molding Site discharged stormwater to both the Passaic River and the Saddle River from 1908 through at least 1988.

1324.    Numerous areas of stained soil were identified throughout the Garfield Molding Site, including areas that are located directly adjacent to and/or in close proximity to the Saddle River.

1325.    Since 1918, the Garfield Molding Site has discharged sanitary wastewater, non-contact cooling wastewater, and boiler blow-down wastewater to a municipal sanitary sewer system which feeds to the Bergen County Utilities Authority sewage treatment plant located in Little Ferry, New Jersey.

1326.    Since 1988, the Garfield Molding Site has discharged humidity room condensate wastewater to a municipal sanitary sewer system leading to the Bergen County Utilities Authority sewage treatment plant.

1327.    In an inspection of the Garfield Molding Site conducted on June 1, 1989, NJDEP observed a concrete trench which was covered with an oily residue, and was documented to be routed for discharge to a catch basin located in the facility's shipping/receiving area.  NJDEP also noted that past practices at the facility included spreading waste oil on the unpaved driveways in an effort to control dust.

1328.    In connection with the June 1, 1989 inspection of the Garfield Molding Site, NJDEP noted that there was a pit covered with a steel plate and a discharge of a grayish dust which had impacted the soils within the area of a small courtyard between Building 14A and Building 1A.  NJDEP also

185

observed a covered concrete pit in the vicinity of Building 4 adjacent to the Saddle River. NJDEP noted that the floor of Building 16 at the Garfield Molding Site was heavily soiled and that a portion of the roof was missing which allowed rainwater to reach the floor. NJDEP also observed a six-inch diameter pipe located along the southern side of Building 7 that extended down to the water table.

1329.    On September 27, 1989, NJDEP issue a Notice of Violation ("NOV") to Garfield after observing a 20-foot by 25-foot area of oil-stained soil during a facility inspection. The NOV stated that the facility "did discharge hazardous substance (motor oil) into soil which could impact waterways of the state of N.J." and also noted that Garfield "failed to notify N.J.D.E.P. as to such release" as required by law.

1330.    The sampling of four catch basins at the Garfield Molding Site revealed the presence of petroleum hydrocarbons and base neutral compounds. Soil and water samples taken from the Garfield Molding Site revealed the presence of ethylbenzene, volatile organic compounds, phenanthrene, phenol, antimony, copper, zinc, arsenic, mercury, fluoranthene, pyrene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, toluene, xylene and chrysene.

1331.    Substances detected in the soil at the Garfield Molding Site include: antimony, base neutral compounds, cadmium, chromium, copper, lead, mercury, metals, nickel, PCBs (aroclor 1260), phenols, silver, selenium, tetrachloroethane, total petroleum hydrocarbons, volatile organic compounds, xylenes, and zinc.

1332.    Substances detected in the groundwater at the Garfield Molding Site include: 2-methylnaphthalene, acenaphthene, benzene, dibenzofuran, ethylbenzene, fluorene, naphthalene, phenanthrene, toluene, and xylene.

1333.    On information and belief, process wastewater and surface water run-off from the Garfield Molding Site discharged into the PVSC Combined Sewer System, discharged directly into the Saddle River, and discharged directly into the Passaic River from the local combined sewer outfall during rain events and/or mechanical failures of the interceptor.

WAS:144301.1

1334. Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Garfield Molding Site.

1335. On or about February 14, 2006, EPA sent a General Notice Letter notifying Garfield Molding Company, Inc. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Garfield Molding Site.

1336. Garfield is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Garfield Molding Site and released into the Newark Bay Complex.

### Geigy Site

1337. The Geigy Company, Inc. property consists of real property and associated improvements located at 39 Avenue C in Bayonne, Hudson County, New Jersey ("Geigy Site").

1338. In approximately 1934, Geigy Company, Inc. ("Geigy") acquired the Geigy Site and operated a chemical manufacturing/processing facility at the Geigy Site.

1339. In approximately 1966, Geigy sold the Geigy Site to Richie-Dale, L.P. However, Geigy continued to operate the Geigy Site until at least 1976, when it moved its operations to a facility located in Toms River, New Jersey.

1340. From at least 1978 until the present, the Geigy Site has been operated as a multi-tenant industrial complex.

1341. Upon information and belief, Geigy was a subsidiary, affiliate, and/or division of Geigy Chemical Company, a U.S.-based subsidiary of J.R. Geigy, A.G., a Swiss-based company.

1342. Upon information and belief, in 1969, the ultimate corporate parent of J.R. Geigy, A.G., merged with Ciba, A.G., and the surviving corporation was renamed Ciba-Geigy, Ltd. Similarly, the U.S.-based subsidiaries of J.R. Geigy A.G. (Ciba Corporation), and Ciba, A.G. (Geigy Chemical Corporation), also merged and formed a new entity, Ciba-Geigy Corporation. Upon information and belief, the specialty chemical divisions, which included the operations at the Geigy Site, were consolidated within Ciba-Geigy Corporation.

1343.    In 1996, Ciba-Geigy, Ltd. merged with Sandoz AG, and the surviving corporation was renamed Novartis AG.  Ciba-Geigy Corporation was subsequently renamed Novartis Corp.

1344.    In January 1997, Novartis AG spun off its specialty chemical divisions into a Swiss-based company known as Ciba Specialty Chemicals Inc.  Upon information and belief, the U.S.-based specialty chemicals divisions within Novartis Corp., including those operations formerly conducted at the Geigy Site, were subsequently reconsolidated into a U.S.-based company known as Ciba Specialty Chemicals Corporation.  In March 2007, Ciba Specialty Chemicals Inc. announced an intent to adopt the name Ciba Inc.  Upon information and belief, the U.S.-based Ciba Specialty Chemicals Corporation was renamed Ciba Corporation.

1345.    Upon information and belief, Ciba Corporation is the corporate successor of Geigy, Geigy Chemical Corporation, and/or other U.S-based subsidiaries, affiliates or divisions of the Ciba-Geigy (now Novartis AG) family of businesses that were responsible for the manufacture/processing of specialty chemicals and dyestuffs at the Geigy Site from at least 1934 through 1976.

1346.    Hazardous Substances and compounds manufactured, handled, and/or processed by Geigy at the Geigy Site include aniline dyes, color lakes, dyes and dyestuffs, insecticides, chemical intermediates, pharmaceuticals, toners, and DDT.

1347.    Wastewater and surface water runoff from the Geigy Site discharged into the Bayonne Combined Sewer System.

1348.    The City of Bayonne did not construct a wastewater treatment plant until approximately 1954.  Until at least 1954, wastewater that discharged into the City of Bayonne Combined Sewer System discharged into waters of the Newark Bay Complex without treatment.

1349.    Until at least 1954, wastewater generated at the Geigy Site was discharged into the Newark Bay Complex without treatment.  Upon information and belief, the wastewater discharged from the Geigy Site contained Hazardous Substances and other compounds.

1350.    Upon information and belief, wastewater discharged from the Geigy Site after 1954 passed through a CSO known as Regulator No. 7, or DSN#010, located at Avenue C and East 1st Street

188

and which discharges into the Kill Van Kull. Upon information and belief, during wet-weather events, periods of peak flow, mechanical failures, blockages, or other faults in the Bayonne Combined Sewer System, all or a portion of the wastewater generated at the Geigy Site was discharged into the Newark Bay Complex without treatment through DSN#010 and/or other segments or areas of the Bayonne Combined Sewer System.

1351.  Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Geigy Site.

1352.  Hazardous Substances and other compounds have been detected in the soil at the Geigy Site, including, but not limited to, benzene, xylenes, and total petroleum hydrocarbons.

1353.  Hazardous Substances and other compounds have been detected in the groundwater at the Geigy Site, including, but not limited to, 1,1,1-TCA, 1,1-dichloroethane, 1,2-dichloroethane, 1,3-dichlorobenzene, 1,4-dichlorobenzene, 2-butanone, 2-hexanone, acetone, arsenic, barium, benzene, beryllium, cadmium, carbon disulfide, chloroform, chromium, copper, ethyl benzene, lead, methylene chloride, MTBE, naphthalene, nickel, toluene, trichloroethene, xylene, and zinc.

1354.  Hazardous Substances and other compounds similar to those that have been manufactured, handled, and/or processed by Geigy at the Geigy Site have been detected in sediment core samples taken from the Kill Van Kull proximate to the Geigy Site, including, but not limited to, DDT.

1355.  Ciba Corporation is a "discharger" and/or a person "in any way responsible" for the Hazardous Substances that were discharged at the Geigy Site and that have discharged into the Newark Bay Complex.

### General Chemical Site

1356.  The General Chemical property consists of real property and associated improvements located at 65 Lodi Street at Eighth Street in Passaic, Passaic County, New Jersey, also designated as Block 1029, lot 25 on the Tax Map of the City of Passaic ("General Chemical Site"). The General Chemical Site is also referred to as the "Dundee Warehouse."

189

1357.   The General Chemical Site abuts the Passaic River, which receives overland flow and sheet stormwater runoff directly from the General Chemical Site.  The Passaic River also received direct discharges from the General Chemical Site via a network of on-site storm sewer drains and floor drains, which were connected to pipes that discharged directly to the Passaic River.

1358.   In approximately 1899, General Chemical Company was founded and operated a nitrating plant, bulk-acid distribution facility, and warehouse for the storage of engineered plastics and pellets.

1359.   Upon information and belief, in approximately 1920, General Chemical Company merged with and into Allied Chemical and Dye Corporation and was operated as a division of Allied Chemical & Dye Corporation.

1360.   Upon information and belief, in approximately 1958, Allied Chemical and Dye Corporation changed its name to Allied Chemical Corporation.  In 1981, Allied Chemical Corporation changed its name to Allied Corporation.

1361.   Upon information and belief, in approximately 1985, Allied Corporation merged with the Signal Companies and the surviving corporation became known as Allied-Signal Corporation.  Upon information and belief, Allied-Signal Corporation was a successor to Allied Corporation and continued operations at the General Chemical Site until at least 1987.

1362.   In approximately 1993, Allied-Signal Corporation changed its name to AlliedSignal Inc. ("AlliedSignal").  Upon information and belief, on or about December 1, 1999, AlliedSignal merged with and into Honeywell Inc.  AlliedSignal was renamed Honeywell International Inc. ("Honeywell").  Upon information and belief, Honeywell is the successor to AlliedSignal and, therefore, succeeds to AlliedSignal's environmental liabilities related to the General Chemical Site.

1363.   From approximately 1899 until approximately 1987, AlliedSignal and its predecessors owned and operated a nitrating plant, bulk acid distribution facility, and warehouse at the General Chemical Site.  In approximately 1960, AlliedSignal ceased nitrating operations at the General Chemical

Site. AlliedSignal ceased bulk acid distribution operations at the General Chemical Site between 1974 and 1976.

1364.    Upon information and belief, Tri-State Building Materials Corporation has owned and operated the General Chemical Site since 1987.

1365.    Upon information and belief, AlliedSignal operated an incinerator on the General Chemical Site that was located approximately thirty feet from the banks of the Passaic River. AlliedSignal also operated an on-site disposal pit and drum washing area at the General Chemical Site that was located approximately sixty feet from the banks of the Passaic River.

1366.    AlliedSignal and its predecessors processed, handled, mixed, manufactured, consumed, stored, or otherwise used Hazardous Substances and other compounds and Hazardous Wastes at the General Chemical Site.

1367.    Floor drains at the General Chemical Site connected to pipes that discharged directly to the Passaic River. Upon information and belief, spills, leaks, and floor washing effluent entered the on-site floor drains and discharged into the Passaic River.

1368.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the General Chemical Site.

1369.    Soil samples taken at the General Chemical Site confirmed the presence of Hazardous Substances and other Compounds, including, but not limited to, arsenic, lead, cadmium, zinc, chromium, benzene, toluene, xylene, selenium, assorted semi-volatile compounds, copper, mercury, petroleum hydrocarbons, and assorted base neutral compounds.

1370.    Groundwater samples taken at the General Chemical Site confirmed the presence of Hazardous Substances and other Compounds, including, but not limited to, assorted volatile organic compounds, chromium, and lead.

1371.    Groundwater at the General Chemical Site is influenced by and flows in the direction of the Passaic River. On information and belief, Hazardous Substances discharged by AlliedSignal to the groundwater beneath or adjacent to the General Chemical Site discharge into the Passaic River.

191

1372.    Sediment core samples taken from the Passaic River from locations adjacent to and/or downstream of the General Chemical Site confirmed the presence of Hazardous Substances similar to those that were discharged to and from the General Chemical Site including, but not limited to, mercury, lead, petroleum hydrocarbons, and assorted base neutral semi-volatile compounds.

1373.    On or about June 8, 2006, EPA sent a General Notice Letter notifying Honeywell of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the General Chemical Site.

1374.    Honeywell, as successor to AlliedSignal, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the General Chemical Site and released into the Newark Bay Complex.

## General Cable Site

1375.    The General Cable Corporation property consists of real property and associated improvements located at 236 West First Street in Bayonne, Hudson County, New Jersey ("General Cable Site").

1376.    From approximately 1929 until approximately 1978, General Cable Corporation owned and operated the General Cable Site, and operated a wire and power cable research and development facility at the General Cable Site.

1377.    Upon information and belief, General Cable Corporation subsequently changed its name to General Cable Industries, Inc. ("General Cable").

1378.    In approximately 1978, Pirelli Cable Corporation ("Pirelli") purchased the General Cable Site and operated a power cable quality assurance and quality control testing facility.

1379.    Upon information and belief, Pirelli owned and operated the General Cable Site until 1981, when the General Cable Site was purchased by Texaco, Inc.  Pirelli continued to operate the General Cable Site until at least 1992.

1380.    On or about December 31, 1999, Pirelli was merged with and into Pirelli Cables and Systems, LLC, which later became Pirelli Communications Cables and Systems USA LLC.  Upon

information and belief, Pirelli Communications Cables and Systems USA LLC changed its name to Prysmian Communications Cables and Systems USA LLC ("Prysmian").

1381.   Upon information and belief, Prysmian is the successor to Pirelli Cable Corporation and, therefore, succeeds to Pirelli Cable Corporation's environmental liabilities related to the General Cable Site.

1382.   Operators at the General Cable Site generated, utilized, and/or stored Hazardous Substances and other compounds, including, but not limited to, trichloroethlyene, copper, lead, PCBs, and various oils and petroleum hydrocarbons.

1383.   The General Cable Site abuts the Kill Van Kull, which received direct discharges, overland flow, and sheet storm water runoff directly from the General Cable Site.  The Kill Van Kull is a tributary of Newark Bay.

1384.   Upon information and belief, since at least 1929, General Cable discharged all or a portion of its process wastewater into the City of Bayonne sanitary sewer system.  Until at least 1954, wastewater discharged into the City of Bayonne sanitary sewer system discharged directly into Newark Bay and/or the Kill Van Kull without treatment.

1385.   Since at least 1969, five pipes emanating from the General Cable Site discharged into the Kill Van Kull.

1386.   On or about December 10, 1969, wastewater discharging into the Kill Van Kull from two pipes at the General Cable Site was green, light brown, and white in color and contained concentrations of copper, aluminum, oil, and solids.

1387.   On or about December 15, 1969, the New Jersey State Department of Health ordered General Cable to cease discharging "industrial wastes and other polluting matter" into the Kill Van Kull and to install a wastewater treatment system at the General Cable Site.

1388.   On or about April 23, 1971, the United States filed an action against General Cable for five counts of discharging excessive quantities of oil and grease into the Kill Van Kull.  General Cable pled guilty to three of the counts.

193

1389.   In 1977 and 1978, the ISC determined that Pirelli was not operating the General Cable Site in compliance with the terms and conditions of its NPDES permit.

1390.   On or about June 14, 1979, approximately 1,000 gallons of wire drawing solution overflowed and discharged from the General Cable Site into the Kill Van Kull.

1391.   Two sumps located within a basement of a structure on the General Cable Site discharged into the storm sewer, which, upon information and belief, discharged into the Kill Van Kull.

1392.   Five floor drains located within a basement of a structure on the General Cable Site were plumbed to the storm sewer, which, upon information and belief, discharged into the Kill Van Kull. Upon information and belief, Hazardous Substances and other compounds, including, but not limited to, mineral oil, trichloroethylene, and scrap oil were stored in the basement.

1393.   Hazardous Substances and other compounds have been detected in the soil at the General Cable Site, including, but not limited to, lead, copper, zinc, polynuclear aromatic hydrocarbons, tetrachloroethene, trichloroethene, and petroleum hydrocarbons.

1394.   Upon information and belief, storm events and general erosion transported Hazardous Substances and other compounds from raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

1395.   Upon information and belief, the General Cable Site flooded during heavy rain events. Upon information and belief, the advancing and receding floodwaters eroded and transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

1396.   On multiple occasions between 1978 and 1980, heavy rainfall and/or flooding overwhelmed the wastewater treatment facilities at the General Cable Site, and Pirelli was forced to open a tide gate so that effluent would bypass the on-site treatment facility and flow directly into the Kill Van Kull.

1397.   Hazardous Substances and other compounds have been detected in the groundwater at the General Cable Site, including, but not limited to, copper, lead, zinc, chromium, and trichloroethene.

194

1398.    On or about July 13, 2007, EPA sent a General Notice Letter notifying General Cable of its potential liability for Response costs relating to the Newark Bay Study Area as the result of the Release of Hazardous Substances from the General Cable Site.

1399.    General Cable is a "discharger" and/or person "in any way responsible" for the Hazardous Substances that were Discharged at the General Cable Site and released into the Newark Bay Complex.

1400.    Prysmian, as successor to Pirelli, is a "discharger" and/or person "in any way responsible" for the Hazardous Substances that were Discharged at the General Cable Site and released into the Newark Bay Complex.

### Givaudan Site

1401.    On information and belief, Morris Clifton Associates is the current owner of property located at 125 Delawanna Avenue, in Clifton, New Jersey (the "Givaudan Site"). The Givaudan Site consists of approximately 31 acres of land located in proximity to the west bank of the Passaic River and the north bank of the Third River, adjacent to their confluence, approximately ten miles upstream of Newark Bay. The Passaic River is approximately 0.3 miles to the southeast of the Givaudan Site.

1402.    The Givaudan Site has been an active industrial facility since 1904. Givaudan Corporation purchased the bulk of the site in 1913, and purchased two other parcels now within the site in 1926 and 1931.

1403.    On information and belief, Givaudan engaged in fragrance production, flavors production and dry chemical blending on the Givaudan Site.

1404.    On information and belief, Givaudan Corporation was succeeded by Givaudan Roure Corporation, the latter of which also operated on the Givaudan Site. On information and belief, Givaudan Fragrances Corporation is the successor to the Givaudan Corporation and the Givaudan Roure Corporation (collectively, "Givaudan").

1405.    On information and belief, Givaudan produced hexachlorophene at the Givaudan Site from 1947-1984. Hexachlorophene is associated with the presence of 2,3,7,8 tetrachlorodibenzo-p-dioxin

195

("TCDD"). TCDD was detected at the Givaudan Site in the former process/production area, as well as the eastern portion of the Givaudan Site. Other substances detected in the soil at the Givaudan Site include: benzenes, napthalene, chloroform, toluene, xylenes, mercury and arsenic.

1406.   Until at least 1985, surface water from the chemical plant at the Givaudan Site was discharged to an onsite drainage pond and the Passaic River via a storm sewer. During heavy rainfall, the drainage pond would overflow, causing heavy flooding throughout the plant at the Givaudan Site.

1407.   Substances detected in the groundwater at the Givaudan Site include toluene, xylenes, 1,2-dichloroethane, trichloroethene, chloroform, 1,2,4-trichlorobenzene, manganese, naphthalene, nickel, arsenic, chromium, and benzene. Groundwater at the site flows from the northwest to the southeast towards the Passaic River, discharging to the Passaic River.

1408.   In August of 1977, Givaudan replaced a sewer line suspended from Passaic County Bridge No. 80 crossing the Third River. The sewer line carried domestic sewerage as well as industrial waste.

1409.   On or about March 15, 1978, a sewer line from the Givaudan Site was eaten through, resulting in a spill to the Third River. The sewer line carried domestic sewerage, as well as industrial waste. On or about March 21, 1978, the same line broke again, resulting in another spill to the Third River. Analysis of Givaudan's wastewater in 1977 revealed the presence of chromium, copper, lead, mercury, nickel and zinc.

1410.   On information and belief, Givaudan discharged process waste fluids to a chemical sewer which discharged to the Third River through a storm sewer. An investigation of Givaudan's chemical sewer in 1983 revealed that there were misaligned and open joints in the piping system, as well as cracked and open pipe in many locations. The 1983 investigation determined that the leakage from Givaudan's chemical sewer was higher than normal.

1411.   On or about June 17, 1983, New Jersey Governor Thomas H. Kean issued Executive Order No. 40B relating to possible dioxin contamination at the Givaudan Site.

1412.   On or about March 5, 1987, Givaudan entered into an Administrative Consent Order with NJDEP concerning groundwater contamination at the Givaudan Site.

1413.   On or about March 5, 1987, Givaudan entered into an Administrative Consent Order with NJDEP concerning TCDD contamination at the Givaudan Site.  This order was amended in February 1988.

1414.   In August 2004, EPA sent a General Notice Letter notifying Givaudan Fragrances Corporation of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Givaudan Site.

1415.   Givaudan is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Givaudan Site and released into the Newark Bay Complex.

### Goody Products, Inc. Site

1416.   H. Goodman & Sons, Inc. owned and operated on an approximately 9.45 acre property located at 969 Newark Turnpike, Kearny, New Jersey, also designated as Block 286, Lot 45C on the tax maps of the City of Kearny, Hudson County, New Jersey (the "Goody Products Site").  H. Goodman & Sons, Inc. operated a hair care accessory manufacturing facility at the Goody Products Site.

1417.   In 1980, H. Goodman & Sons, Inc. changed its name to Goody Products, Inc. ("Goody Products").  In 1994, Goody Products ceased operating at the Goody Products Site.

1418.   Goody Products discharged industrial waste from its operations at the Goody Products Site directly to Dead Horse Creek via a cast iron pipe outlet.  On information and belief, the industrial waste that Goody Products discharged to Dead Horse Creek contained Hazardous Substances including copper, nickel and cyanide.

1419.   Dead Horse Creek flows into Frank's Creek, which in turn flows into the Passaic River.

1420.   Goody Products is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Goody Products Site and released into the Newark Bay Complex.

**Gordon Terminal Service Company Site**

1421.    The Gordon Terminal Service Co. of N.J., Inc. site consists of property at 2 Hook Road, also known as Foot of Hook Road, which is comprised of Block 481, Lot 1 on the tax records of Bayonne, Hudson County, New Jersey (the "Gordon Terminal Service Site").    The Gordon Terminal Service Site is adjacent to the Kill Van Kull which connects to Newark Bay.

1422.    Upon information and belief, Gordon Terminal Service Co. of N. J., Inc. ("GTS") has been operating at the Gordon Terminal Service Site since 1967.

1423.    Gordon Terminal Service Company operates a 90-million-gallon-per-year automotive chemical packaging and petroleum/solvent terminal at the Gordon Terminal Service Site.    Most of the operations at the site involve the blending and packaging of motor oils and transmission fluids for larger companies.    Base stocks of oil are received by ship via the Kill Van Kull and are stored in various above-ground storage tanks at the Gordon Terminal Service Site.    These stocks are mixed with various additives according to the contractors' specifications and packaged in retail sale sized containers such as quarts and gallons or sold in bulk.    GTS also handles prepackaged hydraulic oils, soluble oils, cutting oils, and other industrial lubricants on a smaller scale.    Other operations at the Gordon Terminal Service Site involve solvent transfers and blending of fuel oils.    This portion of the site operations involves No. 2 and No. 6 fuel oils and common chemicals such as perchloroethylene, 1,1,1-trichloroethane, ethylene glycol and styrene monomer.    The Gordon Terminal Service Site serves as a transfer and redistribution center for these materials.    Only the fuel oils are blended prior to shipment.    The total storage capacity at the Gordon Terminal Service Site is 1,000,670 barrels with transfers occurring by tanker truck, ship, barge, or rail car. GTS also packages petroleum products in containers ranging from 1 quart to 55 gallon drums which are shipped in box trailers.

1424.    GTS utilized, handled, mixed, consumed, stored and/or Discharged Hazardous Substances and other compounds at the Gordon Terminal Service Site, including, but not limited to, carbon tetrachloride, caustic soda (NaOH), chloroform, ethylene glycol, methylene chloride,

WAS:144301.1

perchloroethylene, petroleum hydrocarbons, phosphoric acid, polyethylene, styrene monomer, 1,1,1 - trichloroethane, trichloroethylene, and triethane.

1425.    The Gordon Terminal Service Site has at least two discharge outfalls.  Each outfall averages 28,800 gallons per day of stormwater treated by oil/water separators.  On information and belief, the Gordon Terminal Service Site has a network of drains, piping and separators below grade which handles oily runoff and wastewater.  Wastewater from the Gordon Terminal Service Site passes through this network and is discharged to the Kill Van Kull.

1426.    Materials at the Gordon Terminal Service Site are transferred to and from ships in the Kill Van Kull.

1427.    On May 25, 1984, approximately 4,000 gallons of 1,1,1-trichlorethane spilled from a ship unloading at the Gordon Terminal Service Site.

1428.    On information and belief, large quantities of oil, grease, dyes and other substances were released to the waters of the Kill Van Kull via water runoff during a major fire at the Gordon Terminal Service Site in November 1987.  Sheens and raw product were observed on the waters of the Kill Van Kull.  The large fire involved a portion of the inventory consisting of 30,000 to 40,000 55-gallon drums of oil, 200,000 cases of motor oil, 50,000 cases of grease and 100,000 pails and kegs of industrial lubrication materials.  An estimated 2,500 cubic yards of soil that was contaminated as a result of the fire was removed from the Gordon Terminal Service Site in 1988.  After an inspection on March 9, 1988, a Notice of Violation was issued for the release of petroleum hydrocarbons caused by the large fire at the Gordon Terminal Service Site.

1429.    On information and belief, GTS exceeded its NJPDES permit limits for January 1988. An Administrative Order was issued in 1989 for a series of permit exceedances.

1430.    On or about September 3, 1987, 100 gallons of styrene monomer spilled at the Gordon Terminal Service Site.  The styrene monomer spill occurred on soil and was addressed by washing it down with water at the Gordon Terminal Service Site.  No attempt was made to contain and remove the

spilled materials. On or about November 23, 1988, the NJDEP issued a Notice of Violation to GTS for the release of styrene monomer at the Gordon Terminal Service Site.

1431. Gordon Terminal Service Site discharge monitoring reports for the period of August 1, 1988 to January 31, 1989 revealed that effluent limitations were exceeded for biological oxygen demand, pH, total organic carbon and trichloroethylene. At least 19 exceedances of permit discharge limits occurred at the Gordon Terminal Service Site from February 1988 to January 1989, and the NJDEP issued an Administrative Order. Nevertheless, GTS continued exceeding permit levels through at least April 1993.

1432. On or about October 25, 1989, an open valve at the Gordon Terminal Service Site caused 200 gallons of lube oil to spill.

1433. On information and belief, spills, leaks, mechanical failures and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Gordon Terminal Service Site.

1434. On information and belief, lube oil and chemicals lost due to spills and leaks contaminated the Gordon Terminal Service Site.

1435. Hazardous Substances and other compounds have been detected in the soil at the Gordon Terminal Service Site, including, but not limited to, petroleum hydrocarbons.

1436. Gordon Terminal Service Co. of N.J., Inc. is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Gordon Terminal Service Site and released into the Newark Bay Complex.

**Harrison Supply Site**

1437. The Harrison Supply Site consists of property located at 800 Passaic Avenue, Harrison, New Jersey, also designated as Blocks 14, 16 and 18 on the tax maps of East Newark Hudson County, New Jersey ("Harrison Supply Site"). The Harrison Supply Site is located directly or the eastern bank of the Passaic River between river mile markers 5 and 6.

1438.   Upon information and belief, PhilBro, Inc., a real estate company, is the owner of the Harrison Supply Site and leases the property to Harrison Supply Company ("HSC").

1439.   HSC was incorporated in New Jersey on May 28, 1927.   HSC has been a lessee/operator of the Harrison Supply Site since 1927.   During this time, HSC has used the premises for the manufacture, distribution and sale of ready mix concrete and the retail sale of masonry supplies, including sand, cinder blocks, patio bricks, and other masonry merchandise.   Upon information and belief, HSC utilized, processed, handled, stored or otherwise used Hazardous Substances at the Harrison Supply Site including, but not limited to, hydrochloric acid, methyl styrene, sodium hydroxide, and xylene.

1440.   Upon information and belief, stormwater and direct discharges from the Harrison Supply Site collect in storm water drains on the site, which discharge into the Passaic River.

1441.   HSC's operations at the Harrison Supply Site have caused direct discharges of Hazardous Substances into the Passaic River.   On May 9, 1972, HSC pled guilty in United States District Court to the unlawful discharge of alkaline refuse into the Passaic River from its facilities at the Harrison Supply Site.

1442.   On or about June 8, 2006, EPA sent a General Notice Letter notifying HSC of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Harrison Supply Site.

1443.   HSC is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Harrison Supply Site and released into the Newark Bay Complex.

1444.   PhilBro is a Person "in any way responsible" for the Hazardous Substances that were discharged at the Harrison Supply Site and released into the Newark Bay Complex.

### Hartz Mountain Site

1445.   The Hartz Mountain property consists of approximately 10.3 acres of real property and associated improvements located at 700 Frank E. Rodgers Boulevard (S. 4th Street), Harrison, New Jersey, also designated as Block 133, Lot 1 on tax maps of the Town of Harrison, Hudson County, New Jersey ("Hartz Mountain Site").   The Hartz Mountain Site is alternatively addressed as 600 South 4th

Street, Harrison, New Jersey. Upon information and belief, the Hartz Mountain Site has been utilized for industrial operations since approximately 1907.

1446. Upon information and belief, General Motors Corporation operated the Hartz Mountain Site as part of its Hyatt Roller Bearing Division from 1918 to the late 1960s. General Motor's roller bearing operations included metal working, heat treating, grinding, and support activities.

1447. Upon information and belief, Sternco Dominion Realty Corporation purchased the Hartz Mountain Site in 1970.

1448. Upon information and belief, Sternco Industries, Inc. began operating at the Hartz Mountain Site in the early 1970s. Sternco Industries, Inc. manufactured aquariums, aquarium supplies and pet food.

1449. Upon information and belief, Sternco Industries, Inc. merged with Hartz Mountain Pet Foods Inc. in 1973 to form Hartz Mountain Corporation ("Hartz Mountain"). Hartz Mountain manufactured, assembled and warehoused steam cleaning machines, store display racks, and pet supply products, such as aquariums and fish food.

1450. Upon information and belief, Hartz Mountain ceased its manufacturing and assembly operations at the Hartz Mountain Site in 1993. Upon information and belief, Hartz Mountain continued its business-related activities at the Hartz Mountain Site until 1996, at which time the facility buildings at the Hartz Mountain Site were cleared of all equipment and furnishings.

1451. Upon information and belief, Hartz Mountain was jointly purchased in 2000 by the company's management and an investment group named J. W. Childs.

1452. Upon information and belief, in September 2004, Hartz Mountain was acquired by Sumitomo Corporation of America ("Sumitomo America"), the United States-based subsidiary of Japanese conglomerate Sumitomo Corporation. Hartz Mountain Corporation is currently a subsidiary of Sumitomo America.

1453. Hartz Mountain handled, processed, used, stored, or otherwise utilized Hazardous Substances and other compounds at the Hartz Mountain Site, including, but not limited to 1,1,1-

202

trichloroethane, acetylene, argon, chlorodifluoromethane, dimethyl ether, kerosene, methyl bromide, toluene, No. 2 Fuel Oil, grease, pesticides, fungicides, battery acid, and paint thinners.

1454.    Upon information and belief, direct discharges, overland flow, and storm water runoff from the Hartz Mountain Site emptied into the PVSC Combined Sewer System within the Middlesex Combined Sewer Outfall District ("Middlesex CSO"). According to the PVSC, during periods of rainfall or wet weather, a portion of the combined flow within the Middlesex CSO enters an interceptor and discharges through an outfall line into the Passaic River.

1455.    Hartz Mountain admitted in 1976, and again in 1986, that it did not pretreat its effluent before discharging it to the sanitary sewer.

1456.    Upon information and belief, Hartz Mountain did not receive a permit to discharge wastewater into the PVSC Combined Sewer System until at least 1986.

1457.    In a March 1986 PVSC Application for a Sewer Connection Permit, Hartz Mountain admitted that it generated approximately 3,865,400 gallons of sanitary wastewater and 5,798,760 gallons of cooling wastewater effluent in 1985 at the Hartz Mountain Site.

1458.    Upon information and belief, as of May 24, 1988, Hartz Mountain did not have a "closed," non-contact cooling water system for certain equipment at its facility. The cooling water from these pieces of equipment were discharged as effluent to the sewer system.

1459.    Upon information and belief, on September 29, 1981, a leak was discovered in a No. 2 Fuel Oil storage tank located in the "battery room" on the Hartz Mountain Site. Approximately 500 gallons of No. 2 Fuel Oil was discharged to a facility storm outlet, and in turn to the Passaic River.

1460.    In 1986, analysis of samples taken from the wastewater stream at the Hartz Mountain Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, chromium, iron, lead, cyanide, mercury, pesticides, chloroform, and bromodichloromethane.

1461.    Hazardous Substances and other compounds have been detected in the soil at the Hartz Mountain Site, including, but not limited to, PCBs and petroleum.

1462.    Hazardous Substances and other compounds have been detected in the sediments of facility stormwater catchbasins at the Hartz Mountain Site, including, but not limited to, antimony, cadmium, copper, lead, nickel, PCBs, petroleum hydrocarbons, silver, and zinc.  Upon information and belief, these catchbasins are connected to the Middlesex CSO.

1463.    Hazardous Substances and other compounds have been detected in the combined sewer system lines associated with the Hartz Mountain facility, including, but not limited to, copper, lead, PCBs, TPHCs, and zinc.

1464.    Hazardous Substances and other compounds have been detected in the groundwater at the Hartz Mountain Site, including, but not limited to, PCBs, tetrachloroethylene, and trichloroethylene.

1465.    On or about September 11, 2006, EPA sent a General Notice Letter notifying Hartz Mountain of its potential liability for response costs relating to the Lower Passaic River Study Area as a result of the release of Hazardous Substances from the Hartz Mountain Site.

1466.    Hartz Mountain is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Hartz Mountain Site and released into the Newark Bay Complex.

### Hexcel Site

1467.    The Hexcel Site is located at 205 Main Street, Lodi, New Jersey, also designated as Block 161.01, Lot 1.01 and Block 81.01, Lot 10.01 on the tax maps of the Borough of Lodi ("Hexcel Site").  The Hexcel Site is bounded by Main Street to its east, the Saddle River to its west, Molnar Road to its south and the Route 46 Ramp to its north.

1468.    Industrial operations at the Hexcel Site commenced prior to the year 1900, when the site was occupied by United Piece Dye Works.

1469.    In approximately 1944, Fine Organics, Inc., a New York corporation, purchased the Hexcel Site and began manufacturing operations at the site in approximately 1945.  Fine Organics, Inc. manufactured and stored mercurophyllin, pharmaceuticals, synthetic organic chemicals, reagent chemicals, inorganic chemicals and similar products at the Hexcel Site.

204

1470.    PCBs were used in the heat exchange system of Building 1 at the Hexcel Site.

1471.    Fine Organics, Inc. purchased 5,400 pounds of Therminol-1 from Monsanto in 1970 for use at the Hexcel Site.  In 1971, Fine Organics, Inc. purchased 3,000 pounds of Therminol-1 from Monsanto for use at the Hexcel Site.  Therminol-1 consisted of 100% aroclor 1242.

1472.    Fine Organics, Inc. purchased 4,200 pounds of Therminol FR-2 from Monsanto in 1971 for use at the Hexcel Site.  In 1972, Fine Organics, Inc. purchased 3,000 pounds of Therminol FR-2 from Monsanto for use at the Hexcel Site.  Therminol FR-2 consisted of 100% aroclor 1248.

1473.    Aroclor 1242 and aroclor 1248 were detected in soil at the Hexcel Site, as well as in the sediment in the Saddle River in proximity to the Hexcel Site.

1474.    On or about February 5, 1973, Hexcel Subsidiary was formed as a California corporation. On or about May 10, 1973, Hexcel Subsidiary and Fine Organics, Inc. merged, and the surviving corporation became known as Fine Organics, Inc., a California corporation.

1475.    On or about June 25, 1975, Fine Organics, Inc., a California corporation, merged with and into Hexcel Corporation ("Hexcel"), a California corporation.  As a result, Hexcel is the successor to Fine Organics, Inc., a New York corporation, and Fine Organics, Inc., a California corporation and, therefore, succeeds to the environmental liabilities of such entities related to the Hexcel Site.

1476.    After merging with Fine Organics, Inc, a California corporation, in 1975, Hexcel owned and operated the Hexcel Site until March 1986.  When Hexcel owned and operated the Hexcel Site between 1975 and 1986, it blended and packaged industrial cleaning compounds and produced resin products at the site.

1477.    In March 1986, Hexcel sold the Hexcel Site to Fine Organics Corporation, a Delaware Corporation.  On information and belief, Fine Organics Corporation operated the Hexcel Site in substantially the same manner as Hexcel had operated the site prior to selling it to Fine Organics Corporation.

1478.    Fine Organics Corporation owned and operated the Hexcel Site from March 1986 until approximately 1997, when Hexcel repurchased the site.

205

1479.    The industrial sewer at the Hexcel Site originated in the northeast section of the site, turned east towards Building 1 at the site, and then flowed under Molnar Road to the Hendricks Pump Station, which is owned and operated by the PVSC.  The Hendricks Pump Station discharges to the PVSC trunk line, but also has a 15-inch overflow to the Saddle River.  On information and belief, the Hendricks Pump Station was bypassed on occasion, resulting in direct discharges of industrial waste to the Saddle River.

1480.    PCBs and petroleum hydrocarbons were detected in the sediments in the industrial sewer system at the Hexcel Site.  Oil containing PCBs was also observed floating in a manhole and catch basin on the Hexcel Site.

1481.    Water floating in a drain in a pit in Building 1 at the Hexcel Site contained oil and PCBs.

1482.    Substances detected in the soil at the Hexcel Site include:  tetrachloroethene, trans-1,2-dichloroethene, 1,1,2,2-tetrachloroethane, 1,1,2-trichloroethane, 1,1-dichloroethane, benzene, carbon tetrachloride, chlorobenzene, chloroform, vinyl chloride, 1,2-dichloroethane, 1,2-dichlorobenzene, bis(2-ethylhexyl)phthalate, naphthalene, 1,2,4-trichlorobenzene, 1,2-dichlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorobenzene, ethylbenzene, fluoranthene, fluorene, phananthrene, anthracene, di-n-butyl phthalate, dibenzo(a,h)anthracene, benzo(g,h,i)perylene, acenaphthylene, aroclor 1248, aroclor 1254, aroclor 1242, phenol, zinc, arsenic, cadmium, chromium, copper, lead, mercury, nickel, silver, thallium, antimony, and beryllium.

1483.    The Hexcel Site has been subject to flooding.  The storm drain system at the Hexcel Site discharged to the Saddle River, a tributary of the Passaic River.  A storm sewer outfall, which carried storm water from the Hexcel Site, was located approximately 750 feet south and downstream of the Hexcel Site.  There was also a three-inch diameter pipe on the eastern bank of the Saddle River in proximity to the Hexcel Site.

1484.    On information and belief, the Saddle River received overland flow and sheet storm water runoff directly from the Hexcel Site.

WAS:144301.1

1485.   PCBs were detected in much higher concentrations in the sediment of the Saddle River down-gradient of the storm water outfall from the Hexcel Site than at other locations in the Saddle River. PCBs were also detected in proximity to the three-inch diameter pipe on the eastern bank of the Saddle River adjacent to the Hexcel Site.

1486.   On information and belief, the storm sewer system and the industrial sewer were interconnected in one or more locations at the Hexcel Site, thereby allowing discharges to the industrial sewer to be conveyed through the storm sewer, the latter of which discharged into the Saddle River.

1487.   In a letter dated November 20, 2001, NJDEP concluded that there had been releases to the storm sewer at the Hexcel Site from the industrial sewer at the site.

1488.   A dye test of the industrial sewer system at the Hexcel Site on April 14, 1987 confirmed that water in the industrial sewer was flowing into the storm drainage system.

1489.   On information and belief, the interconnection between the storm sewer and the industrial sewer existed during the operations of both Hexcel and Fine Organics Corporation.  On information and belief, the interconnection between the storm sewer and the industrial sewer at the Hexcel Site was not closed until at least March 1990.

1490.   Substances detected in the groundwater at the Hexcel Site include:  chlorobenzene, trans-1,2-dichloroethene, tetrachloroethene, antimony, beryllium, cadmium, chromium, copper, lead, mercury, nickel, PCBs, dense non-aqueous phase liquids, light non-aqueous phase liquids, 1,2-dichlorobenzene, 1,4-dichlorobenzene, methylene chloride, trans-1,2-dichloroethene, cis-1,2-dichloroethene, trichloroethene, toluene, chlorobenzene, 1,1-dichloroethene, benzene, and vinyl chloride.

1491.   Substances detected in groundwater samples taken from wells along the Saddle River in proximity to the Hexcel Site include 1,2-dichlorobenzene and 1,4-dichlorobenzene.

1492.   In general, the direction of groundwater flow in the shallow aquifer at the Hexcel Site is to the west, towards the Saddle River.

1493.   Chlorobenzene and tetrachloroethene were detected in the groundwater and soil at the Hexcel Site, as well as in the surface water of the Saddle River adjacent to the Hexcel Site.  PCBs,

benzene, chlorobenzene, dichlorobenzenes, ethylbenzene and toluene were detected at the Hexcel Site and in the sediment of the Saddle River adjacent to the Hexcel Site.

1494.    On September 19, 2003, the NJDEP issued Directive No. 1 In the Matter of the Lower Passaic River in which NJDEP found that Hazardous Substances were Discharged at the Hexcel Site and that those Hazardous Substances are and/or have emanated into the Lower Passaic River.  NJDEP further determined that Hexcel and Fine Organics Corporation are persons, pursuant to the Spill Act, in any way responsible for the Hazardous Substances that were Discharged at the Hexcel Site.

1495.    On or about February 10, 2004, EPA sent a General Notice Letter notifying Hexcel of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Hexcel Site.

1496.    Hexcel and Fine Organics Corporation are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the Hexcel Site and released into the Newark Bay Complex.

**Hilton Davis Site**

1497.    On information and belief, Drum Service of Newark, Inc. is the current owner of a property located at 104-12 Lister Avenue (also referenced as 120 Lister Avenue) in Newark, New Jersey, also designated as Block 2438, Lot 56 on the tax maps of the City of Newark, Essex County (the "Hilton Davis Site").

Emerald Hilton Davis, LLC

1498.    In 1955, Thomasset Colors, Inc. ("Thomasset") purchased the Hilton Davis Site and commenced operations at the site.  Thomasset manufactured pigments and colors for use in food and cosmetic applications at the Hilton Davis Site.  Thomasset utilized barium sulfate, barium chloride, phthalic anhydride, phthalic anhydride, and phthalocyanine in the manufacture of pigments.  Thomasset also blended and repackaged chromium oxide and chromium hydrate for resale.

208

1499.   In 1957, Hilton Davis Chemical Company, a division of Sterling Drug, Inc. ("Sterling Drug"), acquired Thomasset.   Thomasset operated as part of the Hilton Davis Chemical Company division of Sterling Drug.

1500.   In 1986 or 1987, the Hilton Davis Chemical Company division of Sterling Drug was sold to HD Acquisition Corporation.  In 1987, H.D. Acquisition Corporation changed its name to Hilton Davis Chemical Co.

1501.   In 1993, Freedom Chemical Company ("Freedom Chemical") purchased the Hilton Davis Chemical Co. from PMC, Inc.

1502.   In 1998, BFGoodrich Company ("BFGoodrich") purchased the Hilton Davis Chemical Co. from Freedom Chemical.   Thereafter, Hilton Davis Chemical Co. changed its name to BFGoodrich Hilton Davis, Inc.

1503.   In 2001, BFGoodrich spun-off its Performance Materials Division, including BFGoodrich Hilton Davis, Inc.  BF Goodrich's former Performance Materials Division became known as Noveon, Inc.  BFGoodrich Hilton Davis, Inc. changed its name to Noveon Hilton Davis, Inc.

1504.   In 2004, Noveon Inc. was acquired by The Lubrizol Corporation ("Lubrizol").   As a result, Noveon Hilton Davis, Inc. became a subsidiary of Lubrizol.

1505.   In 2006, Emerald Performance, LLC was formed and it acquired certain polymer and performance materials business units of Lubrizol, including Noveon Hilton Davis, Inc.

1506.   On information and belief, Noveon Hilton Davis, Inc. is now known as Emerald Hilton Davis, LLC.  On information and belief, Emerald Hilton Davis, LLC is a successor to the HD Acquisition Company that acquired Hilton Davis Chemical Company from Sterling Drug.

<u>STWB, Inc. and Eastman Kodak</u>

1507.   On information and belief, Sterling Drug owned the Hilton Davis Site from 1957 until at least 1987.

1508.   In 1988, the Eastman Kodak Company ("Eastman Kodak") acquired Sterling Drug.

1509.    In or about 1992, Sterling Drug changed its name to Sterling Winthrop, Inc. ("Sterling Winthrop").

1510.    In connection with Freedom Chemical's purchase of Hilton Davis Chemical Company, Freedom Chemical entered into an Environmental Matters Agreement dated September 9, 1993 ("EMA") with Sterling Winthrop.  Under the EMA, Sterling Winthrop agreed to take responsibility for certain environmental matters predating 1987.  At the time Freedom Chemical and Sterling Winthrop entered into the EMA, Sterling Winthrop was a wholly-owned subsidiary of Eastman Kodak.

1511.    In 1994, Eastman Kodak sold the capital stock of Sterling Winthrop to SmithKline Beecham plc.

1512.    SmithKline Beecham plc subsequently sold the capital stock of Sterling Winthrop to Miles, Inc., a subsidiary of Bayer AG.  Miles, Inc. is now known as Bayer Corporation.

1513.    Following Eastman Kodak's sale of Sterling Winthrop, Sterling Winthrop advised Freedom Chemical that Eastman Kodak had retained Sterling Winthrop's liabilities with respect to Hilton Davis and to address further communications regarding the EMA to Eastman Kodak.  Subsequently, 360 North Pastoria Environmental Corporation ("360 North"), a subsidiary of Eastman Kodak, notified Freedom Chemical that it should send all future correspondence under the EMA to 360 North and that Sterling Wintrop's responsibilities under the EMA would be managed by 360 North.

1514.    In or about 1994, 360 North undertook the management of certain environmental liabilities of Sterling Winthrop.  On information and belief, 360 North is now known as NPEC, Inc. NPEC, Inc. has responsibility for managing Eastman Kodak's environmental liabilities.

1515.    Sterling Winthrop is now known as STWB, Inc.

1516.    On information and belief, STWB, Inc. is the successor to Sterling Drug, a former owner of the Hilton Davis Site.

1517.    On information and belief, Eastman Kodak retained certain of Sterling Winthrop's liabilities with respect to its division, Hilton Davis, and/or the Hilton Davis Site.

1518.   On information and belief, from 1963 to 1971, Thomasset and/or its successors discharged pigment waste at the Hilton Davis Site into the Passaic River, and utilized a false sewer system to bypass the neutralization pits on site to discharge process wastes directly into the Passaic River. On information and belief, the process water discharged to the Passaic River contained Hazardous Substances, including sulfuric acid and copper.  Copper has been detected in the Passaic River in the vicinity of the Hilton Davis Site.

1519.   Thomasset and/or its successors produced phthalocyanine pigments at the Hilton Davis Site, including phthalocyanine blue and phthalocyanine green.

1520.   On or about July 31, 1956, an inspector observed a pipe discharging a substance with a deep blue color from the Hilton Davis Site into the Passaic River.  The plant manager at the Hilton Davis Site indicated that the substance came from the daily washing of vats on the site.  On or about August 20, 1956, an inspector observed floor washings from the Hilton Davis Site being discharged into the Passaic River.

1521.   In August of 1971, an inspector observed a large amount of green fluorescein dye in the Passaic River, which was traced to the Hilton Davis Site.  The dye had discharged from the Hilton Davis Site into the Lockwood Street storm sewer and then into the Passaic River.  During an August 1971 inspection of the Hilton Davis Site, it was observed that a catch basin area on the site was extremely sloppy and that pollution could occur not only by accidental spills but also any time rain would wash material on the ground into the storm sewer.

1522.   In 1972, the City of Newark detected a chemical substance in the sewer line from the Hilton Davis Site.

1523.   On information and belief, the phthalocyanine blue (and the waste streams associated with its production) produced by Thomasset and/or its successors contained polychlorinated biphenyls ("PCBs").  On information and belief, the production of phthalocyanine green at the Hilton Davis Site resulted in the generation of polychlorinated dibenzo-p-dioxins and dibenzofurans ("PCDD/Fs"), including

WAS:144301.1

2,3,7,8-TCDD.  Dioxin and PCBs have been detected in the Passaic River in the vicinity of the Hilton Davis Site.

1524.    On information and belief, joints in the combined sewer from the Hilton Davis Site to Lister sewer were discovered to be leaking in 1963.

1525.    To comply with the 1986 administrative consent order entered into between Sterling Drug and NJDEP, Sterling Winthrop conducted an investigation at the Hilton Davis Site in 1993 that included soil and groundwater sampling.

1526.    In December 1994, Sterling Winthrop reported that the soil at the Hilton Davis Site was contaminated with arsenic, chromium, copper, and lead.  Other substances detected in the soil at the Hilton Davis Site include:  hexachlorobenzene, toluene, benzene, and chlorobenzene.  The Hilton Davis Site was subject to periodic flooding.

1527.    Sterling Winthrop also reported that the groundwater at the Hilton Davis Site was contaminated with arsenic, chromium, and lead.  Other substances detected in the groundwater at the Hilton Davis Site include:  benzene, ethylbenzene, toluene, chlorobenzene, 1,2-dichlorobenzene, 1,3-dichlorobenzene, 1,4-dichlorbenzene, napthalene, and arsenic.

1528.    On or about August 6, 1996 and September 15, 2003, EPA sent a General Notice Letter notifying Eastman Kodak Company of Sterling Winthrop's potential liability for Response costs relating to the Lower Passaic River Study Area as a result of threatened Releases of Hazardous Substances from the Hilton Davis Site.  EPA notified Eastman Kodak because it is the owner of NPEC, Inc., the latter of which handles Sterling Winthrop's liabilities at the Hilton Davis Site.

1529.    On or about August 6, 1996 and September 15, 2003, the EPA sent a General Notice Letter notifying Bayer Corporation of its potential liability for Response costs relating to the Lower Passaic River Study Area as a result of Releases or threatened Releases of Hazardous Substances from the Hilton Davis Site.

1530.    On or about June 18, 1996 and September 15, 2003, the EPA sent a General Notice Letter notifying 360 North Pastoria Environmental Corporation of its potential liability for Response costs

212

relating to the Lower Passaic River Study Area as a result of Releases or threatened Releases of Hazardous Substances from the Hilton Davis Site.

1531.    On or about September 20, 2004, the EPA sent a General Notice Letter notifying Drum Service of Newark, Inc. of its potential liability for Response costs relating to the Lower Passaic River Study Area as a result of Releases or threatened Releases of Hazardous Substances from the Hilton Davis Site.

1532.    On September 19, 2003, the NJDEP issued Directive No. 1 In the Matter of the Lower Passaic River in which NJDEP found that Hazardous Substances were discharged at the Hilton Davis Site and that those Hazardous Substances are and/or have emanated into the Lower Passaic River.  NJDEP further determined that Thomasset Colors, Inc., Hilton Davis Chemical Company, Sterling Winthrop, Inc., Freedom Chemical Company, 360 North Pastoria Environmental Corporation, Eastman Kodak Company, Drum Service of Newark, Inc., H.D. Acquisition Corporation, Noveon Hilton Davis Inc., SDI Divestiture Corporation, STWB, Inc., PMC Global, Inc., Plastics Manufacturing Corporation, SmithKline Beecham Corporation, and Bayer Corporation are persons, pursuant to the Spill Act, in any way responsible for the Hazardous Substances that were discharged at the Hilton Davis Site

1533.    Emerald Hilton Davis, LLC and STWB, Inc. are "dischargers" and/or Persons "in any way responsible" for the Hazardous Substances that were discharged at the Hilton Davis Site and released into the Newark Bay Complex.

1534.    On information and belief, Eastman Kodak is a Person "in any way responsible" for the Hazardous Substances that were discharged at the Hilton Davis Site and released into the Newark Bay Complex.

### Hoffmann-La Roche Site

1535.    The Hoffmann-La Roche property consists of approximately 125 acres of real property and associated improvements located at or about 340 Kingsland Street in Nutley, Essex County, and the Town of Clifton, Passaic County, New Jersey ("Hoffmann-La Roche Site").

1536.    The Hoffmann-La Roche Site is situated approximately one mile east of the Passaic River.  Storm water runoff, overland flow, and direct discharges to the Hoffmann-La Roche Site collect in on-site storm drains, channels, and catch basins that ultimately discharge into St. Paul's Brook, which bisects the property.  St. Paul's Brook empties into the Third River, which flows eastward before emptying into the Passaic River.

1537.    On or about November 16, 1928, Hoffmann-La Roche Inc. ("Hoffmann-La Roche"), was incorporated in the State of New Jersey.  From approximately 1928 until the present, Hoffmann-La Roche has owned and operated a pharmaceutical research and pharmaceutical/medicinal chemical production facility at the Hoffmann-La Roche Site.

1538.    Hoffmann-La Roche operates a small-scale incinerator for disposal of returned medical products and assorted medicinal wastes on the Hoffmann-La Roche Site.

1539.    Hoffmann-La Roche utilized, manufactured, processed, handled, mixed, consumed, stored, Disposed of, Released, and/or Discharged Hazardous Substances and other compounds at the Hoffmann-La Roche Site including, but not limited to, hexane, toluene, petroleum hydrocarbons, solvents, alcohols, acids, bases, product intermediates, ethanol, chloroform, tetrahydrofuran, acetone, and pyridine.

1540.    In 1947, PVSC inspectors reported that at least 100-gallons of fuel oil spilled into a ditch at the Hoffmann-La Roche Site and discharged into what is now known as St. Paul's Brook.

1541.    In 1947, PVSC inspectors observed the seepage of a white liquid from the Hoffmann-La Roche Site into what is now known as St Paul's Brook.  According to the PVSC, the liquid left a white sediment in the drainage ditch on the Hoffmann-La Roche Site.

1542.    In approximately 1978, PVSC analysis of samples taken from the process wastewater stream at the Hoffmann-La Roche Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, cadmium, chromium, copper, lead, nickel, zinc, arsenic, and mercury.

1543.    On or about September 2, 1982, approximately 1,000-gallons of process wastewater discharged from a 4" glass sewer line and into a trench drain at the Hoffmann-La Roche Site.

1544.    Upon information and belief, spilled product, Hazardous Substances, and other compounds were washed from production buildings at the Hoffmann-La Roche Site into floor drains, which emptied into the on-site process sewer system.

1545.    Since at least the 1940s, the process sewer system at the Hoffmann-La Roche Site has been comprised of underground pipes, which are used to convey process wastewaters into the PVSC sanitary sewer lines.  In 1998, Hoffmann-La Roche identified the process sewer system and all service connections to the production buildings as an area of environmental concern.  Hoffmann-La Roche observed that many of the lines in the process sewer system were made of glass, were cracked, and/or otherwise noted to be in various stages of decay.  Upon information and belief, the process sewer system on the Hoffmann-La Roche Site released untreated process wastewater to and from the Hoffman-La Roche Site.

1546.    Soil samples taken at the Hoffmann-La Roche Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, chlorobenzene, 1,1,2,2-tetrachloroethane, dichloroethene, tetrachloroethene, xylene, ideno (1,2,3-cd) pyrene, polynuclear aromatic hydrocarbons, trichloroethene, acetonitrile, PCBs, mercury, lead, zinc, and petroleum hydrocarbons.

1547.    Groundwater samples taken at the Hoffmann-La Roche Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, chlorobenzene, 1,1,1-trichloroethane, acetone, benzene, hexane, toluene, arsenic, lead, manganese, pyridine, dimethyl phthalate, vinyl chloride, trichloroethene, tetrahydrofuran, ethyl ether, and tetrachloroethene.

1548.    A 2004 report prepared on behalf of Hoffmann-La Roche states that soil contamination remains a source of groundwater contamination at the Hoffmann-La Roche Site.

1549.    Upon information and belief, groundwater at the Hoffmann-La Roche Site flows toward St. Paul's Brook, which ultimately empties into the Passaic River.  Upon information and belief,

215

Hazardous Substances and other compounds discharged to the groundwater at the Hoffmann-La Roche Site discharge into the Newark Bay Complex.

1550.   Upon information and belief, the Hoffmann-La Roche Site has been prone to flooding during heavy rain events.  Upon information and belief, the advancing and receding floodwaters from St. Paul's Brook eroded and transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and on-site soils, as well as from on-site surcharged sanitary sewers, into the Newark Bay Complex.

1551.   Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Hoffmann-La Roche Site.

1552.   On or about November 9, 2005, EPA sent a General Notice Letter notifying Hoffmann-La Roche of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the release of Hazardous Substances from the Hoffmann-La Roche Site.

1553.   Hoffmann-La Roche is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Hoffmann-La Roche Site and released into the Newark Bay Complex.

**Honeywell Site**

1554.   The Honeywell Site consists of approximately thirty-four acres located on Route 440, Jersey City, New Jersey (the "Honeywell Site").  The Honeywell Site is known as Study Area 7 of the Hudson County Chromium sites and consists of three contiguous properties known as Sites 115, 120 and 157.  The Honeywell Site is located directly adjacent to the confluence of the Hackensack River with Newark Bay.

1555.   From approximately 1895 to 1954, Mutual Chemical Company of America ("Mutual") owned and operated a chromate production facility located across Route 440 from the Honeywell Site. Until its close in 1954, this facility extracted chromium from chromium ores to produce chromate

chemicals. This process generated chromium ore bearing waste or chromium ore processing residue ("COPR").

1556. Mutual acquired the property across Route 440 from its Jersey City facility for the purpose of disposing COPR. Mutual's disposal of COPR through a pipeline created a land mass from what was tidal wetlands. Mutual generated and transported approximately one million tons of chromium contaminated COPR to the Honeywell Site. At least until 2003, the COPR at the Honeywell Site was approximately fifteen to twenty feet deep and covered the entire Honeywell Site. Approximately twenty-five to thirty-three percent of the chromium in the COPR at the Honeywell Site was hexavalent chromium.

1557. Honeywell International Inc. ("Honeywell") is the successor to Mutual, as well as Allied Signal, Inc., Allied Chemical & Dye Corporation, Allied Chemical Corporation, and Allied Corporation (the latter of which are collectively referred to herein as "Allied"). Honeywell, therefore, is liable for any and all acts, omissions, debts and liabilities of Mutual and Allied. Honeywell and its predecessors are referred to herein as Honeywell.

1558. In a letter dated April 28, 1983, NJDEP confirmed that groundwater at the Honeywell Site was contaminated with chromium and that approximately 12,600 gallons per day of groundwater was being discharged from the Honeywell Site into the Hackensack River.

1559. In 1983, a Honeywell official described the Honeywell Site as an "extremely contaminated site, visible to the naked eye" with "yellow water . . . draining into the Hackensack River" and concluded "there's something terribly not right with the site."

1560. On October 31, 1995, NJDEP observed chromium contaminated surface water at the Honeywell Site discharging from the site into the Hackensack River. At the same time, yellow-green water was observed discharging from the "swales" (drainage ditches) at the Honeywell Site into the Hackensack River.

1561. In an opinion in *Interfaith Community Organization v. Honeywell International Inc.* ("Interfaith Opinion"), the United States Court of Appeals for the Third Circuit noted that hexavalent

chromium concentrations in the soils at the Honeywell Site were detected at levels over thirty times higher than the applicable New Jersey standard, and at its highest, about 75 to 90 times higher.

1562.    In the Interfaith Opinion, the United States Court of Appeals noted that hexavalent chromium concentrations in the surface water in "swales" or drainage ditches at the Honeywell Site were detected at levels over 350 times higher than New Jersey's acceptable limit.

1563.    In the Interfaith Opinion, the United States Court of Appeals noted that hexavalent chromium concentrations in the groundwater at the Honeywell Site were detected at levels between 200 to 8,000 times higher than the applicable New Jersey standard.

1564.    In the Interfaith Opinion, the United States Court of Appeals noted that hexavalent chromium concentrations in the Hackensack River sediments adjacent to the Honeywell Site were detected at levels roughly 90 to 400 times higher than permitted under the New Jersey standard.

1565.    In the Interfaith Opinion, the United States Court of Appeals noted that Honeywell admitted that hexavalent chromium was seeping to the surface of the Honeywell Site, mingling with surface water run-off, and entering the Hackensack River.

1566.    In the Interfaith Opinion, the United States Court of Appeals noted that Honeywell admitted that chromium from the Honeywell Site has contaminated river sediments in the Hackensack River.

1567.    Substances detected in the groundwater at the Honeywell Site include:  total chromium, hexavalent chromium, cyanide, lead, mercury, zinc and phenols.

1568.    Substances detected in the  surface water at the Honeywell Site include:  chromium, cyanide, lead, zinc and phenols.

1569.    Hexavalent chromium has been detected in the sediments of the Hackensack River adjacent to the Honeywell Site, as well as downstream of the site.

1570.    Hackensack River sediments in the vicinity of the Honeywell Site were found to be contaminated with (i) heavy metals, including but not limited to chromium, arsenic, lead and mercury; (ii)

218

SVOCs; (iii) PAHs; (iv) pesticides, including but not limited to, DDD, DDE, DDT, Alpha-BHC, Beta-BHC, Dieldrin dibutyltin, tributyltin and tetrabutyltin; and (v) PCBs (aroclors and coplanar PCBs).

1571.    Honeywell is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Honeywell Site and released into the Newark Bay Complex.

### Hudson Tool & Die Site

1572.    On information and belief, Hudson Tool & Die Company, Inc. ("Hudson") owned and operated property located at 59 Wall Street, Newark, New Jersey 07105 (the "Hudson Tool Site"). The Hudson Tool Site is approximately 2,800 feet south of the Passaic River and consists of approximately .279 acres of real property and associated improvements.

1573.    On or about February 7, 1962, Daytona Finishing Corporation ("Daytona") was incorporated in the State of New Jersey. Daytona began operating at the Hudson Tool Site in the 1960s. In 1984, Daytona merged with Hudson. Although Hudson was the surviving entity after the merger with Daytona, the Hudson Tool Site continued to operate under the Daytona name.

1574.    Hudson's operations at the Hudson Tool Site included a hot solder dip finish. This process involved physically dipping small electronic parts in a molten 60/40 solder pot and spinning off the excess solder in a centrifuge. The parts were made from either steel, terne plate, brass, copper, Mu metal or stainless steel. The parts had to be treated by vapor, degreasing, alkaline cleaning and acid pickling to remove rust or oxides and fluxed before the solder dipping.

1575.    Other processes at the Hudson Tool Site included brite dipping nickel silver, cupro nickel, copper, brass and stainless steel. Raw materials used in these processes included 60/40 solder, zinc chloride, sodium chloride, potassium chloride, ammonium chloride, trichloroethylene, MacDermids BCB & M-629, Diversey D9-333, trisec, and Oakite Dynadet. Approximately 25.84 tons of Hazardous Waste were generated at the Hudson Tool Site per year, including solder/flux dross, ammonium chloride dross, spent solvent from the parts dryer, BCB chemical polish (nitric acid, phosphoric acid), DS9-333 stainless steel brightener, and filter press sludge.

WAS:144301.1

1576.    On February 20, 1987, PVSC issued a letter to Daytona stating that the company's semi-annual report on compliance was incomplete, and that Daytona was in violation of 40 CFR 433 with respect to copper, lead, nickel and zinc discharges.

1577.    On July 31, 1987, PVSC issued a letter to Daytona stating that the company's semi-annual report on compliance was incomplete, and that Daytona was in violation of 40 CFR 433 with respect to copper, lead, nickel and zinc discharges.  PVSC also noted that Daytona had not submitted a proper total toxic organics (TTO) certification.

1578.    On February 22, 1988, PVSC issued a letter to Daytona stating that the company's semi-annual report on compliance was incomplete, and that Daytona was in violation of 40 CFR 433 with respect to copper, lead and zinc discharges.

1579.    On March 21, 1988, Daytona sent a letter to PVSC admitting its non-compliance regarding average and maximum limits for copper, lead and zinc discharges.

1580.    A PVSC memorandum dated May 7, 1990, noted that Daytona was in violation of regulations regarding the limits for copper discharges.

1581.    A PVSC memorandum dated May 15, 1990, noted that Daytona was in violation of regulations regarding the limits for zinc discharges.

1582.    On October 3, 1990, PVSC issued a Notice of Violation to Daytona stating that the company was in violation of 40 CFR 433 for exceeding the allowable daily maximum and monthly average discharge limits for both zinc and lead.  Daytona was also given notice of its violation of Section 403.12e of the General Pretreatment Regulations for failure to provide all necessary information to demonstrate compliance with the reporting requirements.

1583.    A PVSC memorandum dated April 28, 1992, noted that Daytona was in violation of regulations regarding the limits for lead discharges.

1584.    A PVSC memorandum dated April 28, 1992, noted that Daytona was in violation of regulations regarding the limits for zinc discharges.

WAS:144301.1

1585.   An October 19, 1992 Pretreatment Monitoring Report documented the fact that Daytona was out of compliance with respect to lead discharges.

1586.   On December 10, 1992, PVSC issued a Notice of Violation to Daytona stating that the company was in violation of 40 CFR 433 and Section 313.1 of the PVSC Rules and Regulations.  During the six-month period from March 1992 through August 1992, results for zinc discharge samples taken from Daytona exceeded the daily maximum limit and also exceeded the monthly average limit by 20% or more on no less than three occasions.  A monthly average that is 20% or more above the monthly average limitation for a hazardous pollutant makes the violation a "serious violation," and two serious violations in any six-month period makes the company a Significant Non Complier ("SNC").  Because it had three serious violations in a six-month period, Daytona was designated a Significant Non Complier subject to enforcement action.

1587.   On or about March 17, 1993, PVSC instigated legal action against Daytona in a matter entitled *PVSC v. Daytona Finishing Corporation*, alleging that the company had exceeded its daily maximum and monthly average discharge limits for zinc on at least three occasions during a six-month period in 1992.  Daytona agreed to the entry of a Consent Order and Final Judgment in this matter, and was ordered to pay eleven thousand dollars ($11,000) to PVSC.

1588.   Hudson's operations at the Hudson Tool Site ceased on or about March 4, 1994.

1589.   The following substances were detected in soil samples taken from the Hudson Tool Site between April 1993 and April 1994:   benzo(a)pyrene, cadmium, lead, zinc, polynuclear aromatic hydrocarbons ("PAH") and trichloroethene, which was detected above impact to groundwater soil cleanup criteria.

1590.   Upon information and belief, process wastewater and surface water runoff from the Hudson Tool Site discharged into the PVSC Combined Sewer System and discharged directly into the Passaic River from the Polk Street CSO outfall during rain events and/or mechanical failures of the interceptor.

1591.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Hudson Tool Site.

1592.    Hudson is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Hudson Tool Site and released into the Newark Bay Complex.

### Hy-Grade Electroplating Site

1593.    The Hy-Grade Electroplating Co. ("Hy-Grade Electroplating") owned and operated a facility at 35 Fourth Street, Newark, New Jersey (the "Hy-Grade Electroplating Site").

1594.    Hy-Grade Electroplating operated the Hy-Grade Electroplating Site from at least 1965 until 1998.  Hy-Grade Electroplating engaged in the electroplating of various metal parts with cadmium, chromium, copper, gold, lead, nickel, silver, tin, zinc, and cyanide at the Hy-Grade Electroplating Site. Hy-Grade Electroplating used, stored, generated and/or discharged the following substances at the Hy-Grade Electroplating Site:  copper sulfate, nickel, sulfate, tin stannate, chromium, sodium dichromate, lead sulfate, cadmium, copper, gold, lead, nickel, silver, tin, zinc, and cyanide.

1595.    Hy-Grade Electroplating utilized cadmium, chromium, copper, gold, lead, nickel, silver, tin, zinc, and cyanide in its electroplating process.  The waste streams generated by the electroplating process have been discharged into the sanitary sewer since at least 1965.

1596.    On information and belief, wastewater from the Hy-Grade Electroplating Site discharged to the Clay Street Combined Sewer System.

1597.    The Clay Street combined sewer lines discharged to the Passaic River.  Upon information and belief, from as early as 1965 until 1978, Hy-Grade Electroplating discharged sewage flows to the Clay Street Combined Sewer System resulting in untreated wastewater discharging into the Passaic River. Upon information and belief, Hy-Grade continued discharging wastewater from processes to the Clay Street Combined Sewer System through at least the late 1990's.

1598.    A sample of Hy-Grade Electroplating's wastewater taken in or about 1978 revealed the presence of chromium, cadmium, copper, zinc and mercury.

222

1599.    On information and belief, Hy-Grade Electroplating's process lines discharged into a drain on the north side of the Hy-Grade Electroplating Site near Fourth Street.  In 1976, the PVSC requested Elson T. Killam Associates perform a study of the sources of heavy metals in the PVSC's treatment plant ("Heavy Metals Source Determination Study").  In or about 1978, the  Heavy Metals Source Determination Study reported on samples taken from the effluent of contributors of metals to the PVSC's system.   The Heavy Metals Source Determination Study samples taken from Hy-Grade Electroplating's effluent confirmed the presence of cadmium, chromium, copper, lead, nickel, and zinc. On information and belief, effluent discharged to the Clay Street Combined Sewer System from the Hy-Grade Electroplating Site also contained other Hazardous substances including, but not limited to, cyanide.

1600.    Hy-Grade Electroplating is a "discharger" and/or Person "in any way responsible" for the Hazardous Substances that were discharged at the Hy-Grade Electroplating Site and released into the Newark Bay Complex.

### ICI Americas Site

1601.    Upon information and belief, AGC Chemicals Americas, Inc. ("AGC Chemicals") is the current owner of approximately 33.45 acres of real property and associated improvements located at 229 E. 22nd Street, Bayonne, New Jersey (the "ICI Americas Site").

1602.    The ICI Americas Site is located on a finger of land between Newark Bay and New York Bay.  Upon information and belief, Bayonne city sewers and storm drains from the site empty into the Kill Van Kull.  The waters of the Kill Van Kull are tidal and flow into Newark Bay.

1603.    In four transactions between 1965 and 1969, ICI Americas Inc. ("ICI Americas") purchased  the  ICI  Americas  Site  from  the  predecessors  of  Exxon  Mobil  Corporation.    From approximately  1965  until  approximately  1999,  ICI  Americas  owned  and  operated  a  plant  which manufactured  poly  vinyl  chloride  ("PVC"),  Fluon®  (a  trade  name  for  polytetrafluoroethylene),  and plastic-strengthening resins at the ICI Americas Site.

1604.    The manufacture of PVC is associated with the generation of dioxin compounds.

223

1605.    Upon information and belief, in May 1979, hydrochloric acid spilled from a tank at the ICI Americas Site into city sewers and storm drains leading to the Kill Van Kull, the tidal flow from which enters Newark Bay.

1606.    Upon information and belief, in November 1999, the ICI Americas Site was sold to Asahi Glass Fluoropolymers USA, Inc. ("Asahi Glass").

1607.    AGC Chemicals Americas, Inc., was formed on January 1, 2004, when sister companies Asahi Glass and AGA Chemicals, Inc. ("AGA Chemicals") merged.  As a result, AGA Chemicals is the successor to Asahi Glass.

1608.    AGC Chemicals Americas, Inc. and Asahi Glass Fluoropolymers USA, Inc., manufactured Fluon®, other fluoropolymers, and fluorinated solvents at the ICI Americas Site.

1609.    ICI Americas, Inc. and AGC Chemicals utilized, stored, and discharged Hazardous Substances and other compounds at the ICI Americas Site, including, but not limited to, ammonia, TDI (a compound of toluene), styrene, trichloroethylene, carbon tetrachloride and chloroform.

1610.    Hazardous Substances and metals have been detected in the soil at the ICI Americas Site, including, but not limited to, xylene, benzene, chlorobenzene, ethylbenzene, toluene, naphthalene, arsenic, chromium, mercury, zinc, lead, nickel, manganese, and cadmium.

1611.    Hazardous Substances and other compounds have been detected in the groundwater at the ICI Americas Site, including, but not limited to, xylene, benzene, chlorobenzene, ethylbenzene, toluene, naphthalene, arsenic, chromium, mercury, zinc, lead, nickel, manganese, and cadmium.

1612.    Upon information and belief, groundwater at the ICI Americas Site flows to the tidal waters of the Kill Van Kull and from there to Newark Bay.  Upon information and belief, Hazardous Substances released to the groundwater at the ICI Americas Site discharge into Newark Bay.

1613.    ICI Americas, Inc. is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the ICI Americas Site and released into the Newark Bay Complex.

1614.    AGC Chemicals is a Person "in any way responsible" for the Hazardous Substances that were discharged at the ICI Americas Site and released into the Newark Bay Complex.

## Imperial Electroplating Site

1615.    The Imperial Electro-Plating Co. property consists of real property and associated improvements located at 52 Park Avenue in Lyndhurst, Bergen County, New Jersey (the "Imperial Electroplating Site").

1616.    The Imperial Electroplating Site lies approximately two blocks south of the Passaic River.  Stormwater runoff and direct discharges from the Imperial Electroplating Site collect in on-site storm sewer drains that empty into the Lake Avenue storm sewer.  The Lake Avenue storm sewer discharges directly into the Passaic River.

1617.    In approximately 1950, Imperial Electroplating Co. Inc. was incorporated in the State of New Jersey ("Imperial Electroplating").

1618.    On or about January 8, 1986,  F.E.R. Plating, Inc. was incorporated in the State of New Jersey ("F.E.R. Plating").

1619.    In approximately September 1986, F.E.R. Plating purchased the Imperial Electroplating Site.  Upon information and belief, F.E.R. Plating, which currently conducts business as Imperial Electroplating, is the successor to Imperial Electroplating and, therefore, succeeds to Imperial Electroplating's environmental liabilities related to the Imperial Electroplating Site.

1620.    From approximately 1950 until the present, Imperial Electroplating, and subsequently F.E.R. Plating, owned and operated a metal plating facility at the Imperial Electroplating Site.

1621.    Imperial Electroplating, and subsequently F.E.R. Plating's operations at the Imperial Electroplating Site involved zinc, cadmium, copper, nickel, silver, gold, tin, and black oxide plating lines wherein steel, brass, and other base metals that could be plated with the aforementioned compounds and metals.  The plating operations generally functioned in a barrel electroplating line formation comprised of a series of closed and open dipping, pickling, and rinsing tanks.  The tanks ranged in size from 100 to 1000 gallon capacity.

225

1622.   Imperial Electroplating, and subsequently F.E.R. Plating processed, handled, mixed, manufactured, consumed, stored, or otherwise used Hazardous Substances and other compounds at the Imperial Electroplating Site including, but not limited to, ammonium chloride, cadmium compounds, copper compounds, chromate, hydrochloric acid, hydrogen peroxide, nickel compounds, nitric acid, potassium chloride, potassium cyanide, sodium cyanide, sodium chloride, sulfuric acid, cyanide, and zinc compounds.

1623.   Between approximately November and December 1971, PVSC inspectors discovered a discharge of wastewater effluent from the Imperial Electroplating Site into the Lake Avenue storm sewer line.   The Lake Avenue storm sewer discharged directly into the Passaic River.   Samples of the discharged effluent confirmed that it had a low pH, and contained iron oxide, oil, and other organic compounds.   The PVSC inspector also observed a 3' x 3' pit on the Imperial Electroplating Site, which connected to an area storm drain and that emptied into the Lake Avenue storm sewer line.

1624.   Between approximately September 1979 and December 1979, PVSC inspectors discovered a continuing discharge of wastewater effluent from the Imperial Electroplating Site into the Lake Avenue storm sewer line, which discharged directly into the Passaic River.

1625.   In approximately 1978, an analysis of Imperial Electroplating's wastewater effluent confirmed the presence of Hazardous Substances including, but not limited to, cadmium, chromium, copper, lead, nickel, zinc, arsenic, and mercury.

1626.   In approximately 1997, Imperial Electroplating received a notice of violation from the PVSC concerning its discharges into the sanitary sewer system.   Upon information and belief, prior to July 1997, Imperial Electroplating only performed a pH neutralization of its process wastewaters and did not remove dissolved metals from the effluent prior to discharge.

1627.   In approximately November and December 1971, PVSC inspectors observed poor housekeeping practices at the Imperial Electroplating Site.

1628.   Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the Imperial Electroplating Site.

1629.    F.E.R. Plating, as successor to Imperial Electroplating, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Imperial Electroplating Site and released into the Newark Bay Complex.

### Industrial Petrochemicals Site

1630.    The Industrial Petrochemicals property consists of approximately two acres of real property and associated improvements located at 128 Doremus Avenue in Newark, Essex County, New Jersey ("Industrial Petrochemicals Site").

1631.    From approximately 1931 until approximately 1954, various entities, including Mexican Oil Company and American Oil, owned and/or operated a bulk petroleum storage and distribution facility at the Industrial Petrochemicals Site.

1632.    In approximately 1954, Mr. Henry P. Borda leased the Industrial Petrochemicals Site and began operating a solvent storage, blending and distribution facility under the name of various entities, including Industrial Petrochemicals, Inc. ("Industrial Petrochemicals"), I.P.C. Lubricants, Inc. (a/k/a Regal Lubricants Company, Inc.), and Oilways.  Upon information and belief, I.P.C. Lubricants, Inc. and Oilways are defunct.

1633.    In approximately May 1965, Industrial Petrochemicals purchased the Industrial Petrochemicals Site.

1634.    In approximately March 1976, Henry P. Borda purchased the Industrial Petrochemicals Site from Industrial Petrochemicals.

1635.    On or about August 1, 1983, Vitusa Corp. ("Vitusa") purchased 100 percent of the stock of Industrial Petrochemicals and began operating the Industrial Petrochemicals Site, continuing bulk chemical, petroleum, and solvent blending and storage operations.  Upon information and belief, Vitusa is the corporate successor of Industrial Petrochemicals.

1636.    In approximately 1986, G. J. Chemical Co. ("G. J. Chemical") assumed control of and began operating the Industrial Petrochemicals Site, continuing bulk chemical, petroleum, and solvent blending and storage operations.

227

1637.   In April 2003, Henry P. Borda passed away and the Industrial Petrochemicals Site is now with his estate.

1638.   Hazardous Substances and other compounds utilized, manufactured, processed, handled, mixed, and/or stored at the Industrial Petrochemicals Site include, but are not limited to, acetone, cyclohexane, mineral spirits, methyl ethyl ketone, ethanol, xylenes, trichloroethylene, toluene, ketones, acetates, alcohols, formaldehyde, ethanolamine, diethanolamine, cyclohexanone, assorted solvents, and petroleum hydrocarbons.

1639.   A tank farm at the Industrial Petrochemicals Site was and is located along the northern property boundary and along the Passaic River.

1640.   The Industrial Petrochemicals Site abuts the Passaic River, which received direct discharges, overland flow, and sheet storm water runoff directly from the Industrial Petrochemicals Site.

1641.   Upon information and belief, in approximately 1977, two dry wells were installed at the Industrial Petrochemicals Site to collect storm water runoff, spills, leaks and releases of product, liquid wastes and truck washing wastewater.  Upon information and belief, one of the dry wells located at the northwestern corner of the Industrial Petrochemicals Site ("Northern Dry Well") discharged effluent directly into the Passaic River and to soil and groundwater in the vicinity of the Northern Dry Well, and thence into the Passaic River.  The other dry well, which was located along the southern boundary of the Industrial Petrochemicals Site ("Southern Dry Well"), discharged effluent directly into the Passaic River through a channel along the southern property boundary and to soil and groundwater in the vicinity of the Southern Dry Well.  Hazardous Substances and other compounds have been detected in soils and groundwater proximate to the dry wells.

1642.   In approximately 1992, the Industrial Petrochemicals Site was covered with concrete and storm water drains at the property were purportedly routed to a PVSC sewer line.

1643.   Upon information and belief, prior to 1977, runoff from the Industrial Petrochemicals Site discharged directly into the Passaic River.

WAS:144301.1

1644.    Upon information and belief, from approximately 1977 until at least 1992, runoff from the Industrial Petrochemicals Site was collected in on-site drains and routed into one of two dry-wells, which discharged into the groundwater at the site, or was discharged directly into the Passaic River.

1645.    Upon information and belief, until approximately 1992, spills, leaks and releases of product, liquid wastes, and wastewater from truck washing operations were also allowed to discharge into groundwater at the Industrial Petrochemicals Site, which discharged into the Passaic River.

1646.    On or about March 25, 1987, NJDEP inspectors reported heavy staining of unpaved surfaces "near the Truck Parking Area, mixing tank, around the 'Metal Shed' and near the dry wells;" spilled substances surrounding "drums near the pallet storage and drummed product storage area;" "heavy staining" around valves and pipes associated with tanks within the tank farm area; and generally poor housekeeping throughout the Industrial Petrochemicals Site.  The inspectors also reported that wastewater from the Northern Dry Well was "directed to the Passaic River."

1647.    On April 20, 1990, it was reported that groundwater extracted from wells installed at the Industrial Petrochemicals Site was "yellow-green in color" and "had a noticeable caustic odor." Furthermore, "free product, described as a thick black oily substance, was detected in" Monitoring Well-3 (" MW-3"), which is located in the northwestern corner of the property proximate to the Northern Dry Well and the Passaic River.  Groundwater proximate to MW-3 is tidally influenced and discharges to the Passaic River.

1648.    On February 11, 1991, and March 23, 1992, the NJDEP reported that "free product" was detected in three soil borings taken from the Industrial Petrochemicals Site.

1649.    On April 23, 1991, it was reported that footings attached to a containment dike surrounding the tank farm area did not inhibit groundwater flow, and that "ground water has been observed flowing out of the river bank adjacent to tank # 16." The tank farm area was located along the northern property boundary and adjacent to the Passaic River.

1650.    On March 23, 1992, the NJDEP reported that a "free product seep" was observed "adjacent to the tank farm area."

1651.    On December 30, 1992, it was reported that "free-phase floating product was detected during the 1991 sampling event in upgradient [Monitoring Well-4 ("MW-4")], which is located near the southern site boundary."

1652.    On February 6, 2001, it was reported that groundwater samples could not be collected from MW-4 "due to the presence of approximately 1"-2" of free product."

1653.    Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Industrial Petrochemicals Site.

1654.    Hazardous Substances and other compounds have been detected in the soil at the Industrial Petrochemicals Site, including, but not limited to, PCBs, ignitable substances, benzene, naphthalene, assorted base neutral compounds, PAHs, lead, assorted volatile organic compounds (including solvents such as trichloroethene and tetrachloroethene), and petroleum hydrocarbons.

1655.    Until at least 1992, all or a portion of the Industrial Petrochemicals Site flooded during heavy rain events or high tides.  Upon information and belief, the advancing and receding floodwaters eroded and transported Hazardous Substances and other compounds from the Industrial Petrochemicals Site into the Newark Bay Complex.

1656.    Hazardous Substances and other compounds have been detected in the groundwater at the Industrial Petrochemicals Site, including, but not limited to, assorted base neutral compounds, benzene, tetrachloroethene, chlorobenzene, xylene, ethylbenzene, 1,2-dichloroethene, 1,1,1-trichloroethene, ethylbenzene and other chlorinated and non-chlorinated volatile compounds, petroleum hydrocarbons, chromium, copper, nickel, zinc, mercury, lead, benzene, toluene, xylenes, and tertiary-butyl alcohol.

1657.    Groundwater at the Industrial Petrochemicals Site flows to the Passaic River and groundwater beneath the eastern portion of the property is tidally influenced.  Upon information and belief, Hazardous Substances and other compounds released to the groundwater at the Industrial Petrochemicals Site Discharge into the Newark Bay Complex.

1658.    As reported in a 2005 Remedial Investigation Report, Hazardous Substances remain imbedded in soils beneath the concrete cap at the Industrial Petrochemicals Site.  Upon information and belief, the contaminated soils beneath the Industrial Petrochemicals Site discharge Hazardous Substances into groundwater and thence into the Passaic River.

1659.    G. J. Chemical and Vitusa are "dischargers" and/or persons "in any way responsible" for the Hazardous Substances that were discharged at the Industrial Petrochemicals Site and that have discharged into the Newark Bay Complex.

## Innospec Site

1660.    The Innospec property consists of approximately 1.1 to 1.4 acres of real property and associated improvements located at 418 Falmouth Avenue, Elmwood Park, New Jersey, 07407 (the "Innospec Site").

1661.    From approximately 1955 until approximately 2005, Finetex, Inc. ("Finetex") or its successors owned and operated a facility at the Innospec Site that manufactured specialty chemicals, textile processing and finishing aids, surfactants, emollients, detergents, and cosmetic intermediaries for textile, personal care, cosmetics, and industrial markets.

1662.    Finetex was a corporation organized under the laws of the State of New Jersey on March 28, 1949.  Octel Corp. acquired Finetex effective January 1, 2005.  The name of Octel Corp. was changed to Innospec, Inc. effective January 30, 2006.  Effective January 1, 2007, the business of Finetex, Inc. was merged into Innospec Performance Chemicals U.S. Company, which later was renamed Innospec Active Chemicals LLC ("Innospec").  Innospec, therefore, is the successor to Finetex's environmental liabilities related to the Innospec Site.

1663.    Finetex and, upon information and belief, Innospec, utilized, processed, handled, consumed, and stored Hazardous Substances and other compounds at the Innospec Site, including, but not limited to, acetic acid, acetylene, ammonium hydroxide, benzene, benzoic acid, benzyl chloride, biphenyl, chlorobenzene, 1, 3–dichlorobenzene, 1, 4–dichlorobenzene, diethanolamine, dodecyl benzene sulfonic acid, formaldehyde, hydrochloric acid, isobutyl alcohol, maleic anhydride, methanol, monoethanolamine,

231

n-butyl alcohol, n methyl naphthalene, perchloroethylene, petroleum hydrocarbons, phosphoric acid, phosphorous trichloride, phthalic anhydride, potassium hydroxide, sodium hydroxide, sodium hypochlorite, sulfuric acid, synthetic sperm oil, trichlorobenzene including 1,2,4-trichlororbenzene, vinyl chloride, and xylenes.

1664.   Chlorobenzene, dichlorobenzenes, and others Hazardous Substances or compounds, which Finetex and its successors utilized, processed, handled, consumed, and stored at the Innospec Site are associated with the formation of dioxin compounds.

1665.   Approximately 775 feet west of the Innospec Site is Fleischer Brook, a tributary flowing into the Passaic River.  Fleischer Brook received direct discharges, discharges via the sanitary sewer, overland flow, and sheet stormwater runoff directly from the Innospec Site.

1666.   On August 14, 1972, a leak in a coil in a 550 gallon vat at the Innospec Site resulted in the discharge of synthetic sperm oil through a floor drain to Fleischer Brook, a tributary of the Passaic River.  In October 1998, a discharge from the Innospec Site to Fleischer Brook contained petroleum hydrocarbons at levels that violated Finetex's non-contact cooling and storm water permit.  In 1999, Finetex paid a fine for this discharge pursuant to a settlement agreement with NJDEP.  Failure of a pressure relief safety device at the Innospec Site on September 14, 2000 resulted in the discharge of benzoic acid and unspecified fatty material to the soil.

1667.   Hazardous Substances and other compounds detected in the soil at the Innospec Site include benzene and chlorobenzene.

1668.   Hazardous Substances and other compounds have been detected in the groundwater at the Innospec Site, including vinyl chloride, benzene, chlorobenzene, total xylenes, 1,3–dichlorobenzene, 1,4–dichlorobenzene, and 1,2,4-trichlororbenzene.

1669.   Upon information and belief, groundwater at the Innospec Site flows to Flesicher Brook, which then flows to the Passaic River.  Upon information and belief, Hazardous Substances and other compounds released by Finetex and its successors to the groundwater at the Innospec Site discharge into Flesicher Brook and the Passaic River.

1670.    Innospec is a "discharger" and/or person "in any way responsible" for the Hazardous Substances that were discharged at the Innospec Site and released into the Newark Bay Complex.

## ITT Site

1671.    The ITT Corporation property consisted of at least approximately 150 total acres of real property and associated improvements located at 100 Kingsland Road, 500 Washington Avenue, 390 Washington Avenue, 491 River Road, 492 River Road, 483 River Road, and 417 River Road in Clifton and Nutley, Passaic County, New Jersey ("ITT Site").

1672.    Portions of the ITT Site abut the Third River, a tributary of the Passaic River, that receives overland flow and sheet stormwater runoff directly from the ITT Site. Stormwater runoff and direct discharges from the ITT Site also collect in area catch basins, which discharge directly to the Third River. From the ITT Site, the Third River flows east approximately one quarter of a mile where it empties into the Passaic River.

1673.    Portions of the ITT Site directly abut the Passaic River.

1674.    In approximately 1920, the International Telephone and Telegraph Corporation was incorporated in the State of Maryland, and in approximately 1968, it was reincorporated in the State of Delaware. In approximately 1982, the International Telephone and Telegraph Corporation changed its name to ITT Corporation ("ITT Delaware").

1675.    On or about September 5, 1995, ITT Indiana, Inc. was incorporated in the State of Indiana. On or about December 20, 1995, ITT Delaware merged with an into ITT Indiana, Inc. and the surviving entity changed its name to ITT Industries, Inc., an Indiana corporation.

1676.    On or about July 1, 2006, ITT Industries, Inc. changed its name to ITT Corporation ("ITT"). Upon information and belief, ITT is the successor to International Telephone and Telegraph Corporation and ITT Delaware and, therefore, succeeds to those entities' environmental liabilities related to the ITT Site.

1677.    From at least 1946 until approximately 1996, ITT and its predecessors owned and operated an electrical component manufacturing facility at the ITT Site. In approximately 1996, the ITT

Site was sold to Related Retail Clifton, LP and was subsequently leased by ITT, which remained the site operator. In approximately 1998, ITT repurchased the ITT Site and continues to own and operate the site today. In approximately 2001, ITT subdivided and sold a portion of the ITT Site, designated as Block 83-01, Lot 1 on the Tax Map of the City of Clifton, to Related Retail Corporation.

1678.   Upon information and belief, ITT operates the ITT Site through separate divisions of ITT, including its Avionics Division and its Aerospace Communication Division.

1679.   ITT's operations at the ITT Site include the manufacture and assembly of electronic equipment used in the defense industry. Operations at the ITT Site include welding, soldering, painting, printing, degreasing, drilling, machining, grinding, assembly, and product testing. ITT also manufactured television and radio tubes, telephones, radios, washing machines, and printed circuit boards at the ITT Site.

1680.   ITT processed, handled, mixed, manufactured, consumed, stored, or otherwise used Hazardous Substances and other chemicals at the ITT Site including, but not limited to, acetone, methylene chloride, trichloroethene, 1,1,1-trichloroethane, toluene, sulfuric acid, ethylene glycol, cadmium compounds, chromium compounds, copper compounds, lead compounds, nickel compounds, silver compounds, tin compounds, zinc compounds, molybdenum compounds, xylene, petroleum hydrocarbons, 1,2-trichloro-1,2,2-trifluoroethane, cyclohexanone, titanium dioxide, and methyl chloroform.

1681.   In approximately 1982, ITT installed a treatment system to treat its wastewater effluent prior to discharge into the PVSC sanitary sewer connection. The sanitary sewer line at the ITT Site empties into the PVSC main interceptor at the Yantacaw bypass. PVSC records and reports indicate that wastes passing through the Yantacaw bypass were routinely bypassed directly into the Passaic River.

1682.   On or about August 14, 1986, approximately 300-350 gallons of 1,1,1-trichloroethane were released to the ITT Site from an underground piping vault.

1683.    On or about March 31, 2001, approximately fifty-gallons of ethylene glycol were released to the ITT Site and approximately twenty-gallons discharged into an area storm sewer and reached the Third River.

1684.    From approximately 1946 until at least 1975, boiler blow-down effluent discharged directly to the on-site stormwater collection system, which discharged directly to the Third River, and thence the Passaic River.

1685.    Soil samples taken at the ITT Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, arsenic, benzene, 1,2-dichloropropane, toluene, ethylbenzene, acetone, 1,1,1-trichloroethane, 1,2-dichloroethane, 1,1-dichloroethene, and 1,2-trichloro-1,2,2-trifluoroethane.

1686.    Groundwater samples taken at the ITT Site confirmed the presence of Hazardous Substances and other compounds, including, but not limited to, 1,1,1-trichloroethane, 1,1-dichloroethene, 1,1-dichloroethane, benzene, carbon tetrachloride, tetrachloroethene, toluene, ethylbenzene, xylene, assorted volatile organic compounds, chlorobenzene, trichloroethene, chloroform, methylene chloride, and 1,1-trans-dichloroethene.

1687.    Groundwater at the ITT Site flows to the Third River, which in turn flows and empties into the Passaic River.

1688.    Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances to and from the ITT Site.

1689.    Upon information and belief, storm events and erosion transported Hazardous Substances from chemical process areas, raw material storage areas, finished product storage areas, and on-site soils into the Third River, and thence into the Passaic River.

1690.    On or about June 8, 2006, EPA sent a General Notice Letter notifying ITT or its predecessors of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the ITT Site.

1691.   ITT is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the ITT Site and released into the Newark Bay Complex.

### Karlshamns Site

1692.   The Karlshamns property consists of real property and associated improvements located at One Sanford Avenue in Kearny, Hudson County, New Jersey, also designated as Blocks 13-17, 25, and 26, Lot 279 on the Tax Map of the City of Kearny ("Karlshamns Site").

1693.   The Karlshamns Site lies approximately 0.3 miles north/northwest of the Passaic River. Upon information and belief, direct discharges of industrial wastewaters and stormwater runoff from the Karlshamns Site flowed into area PVSC combined sewer lines within the Worthington Avenue combined sewer overflow district ("Worthington Avenue CSO").   During wet weather events, a portion of the combined flow within the Worthington Avenue CSO discharges through an outfall line into the Passaic River.

1694.   From approximately 1979 until approximately 1984, The Capital City Products Company, a division of Stokely-Van Camp, Inc. ("Stokely"), owned and operated a detergent and edible vegetable fat and oil manufacturing facility at the Karlshamns Site.   Upon information and belief, The Theobald Industries, Inc. ("Theobald"), a New Jersey corporation, owned and operated the Karlshamns Site prior to 1979.

1695.   Upon information and belief, in approximately 1984, the Quaker Oats Company ("Quaker Oats") purchased Stokely and The Capital City Products Company was spun-off to a group of private investors and renamed Capital City Products Company ("Capital City").

1696.   In approximately 1988, Capital City was purchased by Karlshamns AB, which operated Capital City's operations through its subsidiary Karlshamns USA Inc. ("Karlshamns"), an Ohio Corporation.

1697.   Upon information and belief, Karlshamns continued to own and operate the Karlshamns Site until at least March 1, 1995, when the facility was shut-down.

1698.    In approximately 1994, Karlshamns was purchased by Associated British Foods, which operated Karlshamns as Abitec Corporation.

1699.    In approximately 1997, Abitec Corporation merged with and into AC HUMKO Corporation, the sole surviving entity, which was renamed ACH Food Companies, Inc. ("ACH") in 2000. Upon information and belief, Associated British Foods PLC is the parent company of ACH.

1700.    Upon information and belief, ACH is the successor to Karlshamns and, therefore, succeeds to Karlshamns' environmental liabilities related to the Karlshamns Site.

1701.    Operations at the Karlshamns Site included the bleaching, steam refining, and deodorizing of fats and oils, and the blending, spray drying in towers, and packaging of detergent formulas.

1702.    Hazardous Substances and other compounds utilized, manufactured, processed, handled, mixed, consumed, stored and/or Discharged at the Karlshamns Site include, but are not limited to, sulfuric acid, nickel catalyst, sulfonates, sulfates, chloroform, 1,1,1-trichloroethane, oils, benzene, chlorobenzene, methylene chloride, phenol, toluene, and trichloroethylene.

1703.    PVSC discharge monitoring reports and analysis of samples taken from process wastewater effluent discharged from the Karlshamns Site confirmed the presence of Hazardous Substances and other compounds including, but not limited to, oils, chlorides, sulfides, sulfates, ammonia, phosphates, mercury, phenols, cyanides, lead, benzyl butyl phthalate, bis (2-ethylhexyl) phthalate, chromium, zinc, 1,3-dichlorobenzene, 1,4-dichlorobenzene, 1,2-transdichloroethylene, 1,2-dichloroethene, methylene chloride, and di-n-octylphthlate.

1704.    In 1988, Capital City Products received a notice of violation from the PVSC concerning excessive levels of petroleum hydrocarbons that were discharging from the Karlshamns Site into the PVSC sewer system.

1705.    In 1991, Karlshamns was fined $120,000 by the PVSC for multiple violations of the discharge limitations of its wastewater permit.

237

1706.   In 1992, Karlshamns received a notice of violation from the PVSC concerning excessive discharges of petroleum hydrocarbons that were discharging from the Karlshamns Site into the PVSC sewer system.

1707.   Upon information and belief, spills, leaks, mechanical failures, and poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Karlshamns Site.

1708.   In approximately 1993, Quaker Oats reported removing approximately 370 tons of soil contaminated with chlorobenzene and PCBs from the Karlshamns Site.

1709.   Upon information and belief, chlorobenzene is associated with the formation of dioxin compounds.

1710.   Upon information and belief, process wastewater and surface water runoff from the Karlshamns Site discharged into the PVSC Combined Sewer System and discharged directly into the Passaic River from the Worthington Avenue CSO outfall during rain events and/or mechanical failures of the interceptor.

1711.   Sediment core samples taken from the Passaic River adjacent to the outfall of the Worthington Avenue CSO confirmed the presence of Hazardous Substances and other compounds similar to those that were discharged to and from the Karlshamns Site including, but not limited to, bis (2-ethylhexyl) phthalate, chlorobenzene, cyanide, petroleum hydrocarbons, and trichloroethylene.

1712.   On or about August 8, 1996, EPA sent a General Notice Letter notifying Karlshamns USA, Inc. of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Karlshamns Site.

1713.   ACH, as successor to Karlshamns, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Karlshamns Site and released into the Newark Bay Complex.

### Kearny Smelting & Refining Site

238

1714.    Upon information and belief, Kearny Smelting & Refining Corporation ("KSRC") is the current owner of a property located at 936 Harrison Avenue (Block 276, Lot 3.1B), Kearny, New Jersey (the "Kearny Smelting Site").

1715.    KSRC has operated at the Kearny Smelting Site since 1946.

1716.    KSRC's smelting operations involved melting approximately 40,000 - 60,000 pounds of scrap metal per day in a rotary smelting furnace to produce brass and bronze ingots.  These scrap metals contained copper, tin, and/or zinc alloys.

1717.    Upon information and belief, process, cooling and other wastewaters generated from KSRC's operations have historically been discharged into one of two unlined lagoons located at the Kearny Smelting Site.

1718.    KSRC handled, processed, used, stored, or otherwise utilized Hazardous Substances and other compounds at the Kearny Smelting Site, including, but not limited to copper, tin, zinc, cadmium, lead, and petroleum hydrocarbons.

1719.    On January 3, 1984, a NJDEP representative observed KSRC discharging wastewater without a NJDEP permit into New Jersey state ground or surface waters from (a) an indoor washdown sink, (b) cooling tower and settling tank overflow; (c) a leaking electrostatic precipitator, and (d) the lagoon.

1720.    Upon information and belief, on October 22, 1987, Kearny Smelting discharged an estimated several hundred gallons of fuel oil along the eastern fence line.  The Hudson Regional Health Office also observed a discharge of white liquid from a 4-inch PVC pipe, originating in the facility's conveyor pit pump into a drainage ditch which enters the unlined lagoon.  On October 23, 1987, the Hudson Regional Health Commission issued KSRC a Notice of Violation for discharging No. 4 fuel oil, process generated wastewater containing zinc and lead into the unlined lagoon, as well as failing to notify NJDEP of said discharges.

1721. On November 5, 1987, NJDEP issued KSRC a Notice of Violation for causing unpermitted discharges to its lagoon. Upon information and belief, sampling conducted by NJDEP during this investigation revealed the discharge of chloride, copper, lead, nickel, and zinc.

1722. A December 27, 1994 NJDEP Investigation Report indicated that KSRC was no longer using its lagoon water for contact cooling water, but rather was using a recirculating system. During this investigation, an NJDEP investigator noted several violations, including (a) raw material, scrap, product, slag, and waste was still exposed to stormwater, and (b) a bypass line from the contact cooling pit was discharged to the storm sewer, and eventually to Frank's Creek, is violation of N.J.A.C. 7:14A-3 Appendix A Part III F. The NJDEP investigator also noted that acids, bases and other laboratory chemicals were being dumped into a carboy and flushed down the toilet to PVSC.

1723. Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and/or other compounds to and from the Kearny Smelting Site.

1724. Hazardous Substances and other compounds have been detected in the soil at the Kearny Smelting Site, including, but not limited to, antimony, arsenic, beryllium, cadmium, chromium, lead, copper, mercury, nickel, silver, zinc, PAHs, PCBs, naphthalene, phenanthrene, fluoranthene, pyrene, benzo(a)anthraene, benzo(b)fluoranthene, benzo(a)pyrene, indeno(1,2,3-cd)pyrene, dibenz(a,h)anthracene, benzo(g,h,i)perylene, di-n-butylphthallate, acetone, chlorobenzene, 1,2 dichloroethylene, methylene chloride, toluene, trichloroethylene, vinyl chloride, carbazole, dibenzofuran, 4-methylphenol, and phenol.

1725. Hazardous Substances and other compounds have been detected in the groundwater at the Kearny Smelting Site, including, but not limited to, arsenic, cadmium, lead, nickel, thallium, cyanide, benzene, bromodichloromethane, chloroform, methylene chloride, trichloroethylene, acenaphthene, acenaphthylene, 1,4-dichlorobenzene, fluoranthene, isophorone, naphthalene, phenanthrene, bis(2-ethylhexyl)phthalate, phenol, and 2,4-dimethylphenol.

1726.    Hazardous Substances and other compounds have been detected in the surface water of at least one of the lagoons at the Kearny Smelting Site, including, but not limited to, antimony, cadmium, copper, lead, mercury, nickel, selenium, and zinc.

1727.    A 1993 Draft Remedial Investigation Report on the Kearny Smelting Site noted that the water found in the lagoon was "likely adversely impacting the ground water quality in the shallow perched zone surrounding the lagoon."

1728.    On or about September 15, 2003, EPA sent a General Notice Letter notifying Kearny Smelting of its potential liability for Response costs relating to the Lower Passaic River Study Area as the result of the Release of Hazardous Substances from the Kearny Smelting Site.

1729.    Kearny Smelting is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Kearny Smelting Site and released into the Newark Bay Complex.

**Koppers Company Sites**

Koppers Seaboard Site

1730.    The Koppers property in Kearny consists of approximately 155 acres of real property and associated improvements located at Fishhouse Road (also known as the Harrison Turnpike) in Kearny, Hudson County, New Jersey ("Koppers Seaboard Site").

1731.    On or about September 30, 1944, Koppers Company, Inc. ("Koppers") was incorporated in Delaware.  On or about October 7, 1944, Koppers merged with Koppers Company, The Koppers Erecting Corporation, Koppers United Company, and Fuel Investment Associates.  Upon information and belief, Koppers was the sole surviving company from the merger.

1732.    In approximately June 1988, BNS Acquisitions ("BNS"), an indirect subsidiary of Beazer PLC, acquired Koppers.

1733.    In January 1989, Koppers merged with and into BNS and the surviving company changed its name to Beazer Materials & Services, Inc.

241

1734.   In April 1990, Beazer Materials & Services, Inc. changed its name to Beazer East, Inc. ("Beazer East").

1735.   From at least 1917 until approximately the late 1970s, Koppers owned and operated a tar product, light oil, and sulfuric acid manufacturing and processing facility at the Koppers Seaboard Site. Processes at the Koppers Seaboard Site included the use of coke oven batteries, gas conditioning/chemical recovery, and coal tar refining.  Remedial activities at the Koppers Seaboard Site were initiated in the late 1970s and continue to the present.

1736.   A by-product of Koppers' manufacturing process is phenol and related derivates such as 2,4-dichlorophenol, pentachlorophenol, and chlorobenzene, which, on information and belief, are associated with the formation of dioxin compounds.

1737.   The Koppers Seaboard Site abuts the Hackensack River, which received direct discharges, overland flow, and storm water runoff directly from the Koppers Seaboard Site. The Hackensack River flows south from the Koppers Seaboard Site, and empties into Newark Bay.

1738.   In 1976, NJDEP inspectors observed that Koppers unloaded tank cars of coal tar onto the Koppers Seaboard Site and routinely spilled coal tar onto the site.

1739.   In 1976, NJDEP inspectors observed that areas of the Koppers Seaboard Site were covered with coal tar and coal tar derivatives and that contamination continued to leach from the property into the Hackensack River despite the installation of a dike along the Hackensack River.

1740.   In 1979, test wells drilled on the Koppers Seaboard Site encountered one to eight foot thick layers of petroleum products, and one observation well encountered tar products at least twenty feet below the surface.

1741.   On or about October 23, 1980, Coast Guard inspectors observed five areas where oil was discharging from the Koppers Seaboard Site into the Hackensack River.  Two of those areas were observed releasing approximately two gallons of "black oil" per hour into the Hackensack River.

1742.   In 1981, coal tar residues were observed extending from the Koppers Seaboard Site into the Hackensack River and along the river bottom as far as the low tide line.

1743.    In 1982, the EPA reported that the Koppers Seaboard Site was covered with approximately ten feet of oils and tars, which were discharging into the Hackensack River.

1744.    Until at least 1982, Coast Guard officials reported continued discharges of oil from the Koppers Seaboard Site into the Hackensack River.

1745.    Spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Koppers Seaboard Site.

1746.    Hazardous Substances and other compounds have been detected in waste piles at the Koppers Seaboard Site, including, but not limited to, mercury, DDT and related derivatives, PCBs and related derivatives, phenol, and pentachlorophenol.

1747.    Hazardous Substances and other compounds have been detected in the soil at the Koppers Seaboard Site, including, but not limited to, phenol, cyanide, arsenic, lead, mercury, petroleum hydrocarbons, assorted base neutral compounds, benzene, cumene, ethylbenzene, mesitylene, toluene, styrene, assorted volatile organic compounds, napthalene, anthracene, sulfate, fluorene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(g,h,i)perylene, chrysene, fluoranthene, acenaphthene, and acenaphthylene.

1748.    Upon information and belief, storm events and/or erosion transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

1749.    Hazardous Substances and other compounds have been detected in the groundwater at the Koppers Seaboard Site, including, but not limited to, phenol, cyanide, petroleum hydrocarbons, acetone, benzene, chlorobenzene, pentachlorophenol, styrene, xylene, toluene, trichloroethylene, ethylbenzene, 2-methylphenol, 2-butanone, acenapthene, anthracene, mercury, zinc, lead, barium, nickel, aluminum, manganese, arsenic, fluorene, fluoranthene, napthalene, carbazole, dibenzofuran, phenanthrene, 2,4-dichlorophenol, 2,4-dimethylphenol, and bis(2-ethylhexl)phthalate.

1750.   Groundwater at the Koppers Seaboard Site flows to the Hackensack River, which then empties into Newark Bay.  Upon information and belief, Hazardous Substances and other compounds Discharged to the groundwater at the Koppers Seaboard Site discharge into the Newark Bay Complex.

1751.   Hazardous Substances and other compounds similar to those that have been Discharged from the Koppers Seaboard Site have been detected in sediment core samples taken from the Hackensack River adjacent to the Koppers Seaboard Site, including, but not limited to, petroleum hydrocarbons, 2,3,7,8-TCDD, DDT and related derivatives, aluminum, arsenic, barium, beryllium, cadmium, cobalt, copper, lead, manganese, mercury, nickel, zinc, pyrene, napthalene, fluorene, anthracene, acenaphthene, acenaphthylene, chrysene, dibenzofuran, methoxychlor, ideno(1,2,3-cd)pyrene, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(g,h,i)perylene, and fluoranthene.

1752.   Beazer East, as successor to Koppers, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Koppers Seaboard Site and released into the Newark Bay Complex.

<u>Koppers Port Newark Site</u>

1753.   The Koppers property in Port Newark consists of approximately eight acres of real property and associated improvements located at Maritime and Tyler Streets in Port Newark, Essex County, New Jersey ("Koppers Port Newark Site").

1754.   The real property at the Koppers Port Newark Site is owned by the City of Newark and is currently leased to the Port Authority of New York and New Jersey ("Port Authority").

1755.   From approximately 1954 until approximately 1991, Koppers leased the Koppers Port Newark Site and operated a wood treatment facility on the property.  Site operations included the preservation of wood products via a pressure treatment process that utilized tar based Hazardous Substances and other compounds, including, but not limited to, creosote, chromated copper arsenate, assorted water based products, and NCX, a Koppers trademarked compound consisting of formaldehyde, phosphoric acid, and melamine.

1756.   On information and belief, prior to Koppers' lease of the Koppers Port Newark Site, Weyerhaeuser Company subleased the property to American Lumber & Treating Company, which operated a wood treatment facility at the Koppers Port Newark Site from approximately 1940 until 1954.

1757.   The Koppers Port Newark Site is situated approximately 1,000 feet south of the Port Newark Channel, and approximately 2,500 feet north of the Elizabeth Channel.   The Port Newark Channel and Elizabeth Channels empty into Newark Bay east of the Koppers Port Newark Site. Upon information and belief, direct discharges, overland flow, and sheet storm water runoff from the Koppers Port Newark Site flowed into area storm drains, which discharged into a storm sewer pipe beneath Maritime Street, and which discharged into the Port Newark Channel.

1758.   Upon information and belief, prior to 1972, storm water and industrial wastewater effluent at the Koppers Port Newark Site discharged into a combined storm-sanitary area sewer system, which discharged into Newark Bay and/or the Port Newark Channel at a rate of 100,000 gallons per day from various outfalls.

1759.   Upon information and belief, spills, leaks, mechanical failures, and/or poor housekeeping practices resulted in Discharges of Hazardous Substances and other compounds to and from the Koppers Port Newark Site.

1760.   Hazardous Substances and other compounds have been detected in the soil at the Koppers Port Newark Site, including, but not limited to, lead, nickel, arsenic, trichlorobenzene, dichlorobenzene, chlorophenol, acenaphthalene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, benzo(a)pyrene, benzo(ghi)perylene, chrysene, dibenzofuran, fluorene, fluoranthene, naphthalene, phenanthrene, pyrene, p-chloro-m-cresol, phenol, arsenic, chromium, creosote, and copper.

1761.   Hazardous Substances and other compounds have been detected in and beneath on-site storm drains and area catch basins at the Koppers Port Newark Site, including, but not limited to, arsenic, chromium, benzo(a)anthracene, chrysene, benzo(a)fluoranthene, benzo(a)pyrene, assorted polynuclear aromatic hydrocarbons ("PAHs"), napthalene, acenaphthylene, acenathene, fluorene, phenanthrene, anthracene, fluoranthene, pyrene, benzo(ghi)perylene, and formaldehyde.

1762.    Upon information and belief, storm events and erosion transported Hazardous Substances and other compounds from chemical process areas, raw material storage areas, finished product storage areas, and/or on-site soils into the Newark Bay Complex.

1763.    Hazardous Substances and other compounds have been detected in the groundwater at the Koppers Port Newark Site, including, but not limited to, chlorobenzene, ethybenzene, benzene, methylene chloride, trichloroethylene, acenapthene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, chrysene, fluorene, fluoranthene, napthalene, pyrene, phenanthrene, cresols, phenol, arsenic, chromium, copper, and mercury.

1764.    Groundwater at the Koppers Port Newark Site flows regionally to the tidal zones of the Port Newark and Elizabeth Channels of Newark Bay.   Upon information and belief, Hazardous Substances and other compounds discharged to the groundwater at the Koppers Port Newark Site discharged into the Newark Bay Complex.

1765.    Hazardous Substances and other compounds have been detected in the Port Newark Channel, near the outfall for the Maritime Street storm sewer that drained storm water runoff, overland flow, and direct discharges from the Koppers Port Newark Site, including, but not limited to, arsenic, chromium, copper, pentachlorophenol, dichlorobenzene, methylnaphthalene, acenaphthene, anthracene, benzo(a)anthracene, benzo(b)fluoranthene, chrysene, dibenzo(a,h)anthracene, dibenzofuran, fluoranthene, fluorene, naphthalene, phenanthrene, and pyrene.

1766.    Beazer East, as successor to Koppers, is a "discharger" and/or a Person "in any way responsible" for the Hazardous Substances that were discharged at the Koppers Port Newark Site and released into the Newark Bay Complex.

**Lucent Site**

1767.    RTC Properties, Inc. is the current owner of property located at 100 Central Avenue, Kearny, New Jersey, also designated as Block 288, Lot 10.01 on the tax maps of Kearny, Hudson County (the "Lucent Site").   The Lucent Site is comprised of 147 acres on the South Kearny Peninsula.   The Passaic River is adjacent to and directly west of the Lucent Site.

WAS:144301.1

1768.    Western Electric Company, Inc. ("Western Electric") purchased the Lucent Site in 1925 and operated it until January 1984, when the company changed its name to AT&T Technologies, Inc.

1769.    In 1984, AT&T Technologies, Inc. sold the Lucent Site to Union Minerals and Alloys Corporation, but the latter did not acquire title to the Lucent Site until 1985.   The Union Mineral and Alloys Corporation changed its name to RTC Properties, Inc. in 1988.   RTC Properties, Inc. conducts business under the name River Terminal Development Company.

1770.    AT&T Technologies, Inc. merged into American Telephone and Telegraph Company on December 29, 1989.

1771.    American Telephone and Telegraph Company changed its name to AT&T Corp. ("AT&T") on April 20, 1994.

1772.    In 1996, the soon-to-be spun-off systems and technology unit of AT&T renamed itself Lucent Technologies.   In 1996, Lucent Technologies was transferred to Lucent Technologies, Inc.   On information and belief, Lucent Technologies, Inc. ("Lucent") is the successor to Western Electric.

1773.    From 1925 to 1984, Western Electric manufactured switchboards, wiring, and related telecommunications equipment and used PCBs, chromium, mercury, copper, lead, arsenic, nickel zinc, cyanide, beryllium, silver and asbestos at the Lucent Site during this time period.

1774.    Hazardous Substances utilized at the Lucent Site include PCBs, chromium, copper, lead, nickel zinc, cyanide, beryllium, silver, and asbestos.

1775.    The Town of Kearny ("Kearny") owns and operates a wastewater collection system that serves the southern section of Kearny (hereinafter referred to as the "Kearny South System"), including the Lucent Site.   There was no operational wastewater treatment plant connected to the Kearny South System until approximately 1954.

1776.    From 1925 until approximately 1954, all of the process and/or sanitary wastewater generated at the Lucent Kearny Property was discharged from the Kearny South System into Newark Bay, the Hackensack River, and/or the Passaic River without treatment.

WAS:144301.1

1777.   The Kearny South System treatment plant ("Kearny South Treatment Plant") only employed primary treatment technologies, including basic grit screening and removal, primary clarification, and chlorine disinfection, which, upon information and belief, was unable to remove all or some of the Hazardous Substances and other compounds discharged from the Lucent Site.  Furthermore, throughout its history, the Kearny South Treatment Plant experienced frequent malfunctions and mechanical failures.

1778.   From approximately 1954 until approximately 1974, all of the process and/or sanitary wastewater generated at the Lucent Site was discharged from the Kearny South System and/or the Kearny South Treatment Plant into Newark Bay and/or the Hackensack River with minimal and/or inadequate treatment.

1779.   On May 26, 1970, the NJDEP reported that "wastewater received at this plant is industrial in nature," . . . and that "laboratory analysis also shows the presence of toxic substances including zinc and cyanide."  Zinc and cyanide were primary constituents of wastewater discharged from the Lucent Site.

1780.   On October 30, 1973, Kearny reported that the Lucent Site discharged approximately 1,800 thousand gallons per day of "metal wire" and "paper pulp" wastewater to the Kearny South Treatment Plant.

1781.   On May 17, 1974, Western Electric reported that process wastewater generated at the Lucent Site consisted primarily of concentrated process wastewaters generated in metal finishing and plating operations which generated acidic and alkaline wastes, cyanic wastes, and wastes laden with cyanide, chromium (hexavalent), zinc, lead, nickel, copper, and other metals and Hazardous Substances.

1782.   From approximately 1974 until approximately 1984, one-third of the process wastewater generated at the Lucent Site was diverted from the Kearny South System and into an on-site treatment plant, which discharged into the Passaic River.

1783.   From approximately 1974 until approximately 1984, two-thirds of the process and/or sanitary wastewater generated at the Lucent Site was discharged from the Kearny South System and/or

248